IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JOSEPH RUFO,                          )
                                      )
    Plaintiff,                    )
                                      )
v.                                    )    Case No. 1:18-cv-00037
                                      )
ACLARA TECHNOLOGIES, LLC,             )
                                      )
    Defendant.                    )

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Aclara Technologies, LLC ("Aclara" or "Defendant"), by counsel, and pursuant to FED. R. CIV. P. 56, hereby moves for summary judgment in its favor on the claim asserted by Plaintiff Joseph Rufo ("Mr. Rufo"), and states the following in support thereof:

## I.    Introduction

Mr. Rufo has asserted a cause of action (and related request for injunctive and declaratory relief, styled as a separate count) against Aclara for retaliation pursuant to 42 U.S.C. § 1981. With discovery complete, the undisputed facts show that summary judgment is warranted because Mr. Rufo's claim is meritless and belied by the factual record. At best, Mr. Rufo can demonstrate that: (a) he went outside his job duties in setting up a spreadsheet (the "EEO Sheet") (which he said "isn't very informative at the moment") to begin tracking the proportional number of discipline issued to employees by their race, and provided this EEO Sheet to two human resources managers to use as a "tool" going forward to either uncover disparate impact (which is not prohibited by § 1981) or to use as a "statistical defense should we need one"; (b) thereafter, he was placed on and successfully worked through a Performance Improvement Plan ("PIP") for performing tasks not requested of him, as well as another concern; (c) he filed the instant

lawsuit; (d) he received an overall low performance appraisal covering the same time period when he was on the PIP; and (e) his job position, as well as a similar position in a different office, were eliminated because they could no longer be justified from a business standpoint.

However, the record is clear that Mr. Rufo's EEO Sheet was not protected activity, as it was not oppositional activity (because Mr. Rufo presented it objectively and in equivocal terms), and because under settled law, no reasonable person could have concluded that its contents (purported disparate impact) violated § 1981, which only prohibits <u>intentional</u> discrimination. This incontrovertible reality dooms Mr. Rufo's claim, because there is nothing in the record to link the filing of this lawsuit with any of the purported adverse actions of which he complains. Indeed, Mr. Rufo's allegations to that effect heap unsupported inference on unsupported inference, and otherwise rely on conclusory allegations and his own subjective belief of wrongdoing to conclude that Aclara violated the law in any way.

As explained below, the law is well-settled that Mr. Rufo cannot withstand summary judgment by merely showing that he engaged in protected activity (filing this lawsuit) and was subjected to adverse employment actions.  To the contrary, Mr. Rufo must come forward with affirmative evidence that Aclara intentionally retaliated against him <u>because of</u> his protected conduct.  Mr. Rufo cannot meet this burden, and no rational trier of fact could find in Mr. Rufo's favor under the circumstances of this case.  For all of the reasons stated below, Mr. Rufo's case must be dismissed as a matter of law.

## II.    <u>Statement of Undisputed Material Facts</u>

1.      From March 21, 2017, to June 4, 2018, Aclara employed Mr. Rufo as an Office Coordinator.  Deposition of Plaintiff ("Pl.'s Dep."), attached hereto as Ex. A, at 33:5-11, 39:5-25, 40:1-10, 48:17-20, 51:2-4; Pl. Dep. Ex. 2, attached hereto as Ex. B.

2.      Mr. Rufo worked at Aclara's Smart Grid Solutions ("SGS") office in Virginia, which was first located in Reston and then moved to Herndon in November 2017.  Pl.'s Dep. at 48:14 – 49:3; & Ex. B.

3.      Mr. Rufo was hired to provide general administrative support, such as ordering supplies, meeting coordination, ordering lunches for meetings, sending and receiving mail, helping with the office move, and supporting the Vice President of SGS and the Facilities and EHS Manager for the Virginia site as needed. Pl's Dep. at 42:25, 43:1-14; Pl. Dep. Ex. 4, attached hereto as Ex. C; Deposition of Jill Mecey ("Mecey Dep."), attached hereto as Ex. D, at 35:24–36:10, 39:25–40:14.

4.      As Office Coordinator in the Administration Department, Mr. Rufo reported to Jill Mecey, the Manager of Organizational Effectiveness and Administration.  Pl.'s Dep. at 45:24 – 46:1; Mecey Dep. at 22:15-18.

5.      In or around June 2017, Human Resources managers, Gina Petrella and Lyn Salvo, asked Plaintiff to maintain a spreadsheet tracking discipline given to certain SGS workers. Pl.'s Dep. at 59:23 – 72:13; Pl. Dep. Ex. 5, attached hereto as Ex. E.

6.      Mr. Rufo was asked to track the types of discipline issued to SGS Installers/Field Personnel, but he was not asked to track racial or other demographic data.  Pl.'s Dep. at 59:23 – 72:13; & Ex. E.

7.      On August 8, 2017, Mr. Rufo provided to Ms. Petrella and Ms. Salvo the spreadsheet tracking discipline given to SGS workers.  Pl.'s Dep. at 118:21–119:9; Pl. Dep. Ex. 12, attached hereto as Ex. F; Pl. Dep. Ex. 13, attached hereto as Ex. G.

8. Although he was not instructed to track racial or other demographic data, Mr. Rufo added another spreadsheet that purported to include the "raw" number and proportional number of discipline given to SGS workers by their self-disclosed race. Ex. G.

9. Mr. Rufo described his spreadsheet (referenced above and hereafter as the "EEO Sheet") in relevant part as follows:

> The attached are some files related to the violations and determinations for July, 2017. I've included a few notes on some additions I've included in this report over the last one.
>
> In the master record, there is a sheet for EEO. This is intended to provide pertinent information at a glance. Basically, the total racial composition of SGS is matched against the racial proportions of employees with which the disciplinary action was taken. This isn't very informative at the moment because we lack sufficient amounts of data to give this relevancy, however, as time goes on this analysis becomes less skewed and more representative of how we are tracking in relation to how we *should be tracking*. Please disregard the "For future tracking" at the bottom, as this is information I'll use going forward to identify where possible discrepancies are most blatantly and frequently occurring (which could help us identify how/where to fix any issues that might be trending).
>
> Going forward (after there is more data to work with) I intend to track other comparative metrics that could prove useful. As always, I will upload these to the ER folder on SharePoint, and if you wish to see something modified, removed, or added, please just let me know.

Ex. F (emphasis added; italics in original).

10. The EEO Sheet provided by Mr. Rufo reflected the following:

| Workforce Composition | Raw | % | Raw incidents | % incidents |
|---|---|---|---|---|
| Total | 540 | 100.0 | 29 | 100.0 |
| African-American | 161 | 29.8 | 16 | 55.2 |
| American Indian/Alaskan | 5 | 0.9 | 0 | 0.0 |
| Asian | 20 | 3.7 | 0 | 0.0 |
| Hispanic/Latino | 25 | 4.6 | 0 | 0.0 |

| | | | | |
|---|---|---|---|---|
| Hawaiian/Pacific Islander | 2 | 0.4 | 0 | 0.0 |
| White | 30 9 | 57. 2 | 6 | 20.7 |
| Two or more races | 18 | 3.3 | 7 | 24.1 |
| | | | | |
| Note: Workforce composition only includes employees who volunteered to self-identify. All employees and disciplinary actions against employees who did not racially self-identify were not included in these figures. | | | | |
| | | | | |
| Legend: | | | | |
| Greatly Over-represented | | | | |
| Greatly Under-represented | | | | |

Ex. G.

11.     After inferring that Ms. Salvo was displeased with his unrequested addition, Mr.

Rufo reached out to Ms. Mecey, stating in relevant part:

> I *think* I've messed up and I wanted to explain to you before it caught you by surprise[.]
>
> Long story short: I included an EEO analysis in my terms & discipline report and I don't think Lyn [Salvo] appreciated it like I hoped she would[.]
>
> It only went to her and Gina [Petrella], and I included only numerical values with no opinions, but either way, based on the questions she was asking, I don't think this was something welcomed[.]

Pl.'s Dep. at 126:13 – 128:20; Pl. Dep. Ex. 14, attached hereto as Ex. H.

12.     At that time, Mr. Rufo also communicated his stated reason for providing the

EEO Sheet:

> ….I know an apology won't do it, and this really doesn't look good being so close to my other mistake. I know this doesn't hold any weight, but I legitimately thought I was giving Lyn a tool she could use to identify any issues going forward…I really didn't expect this outcome, and my sincere loyalty lies with the company, so whatever it takes to correct this I will understand.

Ex. H (emphasis added).

13.     On August 15, 2017, Ms. Mecey provided Mr. Rufo a "Written Warning and Performance Improvements (PIP)" dated August 14, 2017.  Therein, Mr. Rufo was counseled for, *inter alia*, performing job duties not requested of him.  Pl.'s Dep. at 149:11 – 150:3; Pl. Dep. Ex. 16, attached hereto as Ex. I.

14.     Mr. Rufo worked through and was removed from the PIP on December 19, 2017 Pl.'s Dep. at 165:7-166:2; Mecey Dep. at 221:19-222:14; Declaration of Jill Mecey ("Mecey Decl."), attached hereto as Ex. J, ¶ 3.

15.     Following the end of the 2017 fiscal year (which ended September 30), Mr. Rufo and Ms. Mecey began the process of assessing Mr. Rufo's job performance for the 2017 fiscal year.  Pl.'s Dep. at 188:8–191:5; Mecey Decl. ¶ 2.

16.     Specifically, Mr. Rufo provided a self-assessment of his job performance to Ms. Mecey on October 3, 2017.  Mr. Rufo's self-assessment provided nearly-perfect ratings for each assessed category.  In response, Ms. Mecey immediately sent Mr. Rufo an email asking him to more critically assess his own performance.  Mr. Rufo did not change his scores.  Pl.'s Dep. at 188:8–191:5; Pl. Dep. Ex. 21, attached hereto as Ex. K.

17.     During December of 2017, Mr. Rufo was informed that he was not receiving a merit salary increase at that time.  Pl.'s Dep. at 194:19-195:7l; Mecey Decl. ¶ 2.

18.     On January 9, 2018, Mr. Rufo initiated this lawsuit by filing the initial Complaint. ECF No. 1.

19.     Aclara, including Ms. Mecey, first learned of Mr. Rufo's lawsuit on January 16, 2018.  Def.'s Resp. to Pl.'s Interrogatory No. 21, attached hereto as Ex. L.

20.     On January 18, 2018, Ms. Mecey emailed Mr. Rufo that he was to train Michelle Nails on SGS new hire paperwork and that after she was trained, she would do all SGS new hire paperwork going forward. Mecey Dep. at 235:8–236:5; Mecey Decl. ¶ 4.

21.     By way of background, for a time Mr. Rufo performed functions associated with SGS onboarding. However, SGS onboarding was traditionally a Human Resources function, and was never a formal component of Mr. Rufo's job duties.   Deposition of Angela Hermannes ("Hermannes Dep."), attached hereto as Ex. M, at 49:22 – 53:20, 73:13 – 74:14; Def. Resp. to Pl.'s Interrogatory No. 19, attached as Ex. L; Mecey Dep. at 235:8–236:5.

22.     During the fall of 2017, Human Resources began shifting SGS onboarding responsibilities back into the Human Resources Department.   This decision was made by HR Service Center Employee Chrissy Martel and Angela Hermannes.   Mecey Dep. at 238:18 – 239:9; Hermannes Dep. at 49:22 – 53:20; Def. Resp. to Pl.'s Interrogatory No. 19, attached as Ex. L.

23.     During the fall of 2017, SGS onboarding duties began shifting first to an employee named Kawanna Gilyard, who left Aclara during January of 2018.  Hermannes Dep. at 49:22 – 53:20.

24.     After Ms. Gilyard left Aclara, Michelle Nails was selected to replace her. Hermannes Dep. at 49:22–50:10; Def.'s Resp. to Pl's Interrogatory No. 19, attached as Ex. L.

25.     Ms. Nails completed her drug test for the position on January 11, 2018. Declaration of Lyn Salvo ("Salvo Decl."), attached hereto as Ex. N, ¶¶ 2-3.

26.     Ms. Nails was only given a drug screen test after she had been selected for the position.  Salvo Decl. ¶ 3.

27.     Ms. Nails' start date was January 17, 2018.  Salvo Decl. ¶¶ 2-3.

28.     Ms. Mecey did not make the decision to transfer SGS onboarding responsibilities to Ms. Nails.  Mecey Dep. at 238:18 – 239:9; Hermannes Dep. at 49:22 – 53:20; Def.'s Resp. to Pl's Interrogatory No. 19, attached as Ex. L.

29.     Mr. Rufo testified that he does not know who made the decision to transfer responsibility for SGS onboarding.  Pl.'s Dep. at 200:6-9.

30.     Mr. Rufo complained to Ms. Mecey about the transfer of onboarding responsibilities on January 19, 2018, and in response Ms. Mecey communicated that such responsibility had been transferred to St. Louis to be performed by Ms. Nails.  Mecey Dep. at 235:8–236:5; Mecey Dep. Ex. 54, attached hereto as Ex. O.

31.     Mr. Rufo clarified in his deposition that SGS onboarding responsibilities are the only critical job duties that he believes were taken away from him in retaliation for protected activity.  Pl.'s Dep. at 200:10-13.

32.     In or around April of 2018, Ms. Mecey completed the performance evaluation process that began months earlier with Mr. Rufo's self-assessment.  At that time, Ms. Mecey filled out and provided her portion of Mr. Rufo's performance evaluation for the 2017 fiscal year, and in doing so provided detailed feedback and ratings. Pl.'s Dep. 187:9–188:13, 191:19-21; Pl.'s Dep. Ex. 20, attached hereto as Ex. P.

33.     Due to his overall scores on his 2017 performance evaluation, and consistent with what he was told during December of 2017, Ms. Mecey again informed Mr. Rufo that he was not going to receive a merit salary increase.  Pl.'s Dep. at 196:2-3; Pl. Dep. Ex. 22, attached hereto as Ex. Q.

34.     In May 2018, the administrative assistant in Aclara's Somersworth office chose to resign rather than be placed on a performance improvement plan.   Deposition of Donna

Lapeyrouse ("Lapeyrouse Dep."), attached hereto as Ex. R, at 12:15-22, 18:5-22; Def.'s Resp. to

Pl's Interrogatory No. 21, attached hereto as Ex. L.

35.     Following Ms. Lapeyrouse's notice of resignation, Ms. Mecey made the decision

that there was not a need for a full-time administrative assistant to support the Somersworth

office of about 200 employees and five business leaders. Ms. Mecey decided to eliminate this

full-time position and replace it with a part-time person.  Mecey Dep. at 294: 14 – 298:23,

301:9–303:21; Def.'s Resp. to Pl's Interrogatory No. 19, attached hereto as Ex. L.

36.     When Ms. Mecey was deciding what to do with the Somersworth position, Ms.

Mecey did the same review of the office coordinator position in Herndon, which only has about

40 employees. Ms. Mecey determined that because there was very little work needed done at the

Herndon office, there was no longer a business justification for an office coordinator position at

that office.  Mecey Dep. at 294:14 – 298:23, 301:9–303:21; Def.'s Resp. to Pl's Interrogatory

No. 19, attached hereto as Ex. L.

37.     Mr. Rufo was notified that his position was eliminated on June 4, 2018.  Pl.'s

Dep. at 51:2-4, 210:2–212:13.

38.     Mr. Rufo's position was not replaced, but his duties were redistributed, including

to an executive assistant named Zana Scott.  Mecey Dep. at 303:22–305:1, 306:8-14; Mecey

Decl. ¶ 6.

### III.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) ("Rule 56(a)") provides that summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The nonmoving party

may not rest upon 'mere allegations or denials,' but instead 'must set forth specific facts showing

that there is a genuine issue for trial.'" *McClinton v. Cty. of Chesterfield*, No. 3:06-cv-133, 2007 WL 174028, at *2 (E.D. Va. Jan. 18, 2007). "Summary judgment is not a disfavored procedural shortcut, but rather it is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Bailey v. South Carolina Dept. of Social Services*, 851 F. Supp. 219, 220 (D.S.C. 1993) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 2555 (1986) (internal quotations omitted).

When a defendant properly offers its motion for summary judgment with evidence that supports the view that it is entitled to judgment as a matter of law, the plaintiff must present "affirmative evidence" to establish a genuine dispute of material fact in order to defeat the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2514-2515 (1986), *motion to retax costs denied*, 480 U.S. 903 (1987). If the plaintiff fails to do so, the court must grant summary judgment in favor of the defendant. *Id.*

Where, as here, a plaintiff offers no direct evidence to support his claims, the burden-shifting analysis formulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to the analysis of defendant's summary judgment motion. Under the burden-shifting framework set forth in *McDonnell Douglas*, a Title VII plaintiff bears the initial burden of making out a *prima facie* case. [1] If the plaintiff does so, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory decision. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) (internal quotation omitted), *overruled on other grounds by PriceWaterhouse v. Hopkins*, 490 U.S. 228 (1989). This intermediate burden is light, *Texas Dep't of Community*

---

[1] The required elements of a prima facie case are the same under Title VII and 42 U.S.C. § 1981. *Gairola v. Virginia Dep't of General Services,* 753 F.2d 1281, 1285 (4th Cir. 1985). Except where otherwise indicated, defendant will therefore analyze these claims together throughout this memorandum. *Cf. Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 n.1 (4th Cir. 2002).

*Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981), and it is not the court's role to second-guess the employment decisions of the defendant. *Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000). Once the employer articulates a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff who must then show that the nondiscriminatory reason offered by the defendant for its decision is pretextual to obscure a real motivation of illegal discrimination. "[I]t is not enough . . . to *dis*believe the employer, the fact finder must [also] *believe* the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 515-17 (1993). Mere speculation as to an employer's discriminatory motive is insufficient to survive a summary judgment motion. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## IV.   <u>Argument</u>

### A.   Mr. Rufo's Section 1981 Retaliation Claim Fails as a Matter of Law.

In order to assert a retaliation claim under § 1981, Mr. Rufo must demonstrate that: (1) he engaged in a protected activity; (2) that his employer took adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (quoting *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)). "Once the plaintiff makes this case, the employer can defend itself by producing 'evidence of a legitimate, non-discriminatory reason for taking the adverse employment action.'" *Id.* (quoting *Bryant v. Aiken Regional Medical Centers Inc.,* 333 F.3d 536, 543 (4th Cir. 2003)). Throughout this process, Mr. Rufo bears the ultimate burden of establishing that his protected activity was the *but-for* cause of the alleged adverse actio, and not merely a motivating factor. *Rome v. Dev. Alternatives, Inc.*, 2014

U.S. App. LEXIS 19196, at *3 (4th Cir., Oct. 8, 2014) (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)).

However, as it was laid bare in his deposition, Mr. Rufo's § 1981 claim[2] is based not on law or actionable fact, but instead on his subjective sense that he was wronged.   And although Mr. Rufo may genuinely feel that he was treated unfairly, his testimony leads to one inescapable conclusion:   there is no evidence that any of the alleged wrongs at issue in this case were causally-related to Mr. Rufo's EEO Sheet (which in and of itself was not protected activity) or to the filing of the instant lawsuit.   Because Mr. Rufo's opinions cannot create a material issue of fact, his claim is subject to summary judgment.

**B.    Mr. Rufo Did Not Engage in Protected Activity Under Section 1981 When He Presented His EEO Sheet and, Therefore, It Cannot Be the Basis for His Retaliation Claim.**

In his Amended Complaint, Mr. Rufo alleges two instances of alleged protected activity in support of his retaliation claim: (a) his presentation of the EEO Sheet to Aclara; and (b) filing the instant lawsuit. *See* Am. Compl. ¶ 46, ECF No. 36 (stating "Rufo was engaged in the protected activity of investigating and exposing racially discriminatory practices that had a disparate impact on black and multi-racial employees, and the further protected activity of filing this lawsuit").   However, Mr. Rufo did not engage in protected activity with respect to the EEO Sheet, as that report does not reflect "intentional discrimination" required under § 1981, and because Mr. Rufo did not "stand in opposition" to any alleged discrimination, but instead merely reported its existence in equivocal terms.   As a result, Mr. Rufo did not engage

---

[2] Although Mr. Rufo includes a second count (Count I) in his Amended Complaint, requesting declaratory and injunctive relief, that count does not assert a standalone cause of action, but instead represents a request for relief associated with Count II, his claim for retaliation under § 1981.   Because Mr. Rufo's retaliation claim fails as a matter of law, his requests for declaratory and injunctive relief also fail as a matter of law.

in protected activity under § 1981 when he presented his EEO Sheet and, therefore, he cannot

rely on that spreadsheet in support of his retaliation claim.

> i.   **Mr. Rufo Did Not Engage In Protected Activity in Connection to his EEO Sheet Because He Did Not and Could Not Have Formed a Reasonable Belief that Possible Disparate Impact Violates § 1981, Which Prohibits Only Intentional Discrimination.**

Protected activity in Section 1981 retaliation claims is governed by the same substantive

analysis applied in Title VII retaliation claims: to constitute protected activity, an employee must

have an objectively-reasonable belief that a violation of Section 1981 had happened or was in

progress.  *See, e.g. Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018) (quoting

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *Boyer-Liberto*, 786

F.3d at 282; *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010) (stating that

"[a]s with other statutory retaliation claims, [a § 1981 retaliation claim] requires that the

protected activity involve the assertion of rights encompassed by the statute") (internal

quotations omitted).   "To warrant protection, the employee's perception of a violation must be

'objectively reasonable' under the circumstances known to [him]." *Strothers*, *supra* at 328

(quoting *Boyer-Liberto*, 786 F.3d at 281).

What the reasonable belief requirement means, as a practical matter, is that Mr. Rufo

must provide evidence that he had a reasonable belief that all of the elements of a § 1981

discrimination claim were satisfied when he provided his EEO Sheet; otherwise, he did not

engage in protected activity with respect to the same.  *See, e.g. Strothers*, 895 F.3d at 328

(stating that "because [the plaintiff] is bringing a retaliation claim, she must show that her belief

that these elements were satisfied was reasonable); *Clover v. Total System Serv.'s, Inc.*, 176 F.3d

1346, 1351 (11th Cir. 1999) (stating that "objective reasonableness of an employee's belief that

her employer has engaged in an unlawful employment practice must be measured against

existing substantive law"); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (explaining that failure to charge the employee who opposes an employment practice with substantive knowledge of the law 'would eviscerate the objective component of our reasonableness inquiry"). Of course, this does not mean that Mr. Rufo must affirmatively prove that his EEO Sheet reflected a *prima facie* § 1981 discrimination claim. Rather, it means that Mr. Rufo must show that a reasonable person could believe that the purported disparate treatment illustrated by the EEO Sheet violated § 1981. Mr. Rufo cannot make that showing and, therefore, his EEO Sheet was not protected activity under § 1981.

In this case, Mr. Rufo argues that he engaged in protected activity by "investigating and exposing racially discriminatory practices that had a <u>disparate impact</u> on black and multi-racial employees." However, it is axiomatic that § 1981 only prohibits <u>intentional discrimination</u>, and mere disparate impact – which Mr. Rufo claimed to identify in his EEO Sheet – is excluded from that definition. *See, e.g. General Bldg. Contractors Ass'n, Inc. v. Penn.*, 458 U.S. 375, 391 (1982); *see also Mozee v. American Commercial Marine Serv. Co.*, 940 F.2d 1036, 1053 (7th Cir. 1991) (under § 1981, proof of disparate impact of employer's policies on minority employees does not show liability absent intentional discrimination); *Taylor v. Millenium Corp.*, No. 1:15-cv-1046, 2016 WL 927185, at *9 (E.D. Va. Mar. 4, 2016) (stating that "a disparate impact claim is not viable under § 1981"). Therefore, because protected activity is viewed through the lens of substantive law, Mr. Rufo's EEO Sheet cannot possibly constitute protected activity, as no reasonable person could conclude that disparate impact is prohibited by § 1981. For that reason, this Court should recognize that Mr. Rufo's EEO Sheet was not protected activity.

Similarly, it cannot be overlooked that Mr. Rufo never pointed to any objective evidence of intentional (and therefore protected) or unintentional (and therefore unprotected) discrimination, and instead affirmatively told Aclara that his EEO Sheet "isn't very informative at the moment because we lack sufficient amounts of data to give this relevancy." Ex. F. By backing away from his own analysis, Mr. Rufo not only nullified his claim of oppositional activity, but also emphasized that he did not have a reasonable belief that his EEO Sheet reflected any violation of § 1981.

> ii. **Mr. Rufo Did Not Engage In Protected Activity in Connection to his EEO Sheet Because He Did Not Engage In Oppositional Activity, But Instead Only Reported The Existence of Alleged Disparate Treatment in Equivocal Terms.**

In addition, Mr. Rufo did not engage in protected activity with respect to his EEO Sheet because he did not engage in oppositional activity as required by § 1981. Indeed, as specified above, "[a]n employee engages in protected activity if he opposes an employment practice based on a good faith, [objectively] reasonable belief that the practice violates ... Section 1981." *See, e.g., Henley v. Turner Broadcasting Sys., Inc.*, 267 F.Supp.3d 1341 (N.D. Ga. 2017) (internal citations omitted) (emphasis added). However, in addition to the substantive defects described above, Mr. Rufo also failed to adduce any evidence reflecting oppositional activity, which alone is more than sufficient to justify granting summary judgment in favor of Aclara. Indeed, Mr. Rufo did not <u>oppose</u> any practice made illegal by § 1981, but instead merely reported in equivocal terms the possibility that disparate treatment may be uncovered with more data at a later time.

Under § 1981, "opposition" to unlawful discrimination cannot be equivocal, but instead plaintiffs must "must have stood in opposition to it—not just objectively reported its existence or attempted to serve as an intermediary." *Moore v. City of Philadelphia*, 461 F.3d 331, 350 (3rd

Cir. 2006).  Yet even assuming, *arguendo*, that Mr. Rufo's EEO Sheet pertained in any way to intentional discrimination – which it indisputably did not – Mr. Rufo objectively reported the existence of what he considered <u>potential</u> disparate impact.  In this regard, Mr. Rufo's deposition testimony is instructive.  Asked to describe a phone conversation between himself and Lyn Salvo regarding the EEO Sheet, Mr. Rufo testified that:

> I told her that the vast majority of the disciplinary action that comes across me for tracking involves employees who self-identify as black or multiracial, and that it seems to be indicative of potential systemic discrimination.

Pl.'s Dep. Tr. 121:4-8.  Furthermore, Mr. Rufo acknowledged at the same time that the EEO Sheet:

> isn't very informative at the moment because we lack sufficient amounts of data to give this relevancy, however, as time goes on this analysis becomes less skewed and more representative of how we are tracking in relation to how *we should be tracking*.  Please disregard the "For future tracking" at the bottom, as this is information I'll use going forward to identify where possible discrepancies are most blatantly and frequently occurring (which could help us identify how/where to fix any issues that might be trending.

Ex. F.

This testimony, which is supported by the plain language in the Complaint, reflects that Mr. Rufo merely reported the existence of <u>potential</u> disparate treatment based on data so incomplete it was irrelevant.  Moreover, Mr. Rufo cannot plausibly argue that he "stood in opposition" to any putative disparate treatment, as he explained to Jill Mecey that his purpose in creating the EEO Sheet was to give "Lyn [Salvo] a tool she could use to identify any issues going forward."  Ex. H.

Mr. Rufo's testimony and prior written communications are clear: in creating and disseminating the EEO Sheet, Mr. Rufo did not engage in oppositional activity, but instead

merely identified, in equivocal terms, what he believed was potential disparate treatment. Although neutral and equivocal reports may comport with everyday notions of opposition, they do not meet the § 1981 definition of protected activity and, therefore, Mr. Rufo may not rely on his EEO Sheet to underpin his retaliation claim.

### C. Mr. Rufo Cannot Establish a *Prima Facie* Case for Retaliation Under § 1981 Because He Cannot Establish a Causal Link Between Any Protected Activity and His Termination from Employment.

The "but-for" standard that applies to retaliation claims is a heightened standard and requires a showing that "but for the protected activity, the asserted adverse action would not have occurred." *Wootten v. Virginia*, 2015 U.S. Dist. LEXIS 35949, at *31 (W.D. Va. March 23, 2015) (citing *Nassar*, 133 S. Ct. at 2533). Because Mr. Rufo's EEO Sheet was not protected activity under § 1981, the only actionable claim of protected activity in this case is his filing of the instant lawsuit on January 9, 2018, with notice to Aclara on January 16, 2018. Mr. Rufo claims that Aclara retaliated against him for filing his initial Complaint by: (a) taking away job duties; (b) giving him a negative performance review based largely on his protected activity; (c) denying him an annual merit salary increase; and (d) separating him from employment. *See, e.g.* Pl.'s Am. Compl. ¶¶ 2-3, ECF No. 36. However, no reasonable trier of fact could conclude that Aclara took any employment action whatsoever *because of* this lawsuit.

In fact, there is no evidence establishing a causal connection between the filing of this lawsuit and any of the subsequent alleged events that he claims are adverse employment actions. Indeed, the evidence shows that the complete reversion of SGS onboarding duties back to Human Resources (the alleged change in job duties that Mr. Rufo claims) was long-planned and taken in the regular course of business (Mecey Dep. at 238:18 – 293:9; Hermannes Dep. at 49:22 – 53:20), and also that Mr. Rufo's performance evaluation (and his resulting ineligibility for a

merit salary increase) was based on his performance during fiscal year 2017 (before this lawsuit was filed), as well as detailed managerial feedback unrelated to any protected activity or the filing of this lawsuit (Pl.'s Dep. at Ex. 20, 22). Furthermore, the evidence is clear that Mr. Rufo was not separated from employment for reasons related in any way to protected activity,[3] but instead his position was eliminated (concurrently with a similar position in a different office) because it could no longer be justified from a business perspective (Mecey Dep. 294: 14 – 298:23, 301:9 -303:21).

In response, Mr. Rufo has presented zero evidence – other than speculation – that any of these alleged adverse actions were connected to, much less caused by, the filing of this lawsuit in January 2018. Because Mr. Rufo "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," summary judgment must be granted. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985); *Santos v. Winter*, No. 2:08-3994, 2010 WL 3783150, at *12 (D.S.C. 2010), *aff'd sub nom. Santos v. Mabus*, 446 F. App'x 571 (4th Cir. 2011) (dismissing retaliation claim where the plaintiff "provided no evidence to support his general and conclusory allegations that the reason he received these adverse employment actions was because he filed EEO complaints or otherwise engaged in activity protected by Title VII"). Mr. Rufo has failed to adduce sufficient facts to permit the inference that any of the aforementioned employment decisions – up to and including the elimination of his position – would not have occurred "but for" this lawsuit. Accordingly, he has not established a *prima facie* case of retaliation.

---

[3] Additionally, the lengthy (five month) time period between the filing of this lawsuit and the elimination of Mr. Rufo's position underscores the lack of any causal connection between those two events. *Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x. 229, 233 (4th Cir. 2006) (stating a three to four month period was too long of a period to establish a causal connection). Moreover, that time period precludes any inference of causation from temporal proximity alone. *Id.*

**D.     Mr. Rufo Has Not Offered and Cannot Offer Any Evidence to Rebut Aclara's Legitimate, Non-Retaliatory Reasons for Any of the Conduct of Which He Complains.**

Even if Mr. Rufo could establish a *prima facie* case of retaliation, the burden shifts to Aclara "to rebut the presumption of retaliation by articulating a legitimate non-retaliatory reason for its actions." *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007) (internal quotation marks omitted).  The burden then shifts back to Mr. Rufo "to show that the reason is mere pretext for retaliation by proving both that the reason was false *and that discrimination was the real reason for the challenged conduct.*" *Id.* (citing *Beall v. Abbott Labs*., 130 F.3d 614, 619 (4th Cir. 1997)) (emphasis added).

As previously explained, Mr. Rufo cannot show that discrimination was the real reason for changes to his job duties, his performance evaluation, ineligibility for a merit increase, or the elimination of his position.  Mr. Rufo's subjective belief that he was retaliated against (even if made in good faith) is simply not reasonable in the absence of any specific facts giving rise to a credible inference of retaliation.  For this reason, and those stated above, summary judgment should be awarded in Aclara's favor.

**E.     Because Mr. Rufo Cannot Show That any of the Employment Actions in This Case Were Taken in the Face of a Perceived Risk of Violating Federal Law, this Court Should Grant Summary Judgment in Aclara's Favor on Mr. Rufo's Request for Punitive Damages.**

It is axiomatic that punitive damages are "an extraordinary remedy" and "not every lawsuit under section 1981 calls for submission of this extraordinary remedy to a jury." *Stephens v. S. Atl. Canners, Inc.,* 848 F.2d 484, 489–90 (4th Cir.1988).

The standard governing the recovery of punitive damages under § 1981 is a lofty one: prevailing plaintiffs are "entitled under the common law to punitive damages ... for conduct ... exhibiting malice, an evil motive, or recklessness or callous indifference to a federally protected

right." *Worldwide Network Servs., LLC v. Dynacorp Intern., LLC*, 365 Fed. Appx. 432, 445 (4th Cir. 2010) (quoting *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir.2000)). Illuminating this standard, the Supreme Court has explained that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, <u>not its awareness that it is engaging in discrimination</u>." *Id.* (citing *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535 (1999) (emphasis added)).[4]

Practically speaking, this means that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* As explained by the Supreme Court, this means that punitive damages are inappropriate – even in intentional discrimination or retaliation cases – where, for example, "the employer discriminates with the distinct belief that its discrimination is lawful." *Id.* In fact, "even a defendant who discriminates while intending to cause injury might escape liability for punitive damages under § 1981 if he thought his conduct was lawful." *Id.*

Because Mr. Rufo has not proffered any evidence that Aclara took any employment action at issue in this case (including the elimination of his position) in the face of a <u>perceived risk</u> that taking that action would violate federal law, this Court should recognize that no reasonable jury could award punitive damages in this case and grant summary judgment in Aclara's favor on that issue.

## V.   <u>Conclusion</u>

For the reasons set forth above, Aclara respectfully request that the Court grant summary judgment in its favor on Mr. Rufo's claims because the undisputed facts show that Aclara did not retaliate against Mr. Rufo for exercising rights protected by 42 U.S.C. § 1981 or for any other

---

[4] Although *Kolstad* was a Title VII case, the Fourth Circuit has correctly recognized that *Kolstad* is equally applicable to § 1981 claims such as these. *Lowery,* 206 F.3d at 441.

reason.  Additionally, even if Mr. Rufo could establish a prima facie case of retaliation, this

Court should find that no reasonable jury could award punitive damages on that claim.


Dated: <u>September 21, 2018</u>          Respectfully Submitted,

**Aclara Technologies, LLC**

By   /s/   *J. Clay Rollins*          
J. Clay Rollins, Esquire
Virginia State Bar Number 84382
clay.rollins@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA 23219
Tel.:    (804) 663-2330
Fax:     (855) 843-1809

Heidi Kuns Durr, Esquire (*pro hac vice*)
heidi.durr@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
7700 Bonhomme Avenue, Suite 650
St. Louis, MO 63015
Tel.:    (314) 802-3935

*Counsel for Defendant*

### Certificate of Service

I hereby certify that on this 21st day of September 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notification of such filing to counsel for Plaintiff:

Joshua H. Erlich, Esquire
Virginia State Bar No.: 81298
The Erlich Law Office PLLC
2111 Wilson Blvd., Suite 700
Arlington, VA 22201
Voice: (703) 791-9087
Fax: (703) 351-9292
jerlich@erlichlawoffice.com

Bruce Carl Fox, Esquire (*pro hac vice*)
Penn. Bar No.: 42576
Andrew Jack Horowitz (*pro hac vice*)
Penn. Bar No.: 311949
Obermayer Rebmann Maxwell & Hippel, LLP
BNY Mellon Center, Suite 5240
500 Grant Street
Pittsburgh, PA 15219
andrew.horowitz@obermayer.com
bruce.fox@obermayer.com

*Counsel for Plaintiff*

**Aclara Technologies, LLC**

By   /s/  *J. Clay Rollins*
J. Clay Rollins, Esquire
Virginia State Bar Number 84382
clay.rollins@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA 23219
Tel.:   (804) 663-2330
Fax:   (855) 843-1809

*Counsel for Defendant*

35613373.3