479

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JOSEPH RUFO,             .   Civil Action No. 1:18cv37
                       .
          Plaintiff,   .
                       .
     vs.             .   Alexandria, Virginia
                       .   November 1, 2018
ACLARA TECHNOLOGIES, LLC,  .   9:30 a.m.
                       .
          Defendant.   .
                       .
. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 3 - A.M.

APPEARANCES:

FOR THE PLAINTIFF:          JOSHUA H. ERLICH, ESQ.
                          The Erlich Law Office, PLLC
                          2111 Wilson Boulevard, Suite 700
                          Arlington, VA 22201
                            and
                          BRUCE C. FOX, ESQ.
                          ANDREW J. HOROWITZ, ESQ.
                          QIWEI CHEN, ESQ.
                          Obermayer Rebmann Maxwell &
                          Hippel LLP
                          BNY Mellon Center
                          500 Grant Street, Suite 5240
                          Pittsburgh, PA 15219

FOR THE DEFENDANT:         J. CLAY ROLLINS, ESQ.
                          Ogletree, Deakins, Nash, Smoak &
                          Stewart, P.C.
                          Riverfront Plaza - West Tower
                          901 East Byrd Street, Suite 1300
                          Richmond, VA 23219

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 479 - 617)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

480

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:           HEIDI KUNS DURR, ESQ.
                                  Ogletree, Deakins, Nash, Smoak &
3                                 Stewart, P.C.
                                  7700 Bonhomme Avenue, Suite 650
4                                 St. Louis, MO 63015
                                    and
5                                 JOHN B. FLOOD, ESQ.
                                  Ogletree, Deakins, Nash, Smoak &
6                                 Stewart, P.C.
                                  1909 K Street, N.W.
7                                 Washington, D.C. 20006

8
     ALSO PRESENT:                RACHEL COLANGELO
9                                 RICHARD KATZ
                                  SUSAN HORNEKER
10                                JILL MECEY
                                  NICOLE H. NAJAM, ESQ.
11                                JOSEPH RUFO

12
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
13                                U.S. District Court, Third Floor
                                  401 Courthouse Square
14                                Alexandria, VA 22314
                                  (703)299-8595
15

16

17

18

19

20

21

22

23

24

25

481

1                                    I N D E X

2
                                DIRECT   CROSS   REDIRECT   RECROSS
3
    WITNESSES ON BEHALF OF
4   THE PLAINTIFF:

5   Jill Mecey                          483      503        516
       (Resumed)
6
    Gina Petrella Logozar   520         553      567        572
7
    Michael Garcia          574         600      612        615
8

9

10

11

12                                 EXHIBITS

13                                 MARKED          RECEIVED

14  PLAINTIFF'S:

15  No. 25                                         487
        36                                         546
16      42                                         496
        63                                         608
17      80                                         498

18      101                                        595
        102                                        594
19      105                                        599

20
    DEFENDANT'S:
21
    No. 223                                        489
22      224                                        491
        258                                        601
23      281                                        493
        296                                        499
24

25

482

```
 1                    P R O C E E D I N G S

 2                         (Jury present.)

 3              THE CLERK:  Civil Action 18-37, Joseph Rufo v. Aclara

 4    Technologies, LLC.  Would counsel please note their appearances

 5    for the record.

 6              MR. FOX:  Bruce Fox on behalf of the plaintiff.  With

 7    me I have Andrew Horowitz and Josh Erlich.

 8              THE COURT:  Good morning.

 9              MR. FOX:  And Qiwei Chen.

10              MS. DURR:  I'm Heidi Durr on behalf of defendant,

11    with me is Clay Rollins and John Flood.

12              THE COURT:  Good morning.

13              And good morning, ladies and gentlemen.  Again,

14    you've been a wonderful jury.  You're here bright and early,

15    and we're going to move this case.  I expect you will be

16    getting this case late today for deliberation.  That is the

17    plan.  And so hopefully, we can keep to that schedule.  I know

18    jurors like to be able to sort of plan their lives.

19              I can pretty much assure you you will not need to be

20    here on Monday.  You probably will have to come back tomorrow

21    because I doubt you'll be able to finish your deliberations

22    tonight, but in terms of, you know, planning your lives for

23    next week, I would be surprised if you would have to be here on

24    Monday.  So you can plan accordingly.

25              All right.  Counsel, I do expect we will not have
```

1  cumulative evidence.

2          Ms. Mecey, you're still under your oath from

3  yesterday.

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  All right.  Ms. Durr?

6          MS. DURR:  Thank you, Your Honor.

7   JILL MECEY, PLAINTIFF'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

8                  CROSS-EXAMINATION (Cont'd.)

9  BY MS. DURR:

10 Q.   Ms. Mecey, I want to ask you, how long have you worked for

11 Aclara?

12 A.   I've been with Aclara almost eight years in January.

13 Q.   Okay.  And what was your first position with Aclara?

14 A.   I believe it was an administrative role.  I ordered

15 supplies, did various things like that.  I was a stay-at-home

16 mom and came back to work part time.

17 Q.   So it was a part-time position when you started?

18 A.   It was.

19 Q.   And you've grown in the company?

20 A.   I have.

21 Q.   Okay.  What is your current title?

22 A.   My current title is manager of organizational

23 effectiveness and administration.

24 Q.   Okay.  And just, is that manager of organizational

25 effectiveness and administration, are they the same thing, or

Mecey - Cross                                                          484

1    are they kind of broken out duties?

2    A.   They are broken up.  Organizational effectiveness is one

3    portion of my job, and administration is a separate part of my

4    job.

5    Q.   Okay.  Tell the jury, what do you do as manager of

6    organizational effectiveness?

7    A.   Organizational effectiveness is basically conflict

8    resolution.  If teams are having a hard time communicating,

9    maybe engineering isn't working so well with sales, they will

10   call me, sit down, listen to kind of what's going on.

11          If it's communication issues, typically, I can kind

12   of work with them to communicate better together.  If it's

13   something bigger than communication issues and maybe some

14   leadership training is in store, then I take it to HR, and then

15   they deal with that.

16   Q.   Do you direct any employees or manage any employees as

17   manager of organizational effectiveness?

18   A.   No, I don't.

19   Q.   Okay.  And then you also are manager of administration,

20   you said?

21   A.   That is correct.

22   Q.   Okay.  What do you do as manager of administration?

23   A.   I manage the administrative staff, the executive

24   assistants and office coordinator.

25   Q.   How many executive assistants do you manage?

Mecey - Cross                                                          485

1    A.    Two.

2    Q.    Okay.  And do you have any office coordinators right now?

3    A.    I do not.

4    Q.    Okay.  When you -- when Mr. Rufo was working for you, how

5    many office coordinators did you have?

6    A.    I had -- Joey was an office coordinator, and then I had an

7    administrative assistant that had the same --

8    Q.    And what was her title -- name, I mean?

9    A.    I'm sorry, her name was Donna Lapeyrouse.

10   Q.    Okay.  Now, I heard you testify yesterday that you, you

11   report to or you work for Mr. Garcia, Michael Garcia?

12   A.    I do report in to Michael Garcia and the CEO of our

13   company, Allan Connolly.

14   Q.    What do you do for Mr. Garcia?

15   A.    An executive assistant.

16   Q.    So you do administrative duties for Mr. Garcia?

17   A.    Yes, as an executive assistant.

18   Q.    Tell the jury what you do.

19   A.    I set up meetings for him.  I schedule things on his

20   calendar.  I run meetings for him.  I set up his travel, those

21   sort of things.

22   Q.    What do you do for Mr. Connolly, the CEO?

23   A.    Similar things for our CEO.  I set up meetings.  I get him

24   to conferences he needs to be to.  I sit in on executive staff

25   meetings, take notes in action items.

Mecey - Cross                                                   486

1          THE COURT:  You've used the term "CFO" several times.

2     I'm not sure it's been defined for the jury.

3          THE WITNESS:  I apologize, I mean CEO.

4          THE COURT:  CEO, but explain what that means for the

5     jury.

6          THE WITNESS:  Oh, I'm sorry.  He's the chief

7     executive officer, the president of the company.

8     BY MS. DURR:

9     Q.   And do you serve in an administrative capacity for

10    Mr. Connolly, or is it more operational or something else?

11    A.   As an executive assistant.

12    Q.   Okay.  And then I heard you say that you're also on the

13    executive team; is that right?

14    A.   I am a part of the executive team because of my role as an

15    assistant.

16    Q.   What do you do on the executive team?

17    A.   I sit in on weekly executive staff meetings and support

18    the team as needed.  If we are offsite at a conference and they

19    need help with meetings or meeting certain people, I set those

20    meetings up.

21    Q.   Do you make any decisions as the executive team member?

22    A.   Absolutely not.

23    Q.   In your duties for Aclara, do you provide any human

24    resources-type functions?

25    A.   No, I don't provide human resources functions.

Mecey - Cross                                                            487

1    Q.   Okay.  Now, yesterday -- I want to be clear, though, do

2    you -- have you ever heard the term "EEO"?

3    A.   I have heard the term "EEO."

4    Q.   What does it stand for?

5    A.   It's Equal Employee Opportunity.

6    Q.   Okay.  Now, I want to -- yesterday, there was some

7    testimony about Mr. Rufo wanting to go to Ms. Salvo to say:

8    Hey, I want this position.

9            Do you remember that?

10   A.   I do.

11   Q.   Okay.  Did you ever tell Mr. Garcia about what Mr. Rufo

12   was wanting?

13   A.   To seek another position?

14   Q.   Yes.

15   A.   Yes.

16   Q.   Okay.  And I want to turn your attention to Plaintiff's

17   Exhibit 25.

18           And I don't think it's been admitted yet.

19           THE COURT:  Our rule is any plaintiff's exhibit would

20   be automatically deemed admitted if you are using it --

21           MS. DURR:  Okay.

22           THE COURT:  -- because they put it in.

23           So 25 is in.

24           MS. DURR:  Okay.

25           (Plaintiff's Exhibit No. 25 was received in

Mecey - Cross                                                         488

1    evidence.)

2    BY MS. DURR:

3    Q.    And what is Plaintiff's Exhibit 25?

4    A.    I'm sorry, I can't see it.

5    Q.    It's the top part.

6    A.    It's an e-mail from me to Mr. Garcia on July 11, 2017.

7    "Need your advice as to how to handle this with Joey."

8    Q.    Okay.  So why were you needing advice from Mr. Garcia how

9    to handle Mr. Rufo wanting to get another position?

10   A.    Because I, I know Joey was dishonest.  He had lied to me,

11   and I wanted his advice on how to handle the situation.

12   Q.    Okay.  Did you have a conversation or get any advice from

13   Mr. Garcia?

14   A.    I believe so.

15   Q.    Okay.  I want to turn your attention to Plaintiff's

16   Exhibit 26.

17            THE COURT:  I think that's already in, but if not,

18   it's in.

19   BY MS. DURR:

20   Q.    Okay.  The top portion.

21   A.    Yes.

22   Q.    It says -- this is an e-mail from Mr. Garcia back to you,

23   right?

24   A.    Correct.

25   Q.    And he says, "BTW, I agree with your approach and planned

Mecey - Cross                                                      489

1  comments.  He is rather presumptuous but also claims to have

2  good experience in the military that is applicable.  His

3  behavior has to be adjusted."  Right?

4  A.   Correct.

5  Q.   What's your understanding of what Mr. Garcia meant when he

6  said, "His behavior has to be adjusted"?

7        MR. FOX:  Your Honor, this has been asked and

8  answered, and she is being asking to speculate.

9        THE COURT:  Yes, I agree.  Sustained.

10 BY MS. DURR:

11 Q.   Okay.  Now, we talked yesterday about the discretionary

12 spend e-mail.

13 A.   Correct.

14 Q.   And did Mr. -- did Mr. Rufo ever reach out to you about

15 having to call Mr. Garcia?

16 A.   I believe he did, yes.

17 Q.   Okay.  I want to turn your attention to Defendant's

18 Exhibit 223.

19        THE COURT:  Any objection to 223?

20        MR. FOX:  No objection, Your Honor.

21        THE COURT:  All right.  It's in.

22        (Defendant's Exhibit No. 223 was received in

23 evidence.)

24        MS. DURR:  Okay.  If you could show that, blow that

25 up a little bit?

Mecey - Cross                                                        490

1    BY MS. DURR:

2    Q.   What is Defendant's Exhibit 223?

3    A.   It appears to be an instant message from Joey to me.

4    Q.   Okay.  It's dated July 27, 2017?

5    A.   Correct.

6    Q.   That's the same date that he sent that discretionary spend

7    e-mail?

8    A.   I believe so.

9    Q.   Okay.  And Mr. Rufo wrote to you, "Hi, Jill.  I missed a

10   call from Michael Garcia, who instructed me to call him back

11   (and left his cell), but I cannot seem to reach him at either

12   number."

13            And then he also texted you, "Am I in trouble?"

14            And then he texted you again, "(Or, I should say,

15   more trouble?)"  Right?

16   A.   Yes.

17   Q.   Did you ever text back to Mr. Rufo?

18   A.   I did not.

19   Q.   Did you ever tell Mr. Rufo:  Hey, you're not in trouble?

20   A.   No.

21   Q.   Did you ever tell Mr. Rufo:  Hey, it's not a big deal;

22   don't worry about it?

23   A.   No.  It was actually a big deal.

24   Q.   Okay.  Now, do you recall -- I'm switching and moving

25   forward to the e-mail that Mr. Fox asked you about yesterday

Mecey - Cross                                                    491

1   about Lyn Salvo telling Mr. Rufo after he -- she received the

2   first spreadsheet:  "Beautiful.  Thanks.  Great start."  Do you

3   remember that?

4   A.   I do.

5   Q.   He showed you that first e-mail?

6        And do you remember when you saw that e-mail?

7   A.   I believe Joey sent it to me.

8   Q.   Okay.  And I want to -- do you remember when?

9   A.   I don't remember the date offhand, no.

10  Q.   I want to turn your attention to Defendant's Exhibit 224.

11       THE COURT:  Any objection to 224?

12       MR. FOX:  No, Your Honor.

13       THE COURT:  All right.  It's in.

14       (Defendant's Exhibit No. 224 was received in

15  evidence.)

16  BY MS. DURR:

17  Q.   Is this another instant message exchange between you and

18  Mr. Rufo?

19  A.   It is.

20  Q.   It's dated August 14, 2017, right?

21  A.   Correct.

22       MS. DURR:  Okay.  And can you -- sorry.  Can you go,

23  Susie, to Jill Mecey, 2:02 p.m., and blow the rest of that up?

24  Okay.  Just so it's easier to read.  The whole -- the rest.

25  BY MS. DURR:

```
Mecey - Cross                                                    492
```

1  Q.   And Jill -- excuse me, you instant messaged Mr. Rufo that

2  day and said, "I'm sorry, I just listened to your VM."  What

3  does "VM" stand for?

4  A.   Voice message.

5  Q.   And then you texted him back, "Can you please send me the

6  e-mail that you are referring to?"

7  A.   Right.  "In your voice message."

8  Q.   In your voicemail?

9  A.   Yes.

10 Q.   And Mr. Rufo said, "Yes"?

11 A.   Um-hum.

12 Q.   And then Mr. Rufo said, "One second.  Let me send the

13 e-mail where Lyn replied"?

14 A.   Correct.

15 Q.   And then he also said, "I 100 percent do *not* want her to

16 take any blame.  I just want it understood that I seriously

17 didn't think I was blindsiding anyone."  Right?

18 A.   Correct.

19 Q.   Okay.  And to your knowledge, did Mr. Rufo then forward

20 the e-mail that he was referring to in his voicemail?

21 A.   Yes.

22 Q.   Okay.  I want to turn your attention to Defendant's

23 Exhibit 281.

24          THE COURT:  Any objection to 281?

25          MR. FOX:  No objection, Your Honor.

Mecey - Cross                                                        493

1            THE COURT:  All right.  It's in.

2            (Defendant's Exhibit No. 281 was received in

3    evidence.)

4    BY MS. DURR:

5    Q.   Ms. Mecey --

6    A.   Yes.

7    Q.   -- is Defendant's Exhibit 281 the e-mail from Mr. Rufo

8    where he is forwarding Lyn's e-mail to him from way back in

9    June -- or July, I should say?

10   A.   It looks like it, yes.

11   Q.   Before you received this e-mail from Mr. Rufo, had you

12   ever seen Ms. Salvo's response to Mr. Rufo?

13   A.   No.

14   Q.   The "Beautiful-Thanks" response?

15   A.   The "Beautiful-Thanks" response, I believe that was the

16   e-mail that Joey sent to me.

17   Q.   But that's the first time you ever saw it?

18   A.   Yes.

19   Q.   Okay.  Moving forward in the timeline here, we've had

20   testimony and we've listened to an audio recording of a phone

21   conversation you and Lyn Salvo had with Mr. Rufo on August 29,

22   2015 (sic).  Do you remember that?

23   A.   I do.

24   Q.   Okay.  What prompted or started you -- why did you have

25   this call with Mr. Rufo?

Mecey - Cross                                                    494

1   A.   I had the call with, with Joey at that time because I had

2   found out that he was contesting the PIP rather than talking to

3   me about it.  That's why I had the call.  That's what initiated

4   the call.

5   Q.   Did you tell that to Mr. Rufo on the phone?

6   A.   Yes, I did.

7   Q.   Okay.  I want to turn your attention to Plaintiff's

8   Exhibit 55.  And actually, it's 55-3, lines 13 and 14.

9           If you could highlight those?  Actually, could you do

10  the whole paragraph?

11          THE COURT:  I'm sorry, 55 --

12          MS. DURR:  55-3, portions from line 9 to 17.  That

13  might help the jury.

14  Q.   That's the portion of the transcript that you're talking

15  to Mr. Rufo, right?

16  A.   Yes, it is.

17  Q.   And lines 13 and 14, that's what you told Mr. Rufo:  "What

18  started this, Joey, is the correspondence that Alvin sent to me

19  yesterday"?

20  A.   Correct.

21  Q.   So when you say "what started this," what are you

22  referring to?

23  A.   What started the need for the conversation is the e-mail

24  that Alvin sent me where Joey was saying he was contesting part

25  of the performance improvement plan.

Mecey - Cross                                                          495

1   Q.   And again, what portion was he trying to -- to your

2   understanding was he trying to contest through Alvin?

3   A.   That he had talked to Alvin about the HR manager position.

4   Q.   Okay.  And Mr. Alvin told you that -- and we've seen the

5   e-mails -- that he was the one who actually had approached

6   Mr. Rufo about a position, right?

7   A.   Correct.

8   Q.   So explain to the jury why, why did you not retract that

9   portion of the PIP that was about communication with, with the

10  manager about Mr. Rufo seeking the -- another position after

11  you had received Mr. Jackson's e-mail?

12  A.   Because that wasn't the point.  The point was he had lied,

13  gone behind my back, talked to other people about something

14  that we had just discussed a few weeks before that, and before

15  that, several weeks before that, I felt that he had lied, and

16  that's why that stayed in the, in the performance improvement

17  plan.

18  Q.   What did you think he had lied about that was part of the

19  PIP?

20          MR. FOX:  Your Honor, asked and answered.

21          THE COURT:  Sustained.

22          MS. DURR:  I want --

23          THE COURT:  Sustained.

24  BY MS. DURR:

25  Q.   Okay.  I don't think this -- but you did -- you worked

Mecey - Cross                                                        496

1   with -- this is one clerical matter.  Yesterday, we discussed

2   Plaintiff's Exhibit 42, which was a draft of the warning, and

3   I'm just not sure if it's been admitted or not.

4           It's plaintiff's exhibit, so I wasn't sure if it was

5   automatically admitted?

6           THE COURT:  Well, it's only admitted if either you or

7   the plaintiff move it in.  Otherwise --

8           MS. DURR:  Okay.  That's what I wanted to make sure.

9   I'd like to just move into the record Plaintiff's Exhibit 42.

10          THE COURT:  All right.  It's in.

11          (Plaintiff's Exhibit No. 42 was received in

12  evidence.)

13  BY MS. DURR:

14  Q.   Now, we were -- you did do a performance evaluation for

15  Mr. Rufo, and we've discussed that, but you also went and

16  talked to Mr. Rufo to discuss some of the scores that you gave

17  him, right?

18  A.   Correct.

19  Q.   And we've listened to a portion of that meeting that

20  Mr. Rufo provided, right?

21  A.   Correct.

22  Q.   Okay.  And did you know that that recording was being made

23  after you said no?

24  A.   No.  I asked him not to record it.

25  Q.   Okay.  So at this time, I'd like to play a portion of the

Mecey - Cross                                                              497

1    clip -- clip of that audio recording from where we left off

2    with plaintiff.  It's -- and here you're talking about the

3    scores about communication.

4            (Audio excerpt played.)

5    BY MS. DURR:

6    Q.   And then during this review session with Mr. Rufo, did

7    you -- he also bring up about doing, performing duties for --

8    additional duties for Patty Cavender?

9    A.   I believe he did.

10   Q.   Okay.  Now, who is Patty Cavender, if I'm saying her name

11   right?  And I apologize.

12   A.   I believe she's the assets warehouse manager for SGS.  I'm

13   not certain what her title is.

14   Q.   Okay.  And to your knowledge, what had Mr. Rufo been doing

15   for Ms. Cavender?

16   A.   He had helped her get updated on her expense reports.

17   Q.   Okay.  And you discussed that during your -- the meeting?

18   A.   During that phone call?

19   Q.   Yes.

20   A.   I may have.  I'm sorry.

21           (Audio excerpt played.)

22           THE COURT:  All right.  Ms. Durr, do you have a

23   question?

24           MS. DURR:  At this time, I'd like to move into

25   admission Plaintiff's Exhibit 80, which is a transcript of the

Mecey - Cross                                                        498

1    recording.

2              MR. FOX:  I believe we already did.  No objection,

3    Your Honor.

4              THE COURT:  We've already heard that.  Haven't we

5    heard that already?  Have we heard that already or not?

6              MS. DURR:  Not that portion.

7              THE COURT:  No?  Not yet?  All right.

8              (Plaintiff's Exhibit No. 80 was received in

9    evidence.)

10   BY MS. DURR:

11   Q.   One point of clarification:  The performance evaluation

12   that you did for Mr. Rufo, what period of time was that for?

13   A.   I'm sorry, can you say that --

14   Q.   The performance evaluation that you did for Mr. Rufo that

15   we've been listening to --

16   A.   Yes.

17   Q.   -- what period of time is that for?

18   A.   That would have been for the fiscal year, which would

19   have -- for us would have been September 30 through October 1

20   of 2017.

21   Q.   Okay.  And so October 1, 2017, was Mr. Rufo still on a

22   PIP?

23   A.   He was.

24   Q.   Now, you talked about your other employees, that you

25   managed a few others.  Did any other employees, were they --

Mecey - Cross                                                          499

1    did they -- were they considered a low performer for 2017, the

2    same year as Mr. Rufo?

3    A.    I did have one other low performer.

4    Q.    Okay.  Who was that?

5    A.    Donna Lapeyrouse.

6    Q.    Okay.  Did you give her a performance evaluation, too?

7    A.    I did.

8              MS. DURR:  Okay.  I'd like to move into evidence

9    Defendant's Exhibit 296.

10             THE COURT:  Any objection to 296?

11             MR. FOX:  Your Honor, it's entirely irrelevant.

12             THE COURT:  No, I think it is relevant given the

13   issues in the case.  I'll overrule the objection.

14             (Defendant's Exhibit No. 296 was received in

15   evidence.)

16   BY MS. DURR:

17   Q.    Ms. Mecey, is Defendant's 296 the performance evaluation

18   for Donna Lapeyrouse?

19   A.    It is.

20   Q.    And is this for the same fiscal year as the one that you

21   gave to Mr. Rufo?

22   A.    It is.

23   Q.    Okay.  And on the last page, on the left side under

24   "Section 4:  Signatures, Employee Signature, Donna Lapeyrouse,"

25   do you see that?  Do you see that?  It says the signature date

Mecey - Cross                                                    500

1    for Donna Lapeyrouse is January 25, 2018.

2    A.    Yes.

3    Q.    Okay.  Again, is that months after your fiscal year ended?

4    A.    Yes.

5    Q.    Okay.  Is this, is this when you actually completed the

6    manager comments?

7    A.    No.

8    Q.    Okay.  When did you do the manager comments to

9    Ms. Lapeyrouse's evaluation?

10   A.    I don't remember the exact date.  It would have been a few

11   months later.

12   Q.    A few months later after what?

13   A.    After January, yeah, like, so, spring.

14   Q.    Again, are these -- where did Ms. Lapeyrouse fall in terms

15   of ranking?  Was she a high, medium, or low performer?

16   A.    She was a low performer.

17   Q.    Okay.  Did Ms. Lapeyrouse, did she ever -- did she get a

18   merit increase?

19   A.    No, she didn't.

20   Q.    Okay.  And Ms. -- did you do any other evaluation for the

21   2017 fiscal year?

22   A.    I did for Zana Scott.

23   Q.    Okay.  Did you actually fill out an evaluation for

24   Ms. Scott?

25   A.    I didn't.  We had a conversation and talked through her

Mecey - Cross                                                        501

1   performance evaluation.

2   Q.    Okay.  Did Ms. Scott get a merit increase?

3   A.    She did.

4   Q.    How did she rank in terms of was she a high, medium, or

5   low performer?

6   A.    She was a high performer.

7   Q.    And do you remember, how much was her merit increase?

8   A.    I believe it was 3 percent off the top of my head.  I

9   can't be certain, but I believe it was 3 percent.

10  Q.    Okay.

11          THE COURT:  Now, just for the record, 3 percent of

12  what?

13          THE WITNESS:  It's 3 percent of her, I guess, salary.

14  It was a 3 percent raise.

15  BY MS. DURR:

16  Q.    And -- now, you talked yesterday about having given PIPs

17  before to other employees?

18  A.    Yes.

19  Q.    And then we talked about that, and I don't want to replow

20  that ground, but I just want to clarify, did -- you gave Zana

21  Scott a PIP.  Had Ms. Scott ever reported discrimination to

22  you?

23  A.    No.

24  Q.    Has she ever filed a lawsuit against you?

25  A.    No.

Mecey - Cross                                                          502

1    Q.   Filed a lawsuit, excuse me, against the company?

2    A.   No.

3    Q.   Okay.  Had she ever claimed that she was retaliated

4    against?

5    A.   No.

6    Q.   Patty Schultz was the other person that you had given a

7    PIP to?

8    A.   That's correct.

9    Q.   Okay.  Had she ever claimed retaliation?

10   A.   No.

11   Q.   Had she ever claimed discrimination, that discrimination

12   was going on?

13   A.   No.

14   Q.   Had she ever filed a lawsuit against the company before

15   you gave her the PIP?

16   A.   No.

17   Q.   Well, actually, has she ever filed a lawsuit after you

18   gave her the PIP?

19   A.   No.

20   Q.   Okay.  I want you to tell the jury, have you retaliated --

21   you've sat through the testimony so far and listened to

22   Mr. Rufo's testimony.  Would you tell the jury, have you

23   retaliated against Mr. Rufo, as he's alleged?

24            MR. FOX:  Asked and answered many times, Your Honor.

25            THE COURT:  Sustained.

Mecey - Redirect                                                    503

BY MS. DURR:

1   Q.   How does it feel being accused of retaliation by Mr. Rufo?

2   A.   This has been one of the most painful experiences I've

3   ever been through in my life.  The picture they've painted of

4   me is not me.  I don't recognize that person, and anybody that

5   would know me and does know me does not recognize that person.

6   I have never and would never retaliate, period, against an

7   employee.

8           It's been extremely stressful for me, for my husband,

9   and my three children.  To go through something like this --

10  I'm sorry, it's been very difficult and untrue.

11

12          I'm sorry.  (Crying.)

13          MS. DURR:  No further questions.

14          THE COURT:  All right.  Any redirect?

15          MR. FOX:  Yes, I have redirect, Your Honor.

16                      REDIRECT EXAMINATION

17  BY MR. FOX:

18  Q.   Let's talk about the picture you painted of Joey.  You

19  called him a liar?

20  A.   He did lie to me.

21  Q.   You called him dishonest?

22  A.   Yes.

23  Q.   You said he was a low performer?

24  A.   Correct.

25  Q.   Put him on a PIP?

Mecey - Redirect                                                    504

1    A.    Correct.

2    Q.    You fired him?

3    A.    His position was eliminated, and he was let go, yes.

4    Q.    You said a few times yesterday he was threatening to you.

5    A.    He was very threatening and contentious on the phone, yes.

6    Q.    Did -- if he was threatening to you -- you say he was

7    extremely threatening.

8    A.    His tone was very threatening.  Answering the phone,

9    "Hello, Jill," was threatening.

10   Q.    Doesn't a company terminate an employee when they act in a

11   threatening fashion?  Isn't that a basis for terminating them?

12   A.    I guess it would be the manner of threatening, if it was

13   physical threats, I would suppose.

14   Q.    No one ever said that they terminated him because he was

15   threatening --

16   A.    No.

17   Q.    -- did they?

18          Now, in this phone conversation we heard a couple

19   minutes ago, did you think that your tone was encouraging to

20   Joey in that conversation?

21   A.    I didn't think that my tone was discouraging at all.  I

22   think it was probably more frustrated.

23   Q.    In that conversation, he was making a plea for you to

24   raise his ratings from 1's in the three critical categories of

25   leadership, problem solving, and teamwork to get them up to the

Mecey - Redirect                                                    505

1    point where they'd be at least satisfactory, and you refused to

2    do that; isn't that right?

3    A.   I told him that if he disagreed with my comments as his

4    manager and supervisor --

5         THE COURT:  That's not responsive.  The answer is

6    just yes or no.

7         THE WITNESS:  Can you repeat the question?  I'm

8    sorry.

9    BY MR. FOX:

10   Q.   In that conversation, he was pleading with you to raise

11   his ratings from 1's in those three critical categories, and

12   you refused to do so; isn't that right?

13   A.   That's right.

14   Q.   Do you think that might have been discouraging to him?

15   A.   I'm not sure if it was or not.

16   Q.   You terminated him less than two months later, didn't you?

17   A.   His position was eliminated, yes.

18   Q.   You testified this morning it seems like you remembered

19   what the term "EEO" meant.  Did something happen overnight to

20   improve your memory of that term?

21   A.   Now, I do know what Equal Employee Opportunity means.  I,

22   I don't use "EEO" very often, I apologize.  I do know what that

23   means.

24   Q.   Is that something that occurred to you in the middle of

25   the night?

Mecey - Redirect                                                  506

1   A.    No.  I think I thought out the name of it.  It didn't

2   occur to me in the middle of the night.  I think I do know what

3   it means.

4   Q.    You expressed very harsh views on Mr. Rufo recording the

5   phone conversation that you and Gina Salvo consented to,

6   correct?

7   A.    I was not on a phone conversation with Gina Salvo -- who?

8   With Lyn Salvo?

9   Q.    I'm sorry, with Lyn Salvo.  I'm getting tired.

10  A.    Me, too.

11          THE COURT:  It's early in the morning.  We have a

12  whole day to go through.

13          MR. FOX:  I was up pretty late, Your Honor.

14          THE WITNESS:  I'm sorry, can you repeat that

15  question?

16  BY MR. FOX:

17  Q.    Yes.  You expressed very strong views that -- about Joey's

18  recording conversations in general.  The one conversation he

19  recorded with you and Lyn Salvo, correct?

20  A.    Correct.

21  Q.    And Joey expressed the view to you that although he didn't

22  want to have to do this, he felt it was necessary to record

23  conversations that related to litigation matters so there would

24  be a record of events.  Is that correct?  Yes or no?

25  A.    I believe in the conversation with just me, yes, he did

Mecey - Redirect                                                    507

1    say that.

2    Q.   And there are a number of things that you dispute that

3    Mr. Rufo has testified to; isn't that correct?

4    A.   Yes.

5    Q.   Like whether or not you put him on a warning for analysis,

6    correct?

7    A.    Correct.

8    Q.   And the tape sheds light on that, correct?

9    A.   I'm sorry?

10   Q.   The tape sheds light on that issue, whether or not you put

11   him on warning for analysis?

12   A.   Mr. Fox, he was not on a PIP for warning for analysis.

13   Q.   I know.  That's my point.

14   A.   It was a series of poor judgment.

15   Q.   That's my point.  You disagree with him on that issue,

16   right?

17   A.   I'm sorry, yes, I do.

18   Q.   And the tape addresses that issue of whether or not you

19   put him on warning for analysis, doesn't it?

20   A.   On the -- I don't remember that.  On the recording, the

21   last recording?

22   Q.   Yes.

23   A.   I don't remember.

24   Q.   No, the first recording.

25   A.   I don't remember him bringing that up, I'm sorry.

Mecey - Redirect                                                        508

1    Q.    Okay.  I'm not going to play it again, but if the tape

2    addresses that issue, it would provide a contemporaneous

3    factual record of what was said between the three of you, would

4    it not?

5    A.    Yes, if it was recorded.

6    Q.    And that would be very helpful to this jury in deciding

7    what really happened here, would it not?

8    A.    Yes.  If that was recorded, yes.

9    Q.    And the first tape also addressed the issue of whether you

10   and Ms. Salvo were trying to induce him to resign for talking

11   to other people about the PIP, his federally protected right,

12   correct?

13          MS. DURR:  Objection.

14          THE COURT:  Sustained.  Again, I don't want lawyers

15   making speeches in their question.  Just ask for the fact,

16   please.

17   BY MR. FOX:

18   Q.    Sure.  The first tape addresses that issue as well, that

19   is, the question of whether you and, I'm sorry, Lyn Salvo

20   attempted to get him to resign for talking to other people

21   about the PIP?

22   A.    No.  He was contending the PIP.  I wanted to talk to him

23   about that.  I was not trying to get him to resign.

24   Q.    In the earlier tape, there is -- your recording, your

25   voice is recorded --

Mecey - Redirect                                                509

1    A.   Yes.

2    Q.   -- in which you're saying, "I would take this as your

3    resignation."

4         You heard that, correct?

5    A.   If he couldn't work through this with me, yes.

6    Q.   It's your interpretation, but --

7    A.   I believe that's what I said.

8    Q.   It's a good thing we have that contemporaneous recording

9    so the jury can decide.

10        THE COURT:  No, counsel, that's not a correct

11   question.

12        MR. FOX:  Okay.  I'll move on.

13   BY MR. FOX:

14   Q.   Now, you testified a few moments ago the first time -- you

15   seem to remember when you saw the "Beautiful-Great start"

16   response.  Is that something that came to you overnight as

17   well?

18        MS. DURR:  I'm going to object.  Mischaracterizes the

19   evidence.

20        THE COURT:  Sustained.

21   BY MR. FOX:

22   Q.   You testified that you became aware of it on August 14 and

23   were shown an exhibit for that date, correct?

24   A.   For the e-mail that Joey forwarded me?

25   Q.   Yes, the "Beautiful-Great start" e-mail?

Mecey - Redirect                                                  510

1   A.   I believe that's the e-mail that Joey forwarded to me,

2   yes.

3   Q.   Okay.  So you had that e-mail in your possession before

4   you put him on the PIP the next day, on August 15, correct?

5   A.   I don't remember the dates.  I know I had the e-mail that

6   Joey forwarded to me.  I'm sorry, I'm getting confused on the

7   dates.

8   Q.   Well, let's look at it again, Exhibit 281.  You looked at

9   it a few moments ago.  Your counsel showed it to you.

10             THE COURT:  That's Defense 281.

11             MR. FOX:  I'm sorry, Your Honor?

12             THE COURT:  It's Defense 281.

13             MR. FOX:  Defense 281, thank you.

14             THE WITNESS:  Yes, I do.  Joey forwarded that to me

15   on August 14.

16   BY MR. FOX:

17   Q.   Okay.  And that was a day before you put him on the PIP?

18   A.   If I put him on a PIP on the 15th, that would be correct.

19   Q.   Yet you still put him on the PIP having, having seen this

20   e-mail, correct?

21   A.   Having seen this e-mail?

22   Q.   Yes.

23   A.   Yes.  I had already been putting him on a PIP for his poor

24   judgment.

25   Q.   Now, you won't deny -- we've already covered this and I

Mecey - Redirect                                                    511

1    don't want to cover it again, but you won't deny that you told

2    Joey he was in trouble immediately after he disclosed the EEO

3    analysis, correct?

4    A.   I don't --

5            MS. DURR:  Objection.  It mischaracterizes the

6    testimony.

7            THE COURT:  The jury will recall what the testimony

8    is in that respect.  I'll overrule that objection.

9            THE WITNESS:  I don't remember if I said he would be

10   in trouble.

11   BY MR. FOX:

12   Q.   Okay.  Well, we have the instant message exchange.  I'm

13   not going to --

14   A.   Thank you.

15   Q.   I'm not going to go back there.  I want to move on, but

16   you never told him he was in trouble for the discretionary

17   spend e-mail?

18   A.   We discussed the discretionary spend e-mail, and I asked

19   him not to do that.  I don't know that I used the words, "you

20   are in trouble."

21   Q.   You never gave him a warning for that, did you?

22   A.   No.

23   Q.   And you never told Mr. Rufo he was in trouble when he made

24   inquiry about the HR position expressly conditioned on your

25   approval, did you?

Mecey - Redirect                                                      512

1    A.    No.

2    Q.    Well, you still have your job, don't you?

3    A.    I do.

4    Q.    You sent, you sent e-mails yesterday, Happy Birthday

5    e-mails and so forth, it looks like around late 2017.  Now, in

6    late 2017, Joey complied with -- as of that date, he complied

7    with the demand that he not talk to anyone about the PIP?

8    A.    I'm not sure if he talked to anyone about the PIP at that

9    time or not.

10          MS. DURR:  Object to the form -- object to the

11   question.

12          THE COURT:  It's too late, I mean, if the witness has

13   already answered the question.  You have to be faster than

14   that.

15   BY MR. FOX:

16   Q.    And when you sent him a Happy Birthday card, that was

17   before he filed the lawsuit?

18   A.    Yes.

19   Q.    So at that point, you were starting to feel okay again

20   about Joey?

21   A.    Our relationship had gotten better, yes.

22   Q.    And then when he filed the lawsuit, it went back, didn't

23   it?

24   A.    His behavior changed after he filed a lawsuit.

25   Q.    Okay.  Behavior changed.  How did it change?

Mecey - Redirect                                                      513

1   A.   He started to ask to record conversations.  He was very

2   argumentative, contentious.  I was trying to manage him just

3   like I would manage any other employee, and he made it very,

4   very difficult.

5   Q.   Okay.  When you say it was contentious, do you mean he was

6   contentious in the way that -- was he like he was in the tape

7   we just listened to?  Do you consider that to be contentious?

8   A.   No.

9   Q.   Okay.

10  A.   Other than the fact that he argues with everything that I

11  say, any feedback, other than that, but no.

12  Q.   He only asked to record one additional conversation after

13  the initial one, and that was the conversation we just heard,

14  correct?

15  A.   No.  Joey also told me he was recording another

16  conversation.

17  Q.   When?

18  A.   I believe the first time we discussed his performance.

19  Q.   One other -- he asked you, but you said no again?

20  A.   I said he could.  I've never seen or heard that

21  conversation since.

22  Q.   Did you document that anywhere in his personnel file?

23  A.   Did I what?

24  Q.   Did you document that anywhere in his personnel file?

25  A.   I don't know that I did.

Mecey - Redirect                                                    514

1    Q.    Just so the record is clear, Donna Lapeyrouse, you

2    testified you thought her performance was deficient, correct?

3    A.    Yes.

4    Q.    And she was forced to leave the company as well, correct?

5    A.    She was not forced to leave the company.  She resigned.

6    Q.    Okay.  Well, she was told essentially that if she wouldn't

7    resign, she'd be on a performance improvement plan, correct?

8    A.    That she would be on a performance improvement plan and we

9    could try to work through it.  She felt that the position was

10   not something that she wanted.

11   Q.    And you thought she was a low performer, too?

12   A.    Yes.

13   Q.    Now, you said that -- you made a great deal about your

14   feeling that Joey had somehow deceived you because he had --

15   saw an HR position subject to your additional approval.  Why

16   did you wait almost seven weeks to raise that with him if it

17   was such a serious issue?

18          MS. DURR:  Objection.  Asked and answered.

19          THE COURT:  I don't think it has been.  I'm going to

20   overrule the objection.

21          THE WITNESS:  The reason I didn't talk to him

22   initially is I wanted him to bring it to my attention.  I

23   didn't want to embarrass him at the time.  Again, it was a

24   series -- it was just something in a series of poor judgment

25   that was -- that I included in his performance improvement

Mecey - Redirect                                                        515

1  plan, because I really didn't talk to him.  I didn't honestly

2  know how to handle it.  I didn't want to hurt our relationship.

3  It was dishonest, and I didn't want to embarrass him.

4  Q.   Okay.  Again, you say you didn't want to embarrass him,

5  but if you felt so strongly he was lying to you, why wouldn't

6  you raise that?  Why would you wait seven weeks and then throw

7  it in a performance improvement plan?

8  A.   I put it in --

9  Q.   What's going on there?

10  A.   Right.  I put it in the performance improvement plan

11  because, again, it was a series of behavior.  I, you know, in

12  retrospect, I wish that I would have talked to him about it

13  sooner.  I didn't.  I included it in his plan because to me, it

14  showed a series of dishonesty and poor judgment.

15  Q.   You didn't even want to send him a note or an e-mail or

16  talk to him about it, did you?

17  A.   Again, I didn't want to embarrass him.  I wanted him to

18  bring it to my attention.

19  Q.   And this meeting in St. Louis you talked about, that was a

20  meeting in a Round Robin session, where Joey answered one

21  question that was -- repeated a question that had been asked by

22  somebody participating in that meeting?

23  A.   I was not in the meeting.  I know he answered --

24  Q.   Joey testified about it.

25  A.   I know that he answered a question from an employee that

Mecey - Recross                                                    516

1   he wasn't there to do.  That was for the HR leaders to answer,

2   not somebody who was there to learn.

3   Q.   And that's something that wasn't even mentioned in his

4   PIP, was it?  It's something, I think, that's been trotted out

5   in this courtroom?

6   A.   It was not mentioned in his PIP, no.

7   Q.   When you terminate Joey, you were aware of he was in the

8   middle of a family crisis, were you not?

9   A.   I believe he said that his girlfriend's dad was sick.

10  Q.   Just sick?  Is that your testimony?

11  A.   I believe he said she was -- he was sick.  I'm not sure.

12          MR. FOX:  Okay.  I have no further questions.

13          THE COURT:  Any recross?

14          MS. DURR:  Yes.

15          Would you pull up, Susie, Plaintiff's Exhibit 55,

16  lines 7 to 15?

17                       RECROSS EXAMINATION

18  BY MS. DURR:

19  Q.   This exhibit that I'm showing you is a transcript of the

20  August meeting that you and Ms. Salvo had that was recorded by

21  Mr. Rufo.  Mr. Rufo says, "Oh, no.  I have stated that I've

22  been put on warning because there are some things where I have

23  to kind of really ratchet down on myself and make sure that I

24  don't do anything that can't be misconstrued."

25          And you said, "I don't know how that being

Mecey - Recross                                                      517

1    misconstrued, how you are telling people that you are on a

2    warning for analysis and that how that can be misconstrued."

3            Who -- what did you mean by, "how you are telling

4    people" -- well, strike that.

5            Why did you say, "how you are telling people that you

6    are on a warning for analysis and that how that can be

7    misconstrued"?

8    A.   He had talked to Alvin Jackson about his PIP, and he had

9    also talked to Angela Hermannes and said that -- and told her

10   that, you know, mentioned the word "warning for analysis."  He

11   had mentioned that to her and again never brought that to me

12   but was talking to other people.

13   Q.   First of all, who is Angela Hermannes?

14   A.   She's an HR generalist in St. Louis, in the service

15   center.

16   Q.   I'm sorry, where is she located?

17   A.   I'm sorry, she's in St. Louis, in the HR service center.

18   Q.   Okay.  How do you know that Mr. Rufo talked with Angela

19   Hermannes?

20   A.   She told me in passing one day in the office, and then she

21   just sent me an e-mail letting me know.

22   Q.   What did she, Ms. Hermannes, tell you?

23   A.   I believe --

24           MR. FOX:  I'm going to object, Your Honor.  It's

25   hearsay.

Mecey - Recross                                                          518

1          THE COURT:  I'm going to sustain the objection.

2    BY MS. DURR:

3    Q.   And so is that why you said, "How are you telling people

4    that you are on a warning for analysis," is that based on

5    information provided by Ms. Hermannes?

6    A.   It is.

7          MR. FOX:  That's leading, Your Honor.

8          THE COURT:  Yeah.  Well, the problem is I'm

9    rethinking -- actually, it's not a hearsay problem because

10   she's explaining how it was that she had the conclusion that

11   the plaintiff had done something, so this is all right, this

12   line of questioning.

13   BY MS. DURR:

14   Q.   Okay.  Could you just -- I'm sorry, "How are you telling

15   people that you are on a warning for analysis," why did --

16   where did you get that information from?

17   A.   Again, Angela Hermannes in passing, and then I believe she

18   sent me an e-mail telling me that as well.

19   Q.   Okay.  Now, the same -- during the same call, you also

20   talked about you had a discussion with Mr. Rufo about whether

21   or not he could talk to other people about the, about the PIP,

22   being on the PIP?  Do you remember that?

23   A.   I do.

24   Q.   Okay.  Did you ever tell Mr. Rufo that he absolutely could

25   not talk to anybody else on the PIP?

Mecey - Recross                                                        519

1   A.   No.

2   Q.   Okay.  Did you ever tell Mr. Rufo that he could talk to

3   other people?

4   A.   I don't remember if I said he could or couldn't -- or if

5   he could, but I said I thought it was unprofessional to discuss

6   it, but it was up to him if he wanted to discuss his PIP with

7   other people.

8   Q.   Did you have a follow-up call that same day with Mr. Rufo?

9   And I'm talking about on August 29, 2017.

10  A.   I believe so.

11  Q.   Okay.  And I turn your attention to Plaintiff's Exhibit

12  56.  Plaintiff's 56 is already a memo that we've discussed

13  about your notes to the file about the conversation that's been

14  recorded on August 29, 2017, and then in your note to file, is

15  there a note by you of a follow-up conversation with Mr. Rufo?

16  A.   I can't see it.

17       MS. DURR:  Can you blow that up, the mid-morning

18  conversation, 8/29/17?

19       THE WITNESS:  Yes.

20       MS. DURR:  Okay.  Oh, I'm sorry, could you -- as to

21  the second portion, the second paragraph on the second page.

22  Highlight it, the third line down.

23  BY MS. DURR:

24  Q.   "He also asked me if there was a reason why he couldn't

25  discuss his PIP with other employees.  I told him technically

Petrella - Direct                                                    520

1    he could discuss with other employees, but it's not very

2    professional, and I would prefer that he concentrate on doing a

3    good job and changing his behavior rather than discussing his

4    performance issues with other employees, but reiterated that

5    was entirely up to him."

6           That's what's written, right?

7    A.   Yes.

8    Q.   Is that what you told Mr. Rufo?

9    A.   That's what I noted to file after our conversation, yes.

10   Q.   No, but I'm asking you, is that what you told Mr. Rufo?

11   A.   It is what I talked to -- that is what I told Mr. Rufo,

12   yes.

13          MS. DURR:  I have no further questions.

14          THE COURT:  All right.  Thank you, Ms. Mecey.  You

15   may step down.

16                       (Witness excused.)

17          THE COURT:  Call your next witness.

18          MR. FOX:  Yes, Your Honor.  We'll call Ms. Gina

19   Petrella.

20          THE COURT:  All right.

21      GINA PETRELLA LOGOZAR, PLAINTIFF'S WITNESS, AFFIRMED

22                    DIRECT EXAMINATION

23   BY MR. FOX:

24   Q.   Okay.  Good morning, Ms. Petrella.  Could you state your

25   name for the record, please.

Petrella - Direct                                                    521

1   A.   Gina Logozar.  My maiden name is Petrella, and that's the

2   name I go by at work still.

3   Q.   Okay.  And you're currently the employee relations and

4   compliance officer for Aclara, correct?

5   A.   Yes.

6   Q.   So you're the top EEO compliance person at the company,

7   correct?

8   A.   Besides legal?  Yes.

9   Q.   Okay.  I assume you know what "EEO" means.

10  A.   Yes.

11  Q.   Let me ask you this.  Let's just get right into it:  Let's

12  first talk about this spreadsheet that you and Ms. Salvo

13  assigned to Joey.  Okay.  I'd like to show you Plaintiff's

14  Exhibit 118.

15          THE COURT:  Any objection to 118?

16          MS. DURR:  No objection.

17          THE COURT:  All right.  It's already in.

18          MR. FOX:  Could you just blow up the bottom of the

19  page?

20  BY MR. FOX:

21  Q.   Okay.  And this is an e-mail from yourself to Lyn Salvo

22  and Joey Rufo that says, "Also, Joey, if you could e-mail me

23  the spreadsheet at the end of every month, that would be

24  great!"

25          You generated that, correct?

Petrella - Direct                                                       522

1   A.    That's correct.

2   Q.    What was the purpose of the spreadsheet that you were

3   asking him to generate?

4   A.    We asked Joey to track disciplinary actions for the SGS

5   organization.

6   Q.    Okay.  And you wanted to do that because there were a lot

7   of issues with the SGS installers, correct?

8   A.    There were a lot of performance issues, yes.

9   Q.    And these were the field personnel, correct?

10  A.    That is correct.

11  Q.    And why were there a lot of performance issues with the

12  installers?  What do you attribute that to?

13  A.    That I don't know, but in regards to some of the issues,

14  it was speeding, performance, safety.  It was a large range of

15  issues.

16  Q.    Okay.  You said at your deposition, you had no clue as to

17  why there were performance issues, correct?

18  A.    That is correct.

19  Q.    How were the installers compensated?

20  A.    I do not know.

21  Q.    Were they compensated at a high level?

22  A.    I do not know.

23            MS. DURR:  Objection.  Asked and answered.

24            THE COURT:  Sustained.

25  BY MR. FOX:

Petrella - Direct                                                    523

1    Q.    You don't know that, okay.

2            Was it, was it a big job to put together the

3    spreadsheet?

4    A.    Yes.

5    Q.    Can you describe that for me, the work involved?

6    A.    Sure.  So you would -- so the supervisors would write up

7    their employees, and then the write-up would come back to me or

8    Lyn, and we would forward it over to Joey.  So it just depended

9    how many write-ups we would receive on a daily basis in regards

10   to how much work he was actually doing.

11   Q.    And you estimate on average, it could take two hours a

12   day?

13   A.    It could.

14   Q.    Okay.  And do you have any reason to believe that Joey

15   spent less than two hours a day on the project?

16   A.    Like I said, it depends on how many, how many write-ups we

17   would receive in a day.  So if we received 15 in a day, it

18   could take him a little longer versus receiving two in a day.

19   Q.    Okay.  Let's take a look at Exhibit 22A, Plaintiff's

20   Exhibit 22.  Okay.  You've seen this document or this e-mail

21   exchange, right?

22   A.    Just -- are you asking me if I saw this?

23   Q.    Yes.

24   A.    Yes, I've seen it.

25   Q.    Let's expand it further so you can see the entire document

Petrella - Direct                                                    524

1   further.

2            And you received it the day he sent it, July 7?

3   A.   Yes.  I'd assume I would have received it that day.

4   Q.   Okay.  And this was the e-mail titled "Violations and

5   Determinations Tracking - June 2017," correct?

6   A.   That's correct.

7   Q.   And if we could go to the first paragraph again?  It

8   reads, "Hi, Lyn/Gina.  The attached are some files related to

9   the violations and determinations for June 2017.  I've included

10  a few notes on the attachments that will help you understand

11  where things are being tracked and why they're being tracked

12  that way."

13           Would you have read this -- his e-mail in its

14  entirety?

15  A.   I don't recall reading this e-mail in its, in its

16  entirety.

17  Q.   And you didn't read it because it was, in your mind, too

18  long, correct?

19  A.   Yes.  I work one day a week, so I have -- I don't work on

20  a Friday, which is the day it was received, so I --

21  Q.   You work one day a week, so it was too long for you to

22  read because you don't work enough time?

23  A.   I would have received it and glanced at it and probably

24  waited until I returned to work on Tuesday to review it.

25  Q.   But you don't remember reading the e-mail?

Petrella - Direct                                                        525

1    A.    I don't remember reading this e-mail.

2    Q.    Did you respond to his e-mail by asking him to -- it's one

3    page, right?  Is it one page long?

4    A.    Yes.  On this screen, it is.

5    Q.    Did you respond to his e-mail by asking him to condense it

6    or shorten it or for him to call you and cut to the chase?

7    A.    No.

8    Q.    Did you send an e-mail in response?  Sometimes people use

9    the acronym TLTR, too long to read.  Did you send an e-mail to

10   him saying:  Hey, it's too long to read, or use that acronym?

11   A.    No.

12   Q.    That's an acronym you use on occasion yourself?

13   A.    No.

14   Q.    Okay.  How long had you been working one day a week when

15   this e-mail was generated?

16   A.    I started working one day a week in 2016.

17   Q.    By the way, did you check e-mails during the other days of

18   the week when, when you weren't working?

19   A.    Generally, I scan my phone.

20   Q.    And you check your e-mail every day, don't you?

21   A.    Say that again?

22   Q.    You check your e-mail every day, don't you, every workday?

23   A.    I can't say I check my e-mail every day.

24   Q.    Is it your practice to try to do that every day?

25   A.    It was my practice to scan my phone, yes.

Petrella - Direct                                                    526

1    Q.    Okay.  I'd like to direct your attention back to

2    Plaintiff's Exhibit 22.  A portion of the e-mail beginning at

3    the bottom of the page which says "Going forward," if we could

4    expand that?

5            Joey says there, "Going forward.  There are a few

6    things I intend to track going forward but require more than

7    one month's worth of data to have any value.  This includes a

8    month-to-month comparison on several metrics and tracking of

9    disciplinary action against various EEO categories."

10           You know what he meant by that, don't you, "various

11   EEO categories"?

12   A.    I do know what EEO categories are.

13   Q.    Okay.  And EEO categories include protected categories

14   like race, correct?

15   A.    Yes.

16   Q.    Okay.  The sentence continues, "tracking of disciplinary

17   action against various EEO categories compared to the

18   proportional composition of said categories within SGS.  If

19   everything tracks relatively proportional, then this gives us a

20   statistical defense should we need one.  If things don't quite

21   add up like they should, it identifies areas where we can

22   improve (such as with racial sensitivity training, or perhaps a

23   review to identify why we're getting the numbers we are).

24   Either way, I think it will prove useful."

25           Do you recall reading that?

Petrella - Direct                                                    527

1    A.    I recall reading it during the deposition.

2    Q.    Okay.  But not before that, correct?

3    A.    That is correct.

4    Q.    Now, were you aware that the other recipient of Joey's

5    e-mail in his going forward plan actually did respond to the

6    e-mail?

7    A.    Yes, I'm aware she responded.

8    Q.    Okay.  I'd like to show Plaintiff's Exhibit 22.

9              THE COURT:  That's what we've been looking at, 22.

10             MR. FOX:  No, Your Honor, we were looking at 22A, I'm

11   sorry.

12             THE COURT:  All right.

13             MR. FOX:  22 is the "Beautiful-Thanks" e-mail.

14   BY MR. FOX:

15   Q.    Okay.  And you were copied on this e-mail, were you not?

16   A.    Yes, I was copied.

17   Q.    And you were copied on Friday, July 7, at 3:10 p.m.,

18   correct?

19   A.    Yes, that's correct.

20   Q.    Okay.  So you had a second opportunity -- and this

21   response includes Joey's original e-mail, correct?

22   A.    Yes.

23   Q.    So you had a second opportunity to review Joey's e-mail,

24   correct?

25   A.    After Lyn responded, I took it as her -- she took the

Petrella - Direct                                                    528

1   initiative to respond.  I wasn't going to reply.

2   Q.   Okay.  Well, you were the head of the EEO, right?

3   A.   I am.

4   Q.   Okay.  And Lyn is not, correct?

5   A.   Lyn is the HR business partner for SGS.

6   Q.   Okay.  So is it your testimony that when you saw that Lyn

7   had responded, you made a conscious decision not to read Joey's

8   e-mail, or don't you recall?

9   A.   When I saw that Lyn responded, I figured she was

10  responding to the e-mail and I didn't have to.

11  Q.   As head of EEO compliance for the company, were matters

12  involving the correlation of race with disciplinary action not

13  of great interest to you?

14       MS. DURR:  Object to the form of the question.  It

15  assumes --

16       THE COURT:  Overruled.

17       MS. DURR:  It's mischaracterizing the testimony.

18       THE COURT:  Overruled.  Overruled.

19       THE WITNESS:  It is important to me, but I was

20  unaware of what he was doing, as I didn't read the e-mail.

21  BY MR. FOX:

22  Q.   Okay.  Had you read the e-mail, would it have been

23  important to you?  I assume it would have been.

24  A.   Had I read the e-mail, yes, it's important.

25  Q.   Okay.  Now, at the time that Joey was put on a performance

Petrella - Direct                                                      529

1    improvement plan and final warning, you didn't know he had sent

2    this e-mail; isn't that correct?

3    A.    I don't recall the dates.

4    Q.    Well, he was put on the performance improvement plan on

5    August 15.  I'll represent that to you, if that helps you.

6    A.    Did you say August 15?

7    Q.    Yes.

8    A.    So I would have been aware of that.

9    Q.    I'm sorry, I didn't quite --

10   A.    So he was put on a performance plan on August 15?

11   Q.    Yes.

12   A.    Can you repeat your question?  I'm sorry.

13   Q.    At the time he was put on the performance improvement plan

14   and final warning, you didn't know that he had -- you didn't

15   know about this e-mail?

16   A.    This e-mail, no.

17   Q.    Did you understand that in reading what Joey described to

18   you in the paragraph "Going forward," that he was doing that in

19   order to help the company?

20   A.    I did not read this e-mail.

21   Q.    Okay.  And reading it now -- well, let me ask you this:

22   Did you ever read that e-mail before your deposition?

23   A.    With you?

24   Q.    Yes.

25   A.    No.

Petrella - Direct                                                    530

1    Q.    Okay.

2    A.    I first was aware of the e-mail when you and I met.

3    Q.    Okay.

4              THE COURT:  And just so we're crystal clear,

5    the "this e-mail" you're referring to is the one from Lyn

6    Salvo, or is it the one from the defendant -- plaintiff, or is

7    it both?

8              THE WITNESS:  So the one that -- the one that I'm

9    referring to that I did not read until my deposition is the one

10   dated July 7, 2017.

11             THE COURT:  Well, they're both 2017.

12             THE WITNESS:  Okay.  So I read the "Beautiful-Thanks"

13   prior to deposition.  I saw it when it came through, and that

14   was it.  I didn't -- I chose not to read -- I did not read the

15   e-mail prior to that.

16             THE COURT:  All right.

17             THE WITNESS:  The entire e-mail.

18             THE COURT:  All right.  So you were aware that Lyn

19   Salvo appears to have approved what was ever -- whatever was in

20   Mr. Rufo's e-mail.

21             THE WITNESS:  I don't believe she approved it, but

22   she did respond.

23             THE COURT:  Well, "Beautiful.  Thanks," you were

24   aware that she said that in response to it.

25             THE WITNESS:  Yes.

Petrella - Direct                                                      531

1              THE COURT:  All right.

2    BY MR. FOX:

3    Q.   Okay.  She didn't say in her e-mail:  Hey, hold up, Joey.

4    I don't think you should do this.  I don't want you looking at

5    any EEO data?

6              Nothing like that, correct?

7    A.   The e-mail does not state that.

8    Q.   And just returning to the, Joey's e-mail, beginning on the

9    second page of Exhibit 22A -- rather, at the bottom of the

10   page, 22A, it says, "Lastly" -- after "Going forward," "Lastly,

11   I am maintaining employee folders in the ER section of the HR

12   only SharePoint, as well as copies on my computer and backup

13   drive.

14             "Please reach out to me if there is something you

15   want included or if you envisioned a different format than what

16   was done."

17             That concluding request was directed at both you and

18   Ms. Salvo, correct?

19   A.   Yes.

20   Q.   And you did not reach out to him if you wanted something

21   else included or if you envisioned a different format, did you?

22   A.   I did not read the e-mail, so I did not respond to him.

23   Q.   And you, you don't have a -- you don't have a clue as to

24   what access he had to HR data?

25   A.   I don't.

Petrella - Direct                                                        532

1    Q.   Is that your testimony?  Okay.

2            Okay.  I'd like you to turn to Plaintiff's Exhibit

3    33.  So this is the report that got us where we are today.  Did

4    you ever review this report?

5    A.   August 8, 2017, report?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And when did you review it?

9    A.   Sometime on Tuesday, August 8.

10   Q.   Now, did you read this e-mail?

11   A.   Yes, I read this e-mail.

12   Q.   It wasn't too long to read?

13   A.   No.

14   Q.   Now -- now, you didn't actually read the -- it's your

15   testimony you didn't actually read what was attached to the

16   e-mail; isn't that right?

17   A.   This e-mail itself on the screen?

18   Q.   What was attached to the e-mail, the spreadsheet.

19   A.   The spreadsheet was attached to the e-mail, the violations

20   spreadsheet.

21   Q.   And you didn't, you didn't actually read that either, did

22   you?

23   A.   I opened it.

24   Q.   You opened it, but you didn't read it, correct?  That's

25   what you said in your deposition.

Petrella - Direct                                                      533

1   A.    I reviewed the spreadsheet.

2   Q.    You, you skimmed the spreadsheet, correct?

3   A.    I opened the spreadsheet and looked at it, yes.

4   Q.    Okay.  But you didn't, you didn't read the e-mail.  You

5   just skimmed it.  Wasn't that your testimony?

6   A.    I reviewed the e-mail, and I reviewed the spreadsheet.

7   Q.    Okay.  And I'm just asking you, you just skimmed the

8   e-mail, correct?

9   A.    Yes.  I skimmed the e-mail.  I opened up the spreadsheet

10  and reviewed the spreadsheet.

11  Q.    Why didn't you read the e-mail in full?

12  A.    Out loud?

13  Q.    No, no, I'm sorry, why didn't you at the time read the

14  e-mail in full?

15  A.    Oh, I'm sorry.  I thought you were asking me a question.

16        I opened the spreadsheet first, and I read the e-mail

17  and saw that he was tracking EEO, saw there's a sheet for the

18  EEO.  I opened up the spreadsheet and saw what he was tracking.

19  Q.    Okay.  Now, in this "Going forward" e-mail we looked at a

20  few moments ago, did Joey adequately describe what he was doing

21  in the spreadsheet that he attached to this e-mail Exhibit 33?

22        MS. DURR:  Objection.  Calls for speculation.

23        THE COURT:  I'm going to sustain the objection.

24  BY MR. FOX:

25  Q.    Well, let me ask you this:  Based upon your knowledge,

Petrella - Direct                                                    534

1    since this has been the subject of criticism of Joey, did he do

2    anything in preparing the spreadsheet that he did not make

3    clear in his earlier e-mail?

4              MS. DURR:  Same objection.

5              THE COURT:  No, that's a little bit different.

6    Overruled.

7              THE WITNESS:  I'm sorry, can you repeat what you were

8    asking me?

9              MR. FOX:  I'll let the court reporter read it back to

10   you, please.

11                        (Question read.)

12             THE WITNESS:  Yes.

13   BY MR. FOX:

14   Q.   Okay.  And what was, what was that?

15   A.   So the prior e-mail, he states that it's not, it's not

16   valid information.  So that is true, but he also did not

17   conduct the statistical analysis in a proper way.

18   Q.   Okay.  You don't, you don't know if the data in his report

19   is inaccurate in any way, do you?

20   A.   It is inaccurate.

21   Q.   I'd like to show clip 79.

22             (Video excerpt played as follows:)

23   "Q.  Did Joey adequately describe what he was doing in the

24   spreadsheet that he attached to this e-mail?

25   A.   Yes.

Petrella - Direct                                                  535

1   Q.   And did, did -- in the e-mail, did he state any

2   controversial conclusions?

3   A.   In the -- for the summary e-mail?  No."

4            (End of video excerpt.)

5            MR. FOX:  I'm sorry, the next question and answer,

6   please?

7            MR. KATZ:  You have to read it.

8   BY MR. FOX:

9   Q.   Okay.  And let me pick up further, at line 10 -- or line

10  12:

11           "Question:  Did he say anything in the e-mail that's

12  inaccurate?

13           "Answer:  Compared to the spreadsheet he provided?

14           "Question:  I'm just saying in the description of the

15  spreadsheet, is there anything in there that's inaccurate or

16  wrong with which you take issue?

17           "Answer:  So if you're asking me if I object to what

18  he's written and if I disagree with what he wrote in the

19  e-mail?

20           "Question:  Yeah.  Do you disagree or take issue with

21  anything he said there, or do you think anything he said there

22  is inaccurate?

23           "Answer:  I don't know if it's inaccurate, what the

24  data -- if the data is inaccurate, but what he wrote seems

25  fine."

Petrella - Direct                                                     536

1           THE COURT:  Do you remember testifying to that?

2           THE WITNESS:  Yes.

3           THE COURT:  All right.

4    BY MR. FOX:

5    Q.   Now, let me ask you this:  You didn't review the

6    information that Joey supplied suggesting potential racial

7    disparities that are contained in the spreadsheet; isn't that

8    right?

9    A.   There was a team that reviewed the data.

10   Q.   I was asking you if you reviewed it.

11   A.   I -- after getting -- after reviewing the fact that it was

12   inaccurate, I did not conduct any additional statistical

13   analysis.

14   Q.   Okay.  You didn't conduct any analysis, correct?

15   A.   I personally did not.

16   Q.   I'd like to show you Plaintiff's Exhibit 34.  If you look

17   at this page, this is the EEO tab in the spreadsheet that Joey

18   supplied you, correct?

19   A.   Yes.

20   Q.   As the head of EEO compliance, correct?

21           Now, did you look at -- did you look at this page?

22   A.   I saw this page, yes.

23   Q.   Okay.  And did you look at the key identifying the nature

24   of the information contained here, the legend:  "Greatly

25   over-represented" and "Greatly under-represented"?

Petrella - Direct                                                    537

1    A.    I see that there, yes.

2    Q.    When you saw that data, what did you do with it?

3    A.    I'm not sure I'm allowed to answer the question.

4    Q.    Well, you, you called, you called Lyn Salvo; is that

5    correct?

6    A.    I did call Lyn.

7    Q.    And was the nature of your call to Lyn Salvo to alert her

8    to the fact that Joey had uncovered potential discrimination

9    going on with the SGS installers?

10   A.    Absolutely not.

11   Q.    You didn't, you didn't mention to her the specific data in

12   the chart and the legend showing "Greatly over-represented,"

13   "Greatly under-represented"?  You didn't discuss any of that

14   with her?

15   A.    I called Lyn to ask Lyn if she authorized Joey to put this

16   spreadsheet in the -- put this into the spreadsheet.

17   Q.    Okay.  And did she reveal to you that -- at that point

18   that she had, she had approved it, sent the "Beautiful-Thanks"

19   e-mail?

20   A.    She told me she did not authorize it.

21   Q.    Okay.  Now, you would agree with me that the data in this

22   spreadsheet in retrospect as you sit here now, greatly

23   overrepresented and greatly underrepresented and the

24   corresponding numbers, would have been significant to you as

25   head of EEO compliance, correct?

Petrella - Direct                                                    538

1   A.   This information would have been significant if it was

2   properly -- completed properly, yes.

3   Q.   Okay.  Okay.  I'd like to show you Plaintiff's Exhibit 23.

4        23.  Just put the top of the page indicating who the

5   recipients are.

6        Okay.  This is an e-mail that you sent to Michael

7   Garcia, correct?

8   A.   That is correct.

9        MR. FOX:  And just for reference, so we can see the

10  rest of the page, can we scroll down a little bit?

11  BY MR FOX:

12  Q.   So this is an e-mail where you're forwarding Joey's

13  violations and determinations tracking e-mail and the

14  accompanying spreadsheet and the EEO data, correct?

15  A.   Yes.

16  Q.   Okay.  Let's go back to the top of the page and see what

17  you said again.  You said to Mr. Garcia, "This is what we

18  discussed today."

19       I assume you discussed with Mr. Garcia the

20  spreadsheet and EEO data?

21  A.   I called Michael to ask him if he authorized Joey to do

22  this as well.

23  Q.   Okay.  And you said further, "Although I appreciate his

24  initiative."  Let's just stop there.  You acknowledge that you

25  appreciated Joey had an initiative in supplying to the company

Petrella - Direct                                               539

1   the information he supplied alerting them to the prospects of

2   potential discrimination going on in the field with some 660

3   employees?

4            MS. DURR:  Objection to the form of the question.

5            THE COURT:  Well, I'm going to permit it.  Overruled.

6            THE WITNESS:  We don't have 660 employees.

7   BY MR. FOX:

8   Q.   I'm sorry, in the field.  The SGS installers.

9   A.   That's correct.  We did not have 666 employees at the time

10  in July in the field.

11  Q.   Oh, I'm sorry, I may have misstated it by a bit.  How many

12  employees did you have?

13  A.   Of -- so are you asking me about SGS total or installers?

14  Q.   Installers.

15  A.   In July of 2017?

16  Q.   Yes.

17  A.   Roughly 300.

18  Q.   Okay.  And there were other employees, though, in the SGS

19  group, correct?

20  A.   Yes.

21  Q.   There were another 300 or so, correct?

22  A.   I don't believe that number is correct.

23  Q.   Do you -- when -- when did you last look at this

24  information?

25  A.   Between the deposition and today.

Petrella - Direct                                                    540

1    Q.    Okay.  And what do you think the number is?

2    A.    About 332 head count for SGS for July.

3    Q.    Okay.  And what do you base that on?  What information did

4    you examine?

5    A.    The payroll system that we utilize.

6    Q.    Okay.  And who asked you to do that?

7    A.    Pardon me?

8    Q.    Who asked you to do that?

9    A.    No, I asked if I could have a -- I receive a head count

10   report monthly, and I looked at the head count report.

11   Q.    Okay.  Well, let me return to my original question.

12   Regardless of the number of SGS installers, you appreciated his

13   initiative and acknowledged it in your e-mail to Michael

14   Garcia, correct?

15   A.    I appreciated his initiative, yes.

16   Q.    Okay.  And you said further, "disciplinary actions are

17   focused on performance, not EEO information.  Now that I have

18   this information, I will look into this."

19         Those are your words, correct?

20   A.    Yes.

21   Q.    But you didn't do anything to look into it personally, did

22   you?

23   A.    That's not true.

24         MS. DURR:  Can I request a sidebar, Your Honor?

25         THE COURT:  Yes.

Petrella - Direct                                                         541

1                   (Bench conference on the record.)

2                   MS. DURR:  Defendants need to make a --

3                   THE COURT:  I'm sorry, I can't hear you.

4                   MS. DURR:  We need to make an offer of proof here

5      that if she were allowed to testify about her communication

6      with counsel, that this --

7                   MR. FOX:  I can't hear.

8                   THE COURT:  I'm not going to even address that issue.

9      This was -- you proceeded at your own risk by staying in the

10     case.  I've ruled on this issue.  It's out.

11                  MS. DURR:  Well, for the record, we'd like to make an

12     offer of proof then.

13                  THE COURT:  I'm not going to waste the jury's time

14     right now.  Let's go back.

15                  (End of bench conference.)

16     BY MR. FOX:

17     Q.   Okay.  Let me just go back to the question, maybe rephrase

18     it to make it easier for you.  You said, "Now that I have this

19     information, I will look into this."

20                  You personally did not further evaluate the

21     quantitative data on this issue, did you?

22     A.   I personally did not.  I outsourced it.

23                  MR. FOX:  I'd like to show clip 25.

24                  (Video excerpt played as follows:)

25     "Q.  Did you evaluate the quantitative data on that issue?

Petrella - Direct                                             542

1    A.   No."

2              (End of video excerpt.)

3    BY MR. FOX:

4    Q.   Okay.  Do you recall that testimony?

5    A.   Yes.

6    Q.   And you acknowledge that that's something that would raise

7    red flags, correct?

8    A.   What is something that would raise red flags?

9    Q.   What Joey uncovered?

10   A.   If the data was accurate, it could.

11   Q.   Okay.  Now, did you or anyone in HR generate, not just

12   you, anyone in HR generate any sort of quantitative analysis to

13   address that issue?

14   A.   We do run affirmative action reports annually.

15             THE COURT:  That did not respond to the question.

16             THE WITNESS:  What was the question again?  I'm

17   sorry.

18   BY MR. FOX:

19   Q.   My question is neither you nor anyone in HR generated any

20   sort of quantitative analysis to address that issue?

21   A.   Specific to the spreadsheet that Joey supplied?

22             THE COURT:  That's the question he's asking.

23             THE WITNESS:  So no, I did not run any additional

24   data.

25   BY MR. FOX:

Petrella - Direct                                                    543

1   Q.   And there could still be discrimination occurring to this

2   day, correct?

3             MS. DURR:  Object to the form of the question.

4             THE COURT:  Well, at this point, I'm going to sustain

5   the objection because it -- I'm sustaining the objection.

6   BY MR. FOX:

7   Q.   Okay.  You don't know what's happening in the field to

8   this day, do you, with regard to discrimination and discipline?

9   A.   Like I said earlier, we do run affirmative action reports

10  annually, so we look at that data.  There was nothing outlying

11  that says we have any type of discrimination.

12  Q.   And again, just so the record is clear, whatever these

13  affirmative action reports are, no quantitative analysis --

14            THE COURT:  Now, that's been asked and answered.

15  Let's move on.

16            MR. FOX:  Okay.  Fair enough, Your Honor.

17  BY MR. FOX:

18  Q.   Why is it important to make sure that in carrying out the

19  company's disciplinary activity, that it doesn't discriminate

20  against African-American persons or persons who are

21  multiracial?

22  A.   Race doesn't really make a difference in regards to making

23  sure that we are treating all employees fair and consistent.

24  Q.   I'm sorry, you said race doesn't make a difference?

25  A.   It shouldn't.

Petrella - Direct                                                    544

1    Q.    Okay.  If there were discrimination occurring, that could

2    really expose the company to genuine risk, could it not?

3    A.    If there was discrimination occurring?  Well, it could.

4    Q.    Let me ask you this:  Do you plan on doing any kind of

5    quantitative analysis of this issue that Joey pointed out at

6    any point in the future?

7    A.    Besides the affirmative action and the training?  I'm not

8    sure of the time we would do it.

9              MR. FOX:  Okay.  I'd like to show clip 35, please.

10             (Video excerpt played as follows:)

11   "Q.  Do you plan to do any such analysis at any point in the

12   future?

13   A.  I can't answer that."

14             (End of video excerpt.)

15   BY MR. FOX:

16   Q.    Okay.  Do you recall that testimony?

17   A.    Um-hum.

18   Q.    Now, I'd like to show you Plaintiff's Exhibit 35.  That's

19   another e-mail exchange over the e-mails sent by Joey and the

20   company spreadsheet.  So this is another e-mail exchange over

21   the e-mail sent by Joey and the spreadsheet on August 8, 2017,

22   correct?

23   A.    Yes.  Yes.

24   Q.    Okay.  And in here, you're asking Jill to call either

25   yourself or Lyn Salvo, correct?

Petrella - Direct                                                                545

1    A.    Yes, that's correct.

2    Q.    And you did have a call with them about this, correct?

3    A.    I don't know if it was a call or an e-mail.  I know he

4    spoke with one.

5    Q.    Okay.  And you discussed Joey's report at that point in

6    time, correct?

7    A.    What I discussed with Lyn was I asked her if she

8    authorized Joey to do the report.

9    Q.    Okay.  And you didn't go beyond that topic in the

10   conversation?

11   A.    Not that I recall.

12   Q.    Now, after Joey supplied the spreadsheet to the company

13   and to you, he was stripped of the duty of continuing to supply

14   that report on a monthly basis, correct?

15   A.    I don't know.

16   Q.    Did you not say it was taken back from him?

17   A.    Yeah, that's true.  He was no longer doing it.

18   Q.    And who made that decision?

19   A.    The decision, I don't know.  I believe it was Michael

20   Garcia, but that's -- from -- sitting here today, I don't know.

21   Q.    A couple months ago, you said, "I remember Michael Garcia

22   saying he's no longer going to do that."

23         Does that refresh your recollection?

24   A.    It sounds correct.

25   Q.    Let's go to Plaintiff's Exhibit 36, a few questions about

Petrella - Direct                                                    546

1    the performance improvement plan and written warning.

2              THE COURT:  Is there any objection to 36?

3              MS. DURR:  36?  No objection to 36.

4              THE COURT:  All right.  It's in.

5              (Plaintiff's Exhibit No. 36 was received in

6    evidence.)

7              MR. FOX:  I'm sorry, I have the wrong exhibit.  Let's

8    move on.

9    BY MR. FOX:

10   Q.   Did you see drafts of the PIP?  Did you see drafts of the

11   performance improvement plan?

12   A.   Yes.

13   Q.   Okay.  And you, in fact, were asked to supply the

14   information in the performance improvement plan relating to

15   Joey's submission of the EEO data, correct?

16   A.   That's correct.

17   Q.   And you actually supplied that information that was

18   included in the final PIP, correct?

19   A.   Yes.

20   Q.   Okay.  Rather than look through all the drafts, why don't

21   we just look at the final PIP and have you confirm that.

22              So if we could put up --

23              THE COURT:  44.

24              MR. FOX:  -- Plaintiff's 44?

25              If we could go to "Judgement/Decision Making.  In

Petrella - Direct                                          547

1    addition, you were asked to track disciplinary actions," and

2    the part that follows that?  And then the sentences following

3    that.

4    BY MR. FOX:

5    Q.    Did you -- is that the language that you supplied for the

6    PIP, Ms. Petrella?

7    A.    That is, yes.

8    Q.    And when you referred to "some additional data" in there,

9    you're referring to data showing a potential correlation

10   between race and disciplinary action by the company, correct?

11   A.    I wouldn't represent it that way, but the additional data

12   was the race he added.

13   Q.    Okay.  And no one was happy about that at the company,

14   correct?

15   A.    It wasn't that we were unhappy about the -- by him adding

16   it.  We were unhappy that it wasn't done properly.

17   Q.    Okay.  Why didn't they just tell him not to do it in the

18   future?  Why did they have to put him on a PIP for that?

19   A.    He wasn't put on a PIP specifically for this issue.

20   Q.    Why wasn't he just given a warning and -- let me ask you

21   this:  Based upon your personal dealings with Mr. Rufo, do you

22   think he was the kind of employee who would be responsive to

23   constructive criticism or direction?

24   A.    I really never dealt with Joey all that often.

25   Q.    Okay.  Well, you offered to mentor him, did you not?

Petrella - Direct                                                        548

1    A.    Over e-mail, yes.

2    Q.    So you don't know?

3    A.    I met Joey one time.  I can't answer his character.

4    Q.    Does the company not have a process for documenting --

5    move to another subject, the end of this, if there was an end.

6              Does the company not have a process for documenting

7    removal from a performance improvement plan?

8    A.    The company does have a process.

9    Q.    And what is that process?

10   A.    Typically, the manager and the HR business partner sit

11   down with the employee who's on the performance improvement

12   plan and talk about what they were put on the plan for, what

13   they did exceptional on the plan, whether they were positive or

14   negative on the plan, and then they discuss whether they're

15   removing someone from the plan or terminating employment, if

16   that's what the end result of the PIP was.

17   Q.    And then what else do they do?

18             Let me help you.  They complete a PIP summary form,

19   don't they?

20   A.    They complete a summary typically.

21   Q.    And can you describe for me -- describe to the jury the

22   PIP summary form?

23   A.    Yeah.  It's pretty much what I just described as the

24   meeting.  They would then summarize what the, what the employee

25   did well on the PIP or what they need to continue to work on.

```
Petrella - Direct                                          549
```

1    Q.   And was such a summary form filled out for Joey?

2    A.   Not that I'm aware of.

3    Q.   Why not?

4    A.   I don't know.

5         MR. FOX:  No further questions.  Thank you.

6         THE COURT:  All right.  I think this is a good time

7    to take the morning break, and we'll be on break for 15

8    minutes.

9         (Recess from 11:19 a.m., until 11:36 a.m.)

10                        (Jury out.)

11        THE COURT:  Is there an issue we need to discuss, and

12   should the witness be here for this discussion?

13        MR. FOX:  There is an issue, Your Honor, I'd like to

14   address now.

15        THE COURT:  Do we need the witness here for this?

16        MR. FOX:  It would probably be better without the

17   witness here.

18        THE COURT:  All right.  You'll need to step back.

19                   (Witness stood down.)

20        MR. FOX:  May I proceed, Your Honor?

21        THE COURT:  Yes, sir.

22        MR. FOX:  Your Honor, the last witness --

23        THE COURT:  At the lectern, please.

24        MR. FOX:  Certainly.

25        THE COURT:  The reason -- not only that's just the

Petrella - Direct                                              550

1    practice in this court, but that's where the microphone is.

2    All right.

3              MR. FOX:  I understand.  I should know by now.

4              The last witness testified that analysis was

5    outsourced.  Your Honor, I think that's a violation of your

6    directive.

7              THE COURT:  No.  I mean, it was a clever way of

8    trying to get that in, but that's what it is, all right?

9    There'll be no more information about that because, again, as

10   we said earlier in a previous ruling, counsel can't act as

11   counsel in a court of law and also be a witness, and so we --

12   that's an issue that's passed, all right?

13             MR. FOX:  All right.

14             THE COURT:  That was the whole issue?

15             MR. FOX:  That was the whole issue, Your Honor, yes.

16             THE COURT:  All right.  Let's get the witness and

17   jury back in.

18             MS. DURR:  I'm sorry, excuse me.  The defense also

19   had two issues.

20             THE COURT:  What are your issues?

21             MS. DURR:  Okay.  Which is, so in response to the

22   video clip that plaintiff's counsel played regarding asking

23   Ms. Petrella if she was aware of the data, if the data was

24   inaccurate, they played one portion of the clip, and then

25   another portion of the clip -- deposition, she was asked that

Petrella - Direct                                                       551

1    question again -- and here's the deposition transcript, Your

2    Honor.  I'm not sure if you have them.

3                THE COURT:  Well, you know, the only purpose for

4    these clips is possible impeachment.  They're not going in as

5    evidence in this case.

6                MS. DURR:  But it does go to -- they tried to impeach

7    the witness by playing that clip, and that's unfair to the

8    jury.  They should be able to hear her other testimony where

9    she said --

10               THE COURT:  Well, that's for you to bring out.

11               MS. DURR:  And that's what I wanted to bring out,

12   make sure that it was clear.  So at page 24 --

13               THE COURT:  I don't need this discussion now.

14               MS. DURR:  Well, it's going to -- I'm sorry, Your

15   Honor.

16               THE COURT:  This is the direct examination of

17   Ms. Petrella.  When you go into cross, you can do what you need

18   to do in cross.  Let's finish the direct examination.

19               MS. DURR:  I'm sorry, Your Honor.  Because this issue

20   is so important, I want to just make sure that it's on the

21   record.  So the question that was asked by Mr. Fox at the

22   deposition --

23               THE COURT:  I'm not going to waste the jury's time.

24   When you put -- when you cross-examine the witness, you may go

25   to that portion of the deposition and play it, all right?

Petrella - Direct                                                    552

1            MS. DURR:  But then for the record -- and I -- she

2    asked, "What was the basis for your belief" --

3            THE COURT:  All right.  Let's bring the jury in.

4    You're not listening to me.  I said you will do this when it

5    comes time to do it.

6            What's the other issue that you want to raise?

7            MS. DURR:  And the other issue was, Your Honor, that

8    you made a statement in front of the jury that you -- to the

9    effect of that Lyn Salvo approved the, the request to do that

10   EEO metric, and we just respectfully request that some sort of

11   instruction be --

12           THE COURT:  I'm not going to bother doing that.  The

13   document speaks for itself.  That was a question, not a

14   statement I asked the witness, because she was not being

15   responsive in answering.

16           Let's bring the jury in.

17           THE COURT SECURITY OFFICER:  Yes, ma'am.

18                        (Jury present.)

19           THE COURT:  All right.  Have a seat, ladies and

20   gentlemen.

21           We'll need to bring the witness back in.

22           All right.  Mr. Fox, you've finished with your

23   examination, correct?

24           MR. FOX:  That's correct, Your Honor.

25           THE COURT:  All right.  We're starting the cross.

Petrella - Cross                                                      553

1    Ms. Durr?

2                        CROSS-EXAMINATION

3    BY MS. DURR:

4    Q.   Almost afternoon.  Good morning, Ms. Petrella.  I just

5    have some questions for you.  Could you, could you explain to

6    the jury when you received Ms. -- when you received the

7    August 8, 2017, e-mail from Mr. Rufo, which -- and that had

8    along with it attached the spreadsheet, what reaction did you

9    have to it?

10   A.   My first reaction?

11   Q.   Yes.

12   A.   I was concerned by the information he added because I

13   didn't ask him to do that.

14            MS. DURR:  Okay.  And can you put that on the --

15   August 23?  Okay.  Could you put up Plaintiff's Exhibit 23, the

16   bottom portion?

17   BY MS. DURR:

18   Q.   Okay.  Just explain to the jury, why was it -- why did you

19   have a concern that he had done something that you had not

20   asked him to do?

21   A.   My first concern was that it wasn't done with

22   client-attorney privilege.

23   Q.   Why is that a concern?

24   A.   Well, because as a, as a company, you want to be able to

25   review any processes or procedures that you're doing with an

Petrella - Cross                                                    554

1   attorney or someone with the area of expertise to say:  Let's

2   do a self-audit, let's dig into the information deeper to look

3   to see if we are doing things wrong or right and make some

4   areas of improvement.

5            It's important to get legal involved because they

6   have the expertise and they can give you the guidance as to how

7   to resolve any issues that there may be.

8   Q.   And tell the jury, in your role as EEO compliance officer,

9   do you have experience with, with other types of statistical

10  analysis?

11  A.   So typically when we run affirmative action plans or if we

12  have a reduction in force, if we have a position elimination,

13  we will look at statistical analysis when it comes to age,

14  gender, and race to make sure that we are looking -- making

15  sure we are not treating anyone disparately or inappropriately.

16  Q.   Okay.  And do you actually do those types of analyses in

17  your role as EEO compliance officer?

18  A.   I will put them together, but I always give them to legal

19  to review.

20  Q.   Okay.  And, and, I'm sorry, you said disparate impact

21  analysis.  I'm sorry, could you just explain to the jury what

22  you meant by that?

23  A.   Sure.  So if there is a desperate impact --

24  Q.   Disparate?

25  A.   Yeah.  So what that means is that there's a larger range

Petrella - Cross                                                              555

1    of people in protected classes that are being terminated or

2    demoted or, or whatever, more often than people that are not in

3    a minority or protected class.

4    Q.   I heard you say the self-audit, but could you explain why

5    you believe that the self-audits that a company does need to be

6    done under legal privilege?  What's the purpose of that?

7    A.   So the purpose of a self-audit is to make sure that --

8    while under legal privilege, is to make sure that the company

9    is not exposing itself to the public when they have the

10   opportunity to do that with a lawyer in confidence.  So we want

11   to look internally to make sure that there's practices or

12   procedures that we're doing that we can improve on and we're

13   doing it under legal counsel so we can do that fairly and have

14   open communication and correspondence without that information

15   getting out to the public.

16   Q.   Okay.  Did you review the August 8, 2017, e-mail, cover

17   e-mail that Mr. Rufo sent to you?  And it's up on the -- oh,

18   I'm sorry, it's not on the screen anymore.  And it's

19   Plaintiff's Exhibit 23, the second portion -- the bottom

20   portion, I should say.

21   A.   Yes.  I glanced at it, and then I --

22   Q.   Okay.

23   A.   I looked at it, yes.

24   Q.   You did?  Well, and then I think you also testified that

25   you also opened up the spreadsheet?

Petrella - Cross                                                      556

1   A.   Yes, I did.

2   Q.   Okay.  Did you think that Mr. Rufo was reporting that he

3   thought there was potential intentional discrimination going on

4   when you looked at that spreadsheet or the e-mail?

5           MR. FOX:  I'm going to object.  It calls for

6   speculation as to what Mr. Rufo was thinking.

7           THE COURT:  Sustained.

8           MS. DURR:  I was only asking if she thought.  That

9   was the question.

10          THE COURT:  Rephrase the question.  Let me hear it

11  again.

12          MS. DURR:  I asked did Ms. Petrella think that

13  Mr. Rufo was reporting, was reporting that he thought there was

14  potential intentional discrimination going on.

15          MR. FOX:  Objection.

16          THE COURT:  Yeah, I'm sustaining the objection.

17  BY MS. DURR:

18  Q.   What did you think of Mr. Rufo's report that he provided?

19  A.   I thought it was inaccurate.

20  Q.   And why did you think that?

21  A.   The head count was, it was off.

22  Q.   Okay.

23  A.   There were --

24  Q.   So let's just pause, pause there for a minute here.

25  A.   Okay.

Petrella - Cross                                                          557

1    Q.    Let's go to the spreadsheet itself, which -- and I'm

2    sorry, I've forgotten which number it is, I've got so many

3    different copies of it.  Is it 33?  It's 34A.

4            Just explain to the jury what you felt was wrong

5    about this.

6    A.    So besides the head count being wrong --

7    Q.    Let's pause there.  What's wrong with the head count?

8    A.    It's, it says a total of 540.

9    Q.    And what's wrong with that amount?

10   A.    It was too high.

11   Q.    Okay.

12   A.    But my biggest concern when I looked at this was that

13   there were a number of --

14           MS. DURR:  Can you move it up, or the entire thing?

15   Can you show the entire thing?

16           THE WITNESS:  It mentions -- he writes this only

17   includes employees who voluntary self-identified.

18   BY MS. DURR:

19   Q.    Is that in the Note section?

20   A.    Yes.

21           MS. DURR:  Can you blow that up?

22   BY MS. DURR:

23   Q.    Why was that important to you?  Why did that strike you as

24   making this report wrong?

25   A.    Because not all employees told us what their race or

Petrella - Cross                                                    558

1    gender or whatever would be.

2    Q.   So do you have a -- so did that help you reach a

3    conclusion as to whether you thought that the data was wrong?

4    A.   Yeah.  I mean, it doesn't represent the entire workforce.

5    Q.   Okay.  Now, Mr. Fox played in a clip a portion of your

6    testimony where you testified -- I believe he asked you if you

7    thought that the data that he put in the spreadsheet was

8    inaccurate, and do you remember your response in that clip?

9    A.   No.

10   Q.   Okay.  Well, was -- I'd like to go and play another

11   portion of that deposition, page 24, lines 11 through 13.

12         Oh, I'm sorry, we're just going to read it.  You were

13   asked the question at your deposition:  "Were you aware if any

14   of the data he put in the spreadsheet was inaccurate?"

15         And what was your answer?

16   A.   "Yes."

17   Q.   Okay.  Was that true and accurate at that time you gave

18   your deposition --

19   A.   Yeah.

20   Q.   -- that that was your belief?

21         To be clear, did you ever give Mr. Rufo authorization

22   to do the EEO report that he submitted?

23   A.   No.

24   Q.   Okay.  To your knowledge, do you know if anybody within

25   Aclara ever gave Mr. Rufo the authorization to do that report?

Petrella - Cross                                                      559

1   A.   I know no one at Aclara gave him that authorization.

2   Q.   Okay.  And why -- you testified that the company has not

3   done its own follow-up analysis, right?  You testified to that?

4   A.   I'm sorry, can you say that again?

5   Q.   You testified, I believe, under questioning by Mr. Fox

6   that the company has not done its own statistical analysis?

7            MR. FOX:  Objection, Your Honor.

8            THE COURT:  Well, it's going to call for a yes-or-no

9   answer.

10           MR. FOX:  Okay.

11           THE WITNESS:  The company has not.

12  BY MS. DURR:

13  Q.   Okay.  Could you explain to the jury why the company has

14  not done its own statistical analysis?

15           MR. FOX:  Your Honor, may I approach the bench?

16           THE COURT:  Yes.  I think you'd better.

17           (Bench conference on the record.)

18           THE COURT:  Now, where do you -- what answer do you

19  think she's going to give?

20           MS. DURR:  She's going to explain her belief as to

21  why the company hasn't done it.

22           THE COURT:  What is she going to say?

23           MS. DURR:  She's going to say that she thinks that

24  the number --

25           THE COURT:  I can't hear you.

Petrella - Cross                                                      560

1              MS. DURR:  That she's going to say that the EEO

2     reports show -- that they've already got other EEO reports,

3     that she thought that Mr. Rufo's methodology was flawed, so

4     they didn't put any stock into it, and the company was already

5     going to be addressing the issues of discrimination with the

6     supervisors.  Those are not legal connotations.

7              THE COURT:  All right.  That's not a problem.  That's

8     not a problem.

9              MR. FOX:  Thank you.

10             (End of bench conference.)

11    BY MS. DURR:

12    Q.   Sorry for the break there.  So again, would you please

13    explain to the jury why the company did not do its own

14    statistical analysis after you received this report from

15    Mr. Rufo?

16    A.   So we knew that the data was inaccurate, didn't feel we

17    needed to go into conducting additional statistical analysis

18    when the original data was inaccurate.

19    Q.   Okay.  Does the company itself do any other types of

20    analyses that would touch on terminations if terminations are

21    possibly being -- strike that.

22             Does the company do any other type of analyses where

23    you're recording if people of different races are being

24    disciplined at a higher rate than not -- than other races?

25    A.   So Aclara is a governmental contractor, so we do annually

Petrella - Cross                                                        561

1    have to review the statistical data of race, gender, and --

2    race, gender, and age of employees for terminations.

3    Q.   How is that done?  I mean, not -- I don't mean the process

4    itself, but if you were to look -- what is this report called,

5    first of all?

6    A.   It's an affirmative action report.

7    Q.   Okay.  Is it called an AAP sometimes?

8    A.   Affirmative action plan?

9    Q.   Affirmative action report?

10        Okay.  What information with respect to treatment of

11   people by races in their terminations or discipline are put on

12   that report that you have?

13   A.   We look at voluntary termination, involuntary termination.

14   Q.   Okay.  What's the difference?  I'm sorry, what's the

15   difference between the two?

16   A.   So voluntary termination is if they were to resign or quit

17   the job, three days of no-show.  An involuntary termination

18   would be something that they violated a policy, it was a

19   reduction in force, something that they don't, they don't leave

20   the job on their own.

21   Q.   Okay.  And does the affirmative action report that is run

22   break down number of voluntary terminations and involuntary

23   terminations by race?

24   A.   Yes.

25        MR. FOX:  Your Honor, I'm going to object.  None of

Petrella - Cross                                                            562

1   these documents have been produced in this case, and she's

2   purporting to question her about a document that we've never

3   seen --

4            THE COURT:  Well, we're also not talking about

5   terminations in this case.  This is a disciplinary action, so I

6   think this is a bit far afield.  I'm going to sustain the

7   objection.

8   BY MS. DURR:

9   Q.   To your knowledge, did the report that Mr. Rufo tried

10  to -- that he did, was he also tracking terminations?

11  A.   He was, yes.

12           MS. DURR:  Okay.  In light of that --

13           THE COURT:  All right.  I'll allow it then.  You've

14  tied it up.

15  BY MS. DURR:

16  Q.   Okay.  So again, the affirmative action report, that's

17  within your purview as EEO compliance officer?

18  A.   Yes.

19  Q.   Okay.  When it tracks terminations by voluntary and

20  involuntary, does it also track how many African Americans or

21  Asian Americans and white people or whatever, people of races,

22  is that also tracked on that report for you?

23  A.   Yes.

24           MR. FOX:  Again, Your Honor, I'm just objecting for

25  the record.  None of these reports have been produced to us,

Petrella - Cross                                                       563

1    and I just want to note the objection for the record.

2              THE COURT:  All right, all right.

3    BY MS. DURR:

4    Q.   In addition, do you know if the company takes any other

5    measures to try and address potential discrimination within the

6    company?

7    A.   Well, I know we have company policies when we conduct

8    training.

9    Q.   Okay.  And what is that -- what does that consist of?

10   A.   So we have antiharassment training, ethics training.

11   There are EEO trainings that take place.

12   Q.   Okay.  And are those trainings given to all employees?

13   A.   As far as I'm aware, yes.

14   Q.   Okay.  Have you received those trainings?

15   A.   Yes.

16   Q.   Okay.  Did you have those trainings at the time that

17   Mr. Rufo worked for the company?

18   A.   I believe so.

19   Q.   Okay.  At the time that Mr. Rufo worked for the company,

20   were -- did you know if it was against company policy to

21   retaliate against somebody who had made a report of

22   discrimination?

23   A.   It's always against company policy to retaliate.

24   Q.   Okay.  But the question was were you aware?

25   A.   Oh, I was aware, yes.

Petrella - Cross                                                        564

1   Q.   Okay.  Okay.  I want to turn your attention real

2   quickly -- well, I want to address one thing:  Mr. Fox brought

3   up that you offered to do mentoring for Mr. Rufo?

4   A.   Yes.

5   Q.   Okay.  What was that mentoring about?

6   A.   I believe I just mentioned to Joey that I was -- I really

7   liked employee relations, and if he was interested, that I

8   could train him more on that.

9   Q.   Okay.  Did you provide him with mentoring?

10  A.   No.

11  Q.   And why not?

12  A.   Joey said he was going through some training with Sherm

13  and didn't -- and never responded back to me.

14  Q.   Okay.  Now, I want to turn your attention to the actual --

15  the written warning and performance improvement plan.  That's

16  Exhibit --

17          THE COURT:  44.

18  BY MS. DURR:

19  Q.   -- 44.

20          Would you just, please, explain to the jury what role

21  you played in this report, in this one?

22  A.   What role did I play?

23  Q.   Yeah.

24  A.   I helped enter information into the Judgement/Decision

25  Making section.

Petrella - Cross                                                    565

1              MS. DURR:  Okay.  If you could blow that up?

2    BY MS. DURR:

3    Q.   What portion did you enter?

4    A.   I wrote, "In addition, you were asked to track

5    disciplinary actions and log them onto a spreadsheet.  You

6    provided some additional data that was not instructed for you

7    to provide.  Although the data may seem important for us to

8    track, the information was inaccurate and not completed by

9    someone in the statistical analysis field of expertise.  You

10   should only perform the duties requested of you."

11   Q.   Okay.  And that was under the Judgement/Decision Making?

12            So would you please explain to the jury why you wrote

13   that PIP?  What was your concern?

14   A.   My first concern was that it was not done under legal

15   counsel and that it was inaccurate.

16   Q.   Okay.  So how is that reflective of

17   judgment/decision-making, as this warning reflects to Mr. Rufo?

18   A.   Well, he took it upon himself to do something without

19   getting authorization to do it.

20   Q.   Okay.

21   A.   So that kind of reflects the judgment/decision-making

22   process.

23   Q.   Did you have back-and-forth communications with, with Jill

24   Mecey about -- well, strike that.

25            After the PIP was prepared, did you participate in

Petrella - Cross                                                    566

1    the call to give Mr. Rufo this, this written warning and PIP?

2    A.    No.

3    Q.    Okay.  Did you have e-mail communications, though, with,

4    with Ms. Salvo and Ms. Petrella about that?

5    A.    Jill, you mean?

6    Q.    Oh, excuse me, I'm sorry.  With Ms. Mecey about that.

7    A.    I believe I e-mailed Jill, asking her how it went.

8    Q.    Okay.  I'm sorry, I did want to back up.  You were

9    involved in the drafting of this PIP.  I think we've already

10   established that.

11   A.    Yes.

12   Q.    Okay.  I want to turn your attention to -- and was

13   Ms. Salvo also involved in the drafting of that?

14   A.    I believe she provided the template.

15   Q.    Okay.  I want to turn your attention to Plaintiff's

16   Exhibit 42.

17           Oh, I'm sorry, I was just trying to make sure that

18   this exhibit was admitted.

19           This is an e-mail -- Plaintiff's Exhibit 42 is an

20   e-mail attaching a draft form of the final written warning,

21   isn't it?

22   A.    It's kind of blurry on this end.

23           MS. DURR:  Okay.  Can you blow that up a little bit?

24           THE WITNESS:  Can you, can you scroll down?

25           Yes.  So this is Lyn -- Jill started it, and then

1   they sent it to me to add -- to update to Jill's questions and

2   comments on the form.

3   BY MS. DURR:

4   Q.   Okay.  When you were putting together your portion of the,

5   of the PIP, were you trying to retaliate against Mr. Rufo for

6   reporting discrimination?

7   A.   I didn't hear you.  What did you say?

8           THE COURT:  You need to stay --

9   BY MS. DURR:

10  Q.   I'm sorry, were you trying to retaliate against Mr. Rufo

11  for, you know, reporting discrimination of any kind?

12  A.   I was not, was not trying to retaliate or retaliate, no.

13          MS. DURR:  Okay.  No further questions.

14          THE COURT:  All right.  Redirect?

15          MR. FOX:  A few questions, Your Honor.

16                  REDIRECT EXAMINATION

17  BY MR. FOX:

18  Q.   You said, Ms. Petrella, that one of the -- one of the

19  things that Joey did wrong was he didn't, he didn't prepare the

20  report with the assistance of legal counsel, and you testified

21  your concern was you want to maintain attorney-client privilege

22  for any information uncovered, correct?

23  A.   That's correct.

24  Q.   So your primary concern was maintaining secrecy over the

25  data; isn't that correct?

Petrella - Redirect                                                568

1    A.    Absolutely not.

2    Q.    Well, why did you say you want to maintain attorney-client

3    privilege?

4    A.    So as I mentioned earlier, it's important when you look

5    into data that you have an attorney-client privilege, so when

6    you're looking at the data and you find -- if you find flaws,

7    the attorney can then, has the expertise to say these are areas

8    of recommendation, these are the ways that we would like for

9    you to do it, and they keep that information from the public in

10   getting it out there.

11         We are trying to do a self-audit internally to fix

12   anything, and our attorney helps us, helps us do that.

13   Q.    When you say attorney-client privilege, the privilege

14   allows you to maintain the secrecy of that information,

15   correct?

16   A.    It allows it to be protected.

17   Q.    Okay.  Now, in the "Beautiful-Thanks" e-mail -- let's put

18   up 22 again just so we have it in front of us.

19         MR. KATZ:  22?

20         MR. FOX:  22, please.

21   BY MR. FOX:

22   Q.    Now, when Lyn Salvo in the e-mail in which you were copied

23   says, "Beautiful.  Thanks.  I will look at it more closely this

24   weekend, but great start," she doesn't say in there:  Hey,

25   Joey, make sure you retain counsel or have in-house or outside

Petrella - Redirect                                                   569

1   counsel review this, does she?

2   A.   She doesn't say that.

3   Q.   And no one told him to do that, did they?

4   A.   He was not authorized to do this.  No one told him to do

5   that.

6   Q.   No one directed -- can you answer my question?  No one

7   directed him to do this analysis under the secrecy or

8   protection of legal counsel, correct?

9   A.   That is correct.

10  Q.   And no one told him that in any, in any e-mail or

11  conversation or directive, correct?

12  A.   I believe Lyn -- I believe Lyn didn't realize he was doing

13  it.

14  Q.   This was the only direction he got in this e-mail:

15  "Beautiful.  Thanks.  I will look at it more closely this

16  weekend, but great start!"  Correct?

17  A.   As far as I know.

18  Q.   Now, heard for the first time in this case that the head

19  count was inaccurate.  That wasn't, that wasn't stated anywhere

20  in the PIP, was it?

21  A.   No.

22           MR. FOX:  Let's go to Exhibit 52, which contains a

23  detailed critique of the ways in which Aclara claimed that the

24  information was inaccurate, specifically in the fourth

25  paragraph.  Let's highlight that.

Petrella - Redirect                                                570

1              Let's highlight the, actually the bottom half of the

2      fourth paragraph, which contains a series of criticisms,

3      starting with "Indeed."

4              MS. DURR:  We would place an objection.  Lack of

5      foundation.  There's no foundation that this witness has seen

6      or been involved in this document.

7              THE COURT:  Lay a foundation first.

8      BY MR. FOX:

9      Q.   Sure.  This -- the language I'm about to show you contains

10     a critique --

11             THE COURT:  No, no, no.  The foundation is have you

12     ever seen this document before?

13             THE WITNESS:  I don't believe so.

14             THE COURT:  Well, then there's no foundation.

15             MR. FOX:  Okay.

16             THE COURT:  That's not proper.

17     BY MR. FOX:

18     Q.   All right.  Well, let me ask you this:  Is there any

19     document or any e-mail or any directive or any memorandum that

20     criticized Joey for not having an accurate head count?

21     A.   It was, it was inaccurate data.  We didn't go into

22     specifics.

23     Q.   Okay.  And no one said there was an inaccurate head count

24     in the mountains of paper that have been produced in this case,

25     did they?

Petrella - Redirect                                                    571

1    A.    I don't know.

2              MS. DURR:  Objection.  Calls for speculation.

3              THE COURT:  I'm going to sustain the objection, but

4    the witness already answered.

5    BY MR. FOX:

6    Q.    You're in charge of all the -- you have access to all the

7    personnel records, don't you?

8    A.    No.

9    Q.    Okay.  Do you not have access if you needed to figure out

10   the head count?

11   A.    I have access to head count reports, yes.

12   Q.    Okay.  How did you, how did you -- what records did you

13   review in your claim that the head count was inaccurate?

14   A.    The head count report for July of 2017.

15   Q.    You didn't bring those records today, did you?  They've

16   never been produced in this case, have they?

17   A.    I have no clue what's been produced.

18   Q.    And your testimony was under examination by Ms. Durr, it

19   was that you glanced, you glanced at Joey's e-mail; is that

20   correct?

21   A.    I looked at the e-mail, yes.

22   Q.    You said you glanced, correct?

23   A.    Yes.

24   Q.    And you haven't produced any of these audits that you

25   referred to in your earlier testimony in this case, have you?

Petrella - Recross                                                    572

1    A.    I don't know what's been produced.

2    Q.    You didn't bring any of them with you today, did you?

3    A.    No.

4           MR. FOX:  No further questions.

5           THE COURT:  All right.  Ms. Durr, any redirect --

6    recross?

7           MS. DURR:  Sure.

8                        RECROSS EXAMINATION

9    BY MS. DURR:

10   Q.    First question:  Are -- to your knowledge, do you use

11   the -- when you're doing any self-audits, first of all, do you

12   use legal privilege?

13   A.    Yes.

14   Q.    Okay.  Do you use legal privilege even if you don't think

15   or you have no suspicion that anything is wrong?

16   A.    Yes.

17   Q.    Okay.  And then I had a question about -- by Mr. Fox about

18   whether the reports that you were talking about, whether they

19   were produced, but the information tracking, as you described,

20   terminations voluntary or involuntary by race, is that a

21   standard data that's, that's done on these affirmative action

22   reports?

23   A.    Yes.

24          MR. FOX:  Your Honor, beyond the scope.

25          THE COURT:  Sustained.

Petrella - Recross                                          573

1   BY MS. DURR:

2   Q.   Okay.  And then I want to turn your attention to

3   Plaintiff's Exhibit 44, once again, the portion that you wrote

4   under "Judgement/Decision Making."  We already went through

5   that those were your words that you wrote.  I just want to

6   point out that in this warning to Mr. Rufo, you told him that

7   the information was inaccurate.

8            Can you highlight that?  It's on the last line -- or

9   second-to-the-last line.

10           Is that right?

11  A.   That's correct.

12           MS. DURR:  Okay.  No further questions.

13           THE COURT:  All right.  Does anybody anticipate

14  calling this witness again?

15           MR. FOX:  No, Your Honor.

16           THE COURT:  How about from the defense?

17           MS. DURR:  No, Your Honor.

18           THE COURT:  All right.  Then, ma'am, you're excused

19  as a witness.  You can stay in court and watch the proceedings

20  or leave, but you're not to discuss your testimony or anything

21  you see or hear in court with any witness who has not yet

22  testified.  All right?

23           THE WITNESS:  Okay.

24                        (Witness excused.)

25           THE COURT:  All right.  Your next witness?

Garcia - Direct                                                              574

1            MR. FOX:  Michael Garcia, Your Honor.

2            THE COURT:  All right.

3        MICHAEL GARCIA, PLAINTIFF'S WITNESS, AFFIRMED

4                    DIRECT EXAMINATION

5   BY MR. FOX:

6   Q.   Good morning, Mr. Garcia.  Could you state your name for

7   the record, please.

8   A.   Michael Garcia.

9   Q.   Okay.  And, Mr. Garcia, what is your current position at

10  Aclara?

11  A.   I'm the senior vice president of human resources and

12  organizational effectiveness.

13  Q.   And was that your position at the time that Joey Rufo was

14  put on a PIP and later terminated?

15  A.   Yes, it was.

16  Q.   Okay.  I have some questions for you first about the

17  company -- company's policies, okay?

18  A.   Sure.

19  Q.   Let's take a look at Plaintiff's Exhibit 111.

20            THE COURT:  Any objection to 111?

21            It's already in.

22            MS. DURR:  It's in, okay.

23            THE COURT:  It's in.

24  BY MR. FOX:

25  Q.   Okay.  Have you seen this before?

1   A.   Yes.

2   Q.   And I'd like you to turn to page 8, entitled "Our

3   commitment to no retaliation" in the lower left-hand side of

4   the page.

5             Okay.  Let me read to you, page 8 states:  "We are

6   committed to creating an environment where individuals can

7   raise questions or concerns without fear of retaliation.

8   Hubbell does not tolerate retaliation and expects that any

9   reports or concerns raised will be made in good faith.  Anyone

10  who retaliates against an individual who raises a concern in

11  good faith will be subject to disciplinary action, up to and

12  including termination."

13            Do you agree that that was a policy of the company

14  that was in effect at the time that Joey Rufo was fired?

15  A.   Yes.

16  Q.   And at the time he was put on a PIP?

17  A.   At the time that he was put on the PIP, we were part of

18  Aclara and had not been purchased by the Hubbell organization

19  yet.

20  Q.   But Aclara had the same policy against retaliation,

21  correct?

22  A.   They were similar but not exactly the same.

23  Q.   How was it different?

24  A.   Just the wording and, you know, they're not exactly the

25  same in terms of the wording, but the wording is a little bit

Garcia - Direct                                                       576

1    different.

2    Q.   It wasn't any -- the Aclara policy wasn't easier on

3    retaliatory acts, was it?

4    A.   No.

5    Q.   Okay.  And I'd like to turn to page 9 as well, and I'd

6    like to look at the bullet points on the left-hand side of the

7    page, starting with the fourth bullet point.  And this is under

8    the heading "Working as a Hubbell Manager, Supervisor, or

9    Leader Means We."

10            So this applies to Hubbell managers and supervisors.

11   That would include you, correct?

12   A.   Yes, that's correct.

13   Q.   Jill Mecey, Lyn Salvo, and Gina Petrella, correct?

14   A.   That's correct, yes.

15   Q.   Yes.  Okay.  Thank you.

16            And then it states, "Create a positive work

17   environment where employees are comfortable raising questions

18   and concerns."

19            Does that fairly state the policy?

20   A.   Yes, it does.

21   Q.   Okay.  Now, if we could turn to two bullet points down

22   from that?  "Never retaliate or tolerate retaliation against

23   employees who ask questions or raise concerns in good faith."

24            Do you see that?

25   A.   Yes.

Garcia - Direct                                                           577

1    Q.   Do you have any knowledge that Joey Rufo's report of

2    discrimination was made in bad faith?

3    A.   I didn't realize he made any kind of -- any kind of claim

4    at all.

5    Q.   You're not aware of that?

6    A.   I'm not aware that he made a claim.

7    Q.   Okay.  You're not aware if he acted in bad faith in any

8    way, are you?

9    A.   I'm not sure.  Who are you speaking of, Joey?

10   Q.   Joey is who I'm speaking of, yes.

11   A.   Okay.  What I do understand is that his performance, when

12   I talked with Jill Mecey about his performance, there was a

13   long pattern of judgment.

14   Q.   Okay.  Did he ever act in bad faith in submitting a report

15   of discrimination, to your knowledge?

16   A.   I can't speak to his faith in what he's thinking of.  I

17   don't know.

18   Q.   Okay.  I'd like to turn to page 10, and I'd like to -- if

19   we could move to page 10?

20        If we could look at the top left-hand corner, "How to

21   Seek Advice and Raise Concerns," it states, "Every single one

22   of us, regardless of our role or seniority, has a personal

23   responsibility to ask questions, raise concerns, and report

24   misconduct.  If you suspect that a situation or issue is or may

25   be a violation of the code, policy, or the law, you must report

Garcia - Direct                                                          578

1   your concern."

2          Do you see that?

3   A.   Yes.

4   Q.   Does that require an employee who has a suspicion that

5   there might be discrimination going on to report it to the

6   company?

7   A.   The -- if the employees think there's something going on,

8   they can report it to the company.  That's their choice.

9   Q.   And this is mandatory, correct?  It says you must report

10  that concern?

11  A.   It says -- it reads, "you must report your concern."

12  Q.   So if they failed to report such a concern after being

13  aware of it, they're going to be in violation of this policy;

14  isn't that right?

15  A.   Yes.

16          MR. FOX:  Okay.  Then if you turn to page 34, please?

17          And if we look at the language on retaliation?  On

18  the left-hand side of the page, if we could turn to the

19  heading "Our Commitment to the Code"?  If we could expand that,

20  please?  And if we could look at the third bullet point under

21  that?

22          It states there again, "We do not retaliate against

23  any individual who raises a concern in good faith."

24          Do you see that?

25  A.   Yes.

Garcia - Direct                                                    579

1    Q.    It's evidently an important part of the company's code of

2    ethics since it's mentioned twice.  Is that, is that a fair

3    assessment?

4    A.    Yes.

5    Q.    Okay.  And if we could look at the next column on the

6    right-hand side of the page under "Our Commitment to the

7    Company and Each Other," the first bullet point under that,

8    right before that, it says, "We do not tolerate harassment and

9    discrimination."

10           That's a very important policy of the company, isn't

11   it?

12   A.    It is.

13   Q.    Now, I'd like to show you Plaintiff's Exhibit 8, please.

14   Exhibit 8 consists of an e-mail exchange it looks like you had

15   with Jill Mecey, correct?

16   A.    If there's a way that that can be made a little bit

17   bigger?  I can't actually see it on the screen very well.

18   Q.    Sure.  We could just sort of take you through it.  I just

19   want to ask you a very limited portion, just the first e-mail

20   at the top of the page.  It's an e-mail from Jill Mecey to

21   yourself, and saying, "She can be a kill joy."  I don't care

22   about that.  I do want to ask you about the statement, "I do

23   like his enthusiasm."

24           Were you told by Jill that she liked Joey's

25   enthusiasm?

Garcia - Direct                                                          580

1    A.    Early on, she did.

2    Q.    Okay.  Now, I'd like to go to the EEO data, and without

3    getting into all of the documents at this point, you are aware

4    that Joey sent his spreadsheet and reported it to the persons

5    who asked him to do it, correct?

6    A.    He sent the report in, but he wasn't asked to provide the

7    racial data that he, you know, that he did.

8    Q.    Okay.  Let me ask you this:  You understood he was

9    given -- he was permission to do that?

10   A.    From my understanding, he wasn't actually given permission

11   to do that.

12   Q.    Okay.  Did you ever look at the e-mail that's been marked

13   in this case as Plaintiff's Exhibit 22?  Let me put it up.

14   A.    Sure.  Thank you.

15   Q.    We're going to look at this one more time.  Probably the

16   jury is sick of looking at this, but have you ever seen this

17   before?

18   A.    Yes.

19   Q.    Okay.  And did you see this around the time that it was

20   sent?

21   A.    I don't remember the exact timing, but I do remember

22   seeing it.

23   Q.    Okay.  And what was your reaction when you saw this, this

24   e-mail saying, "Beautiful.  Thanks.  I will look at it more

25   closely this weekend, but great start"?

Garcia - Direct                                                         581

1   A.    My interpretation was Lyn was going to look at it and get

2   back with him.

3   Q.    Okay.  Did anyone ever give him any other feedback other

4   than this nod of approval?

5   A.    Well, it wasn't a nod of approval.  I think they were

6   supposed to talk again, and they never did.

7   Q.    Okay.  I know that's your interpretation.  I'm asking, was

8   there any other communication --

9   A.    I don't know.

10  Q.    -- after he sent --

11  A.    Not that I'm aware of, sir.

12  Q.    Thank you.

13        Now, you understood that when he reported the

14  information he reported, he didn't disseminate widely within

15  the organization?

16  A.    Correct.  He did not.

17  Q.    He didn't release it to the public?

18  A.    No.

19  Q.    So any privacy or confidentiality concerns were guarded by

20  Mr. Rufo, correct?

21  A.    I think he gave it to Lyn and maybe Gina.

22  Q.    The two people who commissioned him to do the report,

23  correct?

24  A.    But again, they didn't give him permission to do part of

25  that.  It was just performance data that he was supposed to

Garcia - Direct                                                          582

1   collect.  That was all he was supposed to do.

2   Q.   Okay.  We obviously have a disagreement there, but I'm

3   just asking you, those are the only two people he sent the

4   report to, right?

5   A.   Yes, that's correct.

6   Q.   He didn't even send it to his supervisor at the time, Jill

7   Mecey, correct?

8   A.   I think he just sent it to those two individuals, yes.

9   Q.   Okay.  Do you think that you would have seen the

10  spreadsheet, the EEO matrix that Joey supplied that indicated

11  there might be something going on at the company?

12          MS. DURR:  Object to the form of the question.

13          THE COURT:  No, I don't --

14          MS. DURR:  I think that's not in evidence.

15          THE COURT:  I don't think that's improper.

16  Overruled.

17          THE WITNESS:  Mr. Fox, would you please repeat the

18  question?

19  BY MR. FOX:

20  Q.   Sure, sure.  Do you think you ever would have seen the

21  spreadsheet that Joey produced?

22  A.   I saw it very briefly, and -- but I took -- I gave that to

23  Gina Petrella.  We talked about it, and I asked her to look

24  into the data.

25  Q.   Okay.  You saw very briefly.  Is it something you just

Garcia - Direct                                                         583

1   skimmed or glanced at?

2   A.   She's the expert in that area, and I asked her to take a

3   look at it and report back to me whether there was, you know,

4   any problem with his report.

5   Q.   Okay.  By the way, did you review his original e-mail

6   where he said what he was going to do going forward?

7   A.   I didn't see that at the time.

8   Q.   Okay.

9   A.   I saw it later.

10  Q.   Do you have any restrictions on lengths of e-mails that

11  you'll read and review?

12  A.   Well, there was no restriction, but the longer the e-mail,

13  and his was long, I mean, it's harder for, you know, everybody

14  is busy, so, you know, it's harder to read his, but they were

15  always very long.

16  Q.   Okay.  How do you know that if you don't recall reading

17  it?

18  A.   It was reported to me by Jill.

19  Q.   That was reported.  Did she report to you that it was just

20  a page?

21  A.   I'm sorry?

22  Q.   Did she report to you the e-mail was just a page?

23  A.   I think we just talked about it.

24  Q.   Okay.  Now, I'd like you to look at 33 again.  I just

25  asked you if you reviewed any, any of the content of this, this

Garcia - Direct                                                    584

1    spreadsheet.  Let's scroll through it.  33.

2              Next page.  Next page.  Next page.  Next page.

3              And the spreadsheets continue like this for a while,

4    I'll represent to you.  Did you ever review any of this?

5    A.   I asked my team to take a look at data and then tell me

6    whether there were any problems with the data.

7    Q.   Okay.  You asked your team, okay.

8              Let's go to 34.  Did you ever review this?

9    A.   I've seen this later, but at the time, no.

10   Q.   Okay.  You saw this at your deposition, correct?

11   A.   I'm not sure when I saw it, but I saw it later.

12   Q.   Does it show that African-American people and people who

13   are multiracial were being disciplined at a much higher rate

14   than people who were identified as being white?

15   A.    Well, it shows that 540 people, which is what jumped out

16   at me when I took a closer look at it because we didn't have

17   nearly that many people.  We only had about 300 or so people at

18   the time.

19   Q.   You didn't mention that to me at your deposition, did you?

20   A.    Well, that's what I noticed, and that's what I noticed

21   afterwards.

22   Q.   And you never produced any documents in this case or can

23   identify any documents suggesting that the number is wrong;

24   isn't that right?

25   A.    Well, what I did do was I relied on my team, who was very

Garcia - Direct                                                     585

1    good at what they do.  I trust them to look at the data and

2    report to me whether they saw any problems.

3    Q.    You relied upon your team for everything concerning this

4    sequence of events, correct?

5    A.    Well, I don't micromanage.  A good leader hires good

6    people, and you trust them to do a good job.

7    Q.    Are they important things that you do yourself?

8    A.    Sure.

9    Q.    Okay.  But you never went so far as to closely examine

10   this data, did you?

11   A.    What we did is Gina --

12   Q.    I'm asking you what you did.

13   A.    What I did?  I spoke with Gina, and Gina, in consultation

14   with additional people, reviewed the data and determined it to

15   be seriously flawed.

16   Q.    Okay.  Would you have been concerned if you had learned

17   that employees who were African American and multiracial were

18   being disciplined at a rate of four times that of the employees

19   identified as white?

20   A.    Absolutely.

21   Q.    Any HR professional would be seriously concerned with

22   that, would they not?

23   A.    Correct.

24   Q.    And they'd want to take further action to investigate and

25   evaluate the significance of that information, would they not?

Garcia - Direct                                                    586

1    A.   Yes.

2    Q.   In fact, you don't know if anyone did any further

3    follow-up analysis or not, do you?

4    A.   The data was analyzed, and it was determined to be

5    seriously flawed.

6              MR. FOX:   Okay.  Let's, let's look at your deposition

7    testimony in that.  64A, please.

8              (Video excerpt played as follows:)

9    "Q.  And why was no one concerned at Aclara about that?

10   A.   I'd asked my team to look at this information.  They're

11   good at what they do, and I trust that they did.

12   Q.   Okay.  In fact, they did no further follow-up analysis,

13   did they?

14   A.   I don't know whether they did or didn't.  I asked them to

15   look at it.  If there was a problem, they would let me know."

16             (End of video excerpt.)

17   BY MR. FOX:

18   Q.   That was your testimony, was it not?

19   A.   Also part of my testimony, if you look at page 84 of my

20   deposition, it does refer to having that data looked at in

21   addition.

22   Q.   Okay.  But that was your testimony we just heard.  That

23   was you, right?

24   A.   That and if you look at page 84 of the deposition, it also

25   says the same, you know, also adds that the data was looked at

Garcia - Direct                                                    587

1    more closely.

2    Q.   Okay.  Well, your counsel can ask you about that if that's

3    true, but I want to ask you, no one did any further statistical

4    analysis or study of any kind to determine whether non-white

5    employees were being disciplined at a much higher rate than

6    white employees, did they?

7    A.   That's incorrect.

8    Q.   Okay.  Then I'd like to read your next deposition excerpt,

9    65:

10                  (Video excerpt played as follows:)

11   "Q.  No one did any further statistical analysis or study of

12   any kind to determine whether non-white employees were being

13   disciplined at a much higher rate than white employees, did

14   they?

15   A.   I don't know.  I didn't talk about that with my staff.  I

16   asked them to look into the data and look into the information.

17   Q.   Okay.

18   A.   And I assume that they did."

19                  (End of video excerpt.)

20   BY MR. FOX:

21   Q.   Okay.  Did Ms. Petrella express to you the view that Joey

22   had displayed initiative in preparing a spreadsheet?

23   A.   I don't remember those words, no.

24   Q.   Okay.  Let's look at Exhibit --

25   A.   Well, actually, there was a point where she did talk about

Garcia - Direct                                                      588

1    he did show, you know, initiative and she would look into the

2    data now that she had it.

3    Q.   Okay.  Let's look at Exhibit 23.  The first portion of it,

4    the first couple lines, this is an e-mail that she sent to you,

5    correct?

6    A.   Yes.  Correct.

7    Q.   And she's saying there that she appreciated his

8    initiative, correct?

9    A.   Well, the whole sentence reads, "Although I appreciate his

10   initiative, disciplinary actions are focused on performance,

11   not EEO information.  Now that I have this information, I will

12   look into this."

13   Q.   Well, I'm going to ask you about each part of this e-mail,

14   but I'm going to ask you now the part I just referred to you.

15   Did she not -- did you agree with her assessment that he

16   displayed initiative?

17   A.   It looks like she does, yes.

18   Q.   Okay.  And do you think he did?

19   A.   Do I think, I'm sorry?

20   Q.   Did you think Joey displayed initiative?  Do you agree

21   with her?

22   A.   You know, I don't know whether that was initiative or some

23   other motive.  I don't know.  So I really can't speak to that.

24   Q.   Okay.  Now, when she says, "Disciplinary actions are

25   focused on performance, not EEO information," that's generally

Garcia - Direct                                                    589

1    true as a general proposition, correct?

2    A.   I'm not sure I understand the question.

3    Q.   Do you agree generally with that statement:  "Disciplinary

4    actions are focused on performance, not EEO information"?

5    A.   I think the scope of the project was just on the

6    performance, to track the performance.

7    Q.   Okay.  But if disciplinary actions turn out to hit

8    disproportionately on a particular racial group, then it is

9    important to assess those disciplinary actions, is it not?

10   A.   It would be, but the scope of the project was just on, on

11   the performance.  It wasn't supposed to be on the racial.

12   Q.   Okay.  Now -- okay.  Let's move on.

13            "Now that I have this information, I will look into

14   this," she says, correct?

15   A.   Could you repeat the question, please?

16   Q.   I just was reading from the rest of the e-mail, stating,

17   "Now that I have this information, I will look into this."

18            Okay.  You read that, right?

19   A.   I did.

20   Q.   Now, Joey's put on a, on a final written warning and PIP.

21   You're aware of that, correct?

22   A.   I know he was put on a, on a written warning, not a final.

23   Q.   Okay.  Well, if the language of the document said in its

24   concluding paragraph, it referred twice to a final written

25   warning, would you, would you tend to accept that language?

Garcia - Direct                                                           590

1    A.   Well, I know in talking with Ms. Mecey, we talked about it

2    being a written warning, not a final warning.

3    Q.   Okay.  All right.  But look, let's, let's do this:  Let me

4    just ask you, you approved that final PIP, did you not?

5    A.   I approved the language, yes.

6    Q.   Okay.  And you reviewed it, correct?

7    A.   I did review it.

8    Q.   Mr. Garcia, when you approved this PIP and this final

9    warning -- or you want to call it a warning, not a final

10   warning -- whatever it is, were you not concerned that the

11   company was retaliating against Joey for bringing to light

12   protected activity?

13            MS. DURR:  I object to the form of the question.

14            THE COURT:  Yeah, I think the question is mis-formed.

15            MR. FOX:  The question is flawed.

16   BY MR. FOX:

17   Q.   Did -- were you concerned when you approved the PIP that

18   the company was retaliating against Joey?

19   A.   He was put on a PIP because of a pattern of poor judgment

20   that included --

21            THE COURT:  No, that's not responsive to the

22   question.  It's a yes or a no answer.  Listen to the question,

23   please.

24            THE WITNESS:  Repeat the question, please.

25   BY MR. FOX:

Garcia - Direct                                                      591

1   Q.   When you put -- when you approved Joey being put on, on

2   the PIP, were you not concerned that, that the company was

3   retaliating against him?

4   A.   I was not.

5   Q.   Did you ever express the view to anyone that the company

6   should make sure that this performance improvement plan might

7   not be viewed as some form of retaliation?

8   A.   In my conversations with Jill, and it's a bit of a, of a

9   mantra in our organization, particularly in the HR, we treat

10  everybody very fair, regardless of whatever, you know, is going

11  on, and I believe that by treating everybody very fairly, you

12  can work your way through most situations.

13  Q.   Okay.  Well, after Joey is put on the PIP, Jill Mecey

14  advised you that he had complained about retaliation; isn't

15  that right?

16  A.   She did not tell me that he was being retaliated against.

17  I don't recall that.

18  Q.   No, that's not what I asked you.  I asked you if she told

19  you that he had complained to her about retaliation.

20  A.   I don't recall her telling me that, that statement, no.

21  Q.   Isn't that something you would have recalled if she had

22  made it?

23  A.   I would look into it if I thought there was retaliation.

24  I absolutely would.

25  Q.   And why would it be necessary to look into it then if an

Garcia - Direct                                                            592

1    employee had made a complaint about retaliation?

2    A.   I was not aware that he had those -- that he had made a

3    claim.  I'm not aware of a claim being made.

4    Q.   Okay.  You're not aware that he complained about that?

5    That's your testimony?

6    A.   No, I'm not.

7    Q.   Okay.  I'd like to look at Exhibit 48.  Okay.

8           It's in?

9           THE COURT:  Oh, it's in, but I'm not sure why this

10   witness is being asked about it.

11          MR. FOX:  I just want to pull up the first paragraph.

12          MS. DURR:  Objection.  Lack of foundation.

13          THE COURT:  Yeah, I'm going to sustain the objection.

14   BY MR. FOX:

15   Q.   Let me ask first, were you aware that Jill Mecey did notes

16   to the file about her conversations with Joey?

17   A.   Am I aware that Jill Mecey?

18   Q.   Did notes to the file documenting her conversations with

19   Joey.

20   A.   I was not -- I was not aware of that.

21   Q.   Okay.  So you didn't see any of her notes?

22   A.   No.

23   Q.   You wouldn't know the content of them?

24   A.   No.

25   Q.   Okay.  I'll move on then.

Garcia - Direct                                                        593

1            What are the steps that are taken in an investigation

2    of retaliation?  What's required to be done in a normal

3    investigation?

4    A.   You get an independent party to look into the case and

5    investigate the case, ask all the appropriate people questions.

6    Q.   And why is it important to have an independent party come

7    in and do that?

8    A.   You want, you know, an honest opinion on what happened.

9    Q.   And you don't want the managers who have been charged with

10   retaliation conducting that investigation, do you?

11   A.   No.

12   Q.   That would be unfair, would it not?

13   A.   Correct.

14   Q.   Okay.  I'd like to show you the answers to interrogatories

15   in this case.  You, you verified the answers to interrogatories

16   in this case, did you not?

17   A.   I'm not sure I know what you meant.

18            THE COURT:  I'm sorry, I couldn't hear the answer.

19   What was your answer?

20            THE WITNESS:  I'm not sure what he meant.

21            THE COURT:  All right.

22   BY MR. FOX:

23   Q.   Okay.  Well, let, let me show you Exhibit 101 -- actually,

24   let's start with Exhibit 102, if we could.

25            THE COURT:  Hold on a second.

Garcia - Direct                                                594

1              And, ladies and gentlemen, I mentioned to you at the

2       beginning of the trial about pretrial discovery, and we talked

3       about depositions, but another aspect of pretrial discovery are

4       what are called interrogatories.  The word "interrogatory" is

5       question, so those are written questions which the lawyers for

6       both sides can submit to the other side, and then the other

7       side is expected to provide an answer to that interrogatory.

8       That helps the lawyers understand some of the issues in the

9       case and the evidence.

10             So 101, you said?

11             MR. FOX:  I moved to 102, Your Honor, I'm sorry.

12             THE COURT:  102.  Is there any objection to 102?

13             MS. DURR:  No objection other than, you know, the

14      objections stated within the document itself.

15             THE COURT:  Well, those are overruled.

16             (Plaintiff's Exhibit No. 102 was received in

17      evidence.)

18             THE COURT:  So let's go.  What's the page number?

19             MR. FOX:  Page 17.

20      BY MR. FOX:

21      Q.   This is your verification, Mr. Garcia, in which you

22      declared under penalty of perjury that the answers to

23      interrogatories submitted on behalf of Aclara were true and

24      correct?

25      A.   Yes, that's correct.

Garcia - Direct                                                    595

1   Q.   Okay.  And I'd like to turn to page 10, Interrogatory

2   No. 21, and the answer there.  Okay.  It states, "Please

3   identify the date that Aclara became aware of the

4   above-captioned lawsuit."

5           And the answer is, "Michael Garcia, Jill Mecey, and

6   Robert Enyard were notified of the lawsuit on January 16,

7   2018."

8           And that was the answer that you verified, correct?

9   A.   Yes.

10  Q.   And how were you notified of a lawsuit?

11  A.   I'm not 100 percent -- I don't recall, but I think it

12  might have been through Rob Enyard.

13  Q.   Okay.  And he's in-house counsel for the company; is that

14  correct?

15  A.   Yes.

16  Q.   Okay.  Let's turn to the, the other set of interrogatory

17  answers, which is Plaintiff's 101.

18           THE COURT:  Any objection to 101?

19           MS. DURR:  No objection.

20           THE COURT:  All right.

21           MS. DURR:  Except for the objections already noted

22  within the document itself.

23           THE COURT:  Those are overruled.

24           (Plaintiff's Exhibit No. 101 was received in

25  evidence.)

Garcia - Direct                                                              596

1    BY MR. FOX:

2    Q.   Okay.  So if we could turn here to page 17, Aclara's

3    answer to Interrogatory No. 14?  The question is asked, "Please

4    identify" --

5         MS. DURR:  If I may before that, there's no

6    verification --

7         THE COURT:  Well, you haven't objected to the

8    exhibit, so it's in evidence.

9         MS. DURR:  Well, then I would argue lack of

10   foundation if he didn't verify these answers.  Then there

11   shouldn't be any questions to him.

12        THE COURT:  You didn't object to the exhibit.  It's

13   in evidence.

14        Go ahead.

15   BY MR. FOX:

16   Q.   Okay.  Mr. Garcia, Interrogatory No. 14 reads, "Please

17   identify and specifically describe any and all reasons that

18   Rufo was placed on a performance improvement plan."

19        Then there's an objection, and it states, "Pursuant

20   to Federal Rule of Civil Procedure 33(d), defendant refers

21   plaintiff" -- defendant is Aclara, right?  Is that right?

22   Defendant is Aclara?

23        Yes?  You say yes?

24   A.   Yes.

25   Q.   And plaintiff is Joey Rufo, correct?

Garcia - Direct                                                    597

1    A.   Yes.

2    Q.   ". . . to the written warning and performance improvement

3    plan for information responsive to this interrogatory."

4              Do you see that?

5    A.   Yes.

6    Q.   Okay.  And no other reasons are identified that Rufo was

7    placed on a performance improvement plan, correct?

8    A.   Not to my knowledge.

9    Q.   Okay.  And this was submitted under oath, correct?

10   A.   I believe it was, yes.

11   Q.   And I'd like to turn to Plaintiff's Trial Exhibit 105.

12   It's another set of answers to interrogatories.

13             THE COURT:  Any objection to 105?

14             MR. FOX:  Or, I'm sorry, I'm sorry, they're responses

15   to request for admissions.

16             THE COURT:  I'm sorry, are you moving it in or not?

17             MR. FOX:  Yes.

18             THE COURT:  105?

19             MS. DURR:  I'm going to object to the potential lack

20   of foundation of asking the witness any questions that he may

21   not have provided the information.

22             MR. FOX:  If we could turn to page 5 --

23             THE COURT:  Well, this is still -- whoever submits

24   this submits it on behalf of the defendant, and these answers

25   are supposed to be accurate.

```
Garcia - Direct                                                   598
```

1            MS. DURR:  Right.

2            THE COURT:  Were you consulted about the plaintiff's

3    request for admissions?

4            THE WITNESS:  I, I can't recall specifically.

5            MR. FOX:  And I just have a question about one of

6    them.  It's the last one.  It's on page 5.  Very briefly,

7    response to Interrogatory No. 25 --

8            THE COURT:  No --

9            MR. FOX:  I'm sorry, Your Honor, request for

10   admission 25.

11           THE COURT:  All right.  Let me stop for a second.

12           And again, ladies and gentlemen, a request for

13   admissions is yet another device used during discovery, and in

14   that situation, one party will ask the other side:  Do you

15   admit a certain fact?  And the answer that that person -- or

16   that that entity provides is what they are admitting.

17           So again, that's a standard tool in discovery.  I

18   don't understand how there can be a dispute that these --

19           MS. DURR:  There isn't a dispute.

20           THE COURT:  All right.

21           MS. DURR:  My only objection was whether there were

22   going to be questions asked of Mr. Garcia about something he

23   may not have known about, but we'll stipulate to the answer on

24   25.

25           THE COURT:  All right.

Garcia - Direct                                                        599

1              (Plaintiff's Exhibit No. 105 was received in

2    evidence.)

3              MR. FOX:   Okay.   Let me just read it into the record

4    then if counsel is stipulating to it.

5    BY MR. FOX:

6    Q.   The question is:   "During the entire period of Joey Rufo's

7    employment with Aclara, the company was aware that it is

8    unlawful under 42 U.S.C., Section 1981, and/or other federal

9    and/or Virginia statutes to take an adverse employment action

10   against an employee in retaliation for reporting in good faith

11   to the company that he has reason to believe that someone

12   within the company is engaging in intentional racial

13   discrimination against another employee of the company."

14             There's an objection.   It reads, "If a response is

15   required, defendant denies the request as written but states

16   that its employees Jill Mecey, Lyn Salvo, Gina Petrella, and

17   Michael Garcia were aware that they are not to retaliate

18   against anyone who, in good faith, makes a complaint or report

19   of ethical concerns, unlawful harassment or discrimination, or

20   participates in an investigation of such a complaint or

21   report."

22             Are you in agreement with that admission?

23   A.   Yes.

24             MR. FOX:   Okay.   That's all I have.   Thank you,

25   Mr. Garcia.

Garcia - Cross                                                          600

1           THE COURT:  All right.  Ms. Durr?

2                      CROSS-EXAMINATION

3    BY MS. DURR:

4    Q.   Mr. Garcia, to your knowledge, were you ever -- did you

5    ever think that Mr. Rufo was reporting any type of

6    discrimination?

7    A.   No.  After we had the data evaluated and it was determined

8    to be flawed in his data --

9           MR. FOX:  I'm going to object.

10          THE COURT:  Wait.

11          MR. FOX:  It's a yes-or-no question, Your Honor.

12          THE COURT:  I think that's correct.  Yes or no?

13          THE WITNESS:  No.

14   BY MS. DURR:

15   Q.   The report that Mr. Rufo sent on August 8 with the

16   spreadsheet, and we've talked about that -- what number was

17   that?  I'm sorry.

18          But can you -- do you know what I'm talking about,

19   the August 8 spreadsheet?

20   A.   The one that he sent to Lyn and Jill?

21   Q.   Lyn and Gina?

22          Okay.  No questions.  Mr. Fox asked you about

23   confidentiality concerns regarding that e-mail that was sent to

24   Lyn Salvo and Gina Petrella.  To your knowledge, is Lyn Salvo

25   an attorney?

Garcia - Cross                                                    601

1    A.    No.

2    Q.    To your knowledge, she's not?

3    A.    She's not an attorney.

4    Q.    What about Gina Petrella?  Is she an attorney?

5    A.    She is not an attorney.

6    Q.    Okay.  If that report was -- so to your knowledge, was

7    that report covered under legal privilege when he sent that to

8    them?

9    A.    No.

10   Q.    Now, at some point, you did receive an e-mail -- or you

11   did see an e-mail from Lyn Salvo that she had sent to Mr. Rufo

12   where it said something about beautiful things?  You had

13   testified that you at some point saw it?

14   A.    Say that last part again?

15   Q.    Excuse me, maybe it will just help if I showed you.  I'm

16   going to turn to Defendant's Exhibit 258.

17             THE COURT:  Is there any objection to 258?

18             MR. FOX:  Bear with me just a moment, please, Your

19   Honor.

20             No objection, Your Honor.

21             THE COURT:  It's in.

22             (Defendant's Exhibit No. 258 was received in

23   evidence.)

24             MS. DURR:  Okay.  Please show that to the witness,

25   please.

Garcia - Cross                                                        602

1    BY MS. DURR:

2    Q.   Just so that you're familiar with this because I know

3    we're throwing this document up, the bottom portion is an

4    e-mail from Mr. Rufo to Lyn Salvo and Gina Petrella dated

5    July 7, 2017.  Do you see that?

6    A.   Yes.

7    Q.   And then the string e-mail above it is a response by Lyn

8    Salvo to Mr. Rufo and Ms. Petrella on July 7, 2017, that

9    says, "Beautiful.  Thanks.  I will look at it more closely this

10   weekend, but great start!"

11   A.   Correct.

12   Q.   Right?  You testified that you saw that?

13   A.   Yes.

14   Q.   Okay.  Now, above that is a string e-mail that Mr. Rufo

15   forwarded this -- these two e-mails to Jill Mecey on August 14,

16   2017.  Do you see that?

17   A.   Yes, I do.

18   Q.   Are you following that?

19        And then above that e-mail is Jill Mecey forwarding

20   the e-mail to you on August 16, 2017.  Do you see that?

21   A.   I do.

22   Q.   Okay.  Do you believe that you saw Lyn Salvo's e-mail

23   response of July 7, 2017, before August 16, 2017, or is this

24   the first time you saw it?

25   A.   That was the first time I saw it.

Garcia - Cross                                                            603

1    Q.   You approved the language of the PIP, so you obviously

2    approved the PIP, right?

3    A.   I did.

4    Q.   Why did you believe Mr. Rufo should receive a PIP?

5    A.   Mr. Rufo had a long pattern of poor judgment in the things

6    that he did.

7    Q.   Had you ever personally talked to Mr. Rufo about his poor

8    judgment?

9    A.   I did.

10   Q.   Okay.  Tell the jury when you did that.

11   A.   It was a situation that he, he sent a memo to the company.

12   The company was having some challenges from a financial point

13   of view, and so there were some cost-cutting efforts that we

14   had undertaken, travel restrictions, slowing down hiring quite

15   a bit, and looking at reducing cost.

16        Mr. Rufo sends out a memo to the Herndon, to that, to

17   that office indicating that there were drastic changes that

18   needed to occur and that we couldn't afford coffee, condiments

19   like honey, and those type of things.

20        So when I saw that and then I also had heard that

21   there were a couple of people who called the office and asked a

22   question:  "Should I start looking for another job?"  You know,

23   "Do I have anything to worry about?"

24        MR. FOX:  Objection.  Hearsay.

25        THE COURT:  It's not hearsay.  It's not being offered

Garcia - Cross                                                              604

1    for the truth of its contents.  Overruled.

2            THE WITNESS:  So when I heard that people had called

3    and asked those questions, of course, it makes any company

4    very, very nervous because, you know, the last thing you want

5    is people to, you know, be afraid that you can't make payroll.

6            So I called Joey, and we had a conversation.  It was

7    not a bad conversation.  I said, "Joey, look, these kind of

8    communications, you have to think about what you write.  In the

9    future, you should not write these things by yourself.  You

10   should not take the initiative to" -- or the action.  Because I

11   looked at it really as more of he didn't have the authority to

12   do that.

13           He was acting as though he was the executive of the

14   office, and by sharing those words, "drastic," that's a

15   problem.  That was certainly my problem.  And when people

16   called to confirm that, that's why I called him and asked him

17   not to do that, to work with his manager in the future.

18   BY MS. DURR:

19   Q.   Did you tell Mr. Rufo:  No big deal that you sent that

20   discretionary spend e-mail?

21   A.   Did I tell him --

22   Q.   Did you tell him that it was not a big deal?

23   A.   I told him that that was a real problem that he sent it

24   and not to send those type of communications again without, you

25   know, working with his manager to make sure that the right

Garcia - Cross                                                    605

1   message was being sent.

2   Q.   Okay.  Now, did Ms. Mecey ever bring to your attention

3   anything about Mr. Rufo wanting to apply for another HR job?

4   A.   Yes.

5   Q.   Apply for an HR job?

6   A.   She did.

7   Q.   Tell me about that.

8   A.   She had mentioned to me that he had interest in working in

9   the HR field and then wanted to apply for a position.  She also

10  had mentioned that she had talked with him and they had a good

11  conversation.  She felt very positive about it, that he had

12  told her, "Look, you know, what I need to do is really just

13  learn the job, learn about Aclara, and stay in the position

14  that I have."

15            MR. FOX:  Your Honor, I object.  This is, this is all

16  hearsay.

17            THE COURT:  Well, actually, it's all repetitive.  So

18  the jury has heard this before.  Let's move this along.

19  BY MS. DURR:

20  Q.   Did you give any advice to Ms. Mecey about how to handle

21  her concerns about Mr. Rufo?

22  A.   I did.

23  Q.   Okay.  What did you tell him?

24  A.   I suggested --

25  Q.   Tell her, excuse me, not him.

Garcia - Cross                                                    606

1    A.    Yes.  I suggested to Jill that she, you know, meet with

2    him and coach him.  We have a policy within HR, we assume good

3    intentions, and I figured that, you know, she could coach him

4    and work with him.  You know, we could, you know, convince him,

5    you know, to not, you know, to be respectful of her, you know,

6    their conversation.

7              He said that he wasn't going to apply, and he did

8    anyway.  And then in the memo, the same type of conversation

9    occurred.

10   Q.    Okay.  I want to turn to Plaintiff's Exhibit 26, the top

11   portion.  This is the -- a response that you provided to Jill

12   Mecey when she had raised this concern about Mr. Rufo's conduct

13   about the HR, applying for that HR position, and you

14   wrote, "BTW" -- does that stand for by the way?

15   A.    By the way.

16   Q.    ". . . I agree with your approach and planned comments.

17   He is rather presumptuous but also claims to have good

18   experience in the military that is applicable.  His behavior

19   has to be adjusted."

20             You wrote those words?

21   A.    I did.

22   Q.    Okay.  First of all, why did you say that his behavior

23   needs to be adjusted?

24   A.    It was because of the type of poor judgment behaviors that

25   he -- that had been reported to me via Jill and the examples

1   that I had heard about.

2   Q.   What are you talking about?

3   A.   The memo that he sent out.  He had sent out a previous

4   memo that was kind of a borderline poor judgment one as well

5   about asking people to get their, you know, to go through a

6   health program that we were sponsoring.  He used the words, you

7   know, "to get your sexy body on," which is, you know, you want

8   to keep that kind of stuff out of the workplace.

9   Q.   Okay.  And so you were aware of that, and then you became

10  aware of Jill Mecey's concern at that point?

11          THE COURT:  Ms. Durr, you need to be -- you need to

12  be at the lectern.

13          MS. DURR:  Oh, excuse me.

14  BY MS. DURR:

15  Q.   And so that's why you said his behavior needs to be

16  adjusted?

17  A.   Yes.

18  Q.   Okay.  How did you think that his behavior needed to be

19  adjusted?

20  A.   Well, partly it was, it was a poor judgment.  The other

21  part was I think he was -- he would do things sort of without

22  permission, and nobody really knew what he was doing.

23  Q.   Okay.  Now, you're aware that, that he did receive some

24  praise from people within the company, right?

25  A.   He did.

Garcia - Cross                                                      608

1   Q.   Okay.  Are you aware that Ms. Patty Cavender praised

2   Mr. Rufo?

3   A.   Yes, I am.  Patty praised him partly because she was being

4   seriously challenged, she was way behind on her expenses for

5   that part of the business and was struggling with that, and

6   Joey had offered to help her do that, and so, you know, anytime

7   someone's going to help you do your job, I'm sure you're

8   appreciative.

9   Q.   How did you become aware of that praise?

10  A.   I heard about that, I think, through Ms. Mecey.

11  Q.   Okay.  I'm going to turn, put up -- I think it's, is it

12  Plaintiff -- Plaintiff's Exhibit 63.

13          THE COURT:  Hold on.  I'm not sure that's in.  Is

14  there any objection to 63?  Oh, it can't be; it's Plaintiff's

15  Exhibit 63.

16          MS. DURR:  So then we move to have it in.

17          THE COURT:  It's in.

18          (Plaintiff's Exhibit No. 63 was received in

19  evidence.)

20          MS. DURR:  Thank you, Your Honor.

21  Q.   Okay.  Just again, I'm going to show you at the bottom is

22  an e-mail from Patty Cavender to Jill Mecey, and the subject

23  line is "Joey Rufo," right?  And it actually goes on beyond

24  that one paragraph.

25  A.   I'm aware of it.

Garcia - Cross                                                            609

1    Q.   You're aware of it?

2    A.   Yes.

3    Q.   And then above it, it shows that Jill Mecey forwarded

4    this, Patty's e-mail, Ms. Cavender's e-mail to you and Lyn

5    Salvo on October 27, 2017, right?

6    A.   Yes.

7    Q.   Okay.  And then above that, you actually replied to Jill

8    Mecey about the e-mail?

9    A.   Yes.

10   Q.   Would you just please read it into the record for the

11   jury?

12   A.   "That is a strong endorsement.  It doesn't have direct

13   application to the situation and problems you are experiencing

14   with him.  Very different areas of behavior and expertise.

15   Regardless, it is good feedback.  And it allows you an

16   opportunity to share what he does well and continue to work on

17   the things he needs to work on what you're" -- which are --

18   "very important as well."

19   Q.   Okay.  Were you critical of Ms. -- of the fact that

20   Ms. Cavender had provided this endorsement of Mr. Rufo?

21   A.   Not at all.

22   Q.   Okay.  Now, you're aware that his position was eliminated,

23   Mr. Rufo's position was eliminated?

24   A.   Yes.

25   Q.   Okay.  And what was your -- were you involved in that

Garcia - Cross                                                          610

1   decision?

2   A.    Ms. Mecey brought --

3   Q.    Just were you involved in that decision?

4   A.    Yes.

5   Q.    Okay.  Would you please explain to the jury your

6   involvement?

7   A.    Yes.  In speaking with Ms. Mecey, the -- that part of the

8   business was struggling financially.  They were actually losing

9   money.  So that was the first item.

10          The second is that a big part of Joey's job was to

11   help the move from the Reston office to the Herndon office, to

12   consolidate.  When that was completed, a big part of the job

13   went away.

14          And you look at that in combination with that's an

15   office that's a relatively small office of about 40 people.

16   When Jill looked at the rest of her team, she had people across

17   the organization that supported much larger groups of

18   individuals, for example, in our Cleveland or Solon office, and

19   there's about 145 people, and it's being supported by a

20   part-time person.

21          And so that and, I guess, in combination, I wasn't

22   concerned because I knew there wasn't any, any retaliation that

23   occurred.

24   Q.    Okay.  Well, at that time -- did you also approve any

25   other position eliminations at that time?

Garcia - Cross                                                           611

1    A.    I did.

2    Q.    What positions did you approve?

3    A.    There was a position, an administrative assistant position

4    in our Somersworth, New Hampshire, office.  There was an

5    individual that was struggling in their performance.  Jill had

6    worked with them and gave them the opportunity to be placed on

7    a performance improvement plan or accept a, a severance that

8    included outplacement and additional time beyond just the

9    standard severance.

10         So the person, Donna, elected to take the

11   performance -- take the severance instead, and that's what she

12   did, and then later, that position was never filled.

13   Q.    Okay.  So it was never filled at all?

14   A.    There was a -- for a brief period, there was a part-time

15   person, and then it still remains open today.  It's not --

16   hasn't been filled.

17   Q.    Okay.  To your knowledge, are there any plans to fill that

18   position?

19   A.    No.

20   Q.    Okay.  By the way, is Mr. Rufo's position, is that filled

21   or not?

22   A.    No.

23   Q.    Okay.  The office coordinator position, I should say.  Any

24   plans to fill the office coordinator position in, in Herndon?

25   A.    It's not needed, no.

Garcia - Redirect                                                    612

1    Q.    Okay.  All right.

2          And then, Mr. Garcia, there was testimony by Mr. --

3    or you provided testimony previously about all of the company's

4    policies about retaliation?

5    A.    Yes.

6    Q.    Have you yourself received training on the company's

7    policies?

8    A.    Yes.

9    Q.    Okay.  And at the time that Mr. Rufo worked for Aclara,

10   did you understand that the company had a policy to not

11   retaliate?

12   A.    Yes.

13   Q.    And that you, you yourself could not retaliate?

14   A.    We do not retaliate.

15   Q.    Okay.  But that you had that understanding as well?

16   A.    I'm sorry?

17   Q.    You had that understanding that you are not to retaliate?

18   A.    Correct.  Absolutely.

19         MS. DURR:  No further questions.

20         THE COURT:  All right.  Is there any redirect?

21         MR. FOX:  Yes.  Briefly, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. FOX:

24   Q.    Take a look at Exhibit 120, please.  This is a job posting

25   for human resources assistant, is it not?

Garcia - Redirect                                                        613

1   A.   Yes.

2   Q.   Okay.  And you just testified a moment ago that no one's

3   been performing Joey's duties; is that correct?

4   A.   Correct.

5   Q.   Okay.  Now, this job listing contains essential functions

6   which basically were Joey's duties except they were being

7   performed in St. Louis, correct?

8            MS. DURR:  Object.

9            THE COURT:  The basis for the objection?

10            MS. DURR:  Lack of foundation of this witness to be

11   testifying about this document.

12            THE COURT:  Well, lay a foundation.

13   BY MR. FOX:

14   Q.   Okay.  You're the head of HR for the whole company; isn't

15   that right?

16   A.   Yes.

17   Q.   Are you generally familiar with positions that are posted

18   in your department for HR?

19   A.   You know, I mean, I am in most cases.  What I do know

20   about this position is that the HR service center, they were

21   interested in consolidating everything in St. Louis to make it

22   easier to manage.

23   Q.   Okay.  And are these essential functions here Joey's job

24   functions?

25   A.   I don't know if they were his functions or not.

Garcia - Redirect                                                          614

1    Q.    Okay.  Could he not fill this position?

2    A.    Could he fill?

3    Q.    Yes.

4    A.    If he was willing to move to St. Louis, I mean, the

5    position was there, but I don't know if he could fill it or

6    not.

7    Q.    The position was never offered to him at the time his job

8    was allegedly eliminated, was it?

9    A.    There was no position.

10          THE COURT:  Well, wait.  So we have context, do you

11   know when this job ad went out?

12          THE WITNESS:  I don't.  I don't know.

13   BY MR. FOX:

14   Q.    Donna Lapeyrouse, her position wasn't eliminated, was it?

15   A.    She elected to resign.

16   Q.    Because she was going to be put on a PIP by Jill Mecey if

17   she wouldn't resign, isn't that right?

18   A.    Correct.

19   Q.    You talked about the company was -- a portion of the

20   company was struggling financially?  You haven't produced any

21   documents in this case suggesting the company was struggling

22   financially, have you?

23   A.    Well, what, what we did is we had sent out at that point

24   in time communication to the entire company --

25          THE COURT:  Wait, wait, wait.  That's not responsive.

Garcia - Recross                                                    615

1    Listen to the question, please.

2              MR. FOX:  Read it.  Kindly read it back, Ms. Court

3    Reporter.

4                        (Question read.)

5              THE WITNESS:  I don't think so.

6    BY MR. FOX:

7    Q.   And were you not aware that Jill Mecey had, had instructed

8    Joey and the other office coordinators in an e-mail to do

9    everything possible to control spending?

10   A.   I am not sure the wording -- I know she talked to them or

11   sent them a communication of some kind.  That's what I know.

12   Q.   And she never told them to keep this confidential, don't

13   tell other employees to do everything possible to control

14   spending, did she?

15   A.   I don't know.

16             MR. FOX:  You don't know.  Okay.  Thank you.  No

17   further questions.

18             THE COURT:  Is there any recross?

19                      RECROSS EXAMINATION

20   BY MS. DURR:

21   Q.   Is there a posted position for the Somersworth

22   administrative assistant position that had been filled by --

23   that had been done by Donna Lapeyrouse?

24   A.   Repeat the question?

25   Q.   Sure.  After Donna Lapeyrouse is no longer doing the

Garcia - Recross                                                    616

1    administrative assistant position in Somersworth, has there,

2    has there ever been a posted position for that location?

3    A.    No.

4    Q.    I want to turn your attention to the document dated -- I

5    mean, excuse me, Bates labeled Plaintiff's Exhibit 120 that

6    counsel showed you.

7              Can you pull that up, in the right corner?

8              First of all, I wasn't clear, do you know when this

9    human resources assistant position in St. Louis was posted?

10   A.    I don't.

11   Q.    Okay.  But at the top there, do you see a date of

12   10/28/2018?  Is that what it says up in the corner?

13   A.    Yes.

14             MS. DURR:  Okay.  No further questions.

15             THE COURT:  All right.  Is anybody going to call

16   Mr. Garcia again?

17             MR. FOX:  No plans, Your Honor.

18             THE COURT:  How about the defense?

19             MS. DURR:  No, Your Honor.

20             THE COURT:  All right.  Then, Mr. Garcia, you are

21   excused as a witness.  That means you can after the lunch break

22   come back and watch the proceedings if you want to, but you're

23   not to discuss your testimony or anything you see or hear in

24   court with any witness who has not yet testified.

25             THE WITNESS:  Okay.  Thank you.

617

1                          (Witness excused.)

2              THE COURT:  All right.  Ladies and gentlemen, we'll

3    take our lunch break, and be back here at 2:00, please.

4              (Recess from 1:04 p.m., until 2:00 p.m.)

5

6                    CERTIFICATE OF THE REPORTER

7        I certify that the foregoing is a correct transcript of

8    the record of proceedings in the above-entitled matter.

9

10

11                                        /s/
                              _____
12                               Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25