618

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
JOSEPH RUFO,                    .    Civil Action No. 1:18cv37
                                .
              Plaintiff,        .
                                .
      vs.                       .    Alexandria, Virginia
                                .    November 1, 2018
ACLARA TECHNOLOGIES, LLC,       .    2:00 p.m.
                                .
              Defendant.        .
                                .
.   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 3 - P.M.

APPEARANCES:

FOR THE PLAINTIFF:                JOSHUA H. ERLICH, ESQ.
                                  The Erlich Law Office, PLLC
                                  2111 Wilson Boulevard, Suite 700
                                  Arlington, VA 22201
                                    and
                                  BRUCE C. FOX, ESQ.
                                  ANDREW J. HOROWITZ, ESQ.
                                  QIWEI CHEN, ESQ.
                                  Obermayer Rebmann Maxwell &
                                  Hippel LLP
                                  BNY Mellon Center
                                  500 Grant Street, Suite 5240
                                  Pittsburgh, PA 15219


FOR THE DEFENDANT:                J. CLAY ROLLINS, ESQ.
                                  Ogletree, Deakins, Nash, Smoak &
                                  Stewart, P.C.
                                  Riverfront Plaza - West Tower
                                  901 East Byrd Street, Suite 1300
                                  Richmond, VA 23219


                     (APPEARANCES CONT'D. ON FOLLOWING PAGE)

                          (Pages 618 - 773)

            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

619

1   APPEARANCES:  (Cont'd.)

2   FOR THE DEFENDANT:            HEIDI KUNS DURR, ESQ.
                                 Ogletree, Deakins, Nash, Smoak &
3                                Stewart, P.C.
                                 7700 Bonhomme Avenue, Suite 650
4                                St. Louis, MO 63015
                                   and
5                                JOHN B. FLOOD, ESQ.
                                 Ogletree, Deakins, Nash, Smoak &
6                                Stewart, P.C.
                                 1909 K Street, N.W.
7                                Washington, D.C. 20006

8
    ALSO PRESENT:                RACHEL COLANGELO
9                                RICHARD KATZ
                                 SUSAN HORNEKER
10                               JILL MECEY
                                 NICOLE H. NAJAM, ESQ.
11                               JOSEPH RUFO

12
    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
13                               U.S. District Court, Third Floor
                                 401 Courthouse Square
14                               Alexandria, VA 22314
                                 (703)299-8595
15

16

17

18

19

20

21

22

23

24

25

620

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES ON BEHALF OF THE PLAINTIFF: | | | | |
| Lyn Salvo | 622 | 640 | 661 | 670 |
| Sienna Church | 673 | 678 | | |
| Joseph Rufo (Recalled) | 689 | | | |
| WITNESS ON BEHALF OF THE DEFENDANT: | | | | |
| Jill Church | 688 | | | |

EXHIBITS

|  | MARKED | RECEIVED |
|---|---|---|
| PLAINTIFF'S: | | |
| No. 82 | | 649 |
| 94 | | 654 |
| DEFENDANT'S: | | |
| No. 290 | | 651 |

Closing Argument by Mr. Fox:               Page 700

Closing Argument by Mr. Flood:             Page 716

Rebuttal Argument by Mr. Fox:              Page 732

621

```
 1                A F T E R N O O N   S E S S I O N

 2                         (Jury out.)

 3              THE COURT:  All right.  Mr. Fox, how many more

 4    witnesses do you have?

 5              MR. FOX:  Just two, Your Honor.

 6              THE COURT:  And they are all by deposition, or are

 7    they live?

 8              MR. FOX:  They're both live.

 9              THE COURT:  I'm sorry?

10              MR. FOX:  They're both live, Your Honor.

11              THE COURT:  All right.  That's fine.  So about what,

12    another hour?

13              MR. FOX:  Yeah, maybe less.

14              THE COURT:  All right.  We gave you -- we sent, I

15    know it was late last night, a proposed charge, and then we've

16    had some -- I've tinkered with them a few more times.  No one's

17    gotten back to us about the charge yet, so I'm anticipating a

18    short charging conference so we can get this case to the jury

19    today, all right?

20              MR. FOX:  All right.

21              THE COURT:  All right.  Let's get the jury in.

22                         (Jury present.)

23              THE COURT:  All right.  Folks, you-all can have a

24    seat.

25              Who's your next witness, Mr. Fox?
```

Salvo - Direct                                                        622

1              MR. FOX:  Lyn Salvo, Your Honor.

2              THE COURT:  All right, Ms. Salvo.

3           LYN SALVO, PLAINTIFF'S WITNESS, AFFIRMED

4                    DIRECT EXAMINATION

5    BY MR. FOX:

6    Q.   Could you state your name for the record, please.

7    A.   Lyn Salvo.

8    Q.   Okay.  Good afternoon, Ms. Salvo.  I have a few questions

9    for you relating to the facts of this case, first starting with

10   what's your position at Aclara?

11   A.   I am the senior director of HR and organizational

12   development.

13   Q.   And you report to Michael Garcia, correct?

14   A.   That is correct.

15   Q.   Could I just very briefly hear about your duties as senior

16   director of HR?

17   A.   I'm sorry?

18   Q.   Could I very briefly hear what your job duties are?

19   A.   Yes.  As the senior director of HR, I'm the site leader

20   for the St. Louis site of about 239 employees.  I am also a

21   business partner for various specific businesses within Aclara,

22   and then I also am in charge of organizational development for

23   the entire organization of Aclara.

24   Q.   Okay.  And is it -- you have a lot of responsibilities; is

25   that correct?

Salvo - Direct                                                          623

1   A.   Yes.

2   Q.   Okay.  And every once in a while, you said at your

3   deposition, things do fall through the cracks?

4   A.   I think for the most part, things sometimes do, but not

5   always.

6   Q.   How large is the Aclara organization?

7   A.   Including the SGS organization, we have over a thousand

8   employees, about 1,076 the last time I checked.

9   Q.   Okay.  And you said at your deposition that there were,

10  676 of them were SGS installers, correct?

11  A.   That sounds about right.

12  Q.   The turnover rate is high for those SGS installers, is it

13  not?

14  A.   Yes, it is.

15  Q.   Why is that?

16  A.   The turnover rate is high because it's a, it's a difficult

17  job.  It's a job that requires people to be working in all

18  kinds of weather outside, working with equipment that is

19  volatile in nature in terms of electricity and gas and water

20  that, that can create safety issues, and it's, and it's not a

21  job that -- it's hard work, and it's not a job that people end

22  up staying in for a long period of time.

23  Q.   Do you know anything about the racial composition of the

24  SGS installers?

25  A.   I do not.

Salvo - Direct                                                        624

1   Q.   You do not to this day?

2   A.   I do not to this day.

3   Q.   Okay.  Well, do you know this:  whether the SGS

4   installers, whether a large proportion of them were people of

5   color?

6   A.   I do not.

7   Q.   Is that not something you've investigated since this

8   lawsuit was filed?

9   A.   I have not investigated that.

10  Q.   Do you ever recall being given training in retaliation?

11  A.   Say that again, I'm sorry?

12  Q.   Do you ever recall being given training in guarding

13  against retaliation?

14  A.   Yes.  I have been trained and I've also done training

15  regarding retaliation in the workplace.

16  Q.   You've done training yourself?

17  A.   I've done training myself.

18  Q.   Okay.  And you're fully familiar with the policies in the

19  Aclara Code of Business Conduct governing good faith reporting

20  of potential illegal activity, correct?

21  A.   Yes, I am.

22  Q.   Now, do you understand that Joey Rufo was looking to you

23  for some level of mentorship in the HR arena?

24  A.   I do, yes.

25  Q.   And, and you would talk with him -- you talked with him

Salvo - Direct                                                    625

1   from time to time about that, right?

2   A.   Yes, I have.

3   Q.   And he expressed a lot of enthusiasm and exuberance; is

4   that, is that fair?

5   A.   That's fair.

6   Q.   And did he emit a positive vibe as an employee within the

7   organization?

8   A.   When I first met him, yes, he did emit a positive vibe.

9   Q.   He was never threatening with you or any other employee of

10  Aclara, was he?

11  A.   He was never threatening to me, but I can't answer about

12  towards any other employee.

13  Q.   I'd like you to take a look at Exhibit 22.  Okay.  This is

14  an e-mail from yourself dated July 7, sent at 3:10 p.m.?

15  A.   Yes.

16  Q.   To Joey Rufo and Gina Petrella.  Can you, can you read it

17  to the jury?

18  A.   It says, "Beautiful.  Thanks.  I will look at it more

19  closely this weekend, but great start!"

20  Q.   Okay.  And Joey's e-mail is below that, correct?

21  A.   Joey's e-mail is below that, correct.

22  Q.   Okay.  And his going forward plans are identified in

23  there, correct?

24  A.   What was the question?  I'm sorry.

25  Q.   Let me ask you this:  You understood he had sent a

Salvo - Direct                                                          626

1   one-page e-mail, correct?

2   A.   It didn't come through my screen as one page, but yes, it

3   was -- but it was a lengthy e-mail to what I'm typically

4   accustomed to.

5   Q.   Okay.  Did you read Joey's e-mail before you responded?

6   A.   I read about the first two lines of the e-mail just to

7   kind of understand what the gist of the e-mail was about.  I

8   opened up the spreadsheet, and I looked at the spreadsheet very

9   briefly just to see the columns on the spreadsheet, and then I

10  closed it out, and I responded to him that it was a nice start

11  and I would look at it in more detail later on.

12  Q.   Okay.  And you did that around July 7, correct?

13  A.   I did that on July 7, yes.

14  Q.   Okay.  And Joey gave his report a month, a month later

15  approximately, correct?

16  A.   He sent, he sent the report out about a month later that

17  indicated it had all of the July statistics in it, yes.

18  Q.   So you had a month to tell him not to move forward with

19  this if that was your intent, correct?

20  A.   Well, when you say if that was my intent, I never went

21  back and read that e-mail in totality.  I was just looking at

22  the spreadsheet based on him completing the spreadsheet as we

23  had asked him to do.

24  Q.   Okay.  And you gave him no further guidance other than,

25  "Beautiful.  Thanks.  I will look at it more closely this

Salvo - Direct                                                        627

1   weekend, but great start," correct?

2   A.    That is correct.  I gave no further detail.

3   Q.    And you never told him:  No, the company doesn't want you

4   to look at the -- doesn't want you to compare the EEO

5   categories; don't do that.  Right?

6   A.    That is correct.  I never told him not to do that, but I

7   had not seen that e-mail, either, that bottom part.

8   Q.    Had you actually read the e-mail, would you have told him

9   not to perform the discrimination analysis?

10  A.    I certainly would have called him to ask for more

11  clarification of what that meant.

12  Q.    Okay.  But you never did that, did you?

13  A.    I never read that part, so no, I did not.

14  Q.    And Gina Petrella, do you understand Gina Petrella's

15  practice not to read e-mails that are over a certain length?

16              MS. DURR:  Objection.

17              THE COURT:  Sustained.

18  BY MR. FOX:

19  Q.    Do you have any practice like that, that you limit your,

20  your review of e-mails to a certain length or --

21  A.    I wouldn't call it a practice.  I know I get a lot of

22  e-mails, and I usually can read in the first few lines of most

23  e-mails what the content is about, and if it sounds like

24  something that I need to get into in further detail, I will

25  continue reading.  If not, I usually put it aside to take care

Salvo - Direct                                                         628

1    of it later.

2    Q.    Okay.  So let's move to Exhibit 33.  This is Joey's

3    August 8 spreadsheet and EEO report, correct?

4    A.    That's what it looks like, yes.

5    Q.    And you recall receiving this document, don't you?

6    A.    I recall receiving this document, yes.

7    Q.    In around the same time it was sent, around August 8,

8    correct?

9    A.    About a month after the first one, August 8, correct.

10   Q.    And then you did review this e-mail accompanying the

11   document, correct?

12   A.    I did but only after I was called attention to it.

13   Q.    Who called it to your attention?

14   A.    Gina Petrella.

15   Q.    And did she indicate to you that the document disclosed

16   disparity in the treatment of non-white employees versus white

17   employees?

18   A.    Not, not in those words, no.

19   Q.    Did you review the content of the spreadsheet?

20   A.    Not at that moment, no.

21   Q.    Okay.  I'd like to show you Exhibit 23.  Let me just ask

22   you this first before I show you the exhibit:  Did Ms. Petrella

23   ever express to you the view that Joey had displayed initiative

24   in preparing this spreadsheet?

25   A.    I'm not sure I understand your question.

Salvo - Direct                                                        629

1  Q.   Did she ever say:  Hey, Joey showed some initiative in

2  preparing this data for the company?

3  A.   I don't remember those words, but I believe that in what

4  you're going to show me, that's what it says.

5  Q.   I'm just asking you if you recall her ever saying that.

6  I'll move on if you don't.

7  A.   I don't recall her saying that.

8  Q.   Now, I'd like to take a look at Exhibit 34.  Do you see

9  that?

10 A.   It's not up yet.

11 Q.   It will take a moment.

12 A.   Okay.

13 Q.   Did you review this EEO spreadsheet?

14 A.   No, I did not.

15 Q.   Okay.  Why didn't you scrutinize this, Ms. Salvo?

16 A.   I didn't scrutinize it because at that point in time, it

17 was a concern that Gina, who was our EEO and compliance

18 specialist, was looking at that, and I don't know enough about

19 these spreadsheets and the EEO analysis to be able to comment

20 on them one way or the other.

21 Q.   Do you know if she scrutinized it herself?

22 A.   I don't know if she scrutinized it.  I know she looked at

23 it.

24 Q.   Other than what Joey did, was, was any monitoring ever

25 done to determine if discipline wasn't meted out to employees

Salvo - Direct                                                              630

1  based upon race?

2  A.   Any monitoring, is that what you asked?

3  Q.   Yes.

4  A.   Not to my knowledge.

5  Q.   Has anyone looked at the issue since, anyone including

6  yourself in the organization, looked at the issue since Joey

7  made the revelations?

8  A.   Not to my knowledge.

9  Q.   Just so the record is clear, so far as you know, the

10  company has done no analysis of any kind, including a

11  statistical analysis, to determine whether or not it's

12  disciplining its employees who are non-white in a

13  disproportionate fashion?

14  A.   If the analysis had been done, I was not made aware of it.

15  Q.   And that's true to today's date, correct?

16  A.   I'm not sure I --

17  Q.   As we sit here in the courtroom, you're not aware of it?

18  A.   Well, since I have been part of reading some of the

19  information, I've been made aware of it, yes.

20  Q.   Okay.  I'm simply asking you if as you sit here today,

21  you're not aware of any such analysis having been done?

22  A.   As I'm sitting here today in terms of anybody saying to me

23  specifically that analysis was done, I was not made aware of

24  that.

25  Q.   Okay.  Now, let's take a look at Plaintiff's Exhibit 43.

Salvo - Direct                                                          631

1   This is an e-mail exchange, and if you'd turn to page 2 and

2   look at the e-mail at the top of the page?  We'll expand that

3   for you.

4            This is an e-mail from Jill Mecey to yourself and

5   Gina Petrella saying, "Thanks, Lyn.  Gina, Lyn, and I will

6   conduct the conversation with Joey hopefully no later than

7   tomorrow morning.  He is IM-ing me and is very concerned that

8   he is in trouble.  I would like to have the conversation as

9   soon as possible."

10           Did you receive that e-mail?

11  A.   Yes, I did.

12  Q.   Okay.  And do you know why Joey was afraid he was in

13  trouble?

14  A.   I would guess that he's concerned he's in trouble based on

15  a conversation that he and I had.

16  Q.   Okay.  And did you -- were you aware that he had been told

17  he may have put the company at risk?

18           MS. DURR:  Objection.  There's no evidence of that.

19           THE COURT:  Yeah, I'm sustaining the objection.

20  BY MR. FOX:

21  Q.   Okay.  Did, did you tell him he may have put the company

22  at risk?

23  A.   Not that I recall, no.

24  Q.   Did you tell him or did you say to anyone the company

25  needed to do damage control?

Salvo - Direct                                                          632

1    A.   No.  I did not say that.

2    Q.   Do you know what that means, damage control?

3    A.   Yes.

4    Q.   What does it mean in this context?

5    A.   Damage control, if there is something done that needs to

6    be corrected via interviews or other courses of action, then

7    that takes place.

8    Q.   Okay.  Did anything like that happen in this case?

9    A.   Damage control?

10   Q.   Yes.

11   A.   Not to my knowledge, no.

12   Q.   How could Joey have put the company at risk by disclosing

13   the EEO data to yourself and Gina Petrella?

14        MS. DURR:  Lack of foundation.

15        THE COURT:  Sustained.

16   BY MR. FOX:

17   Q.   Okay.  Now, you contacted Joey to interrogate him about

18   who he had supplied the report to, correct?

19   A.   I had set up a meeting with Joey so that I could better

20   understand his analysis that he had submitted to Gina and

21   myself, yes.

22   Q.   And the first thing you asked him was did he send it to

23   anyone else, right?

24   A.   No, that was not the first thing I asked him.

25   Q.   That's something you asked him in the conversation,

Salvo - Direct                                                              633

1    correct?

2    A.    I did, yes.

3    Q.    What was the first thing you asked him?

4    A.    Who authorized him completing the information.

5    Q.    And what did he tell you?

6    A.    He didn't tell me anything.

7    Q.    Did he refer you back to your e-mail?

8    A.    No, he did not.

9    Q.    Were you not aware of that e-mail at that point in time?

10   A.    I was aware of the e-mail where I said, "Beautiful, great

11   start," yes.

12   Q.    Okay.

13   A.    But that was not an authorization for him to proceed with

14   an analysis on something I had not read.

15   Q.    Did he not discuss that with you in the call, that you had

16   sent that e-mail giving him a nod?

17   A.    He did not discuss that on the call.

18   Q.    Did you take notes of the call?

19   A.    I don't remember if I did.  It was a short conversation.

20   Q.    And when he asked -- he asked you if he was in trouble

21   with the call, didn't he?

22   A.    He did.

23   Q.    And you said, "Are you in trouble?"  Then you, you

24   scoffed, right?

25   A.    No, I'm not a scoffer.

Salvo - Direct                                                        634

1   Q.   You're not denying you would have rephrased the question

2   and then, and then --

3   A.   When he asked me if he was in trouble, I told him that I

4   did not know, that I was asking him these questions so that I

5   further understood why he completed that analysis, and I needed

6   to review those with Michael, and I would talk with him later.

7   Q.   How did you conclude the call with him?  Didn't you tell

8   him, "Are you in trouble?  Ha"?

9   A.   No, I did not.

10  Q.   How did you conclude it?

11  A.   I said, "Thank you for the information, and we'll be in

12  touch."

13  Q.   Did you not ask him how he extracted the data?

14  A.   I asked him where he got the data to complete the report.

15  Q.   And he explained that to you, did he not?

16  A.   He said he got it from personnel records.

17  Q.   Okay.  And you said to him, "Oh, well, you have a need to

18  know then," did you not?

19  A.   I did not.

20  Q.   You don't recall saying that?

21  A.   I don't recall because I didn't say it.

22  Q.   Well, you understood he, he told you he extracted the data

23  on race from the Paycom system?

24  A.   No, he did not say anything.  I scheduled the call.  I had

25  four questions to ask him.  I asked him the four questions.  He

Salvo - Direct                                                          635

1    responded to me specifically on the four questions I asked.   We

2    closed out the call, and that was it.  He did not say what

3    you're saying he said.

4    Q.   What's your understanding as to how he -- let me ask you

5    this:  Is there any way to get the data on race other than

6    through the Paycom system in the company?

7    A.   I don't --

8              MS. DURR:  Objection.  Calls for speculation.

9              THE COURT:  No, if she knows.  She's the head of HR.

10             THE WITNESS:  Doing EEO analysis is not in my area of

11   expertise, so if I had to gather that information, I would have

12   to get some kind of counseling or coaching as to where to pull

13   information specifically for an EEO analysis.

14   BY MR. FOX:

15   Q.   You're the head of the EEO, and you're telling me you

16   would need coaching to figure out where to get the data for

17   race?

18   A.   For an EEO report?  Yes.

19   Q.   Are you familiar with the Paycom system at all?

20   A.   I am familiar with the Paycom system and the WorkPlace

21   system, which are both payroll systems of the company.

22   Q.   Well, you're aware that the purpose of the system is to

23   keep track of information relating to the employees, including

24   demographic data, racial data, things like that?

25   A.   I am aware but I never use those systems to pull

Salvo - Direct                                                    636

1    information.  I have very specific reasons to be in those

2    systems, and if I needed a race report, I would ask somebody

3    else to run it.

4    Q.    And you know what "EEO" means, don't you?

5    A.    Yes, I do.

6    Q.    Would you expect Ms. Mecey to know that?

7    A.    She's new in her position.  I would not expect her to know

8    it like I would know it after 25 years.

9    Q.    How long was she with the company?

10   A.    She's been with the company about six years, but she's

11   been in that position for a little less than two.

12   Q.    Okay.  And there was a lot of discussion about the EEO

13   data when Joey released it, wasn't there?

14   A.    I was involved in some of the discussion but not all of

15   the discussion.

16   Q.    Now, after you talked to Joey, you reported back to

17   Mr. Garcia, correct?

18   A.    Correct.

19   Q.    You relayed to him your conversation with Joey, correct?

20   A.    Correct.

21   Q.    Okay.  And you didn't conduct any further inquiry of any

22   kind as to whether Joey was authorized to access the data that

23   you used in the report, did you?

24   A.    No, I did not.

25   Q.    Okay.  After issuing Joey a final written warning and

Salvo - Direct                                                          637

1   performance improvement plan -- which you approved, correct?

2   A.   I did not issue him a final written warning.  He was

3   issued a written warning with the performance improvement plan.

4   Q.   You approved that, whatever it was, right?

5   A.   I was involved in helping Jill draft it, yes.

6   Q.   And after that, you and Jill Mecey had a follow-up call

7   with him, correct?

8   A.   That is correct.

9   Q.   And in that call -- and I don't want to replay it.  We've

10  already spent a lot of time in this trial, and I don't want to

11  be duplicative, but did you and Jill Mecey not question Joey

12  relentlessly on with whom he had shared the EEO report?

13  A.   There was a question about who he had shared his written

14  warning but not about who he shared the report with, no.

15  Q.   Okay.  Why were you so concerned about him talking to

16  other people, people like Alvin Jackson?

17  A.   I'm not concerned that he would have talked to other

18  people about a written warning.  That's certainly his choice to

19  do so, but my understanding was he shared that with Alvin

20  Jackson specific to telling him he was planning on contesting

21  that, and contesting that, I'm not sure why he wouldn't have

22  done that with his supervisor rather than go to somebody else.

23  Q.   And you didn't, you didn't want him contesting it, did

24  you?

25  A.   I didn't want him what?  I'm sorry.

Salvo - Direct                                                         638

1    Q.    Contesting it.

2    A.    He could contest it if he wanted to, but sharing that with

3    somebody else without his supervisors, that was the concern.

4    Q.    And he was told that they would take it -- you and Lyn

5    Mecey would take -- you and Jill Mecey would take it as his

6    resignation if he wouldn't stop doing that and stop talking

7    about the performance improvement plan?

8    A.    No, that was not in the context whatsoever.

9    Q.    Is that correct?

10   A.    No, that is not correct.

11   Q.    Now, you were also involved, were you not, in approving

12   the negative performance review that Joey was subjected to?

13   A.    What do you mean by approving?

14   Q.    You were aware of it, correct?

15   A.    I was aware of the performance evaluation that Jill

16   completed, yes.

17   Q.    And she assigned to Joey a number of 1's in critical

18   categories of evaluation like leadership, decision-making, and

19   teamwork, correct?

20   A.    What I remember, yes.

21   Q.    Did Jill Mecey tell you that after he was put on the PIP,

22   Joey had alerted her that he felt that it was retaliation?

23   A.    I don't recall her saying that to me directly, no.

24   Q.    Well, you learned -- did you learn he had raised a

25   complaint about retaliation before this lawsuit, after he was

Salvo - Direct                                                          639

1    put on the PIP?

2    A.    Before the lawsuit?

3    Q.    Yes.

4    A.    No.

5    Q.    You became aware of this lawsuit shortly after it was

6    filed; is that correct?

7    A.    Yes.

8    Q.    Now -- and you were aware that Joey was fired after a

9    lawsuit was filed, correct?

10   A.    His job was eliminated --

11   Q.    Did you raise --

12   A.    -- after some time.

13   Q.    -- or register some concerns as the head of HR around the

14   fact that Joey had filed a lawsuit for retaliation that was

15   still pending at the time that he was let go?

16   A.    Did I voice any concern?

17   Q.    Yes.

18   A.    No, I did not.

19   Q.    It did not concern you that that could be viewed as a

20   separate, new act of retaliation?

21   A.    It did not concern me based on the reason for the position

22   elimination.

23   Q.    Did anyone ever perform an internal investigation of

24   Joey's initial charges of retaliation?

25   A.    Not to my knowledge.

Salvo - Cross                                                        640

1    Q.   By the way, if an employee is threatening to their

2    supervisor, is that something that would have been reported to

3    you typically, assuming you were over the supervisor?

4    A.   Say that question one more time?  I'm sorry.

5    Q.   If an employee had been threatening to their supervisor,

6    is that something you'd find out about for supervisors in your

7    group?

8    A.   If the supervisor reported it to me.

9    Q.   Okay.  You would expect a supervisor to report any

10   threatening behavior, would you not?

11   A.   I can expect it, but it doesn't necessarily mean that

12   somebody's going to report it to me, no.

13   Q.   So if someone engaged in threatening behavior, would that

14   be something as to which the company would take serious action

15   against that employee typically?

16   A.   Yes.

17   Q.   Now, based upon your interactions with Joey, did he seem

18   to you like the kind of person who'd be threatening?

19   A.   I can't answer that.  I've never been in a situation where

20   I might do something that he would want to threaten me.

21           MR. FOX:  I have no further questions.  Thank you.

22           THE COURT:  All right.  Cross-examination?

23                       CROSS-EXAMINATION

24   BY MS. DURR:

25   Q.   First of all, you testified that right now, there's 766

Salvo - Cross                                                               641

1   SGS installers.  Do you know how many installers there were at

2   the end of July 2017?

3   A.   At the end of July, there were about 350-some-odd

4   installer numbers.

5   Q.   Okay.  I wanted to quickly talk about the e-mail that's

6   Plaintiff's Exhibit 22.  No, I'm sorry, oh, 22A.  My apologies,

7   I'm looking at the wrong exhibit.  22A -- or 22, excuse me.

8          Now, at the bottom of this lengthy e-mail from

9   Mr. Rufo is his paragraph that talks about going forward,

10  right?

11  A.   Correct.

12  Q.   Okay.  When you talked to Mr. Rufo on August -- about

13  August 10, I think you testified to, and you had the four

14  questions, and one of them was who authorized you to do this

15  report --

16  A.   Yes.

17  Q.   -- did you have in your mind -- were you, were you aware

18  of this "Going forward" e-mail when you had that call with

19  Mr. Rufo?

20  A.   I don't remember the exact date.  I became aware of it

21  somewhere around that time, but when I talked to him, I was not

22  aware, I believe, of that particular statement.

23  Q.   When you called Mr. Rufo on August 10, did you think you

24  had authorized him to do any kind of EEO report?

25  A.   I -- no, I did not authorize him to do any.  I wouldn't do

Salvo - Cross                                                      642

1    any.  I wouldn't ask an office coordinator to do it.

2    Q.   But you had assigned -- you and Gina had assigned Mr. Rufo

3    to do some sort of a spreadsheet, right?

4    A.   Correct.  Yes.

5    Q.   Okay.  And it was to track discipline?

6    A.   It was to track discipline.  Yes, correct.

7    Q.   Okay.  For what population within SGS?

8    A.   For the installers.

9    Q.   Okay.  So it wasn't for the entire population of SGS?

10   A.   No.  It was for the installers.

11   Q.   Okay.  When you, when you talked to Mr. Rufo on

12   August 10 and asked him who authorized the e-mail, did he

13   mention your e-mail to you, saying:  Hey, Lyn, you did it.  You

14   authorized me to do it?

15   A.   No, he did not.

16   Q.   During that call with you, did he say anything to you

17   about that I think I'm -- I think that there's potential

18   discrimination?

19   A.   No, he did not.

20   Q.   Are you certain about that?

21   A.   I am 100 percent certain about that.

22   Q.   Okay.  Did he tell you that he thinks there's a clear

23   majority of the discipline that passed my desk seemed to

24   involve employees who were either black or multiracial?

25   A.   No, he did not.

Salvo - Cross                                                             643

1    Q.    Did he talk anything about, you know, disparity could be

2    indicative of potential intentional systemic discrimination?

3    Did he use those words?

4    A.    I'm sorry, no, he did not.

5    Q.    Are you certain of that?

6    A.    I am very certain that he did not.

7    Q.    Is it possible that you misunderstood and he said

8    something similar but he didn't use quite those words?

9    A.    No.  As I said, I had four questions to ask him.  I asked

10   him.  He replied directly to those questions, and the call was

11   ended.

12   Q.    Okay.  Did he tell you that, well, you know, I've been

13   seeing a trend since I started doing this tracking of

14   discipline in June, and that's continued unabated since?

15   A.    No, he did not.

16   Q.    Did you -- did he tell you -- well, strike that.

17         Did you ask him:  What do the numbers mean?

18   A.    I don't recall asking him that question, no.

19   Q.    Okay.  Did -- do you remember if he said anything like:

20   No, numbers, this means that employees who self-identify as

21   black or multiracial are greatly overrepresented?

22   A.    No, he did not say anything like that.

23   Q.    Did he say in the call:  I said employees who

24   self-identify as white are greatly underrepresented in Aclara's

25   disciplinary action?"

Salvo - Cross                                                          644

1    A.    No, he did not say anything like that.

2    Q.    Did you ask him if he had access to employees' salary

3    information?

4    A.    No, I did not.

5    Q.    Okay.  Did you ask if he had any previous experience doing

6    analysis?

7    A.    Yes, I did.

8    Q.    Okay.  And what did he tell you?

9    A.    He told me that at a former job, he had done analysis --

10   similar analysis.

11   Q.    Did he tell you that he had done EEO analysis?

12   A.    No.  Not specifically, no.

13   Q.    Did he explain further or did you ask any further

14   questions about what kind of analysis he had done at his

15   previous job?

16   A.    I don't recall, but I did ask him if he had experience in

17   statistics and had taken statistician type of classes or was

18   aware of that.

19   Q.    And what did he say?

20   A.    He -- I don't remember his response.

21   Q.    Okay.  And then did he ask you then, "Am I in trouble or

22   something?"

23   A.    He asked me if he was in trouble.

24   Q.    Okay.  And what did you say?

25   A.    I told him that, the phone call, I needed to determine and

Salvo - Cross                                                      645

1   understand the analysis that he had provided us, and I told him

2   I was going to take the information and his answers from the

3   questions and review them with my supervisor.

4   Q.   Okay.  And then did you have any follow-up calls with

5   Mr. Rufo about the EEO report?

6   A.   I did not.

7   Q.   Okay.  Now, I know you testified that you weren't aware if

8   the company had done any further analysis.  Is it possible they

9   had done any further analysis?

10  A.   It is possible, but again, since that EEO doesn't fall

11  under my areas of specialty, they might not have brought me

12  into that conversation.

13  Q.   Okay.  Now, now, you testified that you were aware of the

14  performance review?

15  A.   Yes.

16  Q.   Mr. Rufo's performance review?

17  A.   I was aware of it, yes.

18  Q.   Okay.  And were you involved in the preparation of that

19  performance review?

20  A.   No, I was not.

21  Q.   Okay.  When did you first see the performance review?

22  A.   The performance review process is something that I oversee

23  for the entire organization, so I do get an opportunity to

24  review documents and review reports related to ratings of

25  employees.

Salvo - Cross                                                          646

1   Q.   Okay.  Well, when did -- did you see Mr. Rufo's

2   performance review before it was finalized and given to him, or

3   was it after?

4   A.   I don't remember, but I do know what his scoring was.   I

5   do know what his overall performance was prior to the

6   completion of the performance appraisal process for the

7   company.

8   Q.   Well -- okay.  I want to turn your attention to

9   Plaintiff's Exhibit 72 -- oh, no, excuse me, that's the

10  wrong -- it's 78.

11  A.   Okay.

12  Q.   Okay.  On the second page and third page, there's scores

13  of competencies -- in Section 2, competencies?

14  A.   Yes.

15  Q.   Employee rating.

16  A.   Yes.

17  Q.   First of all, so you know, this is -- let's -- before we

18  go into that, this -- there's been testimony that this

19  performance review was given to Mr. Rufo by Ms. Mecey in April

20  of 2018.

21  A.   Okay.

22  Q.   And for this year, which was the 2017 performance review

23  year, was that unusual, to be late for managers to be giving

24  reviews?

25  A.   Typically, typically, it would be.  We were running very

Salvo - Cross                                                          647

1    behind on performance appraisals that year.  We weren't

2    finishing up until December and later.  Managers may have

3    completed scoring, but some of the reviews weren't reviewed

4    with the employee until a later time period.  Not what we

5    prefer but that's -- that year was kind of tough on us.

6    Q.   Do you know why it was kind of tough?

7    A.   Well, there were some negotiations or some understanding

8    of kind of having Hubbell purchase us, and there were a lot of

9    departments, HR included and finance, that were working on

10   these integration plans, and it created a lot of extra work

11   where unfortunately, for lack of better terms, it may not have

12   been of a higher priority of getting this done.

13           In terms of reviewing them with employees, the scores

14   were done, but not reviewing them with the employees until

15   later.

16   Q.   Okay.  Do you know if that was something that besides Jill

17   Mecey, that other managers were late on doing?

18   A.   Yeah.  Sorry, yes.

19   Q.   Okay.  So you said that you reviewed these scores on the

20   competencies.  At the end of the day, was Mr. Rufo a high,

21   medium, or low performer?

22   A.   Based on these scores, he would have been a low performer.

23   Q.   Okay.  Now, just so we can understand the scores, on page

24   2, under the competencies, when Ms. Mecey gave -- and Ms. Mecey

25   gave Mr. Rufo a 3 for professional knowledge.  Is that a low

Salvo - Cross                                                              648

1    score?

2    A.   No.  According to our scale, that would have been --

3    scores go from 1 to 5.   5 would be certainly exceeds

4    expectations in all areas of the job.  A 1 would be below

5    expectations and critical areas of the job need improvement,

6    and a 3 is solid -- minimum expectations of the job are being

7    met.

8    Q.   Okay.  So if Ms. Mecey had actually raised that score to a

9    4, that would be a -- that would actually be a more than

10   meeting minimum expectation?

11             THE COURT:  Mr. Fox?

12             MR. FOX:  Objection, Your Honor.

13             THE COURT:  I'm sorry?

14             MR. FOX:  Objection.  It's redundant.

15             THE COURT:  Yeah, it's cumulative.  We're going to

16   sustain the objection.

17   BY MS. DURR:

18   Q.   I mean, he read through the other scores?

19             THE COURT:  It's redundant.  Let's go.

20   BY MS. DURR:

21   Q.   Okay.  Now, are you aware if merit increases are standard

22   throughout the company for all employees?

23   A.   Merit increases is part of the performance appraisal

24   process, but they're not standard.   In other words, an employee

25   may not receive a merit increase based on performance if they

Salvo - Cross                                                          649

1    did not perform well the previous year.

2    Q.   Okay.  Did you -- do you know if all of the direct reports

3    for Jill Mecey for the 2017 year, if they received a merit

4    increase?

5    A.   For the 2017 year?  I believe two of the employees would

6    not have received an increase in the 2017 year.

7    Q.   Okay.  I'm going to turn your attention to Plaintiff's

8    Exhibit 82.

9            THE COURT:  I'm not positive that's in, so any

10   objection?  Again, can't be objections, it plaintiff's, so it's

11   in.

12           (Plaintiff's Exhibit No. 82 was received in

13   evidence.)

14   BY MS. DURR:

15   Q.   And I know it's a little bit small, but are you familiar

16   with this document, Ms. Salvo?

17   A.   Yes.  It looks like a summary of performance ratings given

18   to employees over a three-year period.

19   Q.   Okay.  Let's see here.  Do you have -- have you ever seen

20   these types of charts before?

21   A.   Yes.  They are part of charts that we've compiled as part

22   of the merit increase and performance review summaries.

23   Q.   Okay.  And is this information actually that's part of

24   this litigation that was requested of you to provide?

25   A.   I was asked to supply it, yes.

Salvo - Cross                                                          650

1    Q.   Okay.  And the, and the information on here is true and

2    accurate to the best of your knowledge, right?

3    A.   Yes, it is.

4    Q.   Okay.  So, for example, in 2015 for the two reports for

5    Ms. Mecey, it reflects that there were no increases for those

6    folks, right?

7    A.   That's correct.

8    Q.   And then in 2016, there was an increase for one employee

9    at 1.75 percent and another employee at 2.4 percent, but then

10   the third employee, Patty Schultz, got 0 percent merit

11   increase, correct?

12   A.   That's correct.

13   Q.   And then for the 2017 year, Zana Scott got a 3 percent

14   merit increase?

15   A.   Um-hum, correct.

16   Q.   And Donna Lapeyrouse and Mr. Rufo got no merit increases,

17   right?

18   A.   Correct.

19   Q.   Now, you talked about the policy of the company, that

20   there's no policy of retaliation, correct?

21   A.   I'm sorry?

22   Q.   Does the company have a no retaliation policy?

23   A.   Yes, they do.

24   Q.   Okay.  Do you know where that statement is for Aclara?

25   A.   Well, we have a no retaliation policy that's that; we have

Salvo - Cross                                                          651

1  a Code of Business Conduct and Ethics; and there would be a

2  section there on no retaliation; and then we also have some

3  online training that employees are to take on business conduct

4  and ethics that also includes information on no retaliation.

5  Q.   Okay.  And I want to turn -- I want to turn your attention

6  to Defendant's Exhibit 290.

7           And I don't know that it's been admitted, so I move

8  to have it admitted.

9           THE COURT:  Any objection to 290?

10          MR. FOX:  Probably not.  We haven't objected so far.

11          No objection, Your Honor.

12          THE COURT:  All right.  It's in.

13          (Defendant's Exhibit No. 290 was received in

14  evidence.)

15          MS. DURR:  Defendant's Exhibit 290 -- why don't you

16  go to the first page first so she can identify it.

17  BY MS. DURR:

18  Q.   Is this the Aclara Code of Business Conduct that you were

19  referencing?

20  A.   Yes.

21  Q.   Okay.  And I want to turn your attention to the sixth

22  page.

23          And blow it up.

24          Is there a section that's headed -- with the header

25  "Retaliation Prohibited"?

Salvo - Cross                                                            652

1    A.   Yes, there is.

2              MS. DURR:   Okay.   And would you blow that up?   Okay.

3    BY MS. DURR:

4    Q.   And is that the no retaliation policy that you were

5    referencing?

6    A.   That is one of the policies, but yes, that, that

7    particular verbiage is shown in all of the policies.

8    Q.   Okay.   To your knowledge, that is the statement of Aclara

9    prohibiting retaliation, correct?

10   A.   Correct.

11   Q.   And then for the entire time that you worked at -- that

12   Mr. Rufo worked at Aclara, did you have an understanding that

13   this policy was in place?

14   A.   Yes.

15   Q.   And did you have an understanding that you are not

16   supposed to retaliate against people who make complaints of --

17   A.   No employee is to retaliate against anybody who makes a

18   complaint.

19   Q.   Okay.   And that you understand that if you were to have

20   been found to have retaliated against somebody in violation of

21   their policy, that you could suffer discipline?

22   A.   Yes.

23   Q.   Okay.   And then, and then -- you said that you have

24   provided training to -- about, about discrimination or

25   retaliation?

Salvo - Cross                                                        653

1   A.   We have provided training for supervisors, core leadership

2   classes, that we went around and we met with supervisors and we

3   talked about what it takes to be a supervisor, the rules of

4   do's and don'ts in terms of working with employees, and there

5   was a section that also talked about retaliation and discipline

6   of employees.

7   Q.   Well, I'm sorry, when you said supervisors, was this all

8   Aclara's supervisors, or could you provide some context to this

9   jury as to who you're talking about?

10  A.   Yes.  One of our legal counsel and myself had put together

11  a training program, and we went out to all of the SGS sites,

12  and we met with the program managers and the project managers

13  and the field supervisor to conduct this training.

14  Q.   Okay.  And when did you do this training?

15  A.   We started developing the classes around July-August, and

16  we started doing the training, I want to say, in September --

17  Q.   Okay.

18  A.   -- October of the year.

19            THE COURT:  I'm sorry, what year?

20            THE WITNESS:  Oh, I'm sorry, 2017.

21  BY MS. DURR:

22  Q.   And I want to turn your -- pull up Plaintiff's Exhibit 94.

23            I don't believe this has been admitted in.  We'd move

24  to move its admission.

25            THE COURT:  All right.  It's in.

Salvo - Cross                                                                 654

1              (Plaintiff's Exhibit No. 94 was received in

2    evidence.)

3    BY MS. DURR:

4    Q.   Is this the PowerPoint slide of the presentation that you

5    and -- who is the other person that presented?

6    A.   Tim.

7    Q.   Tim who?

8    A.   I forgot his last name, I'm sorry.  I'm nervous.

9    Q.   Okay.  Is this a slide of what -- is this a PowerPoint

10   presentation of your program?

11   A.   Yes, it is.

12   Q.   Okay.  And I want to turn your attention to page 94-54.

13   Was the topics or items, the issues to consider that's shown on

14   Defendant's -- or Plaintiff's Exhibit 94-54, was that addressed

15   with the SGS supervisors?

16   A.   Yes, it was.

17   Q.   Okay.  Okay.  And then one last housekeeping matter:

18   The -- do you know which -- was there a progressive discipline

19   policy or some type of disciplinary policy that would apply to

20   office -- to an office coordinator position in Herndon?

21   A.   It would be the corrective action guidelines.

22   Q.   Okay.  I'm going to turn your attention to Defendant's

23   Exhibit 302.

24              THE COURT:  Any objection to 302?

25              MS. DURR:  I think it was admitted already.

Salvo - Cross                                                        655

1              THE COURT:  All right.

2              MR. FOX:  No, Your Honor.

3              THE COURT:  All right.  It's in.

4    BY MS. DURR:

5    Q.   Sorry, Ms. Salvo, I know it's kind of small to read.

6    A.   It's small.

7    Q.   Okay.  Is that the corrective action guidelines that you

8    were referencing?

9    A.   Yes, it is.

10             MS. DURR:  Okay.  And if you could scroll a little

11   bit up, Susie, to "Practice," with the bullet points?  Okay.

12   And the paragraph afterwards?  Up a little bit, I'm sorry.

13   BY MS. DURR:

14   Q.   Can you see it, Ms. Salvo, "Practice"?

15   A.   I can.  It's small, but yes.

16   Q.   And to your knowledge, is that an accurate statement of

17   the discipline policy that would have been applicable to

18   Mr. Rufo?

19   A.   Yes.

20   Q.   Okay.  Now, I want to turn your attention to Plaintiff's

21   Exhibit 87.

22             THE COURT:  That's already in evidence.

23   BY MS. DURR:

24   Q.   This is another progressive disciplinary policy, correct?

25   A.   Correct.

Salvo - Cross                                                          656

1    Q.   Okay.  Does this apply to an office coordinator position

2    in Herndon?

3    A.   No.  This was written specifically for the SGS installers'

4    employee handbook.

5    Q.   Okay.  And how much interaction did you have with Mr. Rufo

6    during the entire time that he worked for the company?

7    A.   He didn't directly report to me, so off and on but not

8    much.

9    Q.   Okay.  Did you ever meet with Mr. Rufo face to face?

10   A.   Yes.  I met him at an operations meeting, an SGS

11   operations meeting that was conducted in St. Louis in June.

12   Q.   Okay.  Did he do anything at that meeting that raised any

13   concern with you?

14   A.   There was a point in the presentations where Gina Petrella

15   and I were actually taking that employee handbook and reviewing

16   it with the project managers to kind of help them understand it

17   was a new process, it was a new way of doing things that they

18   hadn't been accustomed to at all, and we were presenting that,

19   and one of the project managers asked me a question, and before

20   I could answer it, Joey Rufo jumped in and answered the

21   question instead of me.

22   Q.   Why was that a problem?

23   A.   It was a problem because his role in that meeting and

24   because this was all new to the group, one, one problem was the

25   knowledge that, that he had about the process itself, and the

Salvo - Cross                                                        657

1    second one was he was asked to come to that meeting so he could

2    sit and observe and understand, number one, SGS a little bit

3    better, but sit there and just observe, you know, the

4    interactions of the, of the group itself.

5    Q.    Did you address that issue with Mr. Rufo?

6    A.    I did not address it with him directly.  I let his

7    supervisor know that that had happened.

8    Q.    Who was his supervisor that you went to?

9    A.    Jill Mecey.

10   Q.    Okay.  And did you direct or ask Ms. Mecey to do anything?

11   A.    Typically when I observe something for somebody who's not

12   my direct report, I will talk to the supervisor.  I will let

13   them know what's occurred, and then I ask them what they would

14   like to do.  Sometimes it's they want me to talk to the person.

15   Other times, it's they want to handle it themselves.

16          And I usually go with what the supervisor recommends

17   or wants to do, and in that case, Jill Mecey said that she

18   would talk to him about it because she's the one who invited

19   him and set the expectation up for him.

20   Q.    Okay.  Now, did Mr. Rufo ever express to you that he was

21   interested in an HR position?

22   A.    Yes, he did on two occasions.

23   Q.    Oh, on two occasions.  Tell us about the first occasion.

24   A.    Right after the SGS operations meeting, during that

25   meeting, we had told the group that even though I was the

Salvo - Cross                                                          658

1    business partner, we were thinking and looking at adding

2    another additional HR manager role that would report to me, and

3    that person would help me with the administration and just kind

4    of working through all of the other things that were going on

5    in SGS, because my job was increasingly growing bigger with SGS

6    on board.

7              So he had sent me an e-mail right after that asking

8    me that he had heard that come up in the meeting, and he was

9    interested in talking to me about putting his hat in the ring

10   to be considered for that position.

11   Q.   Okay.  I'm going to turn your attention to Plaintiff's

12   Exhibit 15.  This is an e-mail from Mr. Rufo to you dated

13   June 16, 2017.  The subject line is "This week."  Is this the

14   e-mail you were just describing to the jury?

15   A.   Yes, it is.

16   Q.   Where he's asking you about, you know, this potential HR

17   position?

18   A.   Yes.

19   Q.   Okay.  And then you said -- I'm sorry, after the e-mail,

20   did you actually have a conversation with him?

21   A.   I did.  I don't know exactly when, but I did follow up

22   because I wanted to respond to his request.

23   Q.   What did you say?

24   A.   I -- at that point in time, we were still working out the

25   details of the position, but I did tell him that I did not

Salvo - Cross                                                              659

1    believe he had enough experience to do with his job what we

2    envisioned that job to be, that he didn't have the employee

3    relations experience we needed, he didn't have the operations

4    field experience that we needed as well to do that job in an

5    effective manner.

6    Q.   Okay.  And then you said there was a second time that he

7    brought it up -- or made you aware that he was interested in an

8    HR position?

9    A.   Yes.  This was about July, beginning of July, and he had

10   sent me another e-mail asking that I would reconsider his

11   interest in being put into that position, and he laid out what

12   he thought his qualifications were specific to taking on that

13   role.

14   Q.   Okay.  And turn your attention to Plaintiff's Exhibit 24.

15   The bottom portion, there's an e-mail from Mr. Rufo to you

16   dated July 6, 2017.  Subject line is "For your consideration."

17             Is this the e-mail that you were just telling the

18   jury about?

19   A.   Yes, it is.

20   Q.   Okay.  And did you have a follow-up -- any follow-up

21   communication with Mr. Rufo about his request that you consider

22   him?

23   A.   On this particular e-mail, again, I know he had asked me

24   to reconsider, but I don't remember having an exact

25   conversation with him at that point.  I let Jill know that he

Salvo - Cross                                                          660

1    had, had asked me to put the request in to, to take the job.

2    Q.   Okay.  Did you consider him for that HR position?

3    A.   No, I did not.

4    Q.   And why not after you -- you reviewed his e-mail with,

5    with the bullet points he had about why he should be

6    interviewed, right?

7    A.   Yes, I did.

8    Q.   Okay.  Did that change his mind at all?

9    A.   No.  What he listed here weren't enough skill sets of what

10   we were looking for specific to that position:  again, somebody

11   that had a lot of operational field experience, knew the

12   population, and also somebody who had a lot of employee

13   relations experience that they could work with.

14   Q.   Okay.  I wanted to -- last question:  I just want to go

15   back to your "Beautiful-Thanks" e-mail.  You said that -- did

16   you ever get that e-mail forwarded to you by Jill Mecey?

17   A.   Yes.  Jill, Jill forwarded it to me.

18              MS. DURR:  Okay.  I want to put up Defendant's

19   Exhibit -- oh, wait.  I think I need to enter it.  We'd like to

20   use Defendant's Exhibit 281 and move for its admission.

21              THE COURT:  Any objection?

22              MR. FOX:  No, Your Honor.

23              THE COURT:  It's already in, isn't it?

24              MR. ROLLINS:  It's already in.

25              THE COURT:  Is it already?  Okay.  That's what I

Salvo - Redirect                                                    661

1    wanted to make sure.

2    BY MS. DURR:

3    Q.    Okay.  Defendant's Exhibit 281, at the very top, the

4    subject line is "Violations and Determinations Tracking," and

5    at the bottom is the "Beautiful-Thanks" e-mail that you've

6    already testified about.  And then on August 14, 2017, Jill

7    Mecey forwarded that e-mail with your response, correct?

8    A.    Correct.

9    Q.    Okay.  And at the bottom of this long e-mail is the "Going

10   forward" e-mail, right?

11   A.    Correct.  Yes.

12   Q.    Okay.  Do you think you read that e-mail -- the "Going

13   forward" paragraph on August 14, 2017?

14   A.    On August -- when she sent it to me?

15   Q.    Yes.

16   A.    That's when I read it, because she had indicated that he

17   had sent it to her because that's what he assumed my approval

18   was.

19   Q.    Okay.  Before August 14, 2017, had you ever read the

20   "Going forward" e-mail?

21   A.    No.

22             MS. DURR:  Okay.  No further questions.

23             MR. FOX:  I have some.

24             THE COURT:  Yes, redirect.

25                         REDIRECT EXAMINATION

Salvo - Redirect                                                    662

1    BY MR. FOX:

2    Q.    You said EEO is not your area, yet you're training people

3    on retaliation for protected activity?

4    A.    Yes.

5    Q.    Okay.  And Exhibit 94, which we just looked at, that's

6    your training people for protected activity, correct?

7    A.    Yes.

8            MR. FOX:  Let's put that up again.  Let's put up the

9    first slide.  Let's put up the progressive discipline slide.

10           MR. KATZ:  Can you give me the number?

11           MR. FOX:  94-28.

12   BY MR. FOX:

13   Q.    "Progressive Discipline + Due Process equals Just Cause."

14   You drafted that, correct?

15   A.    Tim -- our legal counsel drafted these particular slides

16   related to progressive discipline and due process.

17   Q.    And you presented this PowerPoint, did you not?

18   A.    I presented it with him.  He and I co-facilitated this.

19   He presented this particular slide.

20   Q.    Was Joey Rufo given due process when he was put on a PIP?

21           MS. DURR:  Object to the form.  Object.

22           THE COURT:  Overruled.

23           THE WITNESS:  Oh, I'm sorry.

24   BY MR. FOX:

25   Q.    Was Joey Rufo given due process when he was put on a PIP?

Salvo - Redirect                                                          663

1    A.   Yes, he was.

2    Q.   You said you hadn't even read his EEO analysis, Exhibit

3    34A, correct?

4    A.   That's correct.

5    Q.   Yet you put him on a PIP because he had done that

6    analysis?

7    A.   I did not put him on a PIP because he had done an

8    analysis.

9    Q.   Yeah, I heard that, too.  You weren't involved in putting

10   him on a PIP; is that your testimony?

11   A.   When you say I wasn't involved, I wasn't involved in

12   putting him on a PIP.  Jill Mecey put him on the PIP.

13   Q.   Well, let's look at the drafting history of the PIP, and

14   let's look at Exhibit 40.

15           THE COURT:  Well, counsel, let's not wordsmith this,

16   all right?  Come on.

17   BY MR. FOX:

18   Q.   Okay.  Let me ask this very quickly:  You drafted the

19   draft of the PIP that's Exhibit 40, and you supplied it to Jill

20   Mecey, did you not?

21   A.   Gina Petrella and I helped Jill put it together.

22           MR. FOX:  Okay.  Let's put up 40.  And if we can go

23   to the first page?

24   BY MR. FOX:

25   Q.   The first page indicates that you had sent this to Jill

Salvo - Redirect                                                    664

1   Mecey, correct?

2   A.    Correct.

3   Q.    And this is a draft of the PIP?

4   A.    This is a draft of the -- this is one of the drafts of the

5   PIP, correct.

6   Q.    Without going through the other exhibits, you're on all

7   the other PIP drafts, too, are you not?

8   A.    Correct.

9   Q.    Okay.  And let's turn to Exhibit 94 that you drafted, and

10  let's look at page 94-32.  "7 Questions to Discipline and

11  Discharge."  First question:  "Did your employee know the rule

12  and consequences?"

13         Do you see that?

14  A.    Yes, I do.

15  Q.    Do you know if Joey Rufo knew that he wasn't supposed to

16  report on disparities in, in treatment of persons who were

17  disciplined at the company based upon race?

18  A.    I don't know what he knew regarding what his knowledge was

19  of reporting or not reporting it, but he did not have approval

20  to do so.

21  Q.    Do you have any reason to believe he didn't report it in

22  good faith, his belief as to what was happening?

23  A.    I can't answer that.  I'm not --

24         MS. DURR:  Objection.  Calls for speculation.

25         THE WITNESS:  I don't know what his intent or

Salvo - Redirect                                                      665

1   motivation was.

2   BY MR. FOX:

3   Q.   Okay.  Let's look at the fourth question you raised here:

4   "Did you conduct a fair investigation?"  Do you see that?

5   A.   Yes.

6   Q.   Now, it's your testimony Jill Mecey did not report to you

7   that Joey had complained that he was put on a PIP because he

8   reported potential discrimination against African Americans?

9   A.   I'm sorry, what was your question again?

10  Q.   Let me repeat it:  Is it your testimony that Jill Mecey

11  did not report to you that Joey had told her he was put on a

12  PIP because he had pointed out racial discrimination in the

13  disciplinary process?

14  A.   Jill Mecey did not inform me of that.

15  Q.   Okay.  Had you been informed of that, wouldn't it have

16  been critical for the company to conduct a fair investigation?

17          MS. DURR:  Objection.  Calls for speculation.

18          THE COURT:  No, if you know.  I mean, the head of HR

19  should have a sense of that.

20          THE WITNESS:  If that had been reported to me, it

21  would require an investigation.

22  BY MR. FOX:

23  Q.   Skip ahead.  Seventh one:  "Does your penalty match the

24  offense?"  How do you interpret that directive?

25  A.   Exactly as it says:  "Does your penalty match the

Salvo - Redirect                                                        666

1    offense?"  He was put on a PIP, but he was not put on a PIP

2    purely for doing an analysis.  There were other factors related

3    to his judgment that called out that PIP.

4              And it's a performance improvement plan, so it gives

5    him an opportunity to improve on the factors that have been

6    provided to him.

7    Q.    Did the penalty match the offense?

8    A.    The penalty of the performance improvement plan?

9    Q.    Yes.

10   A.    It's a performance improvement plan.  Yes, it did.

11   Q.    The next slide, "Issues to Consider."  94, page 54,

12   please.

13   A.    Yes.

14   Q.    "Issues to Consider," the first one is:  "Disparate

15   Treatment Based on Protected Classes."  That's Item No. 1,

16   correct?

17   A.    Correct.

18   Q.    Why is that an important issue to consider in any

19   investigation of discrimination?

20   A.    I don't know enough about disparate treatment to be able

21   to give an answer that is credible enough for you.

22   Q.    Well, you were conducting this seminar and presenting

23   these slides, were you not?

24   A.    I was not conducting this slide.  This was legal counsel

25   that was conducting this slide.  I basically gave other sides

Salvo - Redirect                                                     667

 1   that I presented based on human resources actions but not on

 2   legal actions.

 3   Q.   The second item is:  "Has the Company followed its own

 4   policy?"  Why is that important?

 5          MS. DURR:  Objection.  Lack of foundation since the

 6   witness has testified she didn't present on this slide.

 7          THE COURT:  Did you present anything on this slide?

 8          THE WITNESS:  On this slide, no.  That was Tim's.

 9          THE COURT:  Then I'm going to sustain the objection.

10   Let's move on.

11   BY MR. FOX:

12   Q.   Okay.  Let's look at the next slide, 94-74.

13          THE COURT:  Did you, did you prepare this slide?

14          THE WITNESS:  No.  That was Tim.

15          THE COURT:  Did you present on this slide at all?

16          THE WITNESS:  Did I present on this slide?  No.  I

17   might have clicked to that slide, but I did not present on that

18   slide.

19          THE COURT:  All right.  Then let's move on.

20   BY MR. FOX:

21   Q.   Okay.  I want to ask you a question about dropping the

22   ball, though, in the context of these matters that relate to

23   this case.  Do you not acknowledge some responsibility for

24   dropping the ball in sending the e-mail to Joey that you sent

25   giving him a green light to do the analysis?

Salvo - Redirect                                                          668

1              MS. DURR:  Objection.

2              THE WITNESS:  I did not give him a green light to do

3      the analysis.

4              THE COURT:  That's a fair question.  Overruled.

5              THE WITNESS:  I did not give him authorization or

6      agreement to do that analysis.

7      BY MR. FOX:

8      Q.   You don't accept any responsibility for that, do you?

9      A.   I accept responsibility when the responsibility is mine.

10     Q.   You let that e-mail sit for a month before getting the

11     analysis, not responding further.  Surely that's dropping the

12     ball, isn't it?

13             MS. DURR:  Objection.

14             THE WITNESS:  I didn't read the e-mail to know if I

15     had dropped a ball or not.

16     BY MR. FOX:

17     Q.   What did you expect Joey to do after he received your

18     e-mail?

19     A.   Are we talking about the "Good start.  I'll look at it

20     later this weekend"?

21     Q.   Yes, we are.

22     A.   I would expect him to do the analysis that we asked him to

23     do, which was basically taking the information of the reports

24     and putting them on a spreadsheet.

25     Q.   Wasn't the ball in your court when he wrote to you?

Salvo - Redirect                                                        669

1    A.    The ball in my court was to basically take a look at what

2    he had sent me, and he asked me for an opinion on that

3    particular spreadsheet.

4    Q.    Now, is it your testimony that when you called Joey and --

5    in the initial call after he released the EEO data and were

6    asking him a series of questions, is it your testimony you

7    weren't aware that he had produced the EEO matrix, which is

8    Exhibit -- which is Exhibit 34A?

9    A.    Are you referring to the call that I had asked him the

10   questions about who authorized him to do the report?

11   Q.    Yes.

12   A.    At that point, I was aware he had done it, yes.

13   Q.    But you haven't reviewed it, correct?

14   A.    I did not review that report, correct.

15   Q.    And had you reviewed that report, you would have seen that

16   he was noting in there that African Americans were greatly

17   overrepresented in discipline and that whites were greatly

18   underrepresented?  Would you not have?

19            MS. DURR:  Objection.

20            THE COURT:  It's cumulative.  We've had this so many

21   times.

22            MR. FOX:  Last question, Your Honor.

23            THE COURT:  All right.

24            THE WITNESS:  Oh, I'm sorry.  So --

25            THE COURT:  There's no question.  I'm sustaining the

Salvo - Recross                                                    670

1   objection.

2            THE WITNESS:  Okay.

3   BY MR. FOX:

4   Q.   What did you understand "greatly overrepresenting" and

5   "greatly underrepresenting" to mean?

6            MS. DURR:  Lack of foundation.  She already testified

7   she didn't review this spreadsheet.

8            THE COURT:  Sustained.

9   BY MR. FOX:

10  Q.   Do you understand -- do you have any knowledge of whether

11  or not there was, in fact, disparate treatment of African

12  Americans in the disciplinary process?

13  A.   Okay.  Do I understand that there was or there wasn't?

14  Q.   Do you have any knowledge of whether there was or wasn't?

15  A.   I have no knowledge whether there was or wasn't.

16           MR. FOX:  I have no further questions.

17           THE COURT:  Any recross?

18                    RECROSS EXAMINATION

19  BY MS. DURR:

20  Q.   Turning your attention back to Plaintiff's -- oh, excuse

21  me.

22           MR. FOX:  Sure.  Give me just a moment.

23  BY MS. DURR:

24  Q.   Turning your attention back to Plaintiff's Exhibit 94, and

25  I have that up there, the core leadership skills, you testified

Salvo - Recross                                                           671

1  you gave that to the SGS supervisors, right?

2  A.    Correct.

3  Q.    Did you give this training to Ms. Mecey?

4  A.    No.  Ms. Mecey was not part of any of the training classes

5  that we conducted.

6  Q.    And the supervisors that you were giving this training to,

7  who did they supervise?

8  A.    Installers.

9  Q.    Okay.  And are those -- are any of those installers, do

10 you know if they're union workforce?

11 A.    We did not conduct any of this training in the union

12 workforce sites.

13 Q.    You did not, okay.

14        And then when -- you were involved in writing of the

15 PIP -- or giving the PIP to, to Mr. Rufo?

16 A.    I didn't -- oh, sorry.

17 Q.    I know you said that Ms. Mecey is the one who gave the

18 PIP, but you reviewed it.

19 A.    Yes.

20 Q.    Based on what you know, do you think that the PIP was

21 given to him fairly?

22 A.    Yes, I do.

23        MS. DURR:  Okay.  No further questions.

24        THE COURT:  All right.  Since we're getting close to

25 the end, I'm assuming no one is going to call Ms. Salvo again

Salvo - Recross                                                    672

1   as a witness, correct?

2            MR. FOX:  (Shaking head.)

3            MS. DURR:  (Shaking head.)

4            THE COURT:  All right.  Ms. Salvo, you're excused as

5   a witness.  You can stay in court and watch the proceeding or

6   leave, but you're not to discuss your testimony or anything you

7   see or hear in court with any witness who has yet testified.

8            THE WITNESS:  Thank you.

9                        (Witness excused.)

10           THE COURT:  Your next witness?

11           MR. FOX:  Sienna Church, Your Honor.  She's been

12  sequestered, so we'll have to get her.

13           THE COURT:  Well, she's outside, right?

14           MR. FOX:  Yes.  It will take a moment.

15           MS. DURR:  Your Honor, before the witness comes in,

16  we have an issue that we'd like to discuss.

17           THE COURT:  All right.  Come on up.

18           (Bench conference on the record.)

19           THE COURT:  Yes, Ms. Durr.

20           MS. DURR:  Okay.  Based on the questions that Mr. Fox

21  asked Ms. Mecey about whether she was aware that the father,

22  the father of Sienna Church was sick or ill or near death, we

23  would move to exclude any evidence or testimony about

24  Ms. Sienna Church's father being in poor health or near death.

25  We think that's highly -- that's irrelevant and highly

Church - Direct                                                    673

1    prejudicial.

2              THE COURT:  Are you planning to go into that?  You

3    know, you can overdo it with a jury, too.  We have a pretty

4    rational jury.

5              MR. FOX:  I'm not going to overdo it.  I'm just going

6    to ask her one question about it.  She knew -- Jill Mecey knew

7    that, the situation that her father died.  She terminated him

8    the very next day, after knowing that.  It shows the kind of

9    people we're dealing with here.

10             THE COURT:  No, I think I'm, I'm going to sustain the

11   objection.

12             MR. FOX:  Your Honor, it goes to their -- it goes to

13   their emotional distress.  They suffered.

14             THE COURT:  I'm going to sustain the objection.

15   Thank you.

16                      (End of bench conference.)

17            SIENNA CHURCH, PLAINTIFF'S WITNESS, AFFIRMED

18                         DIRECT EXAMINATION

19   BY MR. FOX:

20   Q.   Now, Sienna, could you state your name for the record,

21   please.

22   A.   Sienna Church.

23   Q.   What's your relationship to Joey Rufo?

24   A.   He's my partner.  We live together.

25   Q.   How long have you been together?

Church - Direct                                                      674

1  A.    A little over four years.

2  Q.    How did you meet?

3  A.    We initially met on campus at Virginia Tech and then

4  started dating while he was doing some work for my mother's

5  company.

6  Q.    Tell the jury what you do for a living, Sienna.

7  A.    I'm an emergency veterinarian.

8  Q.    How long have you been doing that?

9  A.    Two-and-a-half years.

10  Q.    Okay.  And is an emergency vet a specialty?

11  A.    It's not a specialty, but there is some postgraduate

12  training that goes into it.

13  Q.    Is it stressful?

14  A.    Incredibly stressful.

15  Q.    Can you give us an example?

16          THE COURT:  No.  Counsel --

17          MS. DURR:  Objection.

18          THE COURT:  Counsel, this is way far beyond the scope

19  of what's involved in this case.

20  BY MR. FOX:

21  Q.    Okay.  Let's talk about Joey's job at Aclara.  How did he

22  appear to react -- how did he appear to react when he got that

23  job?

24  A.    He was very excited.

25  Q.    Do you know if he enjoyed the people he worked with?

Church - Direct                                                          675

1   A.   He did.

2   Q.   How was he when he would come home from Aclara typically?

3   A.   He was typically -- in the beginning, he was typically

4   very excited, always had some new thing that he'd been

5   requested to do, felt like he was getting a lot of

6   responsibility.

7   Q.   Did things change at some point?

8   A.   Drastically.

9   Q.   How did they change?

10  A.   You know, he would kind of wake up in the morning and

11  absolutely dread going into work, and he would come home and

12  just be mentally, physically, emotionally exhausted.

13  Q.   Was he worried that he might lose his job?

14          MS. DURR:  Objection.  Leading.

15          THE COURT:  Sustained.  You can't lead this witness.

16  BY MR. FOX:

17  Q.   How was his emotional state at that point?

18          MS. DURR:  Objection.

19          THE COURT:  No.

20          MS. DURR:  Speculation.

21          THE COURT:  No, a person can testify to that.

22  Overruled.

23          THE WITNESS:  In the beginning, he was very stressed

24  and anxious.

25  BY MR. FOX:

Church - Direct                                                           676

1  Q.   Do you recall what his reaction was when he was placed on,

2  on the PIP?

3  A.   He was, he was very, very upset.  He came home that night,

4  and we had plans to go to dinner.  We went to dinner, and he

5  really didn't eat much, really couldn't focus on talking with

6  me about anything.  When we came home, he kind of just said,

7  "I'm tired," and went to bed.  Things really just kind of

8  spiraled from there.

9  Q.   You say it spiraled from there.  Can you describe that?

10 A.   He really started to kind of withdraw from me.  I work

11 overnights, and so we really only get to see each other first

12 thing in the morning or right before I go to work, and that was

13 either when he was kind of dreading thinking about the day

14 ahead or just mentally and emotionally exhausted when he came

15 home.  So we didn't have a lot of communication.

16         His sleep became incredibly restless, and he started

17 sleeping on the couch a lot.  He, you know, didn't really want

18 to spend a whole lot of time with me and really withdrew.

19 Q.   Okay.  Describe to me how, how he reacted and how it

20 affected your relationship when he was fired.

21 A.   The day he was fired was a very difficult day.  My father

22 had --

23         MS. DURR:  Objection.

24         THE COURT:  I've sustained the objection, so we need

25 to move on from that.

Church - Direct                                                          677

1    BY MR. FOX:

2    Q.   Okay.  Why was it difficult?

3              THE COURT:  Wait.  Counsel, don't try to elicit

4    something I said was not coming in.

5    BY MR. FOX:

6    Q.   Okay.  Just describe for a minute, if you can, how Joey

7    reacted to being fired.

8    A.   He called me about nine or ten o'clock in the morning, and

9    I could tell the second I picked the phone up something was

10   very wrong.  I asked what was wrong, and he said he had been

11   fired, and it was devastating for both of us but particularly

12   him.

13   Q.   And what did you observe about him that makes you say it

14   was devastating for you?

15   A.   He became very depressed.  He, you know, had a lot of

16   self-doubt, really lost his self-confidence.

17             MS. DURR:  Objection.  Lack of foundation.

18             THE COURT:  No.  I think somebody who lives with

19   someone for several years can testify as to whether someone has

20   lost their self-confidence.  Overruled.

21             THE WITNESS:  He really, you know, started to worry a

22   lot about his future and our future and what we would be able

23   to do.

24   BY MR. FOX:

25   Q.   Okay.  His, his -- I know it was a tough time for you, but

Church - Cross                                                          678

1    has Joey recovered emotionally from all this?

2    A.   He hasn't.  He's, he's not the same as he was before.

3    He's still really anxious about the future.  He's still, you

4    know, just -- the spark isn't, isn't as bright as it used to

5    be.

6                MR. FOX:  Thank you, Sienna.

7                THE COURT:  Any cross-examination?

8                          CROSS-EXAMINATION

9    BY MS. DURR:

10   Q.   I want to make it clear, Ms. Church, you've never worked

11   at Aclara, have you?

12   A.   No.

13   Q.   Okay.  And you don't know Jill Mecey?

14   A.   No.

15   Q.   You don't know Lyn Salvo?

16   A.   No.

17   Q.   You don't know Gina Petrella?

18   A.   No.

19   Q.   You don't know Michael Garcia?

20   A.   No.

21   Q.   Okay.  And you have no personal knowledge to share with

22   the jury about whether these managers believed Mr. Rufo was

23   reporting intentional discrimination, do you?

24   A.   I don't know what they were thinking.

25   Q.   Okay.  Good.  And so you have no personal knowledge to

Church - Cross                                                              679

1    dispute any testimony that may have been presented by any of

2    those witnesses, correct?

3              MR. FOX:  I'm going to object.  She wasn't --

4              THE COURT:  Sustained.

5    BY MS. DURR:

6    Q.   You wouldn't have any personal knowledge to object to --

7    to dispute any facts about the reasons for giving Mr. Rufo a

8    written warning and PIP, do you?

9    A.   Again, I don't know what they would be thinking.

10   Q.   Okay.  And you have no personal knowledge to dispute any

11   of the testimony that Ms. Mecey, Ms. Salvo, Ms. Petrella, or

12   Mr. Garcia provided as to the reasons for the position

13   elimination, right?

14   A.   I did not hear that testimony.  I don't know.  I have

15   actually overheard conversations between Joey and Ms. Mecey.

16   Q.   Have you ever heard her speaking?

17   A.   Yes.

18   Q.   Okay.  And are you talking about, about the position

19   elimination?

20   A.   There were multiple phone conversations I've overheard.

21   Q.   About the position elimination?

22   A.   I don't think the position elimination specifically, no.

23   Q.   Okay.  And what phone conversations are you talking about

24   then that you overheard?  Are you talking about phone

25   conversations that Mr. Rufo recorded?

Church - Cross                                                            680

1    A.    No.   No.   Phone conversations that he had while I was next

2    to him.

3    Q.    Okay.   And in any of those conversations, did Ms. Mecey go

4    and tell him that she was retaliating against him for, for

5    something that she didn't like?

6    A.    She did talk about him, he should quit.

7    Q.    When was this?

8    A.    I believe it was December or November.

9    Q.    Really?   And you heard -- and in what context?

10   A.    Let's see, I had gone to meet him after work and was

11   waiting for him to finish some stuff up, and she had called

12   about a performance evaluation, to go over with him how he had

13   changed, what he had improved, what he hadn't improved.

14         That was the conversation where she told him he would

15   not be getting his merit increase and that maybe he would come

16   off the PIP in the future and that, you know, if he -- he had

17   done a good job, so it was okay, but he still needed to

18   improve, and if that wasn't something he wanted to do, then

19   maybe he should consider quitting.

20   Q.    Were you at the office?

21   A.    Yes.

22   Q.    Oh, you were at the office when Ms. Mecey was having a

23   conversation with Mr., with Mr. Rufo?

24   A.    Yes.

25   Q.    And did you identify that you were on the call?

```
Church - Cross                                                    681
```

1  A.   No.   It wasn't like it was on speaker phone.

2  Q.   Oh, okay.   Well, then how --

3  A.   It was very easy to overhear.

4  Q.   How come?

5  A.   She was very loud.

6  Q.   So you want the jury to believe that, that Ms. Mecey was

7  speaking very loudly but not on speaker phone, and you actually

8  heard her say that he should quit?

9  A.   Yeah.

10  Q.   Okay.

11  A.   I was sitting right next to him.

12  Q.   Would it surprise you that there's been no testimony so

13  far in this trial about this?   Your boyfriend didn't say

14  anything.

15          THE COURT:   That's not a proper question.

16          MS. DURR:   Okay.

17          THE COURT:   We don't have prior testimony run by

18  witnesses.   We have them sequestered for a reason.   Let's move

19  this along.

20  BY MS. DURR:

21  Q.   And did, did Ms. -- this was in November or December, you

22  said?

23  A.   Yes.

24  Q.   Okay.   And this was at the time -- do you know that -- did

25  you know that Ms. Mecey actually removed Mr. Rufo from the

Church - Cross                                                            682

1    performance improvement plan in December of 2017?

2    A.   All I know is on the call, there was mention of the

3    possibility.

4    Q.   Of a possibility of the PIP, PIP being removed.

5            But you have no evidence whether it was, in fact,

6    removed?

7    A.   No.  There were --

8    Q.   And you have no evidence to dispute Ms. Mecey -- evidence

9    that Ms. Mecey did remove him from the PIP?

10   A.   I don't have access to her files, so no.

11   Q.   Okay.  And Ms. Mecey did not fire him at that time, right?

12   A.   Not at that time.

13   Q.   In that call that you overheard?

14           And you said that -- after Mr. Rufo -- you said that

15   after he got the PIP, that he started spiraling, right?  I

16   think that was your testimony?

17   A.   His emotional state.

18   Q.   His emotional state was spiraling.  Yet he was still

19   working at Aclara, wasn't he, at that time that he was on the

20   PIP?

21   A.   Yes.  We couldn't afford for him not to have a job.

22   Q.   Yeah.  I mean, Aclara didn't fire him, right?

23   A.   Um-hum.

24   Q.   That's right?  Aclara didn't fire him?

25   A.   No.

Church - Cross                                                              683

1    Q.   Aclara didn't dock his pay, cut his -- slash his salary,

2    do anything, right?

3    A.   They did not do any of those things.

4    Q.   Okay.

5    A.   They did look at him with a pretty dang fine-toothed comb.

6    His work life was --

7    Q.   Well, you don't have any personal knowledge of that?

8             MR. FOX:  Your Honor, if the witness could complete

9    her answer, I'd appreciate it.

10            MS. DURR:  I apologize if I'm not.  I just --

11            THE WITNESS:  I mean, watching the person you love

12   wake up every day absolutely dreading whether or not the

13   kitchen was going to be clean enough and feeling the need to

14   take pictures of it, feeling the need to justify every second

15   he was away from his desk and make sure that there was

16   absolutely no reason that they could fire him since he was

17   blatantly told he was on a final written warning and one wrong

18   move and that was it.

19   BY MS. DURR:

20   Q.   Is this all knowledge that you obtained just from

21   Mr. Rufo?

22   A.   Yeah.

23   Q.   Okay.  So you don't know Aclara's side of the story at

24   all, do you?

25   A.   I mean, I've seen the PIP.

Church - Cross                                                          684

1    Q.   Okay.  Other than that, you don't know Aclara's side of

2    the story, do you?

3    A.   I can't say that I've been with them.

4    Q.   Okay.  Again, the answer is you don't know Aclara's

5    side of the story?

6            THE COURT:  That's been asked and answered.  Let's

7    move on.

8    BY MS. DURR:

9    Q.   Okay.  So since Mr. Rufo's position was eliminated, you've

10   been supporting your boyfriend financially, haven't you?

11   A.   To some degree.

12   Q.   Has he been doing other work?

13   A.   Very recently.

14   Q.   Okay.  So is it your opinion that Mr. Rufo was not

15   carrying his weight in your relationship financially before he

16   found a job?

17   A.   That was not my opinion.

18   Q.   Okay.  Is it your opinion that Mr. Rufo was completely

19   leaning on you after his position was -- after he was no longer

20   working at Aclara?

21   A.   I find that very offensive, I'm sorry.  My opinion is that

22   I love him and that we are together and that we're going to do

23   whatever it means to be together.  There is no he/she, you/me,

24   my finances/your finances.  We're together, and there's no

25   blame because that's inappropriate in a relationship.

Church - Cross                                                      685

1   Q.   So you two are a team?

2   A.   Yes.

3              MS. DURR:  Okay.  And -- no further questions.

4              THE COURT:  Any redirect, Mr. Fox?

5              MR. FOX:  No redirect, Your Honor.

6              THE COURT:  All right.  Thank you, Ms. Church.  You

7   may step down, and you can stay in court because I believe

8   you're the last witness for, at least for the plaintiff.

9                        (Witness excused.)

10             THE COURT:  Are there going to be any witnesses for

11  the defense?

12             MS. DURR:  May we have ten minutes?  Because --

13             THE COURT:  All right.  Ladies and gentlemen, let me

14  give you-all a break at this point.

15             But no one is going to call Ms. Church again,

16  correct?

17             MS. DURR:  No.

18             THE COURT:  All right.  So she can stay in court.

19             All right.  Let me tell the jury, I'm going to give

20  you a ten-minute break.  We're getting close to the end of the

21  trial.  This break might get extended slightly, but let me

22  start with ten minutes, and we'll see if we have any more

23  evidence.  All right, folks?  All right.

24             All right.  The jury can leave, all right?

25                        (Jury out.)

686

```
 1            THE COURT:  All right.  Is the plaintiff resting at
 2   this point?
 3            MR. FOX:  Your Honor, we're going to call Mr. Rufo
 4   for some brief rebuttal.
 5            THE COURT:  But you've rested your case-in-chief.  It
 6   doesn't go that way.  You don't get to call one witness twice
 7   in the same case.
 8            MR. FOX:  Oh, correct, Your Honor.  We're resting our
 9   case-in-chief.
10            THE COURT:  All right, all right.  Now, Ms. Durr,
11   what do you need the break for?  I mean, I'm giving you ten
12   minutes, but what are you doing?
13            MS. DURR:  We're going to -- just to assess whether
14   we're going to call another witness.
15            THE COURT:  And that witness has not been in the
16   courtroom?
17            MS. DURR:  No.
18            THE COURT:  All right.  So he or she is outside?
19            MR. FLOOD:  If I may --
20            THE COURT:  I'm sorry?
21            MR. FLOOD:  May I clarify?  We need to confer on
22   actually whether we're going to put Ms. Mecey on the stand in
23   response to that testimony.
24            THE COURT:  Oh, all right.  All right.  All right,
25   we'll do it -- we'll recess court.
```

687

1          MR. FLOOD:  Thank you, Your Honor.

2              (Recess from 3:35 p.m., until 3:50 p.m.)

3                      (Jury out.)

4          THE COURT:  All right.  Ms. Durr, what's the defense

5     going to do?

6          MR. ROLLINS:  Your Honor, we'd like to make a motion

7     for judgment as a matter of law.

8          THE COURT:  All right.  You've made it, I deny it,

9     let's go.

10         MR. ROLLINS:  Yes, Your Honor.

11         THE COURT:  All right.  Are you putting on any

12    evidence?

13         MS. DURR:  Yes, Your Honor.  Defendants called Jill

14    Mecey.

15         THE COURT:  All right.  Wait a minute.  We have to

16    get the jury in then.  All right.  Let's get the jury in.

17         Well, while we're waiting for the jury, have you had

18    a chance to look at the proposed verdict form?

19                      (Jury present.)

20         THE COURT:  All right.  Everybody's here?  You-all

21    may have a seat.

22         All right.  My understanding is the defense is going

23    to put on Ms. Mecey again?

24         MS. DURR:  Yes, Your Honor.

25         THE COURT:  All right.  Ms. Mecey, you're still under

Mecey - Direct                                                          688

1   your affirmation to tell the truth.

2              THE WITNESS:  Yes, Your Honor.

3    JILL MECEY, DEFENDANT'S WITNESS, PREVIOUSLY AFFIRMED, RECALLED

4                     DIRECT EXAMINATION

5   BY MS. DURR:

6   Q.   Ms. Mecey, you heard Ms. Church's testimony where she

7   claims that she heard you in November or December of 2017 tell

8   Mr. Rufo that you were thinking about taking him off the plan,

9   performance improvement plan, but that maybe he should think

10  about quitting.  Did you hear that testimony?

11  A.   I did.

12  Q.   Okay.  What's your reaction to that?

13  A.   Shock.

14  Q.   And did you or did you not say that?

15  A.   I did not.

16             MS. DURR:  No further questions.

17             THE COURT:  Any cross-examination?

18             MR. HOROWITZ:  None, Your Honor.

19             THE COURT:  All right.  Thank you, Ms. Mecey.  You

20  may step down.

21                     (Witness excused.)

22             THE COURT:  All right.  Is there any further

23  evidence, Ms. Durr, or whoever is lead counsel for defense?

24  Any further evidence for the defense?

25             MS. DUFF:  No, Your Honor.

Rufo - Direct                                                      689

1           THE COURT:  All right.  Is there any further evidence

2    from the plaintiff?

3           MR. HOROWITZ:  Yes, Your Honor.  We would just like

4    to put Mr. Rufo on for a briefly rebuttal.

5           THE COURT:  All right.  Mr. Rufo, you're still under

6    affirmation.  Go up to the lectern -- up to the stand, rather.

7    JOSEPH RUFO, PLAINTIFF'S WITNESS, PREVIOUSLY AFFIRMED, RECALLED

8                          DIRECT EXAMINATION

9    BY MR. HOROWITZ:

10   Q.   Mr. Rufo, at the time you submitted your analysis in

11   August of 2017, how many SGS installers did Aclara employ?

12   A.   Are you asking me about the SGS employees which I was

13   tracking the discipline for and the terminations or just the

14   installers?

15   Q.   Yes, I'm sorry, the employees of SGS you were tracking

16   discipline for.

17   A.   I know that they had 540 employees that self-identified

18   racially.

19   Q.   And how did you know that?

20   A.   Because the way the analysis was done was in Paycom,

21   there's a suite of tools that are used for queries, and the

22   qualifiers for those numbers were that they fell within the SGS

23   division and that they were an active employee.

24          MR. FLOOD:  Your Honor, I need to object.  This is

25   beyond the scope of rebuttal to Ms. Mecey's testimony.  This

Rufo - Direct                                                          690

1    testimony should not be permitted.  It's not proper.

2            THE COURT:  I sustain the objection.  Rebuttal is to

3    rebut the defense case, and the only witness the defense put on

4    was that one small witness.

5            MR. HOROWITZ:  Your Honor, the defense put on all

6    their evidence in our case.

7            THE COURT:  I've ruled.

8            MR. HOROWITZ:  I understand.  Okay.  Then nothing

9    further, Your Honor.

10           THE COURT:  All right.  Thank you, Mr. Rufo.  You may

11   step down.

12                         (Witness excused.)

13           THE COURT:  And now, ladies and gentlemen, once

14   again, we have completed all of the evidence, but there are

15   some logistical matters I have to take care of, so you're going

16   to get to go back to the jury room, and we'll get you back in

17   here as quickly as possible.  The next thing you're going to

18   have are the closing arguments of counsel and then my

19   instructions.

20           And I am going to want you folks to just move a

21   little bit more to the center because I really do want to make

22   eye contact with you while I'm reading the instructions, okay?

23   But we'll get this case to you as quickly as we can.

24           I've told the attorneys they each have up to a half

25   an hour for their closing arguments to you, so that's another

691

1    hour.  It's probably going to take me 20 to 30 minutes to give

2    you the instructions.  So we're going to wrap the evidence and

3    the instructions up today.  Most likely, you won't start much

4    deliberating today, so that you're heads up on that.  But

5    anyway, we'll get to you as quickly as possible.  So if you

6    don't mind leaving at this point, we'll stay in session.

7                        (Jury out.)

8            THE COURT:  All right.  Counsel, you know, we

9    e-mailed to you fairly late last night -- well, it was before

10   8:30; that's not all that late -- the Court's proposed charge.

11   I recognize that you-all had done a really good job on agreeing

12   to most of the instructions.

13           We did send you this morning some edits, and then

14   since then, there were two more that I further edited.  I think

15   most of those edits were aesthetic.  For example, in one case,

16   you used the word "worker."  I thought "employee" was a better

17   word since it's an employer and employee is how we've talked

18   about things.

19           I hope you've looked at the instructions because I

20   was not expecting a long charging conference given the fact

21   that you-all did spend a lot of time working on them.  I've

22   looked at the objections that you've filed as to each other's

23   mostly, in my view, linguistic or stylistic things.

24           The only substantive instruction that I recall not

25   giving at all was the plaintiff's instruction as to taxes,

692

1    which I've never given that instruction.  It's not required in

2    the Fourth Circuit, and I don't intend to give that one, but

3    other than that, I want to know if there are any objections to

4    the charge as the Court proposes to give it to you.

5              Yeah.

6              MR. HOROWITZ:  None from the plaintiff, Your Honor.

7              THE COURT:  All right.  How about from the defense?

8              MR. ROLLINS:  None other than the ones previously

9    submitted to the Court, Your Honor.

10             THE COURT:  In other words, you're going to -- for

11   the purpose of the record, you want to hold on to the

12   objections you've noted in the submissions, the first set.

13             MR. ROLLINS:  Yes, Your Honor.

14             THE COURT:  All right.  But, you know, this is your

15   chance.  I mean, if there's a material issue that you think is

16   legally wrong in the instructions the Court is giving, you're

17   supposed to argue that to me now.  Just saying, well, we filed

18   it a while ago, I mean, I'm open to hearing if there's anything

19   you think is from a legal standpoint insufficient or

20   inaccurate, you've got to make the record now.  Otherwise, it's

21   invited error.

22             MR. ROLLINS:  Your Honor, if I may make one point?

23             THE COURT:  Yes.  Which instruction?

24             MR. ROLLINS:  The malice or reckless indifference

25   charge.

693

1           THE COURT:  Right.

2           MR. ROLLINS:  Your Honor, if I could draw your

3   attention to the fourth and final paragraph?

4           THE COURT:  Okay.

5           MR. ROLLINS:  In the defendant's proposed version,

6   there was additional language to flesh out what the cases say

7   constitutes a good faith attempt to comply with the law, that

8   being implementing policies, procedures, training, things of

9   that nature, in a good faith attempt to maintain compliance

10  with antidiscrimination, anti-retaliation laws, and it is

11  defendant's position that the Court's instruction, by omitting

12  that portion, deprives the jury of necessary context from which

13  they could draw the appropriate conclusion based on the

14  evidence.

15          THE COURT:  All right.  Does the plaintiff want to

16  respond to that?

17          MR. HOROWITZ:  Your Honor, certainly we -- there is a

18  good faith defense that exists.  We disagree, of course, with

19  how Aclara construes it.  Aclara believes that just essentially

20  having personnel policies means that you've made a good faith

21  attempt to comply with the law, and we believe that in order to

22  make a good faith attempt to comply with the law, you must

23  implement and follow those policies in good faith.

24          So thank you.

25          THE COURT:  Well, hold on a second.  Maybe I misread

694

1   what you-all submitted, so hold on.  I'm looking at Proposed

2   Instruction 19, and it says:  "Punitive damages agreed."  I did

3   take out a portion of that, as I recall, because we're not

4   talking -- I wasn't even going to mention the word "punitive

5   damages" to the jury.

6           So did you-all look carefully at 19 -- I'm sorry, 26?

7   It's 26 in our instructions.  It was 19 in the one you-all

8   submitted.

9           MR. HOROWITZ:  It's 18, I believe, in the joint

10  proposed.

11          THE COURT:  I'm sorry, 18, 18.  Yeah, okay.

12          MR. HOROWITZ:  Your Honor, the other issue with this

13  was --

14          THE COURT:  Hold on a second.

15          MR. HOROWITZ:  I'm sorry.

16          THE COURT:  We do have the good faith attempt to

17  comply with the law.

18          MR. ROLLINS:  Yes, Your Honor.

19          THE COURT:  It's there.

20          MR. ROLLINS:  Oh, I'm not arguing that it's not there

21  at all.  My only -- our only argument would be on the language

22  specifically that was removed that would provide context for

23  what that really means.

24          THE COURT:  Well, both sides have wanted me to add

25  context to some degree which is arguing your positions.  I've

695

1    cut some of the plaintiff's efforts to put context in, too.

2            No, in relooking at this, I'm satisfied this gives

3    you what the law requires, that you can make the good faith

4    argument and it's there.  So I understand -- is that the only

5    issue the defense has materially?

6            MR. ROLLINS:  Yes, Your Honor.

7            THE COURT:  All right.  All right.  So I'm leaving

8    the instruction as we've proposed it.

9            Now, take a look at the verdict form.  I changed that

10   statement on page 2 that their job is done because it may or

11   may not be done.  It depends on how they answer Question No. 3,

12   but I did reduce in No. 2 -- I think this was the defense

13   request, and I think it's correct -- that the way in which

14   compensatory damages are presented to the jury, that's

15   sufficient in my view.  Pain and suffering, inconvenience,

16   mental anguish, and loss of enjoyment of life.  All right?

17           So if there are no objections, we're ready to start

18   the -- oh, the last thing we need to do, and I think we can do

19   this after we finish with the jury because I really want to get

20   this case to them tonight and I'm sure you-all do as well --

21   what I normally do is to make sure that all the exhibits have

22   been entered into evidence is I will have each side once we get

23   the case to the jury, going through your respective lists of

24   what -- actually, what I have my courtroom deputy do is read

25   her notes as to what exhibits she has formally as entered into

696

1    evidence, and then if either side believes that there's an

2    exhibit that you thought you'd moved in that's not reflected as

3    being in, you can correct that, and if there's an exhibit

4    that's in evidence that either side thinks should not be in

5    evidence, this will be your time to correct that.

6           Given the late hour of the day, the evidence is most

7    likely not going to get to the jury tonight.

8           Now, the only two audiovisual exhibits, I believe,

9    that are actually exhibits are the two -- they're not visual;

10   they're just audio -- are the two tape-recorded conversations

11   between Mr. Rufo and defense folks, correct?

12          MR. HOROWITZ:  Yes, Your Honor.

13          THE COURT:  All right.  What format is that on?  Is

14   it on a disc, CD?  What is it on?

15          MR. HOROWITZ:  Your Honor, they're digital

16   recordings, and we can put them on a disc if that's preferable.

17          THE COURT:  All right.  When we leave, you need to

18   make sure you've checked with my courtroom deputy as to how

19   that -- what format they should be in so the jury, if they want

20   to replay them, can do so in the jury room.  We have a clean

21   laptop from the court that we usually use to do playback, but

22   if you don't have them in that format, then we have a problem.

23   All right?

24          MR. HOROWITZ:  We can do that, Your Honor.  Thank

25   you.

697

1        THE COURT: Okay. And then did you -- overnight, did

2   you put together your proposed indexes of exhibits? I mean, I

3   know some went in today as well, so it might not have been

4   completed.

5        MR. HOROWITZ: We did. I don't -- I'm not aware that

6   either side has any objections to the other party's, but they

7   will require some revisions based on today.

8        THE COURT: All right. That's fine.

9        MR. ROLLINS: That's correct, Your Honor, and they

10  have been exchanged.

11       THE COURT: All right. Good. Are there any other

12  housekeeping matters then before -- oh, how does the plaintiff

13  want to divide up time for your argument? Each side has a

14  total of 30 based on our conversation yesterday.

15       MR. FOX: Your Honor, I'll probably go 20-24 minutes,

16  let's say, and 6 minutes for rebuttal.

17       THE COURT: All right. My law clerk, Mr. Getz, is

18  going to keep track of the time. So he'll try to give you a

19  two-minute warning, just like in moot court, all right? So you

20  need to check it out with him. I am going to try to hold you

21  strictly to the time limit so we can get this case to the jury

22  tonight.

23       MR. FLOOD: I have one more minor issue, Your Honor.

24       THE COURT: Yeah. At the lectern.

25       MR. FLOOD: Thank you. I have, it's basically some

698

1    PowerPoint slides to show during parts of my argument, and it's

2    basically points I'm arguing to the jury.

3              THE COURT:  Yeah.

4              MR. FLOOD:  I alerted Mr. Fox to that.  I've not

5    given him a copy because it's, you know, my argument.  I'll do

6    whatever the Court thinks is appropriate on that.  I have a

7    copy for the Court if you'd like.

8              THE COURT:  Well --

9              MR. FLOOD:  I don't think anything I'll put up is

10   controversial or is not --

11             THE COURT:  That's the danger you run.  I mean, you

12   know, I hate to see an objection drawn during closing argument,

13   but if it's beyond the scope of what the evidence was in the

14   case, you do run that risk.

15             MR. FLOOD:  I understand.

16             THE COURT:  So having put you on notice of that,

17   we'll go ahead.

18             Hold on one second, I'm sorry.

19             So that's the problem with if you're going to use

20   PowerPoint, all right?

21             MR. HOROWITZ:  Yes, Your Honor.  We will also accept

22   the admonition that you just gave to Mr. Flood in that regard.

23             THE COURT:  All right.  So in other words, both sides

24   proceed at their own risk.

25             MR. FLOOD:  I have no problem, I mean --

699

```
 1              THE COURT:  All right.

 2              MR. FLOOD:  -- if it helps to give them a copy, I'll

 3    do it.

 4              I'm not sure it helps because they still may object,

 5    so I understand that dynamic, you know.

 6              THE COURT:  Let them being surprised.

 7                            (Laughter.)

 8              THE COURT:  However, I don't like being surprised, so

 9    if you'll hand it up to my folks?

10              MR. HOROWITZ:  Your Honor?

11              THE COURT:  Yes, sir.

12              MR. HOROWITZ:  Unfortunately, I don't believe that we

13    have a copy of ours.  It's all digital.

14              THE COURT:  All right.  It is what it is.

15              MR. HOROWITZ:  All right.  I apologize.

16              THE COURT:  All right.  So we're set for the jury?

17    All right.  Let's bring the jury in.

18              THE COURT SECURITY OFFICER:  Yes, ma'am.

19              THE COURT:  Mr. Fox, are you making both

20    statements -- both arguments for the plaintiffs?

21              MR. FOX:  I'm sorry, I didn't quite hear you.

22              THE COURT:  Are you doing both arguments for the

23    plaintiffs?

24              MR. FOX:  Yes.

25              THE COURT:  Okay.
```

700

1                      (Jury present.)

2              THE COURT:  All right.  Now, this is, this is going

3    to be closing argument, so if you still want to sit down at

4    this end so you can see the attorneys as they stand at the

5    lectern, that's fine, but when I go to instruct, I'm going to

6    want to be able to see all of your faces, all right?

7              All right, counsel.

8              You can all have a seat.

9                      CLOSING ARGUMENT

10                     BY MR. FOX:

11             Thank you, Your Honor.

12             This is a case about a company that clearly doesn't

13   care about potential intentional discrimination, even when it's

14   put right in front of them, right in front of their face.  It's

15   done nothing to investigate the information it was provided.

16             The only thing they've done is punish the person who

17   brought it to them.  They blamed him and avoid taking any

18   responsibility for their behavior:  not reading e-mails, not

19   being familiar with EEO laws, and clearly not being familiar

20   with the laws of this land in their own internal policies,

21   which do require them to investigate discrimination claims and

22   require them not to punish the person who has brought it to

23   them.

24             It doesn't matter that they now act as if they didn't

25   want to get that information.  They got it.  It was right in

701

1    front of them.  Joey Rufo didn't have to say over and over

2    again:  This is discrimination.  And he did tell them.  The

3    spreadsheet says it all.

4         He had a right to assume that they would read his

5    e-mails and look at the data, and some of them did.  The

6    spreadsheet says it all.  He had a right to assume that they

7    would read the e-mails and look at the data, the highest people

8    in the HR department.

9         It was obvious.  They only had to read the first

10   e-mail, which explained what was going to be put together and

11   how he was asking their permission.  They only had to open this

12   attachment that was with the second e-mail at the end of

13   July -- the end of August, rather.  They only had a whole month

14   to look at -- they had a whole month to look at the e-mail with

15   the description of what he was proposing to do.

16        They never looked at it.  You heard Lyn Salvo today,

17   senior director of HR, say she didn't read the e-mail.  She

18   said, "Great start."  And she testified today that she expected

19   him to move forward.  That's what she said if you listened

20   carefully to her testimony.

21        They also failed to inform anyone but their inner

22   circle about what was in there, including leaving other

23   managers who would have a right to know, like Alvin Jackson,

24   the head of the SGS group, and while it may be coincidence, he

25   happens to be an African American, he said in his testimony

1    that if he had known that there was data on discrimination,

2    he'd want to investigate it further.

3            He wasn't given that chance because it was buried

4    with the inner circle of executives in HR, and they worked hard

5    to keep it that way, to keep Joey without resources or anyone

6    to talk to.

7            The company has used ignorance of the law and

8    incompetence to defend itself in this matter:  It was too long

9    to read.  We didn't see it.  We didn't know what it was.

10           And the best one was Ms. Jill Mecey:  I don't know

11   what "EEO" is.  I'm not a numbers person.

12           And when they did that, they just broke the law.

13           She also finally admitted this morning that she

14   suddenly learned what "EEO" means.  That was telling.

15           The judge will instruct you on the law, but what she

16   will tell you is this:  This case is not about whether there

17   was actual discrimination happening.  We think there was, but

18   let me say that again:  He doesn't have to prove that it was

19   actual discrimination.  All Joey has to prove is that he had a

20   reasonable good faith belief that it was happening, and if

21   there's some uncertainty as to whether the managers in the

22   field were, in fact, targeting African Americans and

23   multiracial people or were influenced by their biases for

24   whatever reason and how they treated them, that's not the issue

25   and that's not what you're here to decide, so don't let them

703

1    confuse you about that.

2          What's also important here is the law protects the

3    employee.  That's the basic purpose for the retaliation laws

4    because it's important for employees in every company,

5    employees like Joey, to be able to bring lawsuits to oppose

6    unlawful discrimination and to be free from retaliation when

7    they do that.  The law protects the employee.  Remember that.

8          Once the company had discrimination data in front of

9    it, the laws in the United States were invoked.  They had the

10   right to recognize this data for what it was:  disparate

11   treatment of their employees based on race, labeled right in

12   the chart for all to see.  And they had the right -- they had

13   to protect his right to see something.  If you see something,

14   then say something, as Alvin Jackson said.

15         And when Joey sued them, believing he was being

16   retaliated against, not seeming to take any action to follow

17   up, they had another legal responsibility that kicked in:  not

18   to do anything to retaliate against him because he was suing

19   them for retaliation.

20         They wanted to maintain a veil of secrecy.  Their

21   case rests on the idea that Joey went above and beyond his job

22   duties and didn't recognize the hierarchies in the

23   organization.  Remember, this is a guy who's in the military.

24   His whole demeanor is military.  Every time he says, "Yes,

25   sir," every time he answers, he's a rule follower.  He follows

1    commands.

2           If anyone knows there is a hierarchy, it's Joey Rufo.

3    So he used what he thought was being supported by his company's

4    policy:  If you see it, say it.  In fact, under the company's

5    policies, you must say it if you see it.  It's mandatory.

6           He's loyal to this company, but he also saw what he

7    believed was discrimination, and he took a personal risk.  He

8    didn't have to do that, but he took a risk to point it out

9    under the belief that they would do something about it, and

10   what happened?  Even if Jill Mecey meant well, they punished

11   him for that, and that's what this trial is about.

12          So this case is not really about Joey.  This case is

13   about what the company did when it heard about discrimination.

14          I think we could stop right there, but because the

15   company has now after the fact said there were legitimate

16   reasons that they harshly reprimanded him, some of them coming

17   out for the first time today, on the last day of the trial,

18   they said they have reasons that they didn't give him a raise

19   and got rid of his job.

20          We have to talk about the legitimacy of those reasons

21   and assess them and see whether or not they were the real

22   reasons for his firing.  We have proven that after Joey sends a

23   report to two of the heads of HR and compliance that shows

24   there's likely discrimination the way that discipline is being

25   applied, he suddenly goes from being a rock star to a horrible

1    employee in basically three days.

2            He's asked to do an analysis of the discipline that's

3    given out to the employees.  He has permission to get into the

4    database for his regular job, and he asks if it's okay if he

5    goes forward.

6            Yes, he asks in the first e-mail they chart.  He

7    tells them what he's suggesting he will do.  He's not going off

8    on his own, on a tangent.

9            The e-mail he receives in response says, "Great

10   start."  He never gets anything that says, "Joey, you need to

11   stop," or anything like that.  HR basically drops the ball in

12   not responding to his description of what he's proposing to do,

13   but they won't -- none of them will admit to any

14   responsibility.

15           And they further drop the ball by admitting that they

16   didn't look at the attachment.  They don't care about what the

17   data says.  They didn't read the e-mail.  They just care that a

18   lower-level -- or as their counsel referred to it, a

19   bottom-level -- employee, that's what they called Joey,

20   happened to take a look at their data and had the audacity to

21   think that they would care about knowing what he had seen in

22   the data.

23           Obviously, the discrimination he uncovered was not

24   important, they tell you.  What was important?  That he had

25   extracted race from people's personnel files?  Even though, as

706

1    I mentioned earlier, he had all the permission he needed, since

2    he had put that data in about race in the first place every day

3    when you onboard the new employees.

4             Have they lost track of what's important here?  That

5    he's offered some data that they didn't want to see, and that,

6    ladies and gentlemen, is the kicker.  That's the essence here.

7    HR got the data, they failed to do anything with the data, and

8    they began to punish the messenger who brought it to them.

9    It's see no evil, hear no evil.

10            It's simply not credible that Salvo -- neither Salvo

11   nor Petrella read the e-mail.  They berate him for his

12   communication, but they utterly failed to communicate with him.

13   They've not proven and they need to prove that this was just an

14   ordinary business decision.  They have turned on him to make

15   little things sound like enormous issues, even though they were

16   never mentioned in their initial responses in this case.

17            For example, we heard the St. Louis trip.  Yesterday

18   they raised this despite the fact it's not even mentioned in

19   any, any of the papers before that, any of the testimony before

20   that.  What really happened there?  Joey raises a question and

21   repeats it in a big room, and now they turn it into somehow

22   he's done something out of bounds.  He's answered a question he

23   wasn't supposed to.

24            There's no documentation anywhere.  They haven't

25   produced anything that that was an issue.  Just another thing

1    that was tacked on.

2           If they were really concerned about any of his

3    behavior, couldn't they give him some coaching and a reminder?

4    Wouldn't he be able to deal with it?

5           No, they've got to put him on a scathing PIP three

6    days after -- two days after they start drafting it, after he

7    sends out data with the EEO analysis, and now what they're

8    doing at this trial is they're backtracking.

9           What is important, they give him a final written

10   warning and a PIP.  They won't give him a raise, they take away

11   all his favorite work tasks that he excels at, and then they

12   come up with a reason to eliminate his job.

13          The defendant strains to defend what is in the end

14   indefensible.  It's truly suspicious.  But I get ahead of

15   myself.

16          Pretext.  Have you heard that a lot?  What does it

17   mean?  Now, what does the company say?  The company's lawyers

18   have tried to prove two defenses.  First, they've tried to

19   prove that the PIP they put Joey on was really because of other

20   reasons than his reported potential discrimination.

21          Second, they tried to prove that the decision to fire

22   him was really because of an alleged need to eliminate his job

23   and had nothing to do with the fact that he had filed this

24   lawsuit against the company.  That's their defense.

25          How do we know what really happened here?  Well,

1   let's talk about the attacks on Joey.  So they attack Joey and

2   make it sound like he's a complete maverick, bending the rules

3   or obsessively driven, where they tell him he cannot tell

4   anyone about what is happening or what he's discovered.

5          He respects their wishes, but unfortunately, there's

6   no turning back.  He's quiet, but the cat's out of the bag.  So

7   they continue to mistreat him.  They try to deny that they were

8   motivated to get rid of him because he discovered something

9   that was very unpleasant to them.

10         The simple truth is that Aclara not only retaliated

11  against Joey; they renewed their attack on his credibility at

12  this trial.  They called him a liar.  You heard that again and

13  again.  They called him dishonest.

14         Now, Joey may not be perfect.  Joey may be ambitious

15  or even a bit, as we heard, overenthusiastic at times.  Is that

16  such a crime?

17         He's not the villain they have made him into.  He did

18  not deserve to get fired, this man.  It was not a legitimate

19  business reason.  It was retaliation, providing data they

20  didn't want to see or even consider.

21         Now, how do we know the HR team did not have a

22  legitimate business reason?  Well, you have to consider the

23  credibility of the witnesses.  You'll have to assess whether or

24  not their testimony rang true.  How credible did they seem to

25  you in comparison to Joey?  You decide that.

709

1              But let's look at the evidence as to timing, who Joey

2      is, excuses made up by HR.  Let's go to timeline just to orient

3      one more time.  Timing is everything, or at least one of the

4      most important things in a case like this in which there's

5      always an excuse for what the company did.  It's not the real

6      reason.

7              Over the course of a few days, Joey goes from being a

8      rock star to being on a PIP in the final written warning.  This

9      happened two days after they started drafting it, after he

10     submitted his EEO analysis.

11             All actions by Aclara happened after Joey brought

12     attention to their treatment of the SGS installers.  There were

13     none before that.  Then the lawsuit was filed on January 9.

14     Aclara was notified of the lawsuit on January 16.  Three days

15     later, Joey is stripped of his onboarding responsibility,

16     something that was on his job description as a core

17     responsibility and had been part of his job from his very first

18     month at Aclara.

19             Then in April, he's given a scathing performance

20     review, no merit increase.  He's given 1's.  He's fired five

21     weeks later.  Was that a surprise?

22             Let 's talk briefly about Joey some more.  He's

23     motivated and hard-working.  He's a performer.  You've heard by

24     all accounts that he was very highly regarded at the company's

25     office.  He's well respected.  Everyone he worked with in

710

1    Virginia offices, they haven't brought anyone in from Virginia

2    who has anything critical to say about him.

3             You heard Alvin Jackson, probably knew him better

4    than any of these people that they testified to today about his

5    so-called faults.

6             Once he worked with Aclara, they say he was

7    uplifting.  Others said he was a good communicator.  They

8    offered him mentoring and progressively more responsibility.

9    And they did this because he's the person you see sitting here.

10   He's an honest, hard-working man.  He just gets things done.

11            He successfully supervised the office move before he

12   was fired, as I mentioned.  They want to minimize that, too.

13   This is the guy they claim doesn't have adequate judgment,

14   leadership, who's not a team player.

15            But Joey wanted to stick it out.  He felt that he was

16   in the right to expose the possible discrimination.  He wasn't

17   going to give up.  They should have known better.

18            And you've got to wonder who was right about this

19   guy?  Patty Cavender, the e-mail about the expense help;

20   Darlene Ican, another complimentary e-mail; or the HR people,

21   who were sent the disciplinary analysis and who used to love

22   him?

23            Joey's the real deal.  He's going to be a success in

24   his job but perhaps something more challenging down the line.

25   He's still young and ambitious, and he needs training.  And

711

1   he's far from the challenge that Jill Mecey said he was to

2   manage.  One wonders if the problem was the supervisor or the

3   supervisee.

4         When they first started out, everything was good, she

5   says.  They were friendly.  She loved him.  Then she didn't

6   like his all Reston office memo, but that was one minor event

7   and not one she considered significant until her higher-ups

8   were concerned about the disciplinary memo, and then the

9   analysis becomes the center of their relationship.

10        Let's talk for a moment about the analysis and the

11   alleged digging in the personnel files.  It sounds awful until

12   you consider the facts, this digging.  He added only one column

13   to the disciplinary form from the personnel files, all those

14   who identified as a particular race or mix of races.

15        He didn't mess around in the personnel files.

16   There's no testimony about that.  He added a race column to the

17   disciplinary worksheet.  He added up the numbers, he did the

18   math, and then he just saved his analysis on the computer since

19   the shared database was not operational for the data set.  He

20   told them what he was going to do.

21        Well, HR freaked out not because of the data.  That's

22   an excuse.  Lyn and Jill and Michael Garcia -- Lyn Salvo, Jill

23   Mecey, and Michael Garcia set about finding ways to make sure

24   no one found out about the potential discoverage.  That's what

25   they meant about damage control.  That term is very telling.

1          They isolated and silenced Joey, and why?  This is

2   not a data breach.  This was not sent to anyone other than two

3   HR people that asked him to do the job.

4          Clearly, when he spoke up about the illegalities they

5   were doing, when he went back down, things got worse.  Of

6   course, managing an employee who has a pending lawsuit against

7   a company is difficult.  It's difficult for everyone, both the

8   employee and the employer, but again, the law protects the

9   employee.  They're not allowed to make him uncomfortable or

10  punish him for offering data.  That's retaliation, pure and

11  simple.  And they cannot make up an excuse for why they did

12  that.  That's pretext.

13         The real reason here, I think, is obvious why they

14  did what they did to him.  His HR supervisor and her bosses

15  said he wasn't qualified to look at the discipline data, that

16  he was just an office coordinator, not qualified to do the job,

17  and they kept saying, "This was unauthorized," over and over

18  again, like a mantra, thinking you'd believe it if they kept

19  saying that.  They acted as if it was not done in good faith.

20         He had no motive to hurt the company.  He loved it

21  there.  And he wasn't looking for a lawsuit, either.  It's the

22  last thing he wanted to do.

23         So let's do a checklist again.  He was asked -- Joey

24  is asked to do analysis of discipline patterns in the company.

25  He was permitted to access the database he was in not for any

713

1    purpose, but surely for the purpose of collecting data which

2    would be related to the discipline patterns, especially when he

3    asked for permission to go forward in the first e-mail.

4            And he heard -- all he heard was, "That's great.

5    Beautiful," from Lyn Salvo, and nothing else.

6            And Joey expected that the e-mail would be read by

7    the people he sent it to in its entirety.  Shame on them if

8    it's actually true that neither Ms. Petrella or Ms. Salvo

9    actually read his e-mail.

10           Unauthorized, they claim.  They try to insinuate he

11   was somehow overstepping his bounds.  He just takes their

12   direction, asks for more direction, and it comes back to bite

13   him?

14           He tells them what he's proposing to do, and he tells

15   them where he will back up the data.  Then he sends a second

16   e-mail a month later.  A full month passes.  No one responds.

17   The data is collected as he proposed, and he sends it only to

18   the two HR people, who have never said:  Don't do this.  Stop.

19   No, don't look at any data.

20           By the way, shame on Jill Mecey if she's the one

21   jumping in to discipline him when she says she has no idea

22   what's in the e-mail or the attachment.  That's her contention

23   in this courtroom today.  She didn't bother to look.  Either

24   she's completely incompetent or she's not being truthful.  And

25   she knows full well what the e-mail was about, that it

714

1    contained discrimination data, and that to punish Joey would be

2    retaliation.

3              And the same can be said of Lyn Salvo.  She claims

4    she didn't look at the matrix.  You have to assess whether or

5    not you believe that.

6              So what did they do?  The PIP.  There's no action

7    plan for improvement.  There are no guidelines.  There's no

8    time frame for improvement, just harsh criticisms for the

9    report.  And then they have to pile it on.

10             They know they can't say it was just one judgment

11   error.  They've got to create a pattern of errors, so they

12   start going back in time and recreating history.  So they go

13   back to the other mistake Joey made and to which he owned up

14   and apologized, which he considered was no big deal when it

15   happened, no one told him it was.

16             He gets an e-mail from Jill saying:  We have to do

17   everything possible to curb costs.  Joey takes this literally

18   and translates a need to take action into a message about what

19   he had control over:  the coffee area and special things people

20   wanted, superficial things.  It was not alarmist.  He wasn't

21   crying, "Fire," in the theater.

22             Now, remember, there was nothing in Jill's e-mail

23   that said don't tell anyone, and, in fact, even Jill Mecey

24   agreed that everyone already knew that because the company was

25   being purchased, that costs would need to be contained so the

1   company looked good on the books.  That was common knowledge in

2   the Virginia office.

3         It was just an end-of-the-week wrap.  It was buried

4   among two other items, something almost no one read, according

5   to Jill Mecey.  He was just passing along information that

6   seemed like he was free to pass along, and people in the office

7   were already aware of it anyway.

8         So another nonissue, one they've trumped up and tried

9   to exaggerate the significance of after the discrimination data

10   is sent.  Seizing upon it, greatly exaggerating it, using it

11   now as a pretext and excuse to find a way to punish him for

12   speaking up.

13         Now, on the PIP, they start piling on this lawsuit

14   with other things.  Joey looked into trying to move into an HR

15   position that became available at his office.  All he did was

16   ask the person who mentioned the job to him, Ms. Salvo, he made

17   it expressly conditional upon Jill Mecey's approval.  He made

18   it very clear he wasn't going to look to move into that job

19   unless she expressly approved.  He was just testing the waters.

20         They're going to persecute him for that?  Is this a

21   crime for wanting to advance in an organization?

22         And the idea that Jill Mecey sat on Joey's so-called

23   lie for about seven weeks hoping he'd say something, that

24   sounds like something out of a lousy relationship, doesn't it?

25   It doesn't sound like a work relationship.

716

1          It's not subtle.  They're doing things to make Joey

2    sound like a rogue employee.  Nothing could be further from the

3    truth.

4          I'm going to reserve my remaining time, Your Honor.

5          THE COURT:  All right.

6                    CLOSING ARGUMENT

7                 BY MR. FLOOD:

8          May it please the Court.

9          Good afternoon.  We've been here for three full days,

10   long days, and when I was an Air Force JAG officer, they always

11   told us at trial strategy classes not to say thank you to the

12   jury.  I'm not in the military now, so I can say I never agreed

13   with that because this is hard work.  You have more hard work

14   ahead of you, but with that said, I want to say to you this

15   case, there are a lot of facts, dates, times, a lot of e-mails,

16   right?  Binders on all the tables that are huge.

17         The case isn't that complicated when you look at its

18   core, when you consider the motivation, the testimony and the

19   documents that are -- will be before you that you've seen and

20   heard during this trial.

21         You may, you may have thought sitting here for three

22   days, Well, where's the photograph?  You know, in today's CSI

23   culture, you know, we need photographs.  We need visuals, not

24   just e-mails maybe or documents.

25         Here 's the photograph, Plaintiff's Exhibit 63.  If

1   we can pull that up?

2          Can you pull that down just a little bit?  And can

3   you zoom in just a little bit for us?  Thank you very much.

4          I hope that's clear.  This is Plaintiff's Exhibit 63,

5   and I don't want to state that too far, that it's a photograph,

6   but what this document is, ladies and gentlemen, it's the

7   equivalent of a photograph in a case where the plaintiff is

8   trying to prove to you the state of mind of Jill Mecey, Michael

9   Garcia, Lyn Salvo, and Gina Petrella, okay?

10          You've heard some testimony about this document.

11   What is this?  Well, number one, why is this important?  Look

12   at the date of this e-mail exchange:  October.  October 27.

13          Can we go on down and show the underlying message?

14   I'm sorry.

15          If you see that lower message, this is where Patricia

16   Cavender sent to e-mail to who?  To Jill Mecey, October 27, and

17   she's praising Mr. Rufo, the plaintiff, for help he's given

18   her.

19          Can we go back on up towards the page?  There we go.

20          What did Jill Mecey do?  Did she delete?  Did she

21   shred it?  Did she just bury it somewhere?  No.  She sent it to

22   who?  To Michael Garcia, her boss.

23          Look at Michael Garcia's comments.  This was --

24   counsel read this to you, at least part of it, a few minutes

25   ago.  This is talking about Ms. Cavender's praise of Mr. Rufo.

718

1          "That is a strong endorsement.  It doesn't have
2    direct application to the situation and problems you are
3    experiencing with him," meaning Jill.  "Very different areas of
4    behavior and expertise.  Regardless, it is" -- what?  It's
5    "good feedback.  And it allows you" -- who's you?  Jill
6    Mecey -- "an opportunity to share what he does well and
7    continue to work on the things he needs to work on" -- what, I
8    think it should say -- but "what you're very important as
9    well."

10          How does that fit timing-wise in this case?  If you
11    recall, a lot of testimony.  August 8 is when Mr. Rufo alleges
12    he first engaged in what the law deems protected activity,
13    okay?  You recall that -- and we'll get to that in a minute.
14    That's an e-mail he sent to Lyn and to Gina, and attached to it
15    was a spreadsheet with that of not just about the disciplinary
16    actions he had been asked to complete, but the extra piece he
17    had not been asked to complete, never instructed to complete,
18    pulling race-related information for some people at least who
19    had been disciplined and attaching that, not just attaching it,
20    putting in his own purported analysis of it, okay?

21          So this October 27 is while he's still on the
22    performance improvement plan.  It's purportedly, according to
23    Mr. Rufo's theory of this case, in the midst of the persecution
24    phase, when at every turn, Jill Mecey is supposedly coming
25    after him, trying to ruin him, saying bad things about him,

719

1   being unfair towards him, retaliating against him.  That's his

2   allegations.

3           Jill didn't bury this e-mail.  She sent it to her

4   boss.

5           Look at her boss's response.  It's a fair, reasonable

6   response, and it shows you in a compelling way what's inside

7   the state of mind, if you will, of Mr. Garcia and Ms. Mecey in

8   particular and Aclara.

9           With due respect to the plaintiff and his right to

10  bring this case, it's nonsense, ladies and gentlemen.  It's

11  nonsense.  This is about an employee who couldn't accept

12  criticism, who couldn't accept that, hey, there are ways and

13  areas that he needed to improve his performance on, and that

14  resorted to alleging in this case falsely that he was the

15  victim of retaliation.

16          He wasn't -- this e-mail shows you in a compelling

17  way they can't refute what was inside the mind and hearts of

18  those two people.  It ruins their case.

19          Let's look at slide 1, please.  Counsel stated to you

20  at one point in his argument, he did state correctly -- and I

21  note the judge will instruct you she's, the Court has told you

22  this already.  We'll give you instructions in just a few

23  minutes.

24          Counsel said, well, Mr. Rufo doesn't have to prove

25  that there was actual discrimination happening at Aclara in

1   relation to the race-related data he pulled without

2   authorization and the analysis he did without being asked, he'd

3   never done before regarding a very complicated issue.

4           Counsel said, well, what he, what he does need to

5   show is that he had a reasonable, good faith belief that

6   someone else's rights, basically, the SGS installers in this

7   case, were being discriminated against.

8           You'll have to decide for yourself when you hear the

9   judge's instructions what counsel left out, and this is

10  critical, ladies and gentlemen, what he didn't tell you when he

11  made that statement is that Mr. Rufo has to prove that he had

12  an objectively reasonable good faith belief that someone else's

13  right to be free from intentional racial discrimination was

14  being violated.

15          And that in particular, in relation to August 8 and

16  what he did on that day, objectively, in terms of what he was

17  thinking is critical.  What does that mean?  Subjective means

18  okay, maybe he really believed in his heart and mind or both

19  that he had found some data that was purportedly damaging to

20  the company or, you know, whatever he thought.  That's

21  subjective.

22          Objective is wait a second.  What would a reasonable

23  person think looking at his e-mail, looking at his data,

24  looking at his words, his words that he conveyed to Aclara on

25  different dates and times that are documented that are before

721

1   you in this case.  That's the correct statement of the law on

2   whether or not he engaged in what's called protected activity,

3   which is really the first umbrella, large key decision point

4   for you in this case.

5           Let's go to the next slide.  Aclara did not retaliate

6   against Mr. Rufo when it issued him a warning and performance

7   improvement plan on -- I believe it was August 15 of 2017.

8   Three key reasons.

9           Next slide, please.  What's the first reason?

10  Aclara's management, in particular Ms. Mecey and then Michael

11  Garcia, had growing concerns about his conduct and performance

12  when?  Before August 8, 2017.  Okay?  So they have growing

13  concerns about his performance and conduct before the date the

14  plaintiff alleges he engaged first in some form of protected

15  activity under the law.

16          What am I talking about?  Next slide, please.  Keep

17  going.  No, go back.  Please go back.  Thank you.

18          What's the piece of evidence that relates to that?

19  The witness that most directly relates to that you heard from

20  today:  Michael Garcia.  He testified to you and Mr. -- talked

21  to him about this issue.  He gave you his recollection of what

22  had happened.

23          Plaintiff's Exhibit 26, which you'll have before you,

24  this is maybe our second photograph, if you will, in the case

25  as to what's in the state of mind, the hearts of Mr. Garcia, in

1    this case, and Ms. Mecey's.

2           In this case, you'll see from the larger e-mail, if

3    you recall, this is where Jill Mecey reached out to Mr. Garcia

4    because the issue of Mr. Rufo pursuing pretty aggressively a

5    chance to interview for an HR management position with

6    Ms. Salvo, that issue developed.  She told you what she thought

7    about it.

8           Did she, did she not want him to be able to progress

9    in the company?  No, she progressed within this company for

10   six -- starting throughout her career.  She's worked in really

11   lower-level position.  She's still an executive assistant but

12   now with management-level responsibilities over that function

13   within SGS.

14          Mr. Garcia's response to Ms. Mecey's inquiry to him:

15   Hey, need your help in figuring out how to manage this issue,

16   that's what supervisors do, right?  They manage employees.

17          He said, "By the way, I agree with your approach and

18   planned comments.  He is rather presumptuous but also claims to

19   have good experience in the military that is applicable.  His

20   behavior has to be adjusted."

21          Let's go back to the slide, please, Susie.

22          Timing.  It's on the slide in front of you, ladies

23   and gentlemen.  That e-mail from Mr. Garcia was by my count 28

24   days before Mr. Rufo alleges he first engaged in some form of

25   protected activity, okay?

1          Briefly, the next bullets on that slide, please,

2   Susie.

3          What are their growing concerns?  Mr. Garcia talked

4   to you about that.  It was, it was things that happened,

5   admittedly some small things, okay?  It didn't formalize in

6   discipline.  It built over time.  It built over time to the

7   point they decided we need to formally address this issue.

8          This slide lists that out for you.  Number one,

9   basically a conduct here in relation to the plaintiff's conduct

10  is trying to play a role he wasn't hired to do as an office

11  coordinator.

12         I want to be clear, one of our counsel said, well, he

13  was a low-level employee, but Aclara is not taking that

14  position in this case.  They're not looking down on Mr. Rufo.

15  They're not, they're not diminishing what he had to do in his

16  responsibilities.  But every team, right, to function well has

17  different team members.  You can't have ten point guards --

18  strike that.

19         You can't have five point guards on the basketball

20  court at any one time.  You can't have nine pitchers on the

21  baseball field at one time.  The team doesn't function that

22  way.

23         Mr. Rufo was a part of the team.  He was new.  He was

24  in an office coordinator position, with certain

25  responsibilities.  He was not in an HR-specific position.  He

724

1   wanted to be.  That's great.  Ms. Mecey made clear to you,

2   Mr. Garcia as well, they didn't resent that.  They didn't

3   begrudge it.  In fact, that's to be commended.  If you want to

4   go higher and farther, Aclara is just the company to do it, we

5   know from Ms. Mecey's own experience, right?  It's a place you

6   can do that in your career.

7           What Mr. Garcia's response reflects -- and this is an

8   important concept under the law that you'll be instructed on in

9   this case.  It's called business judgment.

10          Please, next slide.

11          You'll be given an instruction -- please go ahead --

12  the key concept, but I want -- with all the instructions,

13  listen carefully to the details, okay?  But the headline of

14  this instruction is that this case is not about just

15  second-guessing.  You know, okay.  Well, Mr. Garcia thought on,

16  I think, July 11, 2017, that the plaintiff's behavior had to be

17  changed.  He's wrong.  Therefore, Aclara must be guilty of

18  something.

19          That's not the role of this case, and respectfully,

20  I'd submit that's not your role due in part to this instruction

21  you'll get called business judgment.

22          The judge will tell you, I'm going to paraphrase, I

23  don't want to be misleading about it, employers have a right

24  under the law to make business decisions.  We all know that.

25  It just can't be motivated by an illegal reason, okay?  Aclara

725

1    can make its own subjective personnel decisions.

2           And with due respect, regardless of whether you when

3    you're deliberating agree or not with certain decisions, that's

4    really not the issue before you.  That's really not your charge

5    in deciding the relevant, material issues of this case.

6           Mere disagreement or belief that a decision was harsh

7    or unreasonable is not a proper basis to find for the

8    plaintiff.  You'll be told that.

9           What is the relevant issue, was retaliation the

10   motivating factor, and any of the decisions in terms of the

11   decision to put him on a warning and PIP, and some of the later

12   issues we'll talk about briefly in this case.

13          Next slide, please.

14          The second reason, the company did not retaliate

15   against him.  He did not engage in protected activity in

16   relation to his e-mail or the data that he sent to Lyn and Gina

17   on August 8, 2017.

18          Let's look at the next slide.

19          All right.  You're going to have Plaintiff's Exhibit

20   33.  You've seen a lot of -- seen that handled a lot with

21   witnesses.  We don't need to go through it in great detail

22   here, but this is the e-mail Mr. Rufo is saying, hey, you know,

23   this e-mail and then the data connected to it on the

24   race-related issue that he assembled is protected activity.

25          Let's go back to the slide.  The first bullet

726

1    reflects what I just covered with you in terms of the actual

2    instruction you'll get that Mr. Rufo has to prove that the

3    e-mail and the data he assembled relating to race and employees

4    having been disciplined, it has to meet a standard of being --

5    reflecting an objectively reasonable, good faith belief that

6    someone else's right to be free from intentional race

7    discrimination was being violated.

8         Not only that; he has to show that he opposed what he

9    reasonably believed to be intentional discrimination.

10   Opposition to such, I'm paraphrasing that, cannot be equivocal,

11   but instead, he must show that he stood in opposition to it,

12   not just objectively reported its existence or attempted to

13   serve as the intermediary.

14        Next slide.  We know from plaintiff's e-mail of

15   August 8, he cannot meet that standard under the law, and with

16   due respect, and you'll be told this, you're here to apply the

17   law, ladies and gentlemen.  That's part of your charge.  How do

18   we know from his words, not my words, not his counsel's words,

19   Mr. Rufo's words in that e-mail?

20        What did he say, briefly?  You've heard a lot of

21   about this.  "This isn't very informative at the moment

22   because" -- what?  "We lack sufficient amounts of data to give

23   this relevancy.  However, as time goes on, this analysis

24   becomes less skewed and more representative of how we're

25   tracking a relation and how it should be tracking.

1          What do we know?  He said to Lyn and Gina on August 8

2    it's not very informative.  What's he talking about?  The

3    race-related data he had pulled and assembled himself.  Why?

4    Because we lack sufficient amounts of data to give it this

5    relevancy.

6          He went on to basically acknowledge through the third

7    line that it was skewed data because you needed more time to

8    track that type of issue.

9          Next slide.  Plaintiff's Exhibit 38, which you'll

10   also have in your deliberation room.  What is this?  This is

11   his -- I believe it's his instant message exchange with

12   Ms. Mecey.

13         He says, "Long story short:  I included an EEO

14   analysis in my terms and discipline report, and I don't think

15   Lyn appreciated it like I hoped she would."

16         Briefly, why did he do this?  I would submit to you

17   he was trying to do it to impress Lyn Salvo, who he called,

18   what, a legend, right?  Who he was pursuing a job with as an HR

19   business partner.  Okay?

20         Now, does that mean -- what does that mean?  I mean,

21   if you want the answer for why he did this without being asked

22   to, without being directed to, I would submit to you that's an

23   answer.  That is the answer.

24         He goes on to say in this instant message exchange,

25   "It only went to her and Gina, and I included" -- what? --

1   "only numerical values with no opinions."

2          The judge will instruct you in relation to the legal

3   concept of protected activity, he's got to meet that objective

4   good faith standard, okay, not just a subjective standard, and

5   he's got to stand in opposition.  That e-mail and that text

6   message exchange shows that wasn't the case, and he can't make

7   it the case no matter how bad he wants to sitting in this

8   courtroom this week.

9          Next slide, please.  Those two exhibits show you

10  there's no reference at all to the issue of possible race

11  discrimination, no objective good faith relief on Mr. Rufo's

12  part that others are being discriminated against.  And I listed

13  there again the words that we just covered.  We're not going to

14  read them it again.

15         Next slide, please.  What's more evidence, we know

16  that he doesn't meet the standard for protected activity

17  regarding his activity -- regarding what he did on August 8 in

18  terms of that e-mail and the race data that he pulled and

19  assembled.  A lot of e-mails in this case.  You've looked at

20  them probably until you're blurry-eyed.

21         Not a single one, not a single one has Mr. Rufo

22  saying, hey, ladies and gentlemen within Aclara, I believe

23  there's some form of discrimination going on based on race

24  regarding the SGS workforce.

25         He's saying it now.  The one time he says he said it

729

1    to someone was in a conversation with Lyn Salvo by phone, when

2    he says he told her:  Lyn, I think this data reflects

3    intentional systemic -- meaning company-wide -- discrimination.

4    He's not an expert.  He's never done that type of analysis

5    before.  And, oh, by the way, he didn't record that call, so we

6    can't hear what he said.  He hadn't produced any notes from

7    that call.  We can't know what he said from his notes.

8            Next slide, please.  What he says now has to be

9    judged by what he said then because the state of the mind of

10   the company personnel is critical.  They can't be judged on

11   what he said this week in the courtroom in terms of the impact

12   and their state of mind.  It's what he said then.

13           Next slide.  The next two slides I have for you list

14   out different points.  Why?  The data that he pulled and

15   assembled on race for certain SGS employees who had been

16   disciplined is not relevant and is not reliable.  Ms. Petrella

17   in particular talked to you about that today, their compliance

18   officer, if you will, within human resources.

19           The plaintiff, Mr. Rufo, admitted to several of these

20   points when I asked him questions yesterday.

21           Let's go to the next slide.  Different managers,

22   different places, different facts, different policies at issue,

23   conduct.  No accounting for project-specific racial makeup of

24   the workforce.  D.C. Water site, for example, what was the

25   makeup of the workforce on that site for Aclara versus a site

730

1    in Minnesota.  Obviously, that could be dramatically different,

2    but that data wasn't in there, and that led Aclara, the team

3    that looked at it, to conclude this isn't relevant and reliable

4    data.  Plaintiff is trying to blame Aclara, to say they ignored

5    it.  Far from the truth.

6              Next slide.  We know from his own words he doesn't

7    meet the standard for protected activity.

8              Next slide, please.  Next slide.

9              The third reason is -- go ahead.  We know, we know

10   that beginning with that e-mail from Mr. Garcia, that exchange

11   of July 11, 2017, what was in their minds in relation to

12   Mr. Rufo as an employee.  Mr. Garcia said on that date his

13   behavior has to change, okay?  That's the framework, the

14   context from which you need just to make a decision regarding

15   the motivations in play on August 8.

16             Next slide, please.  We will be brief on these

17   points.  December 19, Ms. Mecey told him she would take him off

18   the PIP.  It did come up in the conversation that he would not

19   get a merit increase for 2017 because of those performance

20   issues, and, oh, by the way, that conversation happened before

21   this lawsuit was filed.  That's critical for you to consider.

22   What plaintiff's position in his assertions reflect, mere

23   disagreement with Ms. Mecey especially in her business

24   decisions on how to manage him as an employee.

25             Next slide.  The performance evaluation, you heard,

731

1   you heard the audio recording from the discussion between

2   Ms. Mecey and the plaintiff in April.  What you heard -- and

3   you'll have, I believe, the recording with you.  You can listen

4   to it again if you want.  You'll have the transcript of it.

5   What you heard was Ms. Mecey being a manager, but what you

6   heard are the words and the honest state of mind of a person

7   who -- Ms. Mecey did not know that call was being recorded.

8           Listen to the end of the two recordings.  We played

9   it yesterday.  What they show, with due respect, is that this

10  plaintiff, he knew he was continuing to record Ms. Mecey in

11  that April conversation.  He absolutely knew.  You hear him at

12  the end announce the date and time into that recorder when the

13  call ended.

14          He knew it.  He didn't tell her.  He didn't alert

15  her.  He didn't have the courtesy to do that.

16          You know what?  That's powerful evidence because all

17  she did was try to be a manager to him.  She adjusted one of

18  his ratings upward and otherwise let him talk, and she

19  responded.  That's called managing an employee.

20          Next slide.  Finally, and I'll wrap this up with this

21  because I'm short on time:  The decision to eliminate his

22  position, number one, consider the timing.  They're trying to

23  hinge that in terms of retaliation on the date the lawsuit was

24  filed, I think January 9.  That decision was made in May,

25  effective June 4.  That's months after the fact.

732

1           Look, if they -- use your common sense, and the judge
2   will instruct you on that.  If they were out to get him, if
3   they were out to retaliate against him for filing that lawsuit,
4   they wouldn't have fired him like that.  Why wait?
5   Q.   You've heard the other evidence.  There are a couple of
6   memos in the file that are in evidence for Ms. Mecey regarding
7   the decision to eliminate not just the coordinator position in
8   Herndon but also basically the position in New Hampshire for a
9   much larger office and operation.  They made the decision to
10  not have someone come back to that position full time.
11          Ladies and gentlemen of the jury, the evidence is
12  clear.  We've presented to you the two photographs, if you
13  will, that I talked about.  They show you all this is is a case
14  of a plaintiff who -- and the company respects him, respects
15  his military service.  That's not what this case is about, with
16  due respect.
17          They made management decisions they thought were
18  right.  It's not about retaliation.  That wasn't their
19  motivation, and he can't accept that, but that doesn't mean he
20  wins.  Thank you.
21          THE COURT:  Okay.
22                    REBUTTAL ARGUMENT
23              BY MR. FOX:
24          It's all about retaliation.  One thing we agree upon:
25  They sure did adjust his behavior, didn't they?  The notion

733

1    that he had an objectively reasonable belief that there was

2    discrimination going on when he found out that African

3    Americans were being disciplined at four times the rate of

4    everybody else?  Given the sample size he had, given the data

5    he uncovered, that doesn't fly.  That doesn't permit them to

6    avoid liability.

7            The notion that they didn't react to the filing of

8    this lawsuit, ultimately a termination, that doesn't fly,

9    either.  Of course, they're not going to terminate him right

10   after the lawsuit was filed.  They're not that stupid.

11           They did remove his onboarding duties within three

12   days.  That wasn't that smart.

13           But the reality is he made it very clear what he was

14   complaining about.  There was no question he was complaining

15   about racial disparities.  It was apparent from the

16   spreadsheet.

17           He told Jill Mecey.  You've got to believe him or

18   Jill Mecey who's telling the truth here.  You've got to look at

19   Jill Mecey's notes, where she documents what he told her.  He

20   complained about retaliation.  She admits that.  If he's

21   complaining about retaliation, what's the retaliation over?

22   It's obviously got to be over the spreadsheet.  It's not

23   anything else.  That's the only thing that he produced.

24           Recall their witnesses.  You assess their

25   credibility.  Alvin Jackson, the lone exception, everyone else

734

1    gets in line.

2            Garcia, he's the top of the pyramid.  He's the next.

3    He claims to know nothing.  He claims that he didn't know

4    that Joey had complained of retaliation for reporting

5    discrimination, yet Jill Mecey said in her testimony yesterday

6    she told him.

7            Look at the untruthfulness.  Petrella sunk herself in

8    when she said Joey had displayed initiative and suggested that

9    she should investigate further.  She sunk herself.  She

10   admitted she didn't do anything further.

11           All claimed not to know anything about the primary

12   details of this case.  Really?  Please?  It's as if they

13   weren't discussed or they weren't advised of the details by the

14   lawyers?

15           And they keep coming up with new ideas.  The very

16   last day of this trial, the head count wasn't right.  They're

17   claiming financial issues with no documentation.  The

18   affirmative action audits that we've never seen.  Is there any

19   substance to these tacked-on arguments?

20           They should have been the ones who were eliminated

21   for gross dereliction of duty.  They turned a blind eye to the

22   whole thing, the whole thing.

23           I'd like to talk to you a little bit about damages,

24   and I'd like to put up the verdict form.

25           This has affected Joey.  You heard Sienna's

735

1   testimony:  He's stoic, as she described it.  He continues to

2   experience emotional distress caused by having to go to work

3   every day.  This is one of the hardest experiences in his life.

4   He didn't get up on the stand and cry about it.  He's the one

5   that lost his job.  He's the one that lost his benefits.  He's

6   the one who's lost his career.

7           Now, in the verdict form, you'll be asked -- if we

8   could put up the first question? -- "Do you find, by a

9   preponderance of evidence, in favor of plaintiff, Joseph Rufo,

10  on his claim for retaliation?"

11          I would ask you to check "Yes."

12          On the next item, "What sum of money would fairly and

13  reasonably compensate plaintiff, Joey Rufo, for damages, if

14  any, that you have found defendant, Aclara Technologies, LLC,

15  caused him?  Answer for the following items."

16          You'll have to calculate his back pay based upon what

17  you know.  Pain and suffering, inconvenience, mental anguish,

18  and loss of enjoyment of life.  Now, this includes, as you'll

19  learn in the jury instructions, about long-term damage to his

20  career, something that has both tangible economic and

21  intangible social value.  We'll ask you to fill in that blank

22  with a million-dollar award, and we'll ask you to total the

23  amounts.

24          The next item, and this is the most important part of

25  the verdict form:  Do you find by a preponderance of the

736

1    evidence that Aclara acted with malice and reckless

2    indifference to the rights of Mr. Rufo?

3          We'll have won the battle but lost the war if you

4    don't check "Yes."

5          Employer acts with malice or reckless indifference

6    when it knows or should have known what it's doing is illegal

7    but does it anyways.  There's no question Aclara knew that

8    retaliation was illegal.  Mecey, Salvo, Petrella, Garcia, they

9    all knew exactly what they were doing.

10          No one is willing to take responsibility.  No one is

11   willing to take any accountability.  No one is willing to admit

12   that they've dropped the ball.  You've got to make the decision

13   as to whether or not they dropped the ball.  You've got to

14   determine if they acted with reckless indifference.

15          We think they did.  They paid lip service to their

16   rules on retaliation discrimination.  Look at what the company

17   did.  Don't look at what it says.  What difference does it make

18   what their rules say if they treat people like this?

19          We ask you to stand for Joey Rufo and return a

20   verdict in his favor.  Thank you.

21          THE COURT:  All right.  I'll let the jurors just move

22   down a little bit so I can see everybody's face.

23          And we will not permit people to come and go in the

24   courtroom, so anyone who wants to leave needs to leave now.

25   All right.

737

1          All right.  Ladies and gentlemen, now that you have

2  heard all of the evidence that is to be received in this trial

3  and each of the arguments of counsel, it becomes my duty to

4  give you the final instructions of the Court as to the law that

5  is applicable to this case.  You should consider these

6  instructions to guide you in your decisions.

7          Now, all of the instructions of law given to you by

8  the Court -- those given to you at the beginning of the trial,

9  those given to you during the trial, and these final

10 instructions -- must guide and govern your deliberations.

11         It is your duty as jurors to follow the law as stated

12 in all of the instructions of the Court and to apply these

13 rules of law to the facts as you find them from the evidence

14 received during the trial.

15         Now, counsel have quite properly referred to some of

16 the applicable rules of law to you in their closing arguments.

17 If, however, any difference appears to you between the law as

18 stated by counsel and that as stated by the Court in these

19 instructions, you, of course, are to be governed by the

20 instructions given to you by the Court.

21         You are not to single out any one instructions alone

22 as stating the law but must consider the instructions as a

23 whole in reaching your decisions.  Neither are you to be

24 concerned with the wisdom of any rule of law stated by the

25 Court.

738

1          Regardless of any opinion you may have as to what the

2     law ought to be, it would be a violation of your sworn duty to

3     base any part of your verdict upon any other view or opinion of

4     the law than that being given in these instructions, just as it

5     would be a violation of your sworn duty as the judges of the

6     facts to base your verdict upon anything but the evidence

7     received in the case.

8          You were chosen as jurors for this trial in order to

9     evaluate all of the evidence received and to decide each of the

10    factual questions presented by the allegations brought by the

11    plaintiff, Joseph Rufo, in his complaint and the denial of

12    those allegations by the defendant, Aclara Technologies, LLC.

13         In resolving the issues presented to you for decision

14    in this trial, you must not be persuaded by bias, prejudice, or

15    sympathy for or against any of the parties to this case or by

16    any public opinion.

17         Justice through trial by jury depends upon the

18    willingness of each individual juror to seek the truth from the

19    same evidence presented to all the jurors here in the courtroom

20    and then to arrive at a verdict by applying the same rules of

21    law as are now being given to each of you in these

22    instructions.

23         Now, there's nothing particularly different in the

24    way that a juror should consider the evidence in a trial from

25    that in which any reasonable and careful person would deal with

739

1    any very important question that must be resolved by examining

2    facts, opinions, and evidence.  You are expected to use your

3    good sense in considering and evaluating the evidence in the

4    case.  Use the evidence only for those purposes for which it

5    has been received, and give the evidence a reasonable and fair

6    construction in the light of your common knowledge of the

7    natural tendencies and inclinations of human beings.

8          Now, the evidence in this case consists of the sworn

9    testimony of the witnesses, regardless of who may have called

10   them, all exhibits received in evidence, regardless of who may

11   have produced them, and all facts which may have been agreed or

12   stipulated to.

13         When the attorneys on both sides stipulate or agree

14   as to the existence of a fact, you may accept the stipulation

15   as evidence and regard the fact as proved.  You are not

16   required to do so, however, since you are the sole judges of

17   the facts.

18         Now, the Court has -- all right.

19         Any proposed testimony or proposed exhibit to which

20   any objection was sustained by the Court and any testimony or

21   exhibit ordered stricken by the Court must be entirely

22   disregarded.  Anything you may have seen or heard outside the

23   courtroom is not evidence and must be entirely disregarded.

24         The questions, objections, statements, and arguments

25   of counsel are not evidence in the case unless made as an

1    admission or a stipulation of fact.  You are to base your

2    verdict only on the evidence received in the case.  In your

3    consideration of the evidence received, however, you are not

4    limited to the bald statements of the witnesses or to the bald

5    assertions in the exhibits.  In other words, you're not limited

6    solely to what you see and hear as the witnesses testify or as

7    the exhibits are admitted.  Instead, you are permitted to draw

8    from the facts which you find have been proved such reasonable

9    inferences as you feel are justified in the light of your

10   experience and common sense.

11           Inferences are simply deductions or conclusions which

12   reasonable -- I'm sorry, which reason and common sense lead the

13   jury to draw from the evidence received in this case.

14           Now, testimony and/or exhibits can be admitted into

15   evidence during a trial only if it meets certain criteria or

16   standards.  It is the sworn duty of the attorney on each side

17   of a case to object when the other side offers testimony or an

18   exhibit which that attorney believes is not properly admissible

19   under the rules of law.  Only by raising an objection can a

20   lawyer request and then obtain a ruling from the Court on the

21   admissibility of the evidence being offered because the

22   attorney has made an objection.

23           Now, do not attempt to interpret my rulings on

24   objections as somehow indicating how I think you should decide

25   the case.  I am simply making a ruling on a legal question

741

1    regarding that particular piece of testimony or exhibit.

2              It is the duty of the Court to admonish an attorney

3    who, out of zeal for his or her cause, does something which I

4    feel is not in keeping with the rules, evidence, or procedure.

5              You are to draw absolutely no inference against the

6    side to whom an admonition of the Court may have been addressed

7    during the trial of this case.

8              And during the course of the trial, I occasionally

9    ask questions of a witness.  Do not assume that the Court holds

10   any opinion on the matters to which a question may have

11   related.  The Court may ask a question simply to clarify a

12   matter, not to help one side of the case or hurt the other.

13             And remember at all times that you as the jurors are

14   the sole judges of the facts of the case.  In other words, no

15   matter what the Court says about the evidence or what the

16   lawyers say does not control.  It's what you, the fact finders,

17   find.

18             I think I've told you several times during the trial

19   that the questions asked by a lawyer for either party to this

20   case are not evidence.  If a lawyer asks a question of a

21   witness which contains an assertion of fact, therefore, you may

22   not consider the assertion by the lawyer as any evidence of

23   that fact.  Only the answers of the witness are evidence.

24             And if any reference by the Court or by counsel to

25   matters of testimony or exhibits does not coincide with your

742

1    own recollection of that evidence, it is your recollection

2    which should control during your deliberations and not the

3    statements of the Court or of counsel.

4          Now, in coming to your decisions on the facts of this

5    case, you should not be determined by the number of witnesses

6    testifying for or against a party or by the number of exhibits

7    introduced by one side or the other.

8          You should consider all of the facts and

9    circumstances in evidence to determine which of the witnesses

10   you choose to believe or not believe and which of the exhibits

11   have more or less value.  You may find that the testimony of a

12   smaller number of witnesses on one side is more credible than

13   the testimony of a greater number of witnesses on the other

14   side or that one or two exhibits may have more significance to

15   your evaluation of the case as against numerous exhibits which

16   you find have less significance.

17         To sum up this instruction, always consider the

18   quality of the evidence rather than the quantity of the

19   evidence.

20         Now, there are two types of evidence that are

21   generally presented during a trial, and they're called direct

22   evidence and circumstantial evidence.  Direct evidence is the

23   testimony of a person who asserts or claims to have actual

24   knowledge of a fact, such as an eyewitness.  Circumstantial

25   evidence is proof of a chain of facts and circumstances

743

1    indicating the existence of a fact.

2              An example of circumstantial evidence is the

3    following:  You leave your home at noon on a cold February day.

4    Your front yard is bare at the time.  It then starts to snow,

5    and you return at 5 p.m., and you see a footprint in the snow

6    that now covers your front yard.

7              From the facts that you left your home at noon and

8    returned at 5 p.m., that you see, that is, you have direct

9    evidence of a footprint, and you know from common experience

10   that human beings are normally associated with footprints, you

11   can infer that there was a person in your yard sometime between

12   noon and 5 p.m.

13             If you had actually seen a person, that would be

14   direct evidence of the fact.  Because you haven't seen the

15   person, however, you can assume or conclude that there was

16   someone in your yard from these other facts.  That's called

17   circumstantial evidence.

18             Now, the law makes no distinction between the weight

19   or value to be given to either direct or circumstantial

20   evidence, nor is a greater degree of certainty required of

21   circumstantial evidence than of direct evidence.  You should

22   weigh all the evidence in the case in making your decisions.

23             Now, typewritten transcripts of recorded

24   conversations have been introduced in this case, and as I told

25   you when the conversations came in, recordings of conversations

744

1    have been received in evidence and played for you, and

2    typewritten transcripts of these recordings have been furnished

3    to you.  The transcripts of these conversations are being given

4    to you solely for your convenience in assisting you in

5    following the conversations or in identifying the speakers.

6            In all instances, it is the recording itself that's

7    evidence, and the typewritten transcript is not.  And I believe

8    I told that to you during the trial.  So what you hear on the

9    recording is the evidence; what you read on the transcript is

10   not.  If you perceive any variation between the two, you will

11   be guided solely by the recording and not the transcript.

12           If you cannot, for example, determine from the

13   recording that particular words were spoken or if you cannot

14   determine from the recording who said a particular word or

15   words, you must disregard the transcript insofar as those words

16   or that speaker are concerned.

17           In certain instances, evidence may be admitted only

18   for a particular purpose and not generally for all purposes.

19   For the limited purpose for which this evidence has been

20   received, you may give it such weight as you feel it deserves.

21   You may not, however, use this evidence for any other purpose

22   not specifically mentioned.

23           Now, the next couple of instructions are going to go

24   towards how you evaluate the credibility of witnesses, and the

25   word "credibility" simply means the degree to which you're

1    going to believe any witness.

2            You as jurors are the sole and exclusive judges of

3    the credibility of each of the witnesses called to testify in

4    this case, and only you determine the importance or the weight,

5    if any, that their testimony deserves.  After making your

6    assessment concerning the credibility of a witness, you may

7    decide to believe all of the witness's testimony, only a

8    portion of it, or none of it at all.

9            In making your assessment of that witness -- of each

10   witness, you should carefully scrutinize all of the testimony

11   given by that witness, the circumstances under which each

12   witness has testified, and all of the other evidence which

13   tends to show whether a witness in your opinion is worthy of

14   belief.

15           Consider each witness's intelligence, motive to

16   falsify, state of mind, and appearance and manner while on the

17   witness stand.  Consider the witness's ability to observe the

18   matters as to which he or she has testified, and consider

19   whether he or she impresses you as having an accurate memory or

20   recollection of these matters.

21           Consider also any relation a witness may bear to

22   either side of the case, the manner in which each witness might

23   be affected by your verdict, and the extent to which, if at

24   all, each witness is either supported or contradicted by other

25   evidence in the case.

1          Now, inconsistencies or discrepancies in the

2   testimony of a witness or between the testimony of different

3   witnesses may or may not cause you to disbelieve or discredit

4   such testimony.  Two or more persons witnessing an incident or

5   a transaction may simply see or hear it differently.  Innocent

6   misrecollection, like failure of recollection, is not an

7   uncommon human experience.  However, in weighing the effect of

8   a discrepancy, always consider whether it relates to a matter

9   of importance or to an insignificant detail, and consider

10  whether the discrepancy results from innocent error or from

11  intentional falsehood.

12          After making your own judgment or assessment

13  concerning the believability of a witness, you can then attach

14  such importance or weight to that testimony, if any, that you

15  feel it deserves.

16          The testimony of a witness may be discredited, or as

17  we say in the law, impeached, by showing that he or she

18  previously made statements which are different than or

19  inconsistent with his or her testimony here in court.  The

20  earlier inconsistent or contradictory statements are admissible

21  only to discredit or impeach the credibility of the witness and

22  not to establish the truth of these earlier statements made

23  somewhere other than here during the trial.

24          It is the province of the jury to determine the

25  credibility of a witness who has made prior inconsistent or

747

1    contradictory statements.

2            The testimony of a witness may also be discredited by

3    showing that the witness will benefit in some way by the -- I'm

4    sorry, this is not the right instruction.

5            The testimony of a witness can be discredited also by

6    showing that the witness might have bias favoring either the

7    plaintiff or the defendant in this case, and so you must look

8    at any evidence that may or may not be in the case as to the

9    bias of any witness.

10           You should consider and decide this case as a dispute

11   between persons of equal standing in the community, of equal

12   worth, and holding the same or similar stations in life.  A

13   corporation is entitled to the same fair trial as a private

14   individual.  All persons, including corporations and other

15   organizations -- and in this case, the defendant is an LLC, but

16   it's basically the same thing -- stand equal before the law and

17   are to be treated as equals.

18           Now, the next instructions get into some of the

19   actual details of the specific issues in this case.  So in this

20   case, the plaintiff, Joseph Rufo, has made a claim under Title

21   42 of the United States Code, Section 1981, which is a federal

22   civil rights statute that prohibits discrimination against an

23   employee because of the employee's race.  Section 1981 also

24   prohibits employers from retaliating against an employee for

25   engaging in protected activity, such as reporting

748

1    discrimination in the workplace.

2         The purpose of Section 1981's prohibition on

3    retaliation is to protect Section 1981's prohibition on

4    intentional discrimination in employment.  If employees are

5    afraid of retaliation by their employers for reporting

6    discrimination, they may be discouraged from reporting such

7    conduct.

8         In this lawsuit, you must determine whether

9    defendant, Aclara Technologies, LLC, retaliated against

10   Mr. Rufo for engaging in activity protected by Section 1981.

11   If you find that it did, you must assess what, if any, damages

12   Mr. Rufo should receive.  You are not here to determine whether

13   Aclara engaged in discrimination.

14        Aclara denies that Mr. Rufo was retaliated against in

15   any way.

16        Now, to prevail on this claim against Aclara,

17   Mr. Rufo must prove each and every one of the following three

18   facts by a preponderance of the evidence:

19        One, that he engaged in protected activity;

20        Two, that Aclara took an action or actions against

21   Mr. Rufo that a reasonable employee would have found materially

22   adverse; and

23        Three, that Aclara would not have taken some or all

24   of these actions if not for Mr. Rufo's protected activity.

25        Now, Section 1981 protects employees who make a claim

749

1   of racial discrimination or retaliation or participate in any

2   manner in a claim of discrimination or retaliation or in any

3   related investigation or proceeding.

4            In this case, Mr. Rufo asserts that he engaged in two

5   protected activities:  one, that he began tracking what he

6   described as the disproportionate amount of discipline issued

7   to certain SGS installers by race; and two, that he filed this

8   lawsuit alleging retaliation for engaging in that protected

9   activity.

10            As to the first claimed protected activity, that is,

11  filing the report or preparing and filing the report, Mr. Rufo

12  does not have to prove that Aclara actually engaged in

13  discrimination against the SGS installers.  That is not an

14  issue in this case and not for you to decide or consider.

15  Rather, to establish that his reporting the disproportionate

16  amount of discipline issued on a racial basis constitutes

17  protected activity, Mr. Rufo must prove by a preponderance of

18  the evidence that he had an objectively reasonable good faith

19  belief that someone else's right to be free from intentional

20  racial discrimination was being violated.

21            Furthermore, Mr. Rufo must prove by a preponderance

22  of the evidence that he opposed what he reasonably believed to

23  be intentional discrimination.  Opposition to unlawful

24  discrimination cannot be equivocal, but instead, Mr. Rufo must

25  have stood in opposition to it, not just objectively -- not

750

1    just objectively reported its existence or attempted to serve

2    as an intermediary.

3         As for the second claimed protected activity, which

4    again is the filing of this lawsuit, I have already ruled that

5    Mr. Rufo's filing of this lawsuit alleging retaliation is

6    protected activity, and you should treat it as such for the

7    purposes of your deliberations.

8         Now, a materially adverse employment action is any

9    action by an employer, in this case Aclara, that is likely to

10   discourage a reasonable employee in Mr. Rufo's position from

11   exercising his rights under Section 1981.

12        I have already ruled that the following actions by

13   Aclara toward Mr. Rufo were materially adverse:

14        One, placing Mr. Rufo on a written warning and

15   performance improvement plan;

16        Two, giving Mr. Rufo a negative performance review;

17        Three, denying Mr. Rufo a merit salary increase; and

18        Four, terminating Mr. Rufo's employment.

19        You should consider these actions by Aclara to be

20   materially adverse for the purposes of your deliberations.

21        Now, Mr. Rufo must also prove that Aclara would not

22   have taken its materially adverse employment actions against

23   him but for any protected activity that he engaged in.  To

24   prove this, he does not need to show that his protected

25   activity was the sole factor in the decisions Aclara took

751

1    against him.  Instead, Aclara may be held liable for

2    retaliation even if other factors contributed to the adverse

3    employment action, so long as retaliation was the factor that

4    made the difference.

5         Ultimately, you must decide whether any protected

6    activity by Mr. Rufo was the determinative factor on the

7    disciplinary action that was taken by Aclara.  "Determinative

8    factor" means that if not for Mr. Rufo's actions, the

9    disciplinary action or actions would not have occurred.

10        Mr. Rufo has the burden of proving Aclara's

11   retaliatory intent.  Retaliation is intentional if it is done

12   voluntarily, deliberately, and willfully.  However, Mr. Rufo is

13   not required to have direct evidence of retaliatory intent.

14   Mr. Rufo can present direct or circumstantial evidence to show

15   that his claimed protected activity caused Aclara's materially

16   adverse actions against him.

17        Direct evidence of retaliation is remarks or actions

18   that, if believed, prove that Mr. Rufo's claimed protected

19   activity was the cause of Aclara's materially adverse actions

20   against him.

21        Indirect or circumstantial evidence includes proof of

22   a set of circumstances that allow you to reasonably believe

23   that Mr. Rufo's claimed protected activity was the cause of the

24   materially adverse actions that Aclara took against him.

25        Circumstantial evidence can be shown by suspicious

752

1   timing of events, ambiguous or contradictory statements, and

2   other bits and pieces of information from which you infer an

3   intent to retaliate.  Evidence of a pattern of retaliatory

4   conduct occurring soon after protected activity occurs could

5   also raise an inference of retaliatory motive.

6          In making a determination as to whether there was

7   intentional retaliation in this case, you may consider any

8   statement made or act done or omitted by a person whose intent

9   is at issue, as well as all other facts and circumstances that

10  indicate his or her state of mind.

11         Mr. Rufo claims that Aclara's stated reasons for its

12  materially adverse employment actions are not the true reasons,

13  but instead, pretext or excuses to cover up for retaliation.

14  If you find based on the facts that defendant's explanations

15  for its adverse actions against Mr. Rufo are not worthy of

16  belief, then you may, but need not, draw the inference that

17  retaliation was the true reason Mr. Rufo was subject to those

18  actions.

19         When deciding Mr. Rufo's retaliation claim, you must

20  keep in mind that an employer is entitled to make business

21  decisions for any reason, whether good or bad, so long as those

22  decisions are not motivated by a factor that is illegal, such

23  as retaliation.  Accordingly, Aclara is entitled to make its

24  own subjective personnel decisions, regardless of whether or

25  not you agree with the decision, and can make a decision about

753

1    an employee for any reason that is not discriminatory,

2    retaliatory, or otherwise illegal.

3           It is not your function as jurors to second-guess

4    decisions Aclara made with regard to Mr. Rufo if those

5    decisions were otherwise lawful.  Likewise, you may not find

6    for Mr. Rufo and against Aclara just because you may disagree

7    with Aclara's stated reasons for their decisions with regard to

8    Mr. Rufo, or because you believe that a decision was harsh or

9    unreasonable.  Instead, your function is to determine only

10   whether in making its decisions retaliation was the motivating

11   factor in any of those decisions.

12          I'm now going to instruct you on damages, and just

13   because I am instructing you on how to award damages does not

14   mean that I have any opinion on whether or not Aclara should be

15   held liable.

16          If you find by a preponderance of the evidence that

17   Aclara intentionally retaliated against Mr. Rufo for engaging

18   in protected activity, then you must consider the issue of

19   compensatory damages.  You must award Mr. Rufo an amount that

20   will fairly compensate him for any injuries he actually

21   sustained as a result of Aclara's conduct.  The damages that

22   you award must be fair compensation, no more and no less.  The

23   award of compensatory damages is meant to put Mr. Rufo in the

24   position he would have occupied if the discrimination had not

25   occurred.  Mr. Rufo has the burden of proving his damages by a

754

1    preponderance of the evidence.

2         Mr. Rufo must show that the injury would not have

3    occurred without retaliation by Aclara.  Mr. Rufo must also

4    show that retaliation by Aclara played a substantial part in

5    bringing about the injury and that the injury was either a

6    direct result or a reasonably probable consequence of Aclara's

7    acts.

8         This test -- a substantial part in bringing about the

9    injury -- is to be distinguished from the test you must employ

10   in determining whether Aclara's actions were caused by

11   retaliation.  In other words, even assuming that Aclara's

12   actions were caused by retaliation, Mr. Rufo is not entitled to

13   damages for an injury unless Aclara's retaliatory action

14   actually played a substantial part in bringing about that

15   injury.

16        In determining the amount of any damages that you

17   decide to award, you should be guided by common sense.  You

18   must use sound judgment in fixing an award of damages, drawing

19   reasonable inferences from the facts in evidence.  You may not

20   award damages based on sympathy, speculation, or guesswork.

21        You may award damages for any pain, suffering,

22   inconvenience, mental anguish, or loss of enjoyment of life

23   that Mr. Rufo experienced as a consequence of Aclara's alleged

24   retaliation if proven.  No evidence of the monetary value of

25   intangible things such as pain and suffering has been or need

1    be introduced into evidence.  There is no exact standard for

2    fixing the compensation to be awarded for these elements of

3    damage.  Any award you make should be fair in light of the

4    evidence presented during the trial.

5          You may award damages for losses that Mr. Rufo may

6    suffer in the future as a result of Aclara's retaliation.  For

7    example, you may award damages for loss of earnings resulting

8    from any harm to Mr. Rufo's reputation that was suffered as a

9    result of Aclara's retaliation.  Where a victim of retaliation

10   has been terminated by an employer and has sued that employer

11   for retaliation, he may find it more difficult to be employed

12   in the future, or may have to take a job that pays less than if

13   the retaliation had not occurred.

14         That element of damages is distinct from front pay,

15   or the amount of wages Mr. Rufo would have earned in the future

16   from Aclara if he had retained his job there.  The jury may not

17   award front pay damages, as that issue is decided by the Court,

18   if Aclara is found liable for retaliation.

19         As I instructed you previously, Mr. Rufo has the

20   burden of proving his damages by a preponderance of the

21   evidence, but the law does not require that Mr. Rufo prove the

22   amount of his losses with mathematical precision; it requires

23   only as much definiteness and accuracy as the circumstances

24   permit.

25         In assessing damages, you must not consider attorney

756

1    fees or the costs of litigating this case.  Attorney fees and

2    costs, if relevant at all, are for the Court and not the jury

3    to determine.  Therefore, attorney fees and costs should play

4    no part in your calculation of any damages.

5          If you find that Aclara intentionally retaliated

6    against Mr. Rufo, you may also award him back pay damages, that

7    is, an amount that reasonably compensates Mr. Rufo for any lost

8    wages and benefits, taking into consideration any increases in

9    salary and benefits, including pensions, that Mr. Rufo would

10   have received from Aclara had Mr. Rufo not been the subject of

11   Aclara's intentional retaliation.

12         Back pay damages, if any, apply from the date Aclara

13   took a materially adverse employment action against Mr. Rufo

14   until the date of your verdict.

15         You must reduce any back pay award by the amount of

16   the expenses that Mr. Rufo would have incurred in making those

17   earnings.

18         If you award back pay, you are instructed to deduct

19   from the back pay figure whatever wages Mr. Rufo has obtained

20   from other employment during this period.  Mr. Rufo has the

21   burden of proving back pay damages by a preponderance of the

22   evidence.

23         Now, you are instructed that Mr. Rufo has a duty

24   under the law to mitigate his damages.  That means that

25   Mr. Rufo must take advantage of any reasonable opportunity that

757

1    may have existed under the circumstances to reduce or minimize

2    the loss or damages caused by Aclara.

3         Aclara has the burden of proving that Mr. Rufo has

4    failed to mitigate his damages.  So if Aclara persuades you by

5    a preponderance of the evidence -- and it's that same standard

6    I'm going to define for you in a second -- that Mr. Rufo failed

7    to take advantage of an opportunity that was reasonably

8    available to him, then you must reduce the amount of Mr. Rufo's

9    damages by the amount that could have been reasonably obtained

10   if he had taken advantage of such an opportunity.

11        Mr. Rufo claims that Aclara acted with malice or

12   reckless indifference to his federally protected rights and

13   that as a result, there should be an award -- an additional

14   award of damages, which we'll address later, but a finding of

15   malice or reckless indifference against Aclara is permissible

16   in this case only if you find by a preponderance of the

17   evidence that a management official of Aclara personally acted

18   with malice or reckless indifference to Mr. Rufo's federally

19   protected rights.  You are instructed that Michael Garcia, Lyn

20   Salvo, Gina Petrella, and Jill Mecey are management employees

21   of Aclara.

22        An action is with malice if a person knows that it

23   violates federal law prohibiting retaliation and does it

24   anyway.  An action is with reckless indifference if taken with

25   knowledge that it may violate the law.

758

1          However, even if you make a finding that there has

2     been an act of retaliation, you cannot make a finding of malice

3     or reckless indifference against Aclara if Aclara proves by a

4     preponderance of the evidence that it made a good faith attempt

5     to comply with the law.

6          Now, throughout these instructions, I have referred

7     to the burden of proof that the parties have on specific issues

8     as being by the "preponderance of the evidence."  That standard

9     of proof requires proving in light of all the evidence that

10    what is claimed is more likely true than not true.

11         In determining whether any fact has been proved by a

12    preponderance of the evidence in the case, you may unless

13    otherwise instructed consider the testimony of all witnesses,

14    regardless of who may have called them, and all exhibits

15    received in evidence, regardless of who may have produced that

16    evidence.

17         You may have heard the term "proof beyond a

18    reasonable doubt."  That's a burden of proof in a criminal

19    case.  That is a stricter standard of proof.  It does not apply

20    to this case, so you should put that out of your mind.

21         Just one other way of thinking about the

22    preponderance of the evidence, if you turn behind you, there's

23    a balance scale sitting on the, on the counter there.  I'm sure

24    you've all seen a balance scale.  So the party that has the

25    burden of proof on a particular issue, all right, has to have

759

1    that scale tip in the party's favor.

2           So what you do on each issue is you look at the

3    evidence that favors each side, and you put the evidence on the

4    scales.  If the party with the burden of proof, if the scales

5    tip in that party's favor, and it only to be a feather weight

6    but it has to tip, then the party has met the burden, all

7    right?  If it's fifty-fifty, if the scales are absolutely

8    equal, the party with the burden of proof does not win on that

9    issue because they have not produced the greater weight of the

10   evidence, all right?

11          And obviously, if the evidence tips in favor of the

12   other party, the party with the burden of proof does not win.

13   So if a party -- and both parties in this case have different

14   burdens -- have the same burden of proof but on different

15   issues.  So for the issue where a particular party has the

16   burden of proof, for them to win on that issue, the scales must

17   tip in their favor to some degree.

18          We've reached the last instruction.  I know these

19   take a while.

20          Upon retiring to your jury room to begin your

21   deliberations, the first order of business is for you to elect

22   one of your members to be the foreperson.  Now, the foreperson

23   will preside over your deliberations and will be your

24   spokesperson here in court, but remember the first instruction

25   or one of the early ones I gave you at the beginning of the

760

1  trial:  You are eight coequal judges, so the fact that one of

2  you is going to be the foreperson does not mean that his or her

3  opinion is more worthy of consideration than any of the other

4  jurors, but we do need for administrative purposes one person

5  who can sort of manage things.

6          Now, your verdict must represent the collective

7  judgment of the jury.  In order to return a verdict, it is

8  necessary that each juror agree to it.  Your verdict, in other

9  words, must be unanimous.

10         It is your duty as jurors to consult with one another

11  and to deliberate with one another with a view towards reaching

12  an agreement if you can do so without violence to your own

13  individual judgment.  Each of you must decide the case for

14  yourself, but do so only after an impartial consideration of

15  the evidence in the case with your fellow and sister jurors.

16         In the course of your deliberations, do not hesitate

17  to reexamine your own views and to change your opinion if

18  convinced it is erroneous.  Do not surrender your honest

19  conviction, however, solely because of the opinion of your

20  fellow or sister jurors or for the mere purpose of thereby

21  being able to return a unanimous verdict.

22         Remember at all times you're not partisans.  You

23  don't represent Mr. Rufo, and you don't represent Aclara

24  Technologies, LLC.  Instead, you are judges, specifically,

25  judges of the facts of this case, and your sole interest is to

761

1    seek the truth from the evidence received during the trial.

2           Your verdict must be based solely upon the evidence

3    received in the case.  Nothing you have seen, read, or heard

4    outside of the courtroom may be considered.  Nothing that I

5    have said or done during the course of this trial is intended

6    in any way to somehow suggest to you what I think your verdict

7    should be.  And nothing said in these instructions and nothing

8    in the form of a verdict are to suggest or convey to you in any

9    way what your verdict should be.  What the verdict shall be is

10   the exclusive duty and responsibility of the jury.  As I've

11   said many times, you are the sole judges of the facts.

12          Now, we've prepared a verdict form for you.  You've

13   actually seen it, but I'm going to go over it with you again.

14   It has the caption of the case, and it has the case number, and

15   then it has the following.

16          The first question:  Do you find by a preponderance

17   of the evidence in favor of plaintiff, Joseph Rufo, on his

18   claim of retaliation, in violation of 42 U.S.C., Section 1981?

19          And you're going to indicate either yes or no, and

20   you can do it with a check mark or an X, but that must be

21   clear.

22          Now, if you find yes, then you have two more

23   questions to answer.  If you say no, that ends your decision,

24   and the foreperson will then sign his or her signature.  We ask

25   the foreperson to print his or her name because we often can't

1    read your signature, and then the date the decision is made.

2    So today, believe it or not, is November 1.  If -- there won't

3    be time today, but if -- tomorrow would be November 2.

4            Now, if the jury found yes, that is, if you do find

5    that Mr. Rufo has proven his claim for retaliation, the next

6    question you need to answer is what sum of money would fairly

7    and reasonably compensate the plaintiff for the damages, if

8    any, that you have found defendant, Aclara Technologies, caused

9    him?

10           And we first ask you to indicate what, if any, back

11   pay you find, and that is defined as wages and benefits from

12   June 4, 2018, to the present.

13           And the next category, pain and suffering,

14   inconvenience, mental anguish, and loss of enjoyment of life.

15           And then we would ask you to add those two numbers,

16   so that the final number would be write the total of the

17   amounts you indicate, just to make sure that we're clear about

18   that.

19           And the third and last question is do you find by a

20   preponderance of the evidence that Aclara acted with malice and

21   reckless indifference to Mr. Rufo's rights protected by Title

22   42, United States Code, Section 1981?  And there you'll just

23   indicate yes or no.

24           So that's the verdict form.

25           Now, when you go in to your deliberations, you're

763

1    going to have a couple of copies of the jury instructions.  We

2    have to make corrections to them and get them back to you.  You

3    will have all of the physical exhibits that have been entered

4    into evidence.

5           I've asked the lawyers to produce an index, each

6    side, an index of the exhibits that have been entered into

7    evidence, so you'll have the exhibit number and a little bit of

8    a description, so you should be able to find them pretty

9    quickly, and you'll have one copy of the verdict form.

10          Now, during the course of your deliberations, it's

11   very important that, number one, you never discuss how your

12   deliberations are going with anybody.  You don't tell my court

13   security officer, you'd never tell me, and you certainly don't

14   tell anybody outside of the courthouse or the courtroom.

15          If you need to communicate with the Court, that is,

16   if you have a question or something you want to bring to the

17   Court's attention, the procedure is to write a note.  Usually

18   the foreperson will write it and sign it, fold it over, and let

19   Mr. Hendrick know that you've got a note for the Court.

20          Now, my practice is to require that at least one

21   lawyer per side must stay on this floor throughout the time

22   that a jury is deliberating, and that is because if you have a

23   question, I can't answer your question without clearing it with

24   counsel, and if I let them go back to their office, you might

25   have to wait half an hour before I can get an answer to you,

764

1    and we try not to waste your time.

2          Because of that requirement that they be here, I

3    always want jurors to let us know when you're not deliberating.

4    So, for example, as you think about your schedule tomorrow, you

5    know, if you're going to take a morning coffee break the way

6    we've been doing, around 11:00 or 11:15, if you'll let us know

7    coffee break for 15 minutes, then I can let the lawyers leave

8    the floor.  The same way you decide about how you want to do

9    lunch, knowing that you're going to have an hour lunch, or you

10   could take a half-hour lunch, or you could take a two-hour

11   lunch, your schedule is going to be your own once you get

12   started with deliberations, but we just need to know when

13   you're not deliberating.

14         The other important thing is to remember that jury

15   deliberation is a collective thinking process.  We have eight

16   judges in that room, and so it's really important that each of

17   you when you express your views about things are being listened

18   to by the other seven jurors.  So if a juror, for example, is

19   in the restroom or has run downstairs to grab something, you

20   need to stop deliberating because it would not be fair if some

21   of you were talking and one of the jurors was not in the room

22   hearing that.  So that's how I want to make sure you're careful

23   in terms of your deliberations.

24         And when you have finally reached a decision and have

25   filled out the verdict form, you fold it over, knock on the

765

1  door, let Mr. Hendrick know that you've reached a verdict, and

2  then we'll bring you back in.

3        All right.  Counsel, approach the bench.

4        (Bench conference on the record.)

5        THE COURT:  It was either late at night or you-all

6  didn't read the instructions, but you saw I had a bias one.  I

7  had to correct that because it was for a criminal case, the

8  bias instruction.  So I'll clean that up before it goes to the

9  jury, okay?

10        MR. FOX:  Thank you.

11        THE COURT:  Any objection to the charge as given?

12        MR. FOX:  No, Your Honor.

13        THE COURT:  Any objection other than what you

14  indicated before?

15        MR. ROLLINS:  Only the objection previously stated

16  about prior to the charge that was given.

17        THE COURT:  That's fine.  Then we're all set to go,

18  all right?  How much time is it going to take for you-all to

19  get your exhibit lists done, the index?  Or do you think

20  your -- do you think they're ready to go to the jury now?

21        MR. FOX:  Yeah.  I think they're done, aren't they,

22  as far as I know.

23        MR. ROLLINS:  We'll need to update ours for the new

24  exhibits that were entered today.

25        THE COURT:  Okay.

766

1          MR. ROLLINS:  But it won't take very long.  I don't

2    think there were a tremendous number that were admitted today.

3          THE COURT:  I don't care if you do it by hand.  It's

4    only -- no it's 6:00.  I'll send the jury home for tonight,

5    okay?

6          MR. FOX:  Okay.

7          MR. ROLLINS:  Okay.

8          THE COURT:  All right.  We'll stay in session.  I

9    want to get all the exhibits taken care of tonight, all right?

10   Thank you.

11          (End of bench conference.)

12          THE COURT:  Ladies and gentlemen, what I'd like you

13   to do -- and you're going to be getting out of here in a couple

14   of minutes because it's almost 6:00, and it will take us a few

15   minutes yet to pull the exhibits together and get them to you.

16   The best thing would be to go in the jury room now, decide who

17   is going to be the foreperson, and then decide among yourselves

18   decide how you want to run tomorrow.  That is, you can start as

19   earlier as 8:00.  That's as early as the building opens up.

20   You can start at ten.  You can start whatever time you want,

21   but you need to, obviously, agree because you can't start

22   deliberating until all eight of you are together, all right?

23          We'd also like to know, if you could, approximately

24   what your time schedule looks like tomorrow, if you want to

25   stay on the same schedule and have lunch at 1:00, if you want a

1    shorter lunch period.  It's just nice for planning purposes.

2              I have a regular docket at 9:00 in this courtroom.

3    We will interrupt that docket if you have questions or issues.

4    But when you come in tomorrow morning, you'll have in the jury

5    room, I think given there are eight of you, I'll give you three

6    sets of the jury instructions.  You'll have the verdict form,

7    all the exhibits.  You will have indexes for these exhibits,

8    and we will get you a playback unit if you need to listen to

9    the recordings, all right?  And then if you have any -- and

10   you'll have your notebooks, which again, leave here tonight,

11   but you can have the benefit of your notebooks for your memory.

12             So we're going to stay in session.  We have some

13   housekeeping matters to do with the exhibits, but if you could

14   decide what time you're going to start tomorrow morning and who

15   the foreperson is and then just send that to us on a note, I'll

16   bring you back in one more time just to make sure you have

17   final instructions this evening, but why don't you go back to

18   the jury room right now, all right?

19                       (Jury out.)

20             THE COURT:  All right.  So while we're, while we're

21   waiting for the jury to come back in, I'm going to have

22   Ms. Guyton slowly start reading to you the exhibits which her

23   notes show are in, and you-all need to be listening carefully,

24   because this is, this is the time to clarify the record in that

25   respect, all right?

768

1          THE CLERK:  Plaintiff's exhibits:  No. 1, No. 4, 5,

2     6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22,

3     22A, 23, 24, 25, 26, 27, 28, 31, 32, 33, 34, 34A, 34B, 34C, 35,

4     36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 48, 49, 52, 53, 54,

5     55, 56, 60, 61, 62, 63, 66, 68, 70, 71, 72, 73, 74, 78, 79, 80,

6     81, 82, 83, 84, 87, 88, 89, 94, 96, 99, 101, 102, 105, 111,

7     112, 113, 118, 119, 120, and 122.

8          THE COURT:  All right.  Now, does the plaintiff think

9     there are any other exhibits that you entered into evidence

10    that are not recorded there?

11         MR. HOROWITZ:  No, Your Honor.

12         THE COURT:  All right.  Then I -- all right.  Let's

13    hear now from the defense.

14         THE CLERK:  Defendant's exhibits:  D-213, D-214,

15    D-219, D-223, D-224, D-229, D-231, D-251, D-252, D-254, D-255,

16    D-258, D-269, D-275, D-277, D-281, D-282, D-284, D-290, D-296,

17    and D-302.

18         THE COURT:  Does the defense think you entered any

19    other exhibits that are not listed here?

20         MR. ROLLINS:  If we could have one moment, Your

21    Honor?

22         THE COURT:  Yes.

23         MR. ROLLINS:  Your Honor, we have --

24                     (Knock on jury room door.)

25         THE COURT:  Wait, wait, wait.  Hold on one second.

769

1    We've got a knock on the door.

2              We're going to have to give them some paper.  Those

3    are little, tiny notes.

4              THE COURT SECURITY OFFICER:  Yes, ma'am.

5              THE COURT:  Okay.  All right.  Mr. Levine is the

6    foreperson, and they want to start at 9:30 tomorrow morning.

7    They're going to take a 15-minute break at 11:00, a half-hour

8    lunch break from 1:00 to 1:30, and a 3:00 break in the

9    afternoon, all right?  So you know who the foreperson is and

10   what the schedule is for the day.

11             So you-all are going to have to clean your --

12   remember, I have a docket tomorrow, so everything out of the

13   courtroom at this point.  We're going to give you the extra

14   copies that you gave to the Court, I don't need them any

15   longer, so we'll get that back to you tonight as well.

16             And both of, both of you can go ahead and correct

17   your -- or bring up to date your index forms.  Just get them

18   here tomorrow morning before -- unless you want to leave them

19   tonight before you go.  But you don't have a typewriter here.

20   How would you -- the plaintiff's is completely accurate?  Every

21   one of your exhibits is in, or do you need to do some modifying

22   of it?

23             MR. HOROWITZ:  Your Honor, there's a few exhibits on

24   our original list that were not used or admitted.  We can

25   either black those out or we can submit a new list.

770

```
 1          THE COURT:  Here's what I suggest:  Overnight, submit
 2    them to us because I want them here early enough to give to the
 3    jury at 9:30 on the dot, okay?  Or actually, I'd like to get
 4    the stuff in there by 9:15.
 5          So if you've e-mailed the updated exhibit list to
 6    Matt, we'll have it ready to give to the jury tomorrow morning,
 7    all right?  You-all don't need to be up here until 9:30, and I
 8    don't need all counsel.  You decide how you want to, you know,
 9    use your resources.  But we will need one attorney per side
10    throughout the time the jury is deliberating, and so you can
11    plan accordingly.
12          In case you don't know it, there is a lawyer lounge
13    on the fourth floor.  We're not going to go looking for you, so
14    you really do have to stay on this floor, but if you bring
15    extra people and they need a place to work, they can work there
16    to some degree.
17          All right.  Is there anything else we need to address
18    this evening?
19          MR. HOROWITZ:  Your Honor?
20          THE COURT:  Yeah.  Actually, you know, before we do
21    that, let's bring the jury in and send them home for the night,
22    I'm sorry.
23                        (Jury present.)
24          THE COURT:  All right.  Folks, have a seat just for
25    one second.  I just want to give you just again one more set of
```

771

1    instructions.

2          So, Mr. Levine, we appreciate your getting the note

3    to us for your schedule tomorrow, and I -- we'll get you some

4    more paper.  You don't have to use little, tiny pieces like

5    this, all right?

6          Remember, it's even more important now that you

7    continue to follow my instructions, and that is, you're not to

8    be even thinking about the case tonight.  Just go home and get

9    a good night's sleep.  Don't e-mail each other.  Don't try to,

10   you know, have any communications about the case.  Do not

11   conduct any investigation.

12         I, again, don't think there should be anything in the

13   newspapers about any issues related to this kind of a case, but

14   stay away from anything that might contaminate your thought

15   process.  Again, you've been a great jury, always getting here

16   on time, but remember, if one of you is late, it's going to

17   hold up all the rest of the group.

18         We'll get some fresh paper in there for you as well

19   because it doesn't look like you have enough to work with here.

20   And if you need, you know, Magic Markers or anything,

21   everything goes by a note.  You can't just ask my court

22   security verbally.  We have to have a written note for any

23   communication, all right?

24         All right.  Then you're all free to go.  We'll see

25   you tomorrow morning at 9:30, okay?

772

1                        (Jury out.)

2              THE COURT:  I think there was an issue or a question?

3              MR. HOROWITZ:  Yes, briefly, Your Honor.

4              THE COURT:  Yes.

5              MR. HOROWITZ:  I apologize for not raising this

6    before, but I remembered that we have two exhibits that have

7    been admitted into evidence in their native Excel and

8    PowerPoint forms.  Shall we submit that to the courtroom deputy

9    along with the audio files, or is there a different way that

10   Your Honor would prefer that we handle that?

11             THE COURT:  Well, the jury, if they want to see it,

12   which exhibit is that?

13             MR. HOROWITZ:  It's 34B and C, I believe.

14             THE COURT:  That creates a problem.  You're going to

15   have to put them in a format that the jury can get.  Either

16   print it out or put it on a disc that they can play on the

17   computer.

18             MR. HOROWITZ:  Okay.

19             THE COURT:  All right?

20             MR. HOROWITZ:  We will do that.

21             THE COURT:  All right?  And just make sure it's a

22   clean disc so there's nothing else on it.

23             Let me just see what we're talking about.

24             MR. HOROWITZ:  Your Honor, it may be helpful if

25   Mr. Katz could address the Court on this issue.

773

1           THE COURT:  Well, these are, these are fancy, fancy

2     copies of the report, aren't they?

3           MR. HOROWITZ:  Yes, Your Honor.

4           THE COURT:  We've already got it in in a different

5     format.  There's no reason to -- we're not going to do it two

6     or three times, if that's what you're trying to do.

7           MR. HOROWITZ:  No.  We will just use it as is in the

8     binder.  Thank you, Your Honor.

9           THE COURT:  Much better.  Yes, okay.

10          All right.  Anything else?

11                      (No response.)

12          THE COURT:  No?  All right.  Then you-all have to

13    clean up the courtroom a little bit, and we'll recess court

14    until 9:30 tomorrow morning.  9:00 tomorrow morning for us.

15      (Recess from 6:05 p.m., until 9:30 a.m., November 2, 2018.)

16

17                  CERTIFICATE OF THE REPORTER

18      I certify that the foregoing is a correct transcript of

19    the record of proceedings in the above-entitled matter.

20

21

22                         _____
                                          /s/
23                              Anneliese J. Thomson

24

25