UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JOSEPH RUFO, Plaintiff, vs. ACLARA TECHNOLOGIES, LLC, Defendant.

Civil Action No. 1:18cv37

Alexandria, Virginia
November 2, 2018
4:45 p.m.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 4

APPEARANCES:

FOR THE PLAINTIFF:

JOSHUA H. ERLICH, ESQ.
The Erlich Law Office, PLLC
2111 Wilson Boulevard, Suite 700
Arlington, VA 22201
and
BRUCE C. FOX, ESQ.
ANDREW J. HOROWITZ, ESQ.
QIWEI CHEN, ESQ.
Obermayer Rebmann Maxwell & Hippel LLP
BNY Mellon Center
500 Grant Street, Suite 5240
Pittsburgh, PA 15219

FOR THE DEFENDANT:

J. CLAY ROLLINS, ESQ.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1300
Richmond, VA 23219

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 774 - 818)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES: (Cont'd.)

FOR THE DEFENDANT: HEIDI KUNS DURR, ESQ.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
7700 Bonhomme Avenue, Suite 650
St. Louis, MO 63015
and
JOHN B. FLOOD, ESQ.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street, N.W.
Washington, D.C. 20006

ALSO PRESENT: RACHEL COLANGELO
RICHARD KATZ
SUSAN HORNEKER
JILL MECEY
NICOLE H. NAJAM, ESQ.
JOSEPH RUFO

OFFICIAL COURT REPORTER: ANNELIESE J. THOMSON, RDR, CRR
U.S. District Court, Third Floor
401 Courthouse Square
Alexandria, VA 22314
(703)299-8595

# I N D E X

Opening Statement by Mr. Fox: Page 792

Opening Statement by Mr. Flood: Page 795

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES ON BEHALF OF THE PLAINTIFF: | | | | |
| Jill Mecey (Recalled) | 797 | 800 | | |
| Michael Garcia (Recalled) | 801 | | | |

Closing Argument by Mr. Fox: 804

Closing Argument by Mr. Flood: 807

P R O C E E D I N G S

(Jury out.)

THE CLERK:  Civil Action 18-37, Joseph Rufo v. Aclara Technologies, LLC.  Would counsel please note their appearances for the record.

MR. FOX:  Yes, Your Honor.  Bruce Fox.  With me I have Andrew Horowitz and Qiwei Chen.

THE COURT:  Good afternoon.

MS. DURR:  And Heidi Durr for defendant, and with me is J. Clay Rollins and John Flood.

THE COURT:  Okay.  This question from the jury shows just how careful our juries are, that they could read that fine a distinction.  And they're correct that the verdict form should have used "or" rather than "and."  So it's my intention to tell the jury that they should cross out the word "and" and write "or" for Question No. 3, and I think that solves their problem.

Is there anything that defense wants to add to that?

MR. ROLLINS:  No, Your Honor.

THE COURT:  All right.  So that's what we'll do, all right?

Let's bring the jury in.

THE COURT SECURITY OFFICER:  Yes, ma'am.

THE COURT:  And we're going to stay in session afterwards because I need to talk to you about how we proceed

this afternoon.

(Jury present.)

THE COURT: Please have a seat, ladies and gentlemen. And I want to first of all commend you for, number one, being here on time, and for sending through such a very, very articulate question, which shows how carefully you've gone about looking at this case.

And you are correct that there is an inconsistency between Question 3 on the verdict form and the jury instructions, and so I will ask the foreperson to correct Question No. 3. That "and" should be an "or." So in other words, "Do you find by a preponderance of the evidence that Aclara acted with malice or reckless indifference?" And that's how that should be phrased. So if you'll make that correction, I believe that answers your question, all right?

So we'll send you back in to continue your deliberations, and we'll stay in session afterwards. All right. So you may go back. Thank you.

(Jury out.)

THE COURT: So that we don't -- because it is getting late, I don't know if this means we're going to get a quick answer from the jury or not, but we do need to get prepared for a punitive damages phase to the trial. I've looked at the Proposed Jury Instruction 29, which is what you've all agreed to, and then the only note that I saw here in terms of the --

there's a bracket issue, defendant does not agree with the -- I'm sorry, does not disagree with the substance of this instruction, provided that it is given only if the Court decides that the jury may consider punitive damages, and objects to the bolded paragraph only to the extent that admissible evidence of Aclara's financial resources is not introduced during the punitive damages phase of a trial.

So my understanding is, if I understand the position of the defense, is that the entire instruction, with the bolded portion, can now go to the jury since they will have been through the first phase without any of that information coming in. Is that what everybody understands or not?

MR. FOX: Yes, Your Honor, on behalf of plaintiff.

MR. ROLLINS: Your Honor, we would anticipate making a motion for judgment as a matter of law on the issue of punitive damages and whether that should go to the jury at the appropriate time.

THE COURT: Well, we're going to let the case go to the jury. I don't want to hold them up. Again, they may be another hour or two. We may be going into Monday; I don't know. What I want to do now is just get the case teed up. You can always make a post-decision judgment -- motion.

And frankly, when a case has taken this much time, I let the jury do whatever they're going to do, and we can always address legal problems after the fact. So I'm not going to

deny you the ability to make your record, but we're going to get the jury element finished first.

MR. ROLLINS: Yes, Your Honor.

THE COURT: All right. So --

MR. ROLLINS: I just wanted to make sure defendant's position on this was clear.

THE COURT: I understand. But in terms of Instruction No. 26 -- I'm sorry, it's 29 as you-all -- I'm sorry, what number was it? It was the last instruction in the package that you sent us.

MR. ROLLINS: Yes, Your Honor.

THE COURT: All right. You want that instruction given with the bold language included; is that correct?

MR. ROLLINS: Which is the bold language, Your Honor? If you could please read that one more time?

THE COURT: Yeah. "The extent to which a particular amount of money will adequately punish a defendant and the extent to which a particular amount will adequately deter or prevent future misconduct may depend upon a defendant's financial resources. Therefore, if you find that punitive damages should be awarded against Aclara, you may consider the financial resources of Aclara in fixing the amount of those damages."

I think that's fairly standard in punitive damage instructions.

MR. ROLLINS: It is, Your Honor.

THE COURT: All right.

MR. ROLLINS: And defendant's only objection to that would be that we would, we would object to that portion being provided to the jury if during the punitive damages phase, no admissible evidence regarding Aclara's financial resources are introduced.

THE COURT: Okay. Now, that gets to the next question. Mr. Fox, how long do you anticipate evidence taking in a punitive damages phase of the trial?

MR. FOX: Ten minutes, Your Honor.

THE COURT: Ten minutes.

MR. FOX: Yes.

THE COURT: All right. How much evidence will the defense have?

MS. DURR: Your Honor, we've already provided briefing on this, but we have filed motions in limine to keep out certain evidence, and I just wanted to give -- to provide the Court notice of that.

THE COURT: Well, what are they?

MS. DURR: We anticipate that the plaintiffs are going to try and present evidence of the acquisition price of, of what Hubbell paid to acquire Aclara, and that is not evidence of Aclara's net worth. It's a very poor proxy for net worth.

It's just -- it was just the purchase price that Hubbell agreed to pay as part of a blind auction process. It was based on the value that Hubbell deemed that it was worth for them to pay when they were trying to outbid the other bidders, and so it's not evidence of Aclara's actual net worth.

And, in fact, an acquisition price in itself is just, it's based on a multiplier of what it -- of what Hubbell would have viewed as -- what Hubbell would have viewed as Aclara's actual value, and frankly, plaintiff sought no net worth discovery in this case, so there's no evidence of actual net worth of Aclara.

Secondly, the other item is that plaintiff has -- we anticipate, although we're not sure that Hubbell -- that plaintiff may try and enter into evidence Hubbell's 10Q SEC filing. Hubbell, Inc., is not a defendant in this case, and so that information should not be admissible.

THE COURT: All right. Mr. Fox, do you want to respond to that?

MR. FOX: Yes, Your Honor. This issue was addressed already in the bifurcation motion, Your Honor. Counsel's position is contrary to the weight of authority in cases in this district. It's well settled both under law and basic economic principles that arm's length sales are the best evidence of the value of assets of the business.

We cited the case out of the Western District of

North Carolina, *U.S. v. Music Masters*, 621 F. Supp. 1046, in our brief in opposition to the motion to bifurcate, citing that authority.

Aclara's recent sales price, and this was in February of this year, Your Honor, couldn't be better evidence of what it's worth. It's what they paid for it. And it's probative evidence of what a punitive damages -- to support a punitive damages award to make Aclara change its ways.

They've cited one case, Your Honor; it's totally inapposite. It's, it's *Sadler v. Advanced Bionics*. It's an unpublished order from Kentucky. It's the sole authority they've cited. It's of no value here.

First, the discussion quoted by Aclara is mere dicta because the evidence of defendant's financial condition in that case was irrelevant under Kentucky law, and their brief conveniently omits the fact in that case, the acquisition took place three years after the plaintiff's injury and four years after the company in that case, it was a defective products case, manufactured a defective device.

So again, this is the best evidence. It will be very easy to present it because all we have to do is basically present the press release, which shows the acquisition price was 1.1 billion, and that's essentially all we need to get this to the jury for the next phase, Your Honor.

THE COURT: What exhibit number is that? And is that

here in the courtroom, since we gave you back your exhibits?

MR. FOX: It's Exhibit 64, Your Honor, I believe.

THE COURT: Let me take a look at it, please. May I have it?

MR. FOX: Yes. And I have it highlighted for you, Your Honor, portions we want to use. It's off of the company website.

THE COURT: Well, this article also includes the statement, "Aclara declared revenues of 500 million and adjusted EBITDA of 90 million for the fiscal year ended September 30, 2017."

Does the defense dispute that those numbers are accurate?

MS. DURR: No, Your Honor.

THE COURT: Those are the numbers you can give to the jury, all right? I don't want you giving them this whole article. I think that's unnecessary. I think we can -- why not just give them a stipulation? Is there any dispute about that?

MS. DURR: We can stipulate to the 500 million. As net worth?

MS. NAJAM: It's revenue.

THE COURT: This is revenue. It's revenue.

MS. DURR: Yes, because it's not reflecting the --

MR. FOX: 1.1 billion net worth, Your Honor. We'd

certainly stipulate to that.

THE COURT: Well, I'm not going to do that because this says "Hubbell to acquire." It doesn't mean that they actually did -- I don't know if they did or did not. I don't know what the final number is, but I do have Aclara prepared to stipulate --

MR. FOX: Your Honor, just one further document. The 10Q that Ms. Durr was talking about, on page 11 of that document, I can show it to you now, confirms the acquisition did take place. It's in their SEC filing. It's certified and filed with the SEC. So that's a business record. That should come in. That confirms that the sale was 1.1 billion.

Would you like to see that, Your Honor?

THE COURT: Yes.

Well, that does appear to be decent evidence.

MS. DURR: Your Honor?

THE COURT: Yes.

MS. DURR: We're not disputing that that's the acquisition price. We're disputing that that's the actual net worth of Aclara. And it doesn't reflect the liabilities that Aclara had. All that reflects is that Hubbell believed that if it acquired this company, that it would go and have some value to Hubbell, and so it's willing to pay that.

THE COURT: I understand that. Do you have evidence as to the liabilities of Aclara?

MS. DURR: We can put on testimony regarding the liabilities.

THE COURT: All right. How long do you think that's going to take?

MS. DURR: Well, it will be one question.

THE COURT: All right. That tees it up. I mean, we're going to let the plaintiff put on -- I don't think I -- I don't want this whole press release going in. I think there's more information in there than is necessary, but you can, I think, just ask a question or two. You've got the plaintiff's people here. Mr. Garcia is here. I'm sure he can answer those questions, can't he?

Mr. Garcia, are you aware of the finances?

MR. GARCIA: I'm aware of the revenues and also the liabilities.

MR. FOX: Your Honor, if I may, I mean, he's a senior vice president of HR. He's not a financial official of the company. He's not an officer of the company.

THE COURT: Well, just find out when I go off the bench if he's going to dispute these representations, that it was, the purchase price was 1.1 billion, their reported revenues was 500 million.

And, you know, again, we don't know what the jury is going to do, and it may very well be that there may or may not be a surprise in what they've done, I don't know, but I don't

intend to keep them here, you know, until midnight tonight getting this evidence in, and I don't know how long they are going to want to proceed.

Now, just so we don't have any problems, I believe we have a supplemental verdict form, if I can find it here.

Matt, did we bring it in?

MR. FOX: We do, Your Honor.

THE COURT: Yeah, here it is. All right.

This is the verdict form simply --

(Knock on jury room door.)

THE COURT: We'll wait and see what they do. The verdict form simply says, "State the amount of punitive damages, if any, that should be assessed against defendant, Aclara Technologies, LLC." Is there any objection to that form?

MR. ROLLINS: No, Your Honor.

THE COURT: We'll get you copies of it. Okay.

THE COURT SECURITY OFFICER: The jury has reached a verdict, ma'am.

THE COURT: All right. Let's ask them to come in, and make sure it's folded over.

THE COURT SECURITY OFFICER: Yes, ma'am.

(Jury present.)

THE CLERK: Okay. Mr. Foreperson, has the jury reached its verdict?

THE FOREPERSON: We have.

THE CLERK: Can you hand it to the court security officer, please?

THE COURT: You may be seated.

THE CLERK: In the matter of 18-37, Joseph Rufo v. Aclara Technologies, LLC, Question 1: "Do you find by a preponderance of evidence in favor of plaintiff, Joseph Rufo, on his claim for retaliation in violation of 42 U.S.C., Section 1981?

"Yes.

Question 2: "What sum of money would fairly and reasonably compensate plaintiff, Joseph Rufo, for the damages, if any, that you have found defendant, Aclara Technologies, LLC, caused him?

"Back pay (wages and benefits from June 4, 2018, to present): $35,000.

"Pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life: $300,000."

Total of the amounts you indicate comes to $335,000.

Question 3: "Do you find by a preponderance of the evidence that Aclara acted with malice or reckless indifference to Mr. Rufo's rights protected by 42 U.S.C., Section 1981?

"Yes."

Signed Foreperson, Mark Levine, November 2, 2018.

Ladies and gentlemen, is this your unanimous verdict?

(Jurors nodding heads.)

THE COURT: Does either side wish to have the jury polled as to this verdict?

MR. FLOOD: We would, Your Honor.

THE COURT: All that means, ladies and gentlemen, is we're going to ask each of you if this decision represents your individual judgment as well as your understanding of the collective judgment of the jury.

THE CLERK: Juror No. 23, Natalie Kuadey, is this your verdict?

JUROR KUADEY: It is.

THE CLERK: Juror No. 20, Brooke Gier, is this your verdict?

JUROR GIER: Yes.

THE CLERK: Juror No. 35, Katrina Rose, is this your verdict?

JUROR ROSE: Yes.

THE CLERK: Juror No. 12, Aditi Dandekar, is this your verdict?

JUROR DANDEKAR: Yes.

THE CLERK: Juror No. 24, Mark Levine, is this your verdict?

FOREPERSON LEVINE: Yes.

THE CLERK: Juror No. 21, Gilma Hernandez, is this your verdict?

JUROR HERNANDEZ: Yes.

THE CLERK: Juror No. 7, Michael Brennan, is this your verdict?

JUROR BRENNAN: Yes.

THE CLERK: And Juror No. 15, Steve Duong, is this your verdict?

JUROR DUONG: Yes.

THE COURT: All right. Folks, if you will just go back to the jury room, there's one other matter that we do have to take care of. We're going to need your time just a little bit longer, so if you go on back to the jury room, we'll be with you in a second.

(Jury out.)

THE COURT: All right. Well, that verdict strongly suggests that there may not be a significant, if any, punitive damages. Do you still want to proceed with that part of the case?

MR. FOX: Yes, we do, Your Honor.

THE COURT: All right. So we're going to tell the jury that they have to still address the issue of the amount of damages since they made that finding.

And I'm going to ask you each to take, what, five minutes as an opening statement? I mean, it's 5:00 this evening. I don't want to keep the jury here any longer than we have to, all right?

MR. FOX: Okay.

THE COURT: A five-minute opening statement for each side, you just explain to them what's going to go on?

MR. FOX: Yes.

THE COURT: We'll put on the evidence, five-minute closing, I'll give them the instruction, and we'll send it back, all right?

MR. FOX: Yes. May I take a comfort break for just a moment?

THE COURT: All right. Five minutes, because I really don't want this to go too long. Five-minute recess.

(Recess from 5:05 p.m., until 5:13 p.m.)

(Jury out.)

THE COURT: I know the defense wants to make another motion, but we'll hear the motions after the jury is finished, all right? You're not waiving any rights by not making your motion at this time.

I'm going to have my law clerk, Matt Getz, be the timekeeper. As soon as your five minutes is up, he's going to say, "Time," and I want people to stop because I want the jury to not be here any later than they have to be.

All right. Are we ready to proceed?

MR. FOX: I am, Your Honor.

THE COURT: All right. Let's bring the jury in. I will tell them why they're coming back in.

(Jury present.)

THE COURT: All right. Ladies and gentlemen, I know it's been a long day -- please have a seat -- but there's one last order of business that you do still have to attend to. Because you have decided that Aclara acted either with malice or reckless indifference to Mr. Rufo's federally protected rights, the last order of business is to determine whether an award of punitive damages would be appropriate.

So we're going to have to have a little bit more evidence. I've limited the attorneys significantly in terms of the amount of time this will take and the amount of evidence, but there's one last issue that you are going to have to decide.

All right. Mr. Fox, do you want to make an opening statement?

MR. FOX: Yes, Your Honor.

OPENING STATEMENT

BY MR. FOX:

You've already determined the truth. Now it's time to focus on fairness and justice. That's what we're seeking for Joey and the community to shed light on what Aclara is doing behind closed doors. That's why we're here now in this final, short stage of deliberations.

The message to Joey Rufo and all the employees in the Northern Virginia community is if you dare to stand up to

Aclara, a billion-dollar company, if you try to do what's right for yourself and for other workers, they will take you on. They will break you up. They will shut you up. They deal with Joey Rufo, and nothing is going to stop them from doing it in the future until you, the jury, the voice in the community, says enough. No more.

MR. FLOOD: I'm going to object. This is argument, not opening.

THE COURT: That's correct. This should be opening statement only. Sustained.

MR. FOX: Okay. We will present evidence that this company is worth $1.1 billion, and as you will see in the jury instructions that the judge will give you, you're entitled to consider the financial condition of the company in deciding what award will deter them.

We'll show that punitive damages -- why punitive damages in this case? Let me give you some of the reasons: the involvement of senior management in this, the lack of remorse from every single one of their witnesses, the pattern of misconduct, the continued misconduct, and the need to deter them from ever doing this again in the future.

We've proven the company's reasons for firing Joey were not supported by any believable evidence and that it was a product of their desire to silence him. We're here because Joey said no, you can't do that anymore.

Of their witnesses, "The e-mail was too long." Translate: I don't care.

"I don't do numbers." Translate: I don't care.

"I didn't read it ever." Translate: I don't care.

It makes it even more offensive that they enact policies, their senior HR people. These aren't, these aren't lower management. These are senior HR people, the executive vice president of the company. It makes it even more offensive that they enact these policies and blatantly ignore them.

All this talk about not discriminating, about encouraging good faith reporting, about perceived discrimination. All this talk about diversity. It's just talk. That's all it is. They've shown no genuine belief that they care about things. They've shown no genuine belief that they care about the people, either.

MR. FLOOD: I renew the objection, Your Honor.

THE COURT: You're still arguing, Mr. Fox.

MR. FOX: Okay, Your Honor. I'll try to -- I'll try to wrap it up.

Retaliation is a very serious form of workplace misconduct, and the law treats it as such. That's why Judge Brinkema will shortly instruct you on your right to assess the company with punitive damages for this level of misconduct.

This is a case where they chose to do what was expedient and suffer the consequences, with complete disregard

for federal law. This was a company that was sold for 1.1 billion just in February, February 2 of this year. What amount of money will be sufficient to deter a company of this size?

You've seen, you've seen the legal resources they've thrown into this case to defend what is indefensible rather than spending it for worthy purposes. What percentage of their value will deter them? That's for you to determine at this stage of the case.

So one more time, at the end of the short session, I'm going to ask you again to stand up for Joey, for Joey Rufo and for other people like him, and do justice. Thank you.

THE COURT: All right. Mr. Flood?

OPENING STATEMENT

BY MR. FLOOD

Good afternoon, Mr. Foreman, members of the jury. This is a separate phase of the case. Aclara respects your decision on the liability phase and what you've already decided. We're not here to reargue that or reargue those points.

I do want to point out to you in this brief opening session here, our comments, you will be instructed by the judge an additional instruction on punitive damages, okay? And we ask and know you will, due to your careful attention to this case, that you look at that instruction carefully once you go

back to deliberate on this issue.

And what you will see there is that, number one, your decision on whether to award punitive damages, it's still within your discretion. In other words, you made finding on Issue No. 3 in the first phase of the case. It is not mandatory that you award additional money at this point in relation to the issue of punitive damages. You'll get more information about that on this instruction.

Second, counsel has talked about, I believe, it's the acquisition price of Aclara by Hubbell within the past year or so, a very high number, $1.1 billion. You'll hear, I think, brief testimony from Mr. Garcia, who will give you a little more detail about the finances of Aclara for you to consider.

I note that the instruction you'll be given will refer to that issue as something you can consider in deciding if additional money should be given, and if so, how much, but again, it's not required for you to do that.

Third, we will point out to you when I get up in just a, I think a very short manner of minutes, to give our actual argument on -- brief argument on this issue before you go back to deliberate, we'll point out to you some things you have already heard in the case that really do relate to this stage of the case.

You heard talk about Aclara's policies, training they've done. You may recall some of that testimony and

evidence already. We'll commend to you that evidence at this stage of the case once we argue because we think that will be vital for you to consider as you determine what, if anything, more to award at this point of the case.

Thank you very much.

THE COURT: All right. Mr. Fox, call your -- or put on your evidence.

MR. FOX: Okay. We'd like to call Ms. Jill Mecey again.

THE COURT: Ms. Mecey? You're still under your oath from the other day.

JILL MECEY, PLAINTIFF'S WITNESS, PREVIOUSLY AFFIRMED, RECALLED

DIRECT EXAMINATION

BY MR. FOX:

Q. Ms. Mecey, now, Aclara was acquired by Hubbell Power Systems in late twenty seven- -- actually, earlier this year; isn't that correct?

A. Correct.

Q. Okay. Now, I'd like to show you Plaintiff's Exhibit 64.

THE COURT: Is there any -- is there an objection to 64?

MR. FOX: If we could expand the title of the document?

MS. DURR: No additional objections, Your Honor.

BY MR. FOX:

Q. Okay. Now what -- let me ask you first, what is this document? Is it a press release by Aclara announcing the acquisition?

A. It looks like it, yes.

Q. And is it your understanding that Hubbell acquired Aclara for 1.1 billion?

A. Yes.

Q. Do you understand that to be the value of Aclara?

A. I'm not sure what the value -- I don't know.

Q. That's your understanding, correct?

A. I understand that's what it was purchased for by the press release.

Q. Okay. And it states -- and let's look at the third -- well, let's just go through the document, if we could, a little bit. Please expand the first portion of it.

Let's look at the first full paragraph. Okay. And then if we could scroll down further?

Okay. So this indicates that the company was purchased for $1.1 billion in an all cash transaction, correct?

A. Yes.

Q. And then if we could go down to the next paragraph, I just want to focus on the highlighted language. Aclara reported revenues of $500 million and adjusted EBITDA of 90 million for the fiscal year ended September 30, 2017.

Is that correct?

A. That's what it says.

Q. Do you have any reason to believe that information is not true?

MS. DURR: Objection. Lack of foundation.

THE COURT: Sustained. Sustained.

BY MR. FOX:

Q. You answered in your deposition that you thought it was true, did you not?

A. I don't know. Mr. Fox, I'm not -- I don't -- I don't know about purchase amounts of companies and net worths. I don't, I'm sorry.

Q. Okay. Let's play the deposition.

(Video excerpt played as follows:)

"Q. And is it your understanding that Hubbell acquired Aclara for $1.1 billion?

A. That is my understanding."

(End of video excerpt.)

THE WITNESS: That's what you just asked me, and I believe I just said that.

MR. FOX: No, if we could go to the end?

"Q. And Aclara reported revenues of $500 million and adjusted EBIDTA of $90 million, correct?

A. Yes."

(End of video excerpt.)

MR. FOX: Okay. Okay. I have no further questions

of this witness, Your Honor.

THE COURT: All right.

Ms. Durr?

No, wait. Stay there. Stay there. There may be questions for you.

THE WITNESS: Sorry.

CROSS-EXAMINATION

BY MS. DURR:

Q. Ms. Mecey, do you have any knowledge beyond what's written in this press release as to what Aclara's reported revenues are or adjusted EBIDTA is?

A. No.

Q. Do you know what Aclara's net worth is?

A. No.

MS. DURR: No further questions.

THE COURT: Is there any redirect on that?

MR. FOX: There's no redirect, Your Honor.

THE COURT: All right. Thank you. You may step down.

(Witness excused.)

THE COURT: Anything else from the plaintiff?

MR. FOX: I'd like to call Mr. Garcia to just to address the 10Q.

THE COURT: All right. Mr. Garcia?

MICHAEL GARCIA, PLAINTIFF'S WITNESS,

PREVIOUSLY AFFIRMED, RECALLED

DIRECT EXAMINATION

BY MR. FOX:

Q. Mr. Garcia, good evening. I'd like to ask you a question. It's your understanding that Aclara was acquired by Hubbell for 1.1 billion in a cash transaction, correct?

A. Yes.

Q. And Hubbell managed -- manages the company now, owns the company now, correct?

A. Yes.

Q. And if I could just show you the press release again, Exhibit 64? Is this the press release announcing the acquisition?

A. That shows the, the purchase price. It does not show the liabilities of the organization.

Q. Okay. Now, are you, are you a financial officer of the company?

A. I am not.

Q. Okay. Do you have any personal knowledge of the liabilities of the company?

A. I do.

Q. If you -- when you say "personal knowledge," what does that derive from?

A. That derives from talking with the senior financial leader, senior vice president of the organization.

Q. Okay. Would any of these liabilities have been taken on, were these new liabilities that were taken on since the company was acquired for 1.1 billion?

A. Yes. There's $500 million or slightly more than that of liability for the company.

Q. That was my -- my question is: Were those taken on since the acquisition? Do you know that or not?

A. That is my understanding, correct.

Q. How were they taken on? What liabilities are these?

A. I don't know the details.

Q. You don't know the details?

A. I know the number.

Q. What type of liabilities were they? For what?

A. The liabilities, the debt of the organization.

Q. Who told you this?

A. The senior vice president of finance in the organization.

Q. So this is purely hearsay.

A. No, it's not hearsay. It's from the senior financial officer.

Q. Did he say what the liabilities are for?

A. It's the debt of the company.

Q. Did he say how this new debt was incurred?

A. It's not new debt. It's the debt the company had.

Q. Okay. So it was the debt that the company had as of the time it was acquired for 1.1 billion, correct?

A. Yes, correct.

Q. Okay. So that wouldn't lessen the value of the company, would it?

A. That I don't know.

Q. Okay. Let's look at Exhibit 110.

THE COURT: Is there any objection to 110?

MS. DURR: I'll place an objection to the admission of 110 for the reasons that we discussed before.

THE COURT: Let me take a look -- I don't have any of these exhibits up here because we sent them all back to you-all.

MR. FOX: We can put up, Your Honor --

THE COURT: No, you can't put it up. There's an objection.

MR. FOX: Sorry.

THE COURT: Sustained. It's not going in.

MR. FOX: Okay. I have no further questions.

THE COURT: All right. Any cross-examination for Mr. Garcia?

MR. FLOOD: May we have just one moment?

Thank you.

MS. DURR: No questions for the witness, Your Honor.

THE COURT: All right. Mr. Garcia, thank you. You may step down.

(Witness excused.)

THE COURT: Any other evidence, Mr. Fox?

MR. FOX: Your Honor -- that's all we have, Your Honor.

THE COURT: All right. Does defense have any evidence you want to put on?

MS. DURR: No, Your Honor.

THE COURT: All right. Then let's have argument so we can get this to the jury, all right?

CLOSING ARGUMENT

BY MR. FOX:

Ladies and gentlemen of the jury: They can't escape liability for punitive damages by window dressing with unenforced policies. I think that's what you're going to hear, that they have policies that somehow should insulate them. I think it makes it even more offensive if they have policies that they blatantly violate and ignore.

Think about the consequences here based upon what you know. Nothing done to follow up after Joey alerted them to a serious problem in the field more than a year ago. That alone is sufficient to require punitive damages.

These are the SGS installers. They're still out there. Their problems haven't been addressed. They've had over a year to address it. They've done nothing.

Consider the arrogance of refusing to accept any personal responsibility in this case. Consider both the head

of HR and the head of compliance, who were clearly trying to cover up the fact that they gave Joey the nod, that they gave him approval, who came into this courtroom and attacked Joey.

Given his position and given what he did for this country, to call him a liar? To attack his credibility? To attack his dishonesty? I think it was a signature moment yesterday when they went after Sienna, suggested that he was mooching off her. How dare they? How dare they come into this courtroom and attack him?

Now, punitive damages are designed to remedy this type of attitude, this type of irresponsibility, and it's like a thief who gets caught. He shouldn't have to just pay his money back. There must be some other consequences that are meaningful to deter him and others from stealing again.

Now, this is a critical part of the jury instructions you'll be hearing from Judge Brinkema in a few minutes. She'll tell you if you find that punitive damages should be awarded against Aclara, you may consider the financial resources of Aclara in fixing the amount of damages. Well, you've just heard and there's no dispute about that, that this company sold for 1.1 billion earlier this year.

You should think about the relativity of money. Let me illustrate this concept this way. Let's assume a defendant has a net worth of 10,000. Clearly, a punitive damages assessment of 10 percent, or 1,000, would not seem excessive.

Similarly, a 10 percent net worth assessment against a large corporation would appear to be reasonable.

Now, I'm not suggesting 10 percent, but I am suggesting a sum that will deter Aclara or others from committing similar wrongful acts in the future. This is really to protect this community. What percentage of their value will deter them and make them think twice and make other companies like them in the corporate community think twice before committing multiple acts of retaliation against a whistle-blowing employee?

Remember, it wasn't just one act of retaliation. What makes it really lamentable is that after they were sued and they were directly called out for retaliating, then they retaliate again while the lawsuit was pending. In the Rocket Docket, they couldn't wait for this Court to decide the issues at trial. They showed no respect for this district. They just couldn't wait to terminate him.

What percentage of value is going to deter them from ignoring potential discrimination affecting a large segment of African-Americans/multiracial people in their workforce? They're indifferent to those situations, to those workers.

How much money have they made this week while we've been sitting in this courtroom? How many millions have they pocketed while we've been here?

Joey filed this lawsuit against them, against his

current employer at the time, as an act of courage. That's not the first time he acted in such a fashion. The only way this company can be stopped from doing this again, from turning a blind eye to discrimination, from covering it up by retaliating against a good person, is if you also have the courage to speak their language. Money is the only thing that matters to them. They're just a paper entity.

You have to render an award that really matters to them and make them feel accountability. They feel none now. Again, that's the only language they know. You have the right, the responsibility, and the duty to have the courage to say enough is enough.

So one more time, I ask you to stand for Joey Rufo, for people like him, and do justice. Thank you.

THE COURT: All right. Mr. Flood?

CLOSING ARGUMENT

BY MR. FLOOD:

May it please the Court, Mr. Foreman, members of the jury.

I have a brief amount of time to address you on this issue. You've already decided to award what we think is a very substantial amount of money to the plaintiff. I'm not here to reargue that. I think Aclara would understand that as your decision to provide what we would understand is make whole relief to him for the back pay amount, on emotional distress

and related issues there.

I ask you to separate that from this because this is really not about does he deserve more money, should we award more money.

The judge will give you the instruction, Instruction No. 29: "A jury may award punitive damages to punish a defendant and to deter the defendant and others like the defendant from committing such conduct in the future.

Aclara has received your message from the liability phase of this case. You know from evidence that you saw and heard earlier in the case that this is a company that makes significant efforts to train its employees, to ensure that the right thing is done on issues such as, you know, nondiscrimination in the workplace, equal employment opportunity, and nonretaliation against someone who brings forward a good faith complaint of discrimination, for example.

Briefly, you heard, I think it was Mr. Garcia testify about that yesterday. Ms. Salvo talked about that she has personally gone out with counsel for Aclara and outside counsel and done training within SGS at each of the sites, okay? I believe she said it was multihour training, significant training.

You have, I believe, those training -- I know those training records are in evidence, and you can review them as you make this decision. I believe it's Plaintiff's Exhibit 94.

And witnesses were asked about that yesterday.

They have policies Aclara level and Hubbell level to address and condemn discrimination in the workplace, illegal harassment, and retaliation, okay?

This is a company that, number one, has received your message. This is a company that is -- has taken and will continue to take significant steps and do what -- everything they can to make sure their folks comply with the law.

And I can assure you lessons are being learned now from your decision today.

Briefly, the judge will tell, it's in the second paragraph of the instruction, "Moreover, an award of punitive damages is discretionary." So despite your findings so far on Question 3 on the first verdict form, it's still within your discretion whether any amount of punitive damages should be awarded in this case.

The verdict form you'll receive, you'll see and I've circled on my copy, it says, "State the amount of punitive damages, if any, that should be assessed against defendant, Aclara Technologies, LLC. Okay?

You've done justice from our perspective with full respect for your decision. You've made a decision, rendering justice to the plaintiff on his claims. You found liability on the retaliation claim. You awarded him back pay. You awarded him a significant amount of money on the emotional distress

category of damages.

With due respect, we submit he's now been made whole for that. We would submit to you that there is not an appropriate basis at this point to award further money in the form of punitive damages.

In response to counsel's comments, I would note in addition to the training you heard about from Ms. Salvo and the exhibits that are in the record, Plaintiff's Exhibit 88, Plaintiff's Exhibit 89, 94, Plaintiff's Exhibit 111, for example, Ms. Salvo has gone out to all those sites. They've already done -- in the fall of 2017. They've done extensive training on these types of issues.

You heard from Alvin Jackson, who testified that he goes out to all these sites all the time. He's never perceived a problem.

So the picture they're trying to paint for you now, trying to get money on this issue --

THE LAW CLERK: That's time, counsel.

MR. FLOOD: Thank you very much.

THE COURT: All right. Ladies and gentlemen, because you have decided that Aclara acted with malice or reckless indifference to Mr. Rufo's federally protected rights, you must now determine whether to award what are called punitive damages. A jury may award punitive damages to punish a defendant and to deter the defendant and others like the

defendant from committing such conduct in the future.

Regardless of your finding that there has been an act of retaliation with malice or reckless disregard of plaintiff's rights, you cannot award punitive damages if Aclara proves by a preponderance of the evidence that it made a good faith attempt to comply with the law. Moreover, an award of punitive damages is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied and that Aclara has not proved that it made a good faith attempt to comply with the law, then you may decide to award punitive damages, or you may decide not to award them.

I will now discuss some considerations that should guide your decision -- I'm sorry, should guide your exercise of this discretion. You should consider the purposes of punitive damages. The purposes of punitive damages are to punish a defendant for a malicious or reckless disregard of federal rights, or to deter a defendant and others like the defendant from doing similar things in the future, or both. Thus, you may consider whether to award punitive damages to punish Aclara.

You should also consider whether actual damages standing alone are sufficient to deter or prevent Aclara from again performing any wrongful acts that may have been performed. You should consider whether an award of punitive damages in this case is likely to deter others from performing

wrongful acts similar to those Aclara may have committed.

You should also keep the purposes of punitive damages in mind when deciding the amount, if any, of punitive damages you will award; that is, in deciding the amount of punitive damages, you should consider the degree to which Aclara should be punished for the wrongful conduct at issue in this case and the degree to which an award of one sum or another will deter Aclara or others from committing similar wrongful acts in the future.

The extent to which a particular amount of money will adequately punish a defendant and the extent to which a particular amount will adequately deter or prevent future misconduct may depend upon a defendant's financial resources. Therefore, if you find that punitive damages should be awarded against Aclara, you may consider the financial resources of Aclara in fixing the amount of those damages.

Now, to assist you in making this last decision, and this is the last decision you have to make in this case, we have a second verdict form. Again, it has the same caption, and it says, "State the amount of punitive damages, if any, that should be assessed against defendant, Aclara Technologies, LLC."

And then we just leave a line for you to fill out because the number is within your discretion if you choose to award any punitive damages. And then again, the foreperson

would date and sign this verdict form.

As you consider this decision, again, it must be unanimous, so all eight of you must agree with it, and you are allowed to use all the evidence produced during the case, that is, all the exhibits that you currently have, and I guess we had one additional one admitted, and that additional one, we need to send a copy in with the jury.

So I'm going to send into the jury room with you, again, I think we have four copies, that seems to be what you like, four copies of this instruction, the verdict form, the one additional exhibit, and you will have your collective memories, and we will await your decision on this, all right?

Counsel, approach the bench for one second.

(Bench conference on the record.)

THE COURT: All right. That was the instruction you-all gave me, without an objection to the instruction, correct?

MR. FOX: Right.

MS. DURR: Okay.

THE COURT: Right. So no objection. All right. We're going to send it in and see what happens.

MS. DURR: Thank you.

MR. FOX: Thank you, Your Honor.

(End of bench conference.)

THE COURT: All right. Ladies and gentlemen, we're

going to then recess court and let you go back to the jury room to do your deliberations. We'll get these extra papers to you in a second. Thank you.

We'll recess to await the decision of the jury.

(Recess from 5:46 p.m., until 6:19 p.m.)

(Jury out.)

THE COURT: All right. The jury's reached a verdict, so we'll bring them in.

THE COURT SECURITY OFFICER: Yes, ma'am.

(Jury present.)

THE COURT: You-all may have a seat.

THE CLERK: Mr. Foreperson, has the jury reached its verdict?

THE FOREPERSON: Yes, we have.

THE CLERK: Can you hand it to the court security officer, please?

Okay. In the matter of 18cv37, Joseph Rufo v. Aclara Technologies, LLC, "State the amount of punitive damages, if any, that should be assessed against defendant, Aclara Technologies, LLC.

"$400,000.00.

"So say we all this 2nd day of November, 2018."

Signed Foreperson, Mark Levine.

All right. Ladies and gentlemen, is this your unanimous verdict?

THE JURORS: Yes, it is.

THE COURT: Does either side wish to have the jury polled on this issue?

MR. FLOOD: We would, respectfully.

THE COURT: All right. We're going to do the same process we did again just to make sure everybody is in agreement with this decision.

THE CLERK: Juror No. 23, Natalie Kuadey, is this your verdict?

JUROR KUADEY: Yes.

THE CLERK: Juror No. 20, Brooke Gier, is this your verdict?

JUROR GIER: Yes.

THE CLERK: Juror No. 35, Katrina Rose, is this your verdict?

JUROR ROSE: Yes.

THE CLERK: Juror No. 12, Aditi Dandekar, is this your verdict?

JUROR DANDEKAR: Yes.

THE CLERK: Juror No. 24, Mark Levine, is this your verdict?

JUROR LEVINE: Yes.

THE CLERK: Juror No. 21, Gilma Hernandez, is this your verdict?

JUROR HERNANDEZ: Yes.

THE CLERK: Juror No. 7, Michael Brennan, is this your verdict?

JUROR BRENNAN: Yes.

THE CLERK: And Juror No. 15, Steve Duong, is this your verdict?

JUROR DUONG: Yes.

THE CLERK: Thank you.

THE COURT: All right. Ladies and gentlemen, I want to thank you for your service, and if you don't mind, I'll come back and thank you personally in the jury room if you'll just wait for us for one second. We're not going to hold you up any later, all right?

Thank you. You may go back.

(Jury excused.)

THE COURT: Given the hour, and I don't want to hold the jury up any longer, what I'm going to do is we'll enter the judgments of the jury, set 14 days for the filing of any posttrial motions. I strongly recommend both sides think about working out any loose ends in the case. Obviously, attorneys' fees are an issue that are going to come down the pike, and hopefully, you can work that out.

If there are motions that are filed, then we'll set a hearing date sometime once I see what you've got, all right?

Anything further on this case?

MR. ROLLINS: Yes, Your Honor. For the record, we

would just like to note that we are renewing our motion for judgment as a matter of law.

THE COURT: Well, just for the record, I will tell you I think there was more than enough evidence for this case to have gone to the jury. The timing of these negative -- or adverse employment actions is such that any reasonable juror could have drawn the conclusions which they did. I think the damages were not outrageous.

I think as I said to you at least once, you know, this was hopefully a learning experience for the defendant. You've got to read your e-mails, and your HR people should be more attuned to things than they were. I think this was an important case for you to use as a training experience for your staff, and in any case, I'm satisfied that the jury's verdicts and the numbers they reached were reasonable, not excessive.

I'll hear whatever motions you've got, if you do have any, but again, I recommend since there still, obviously, is another round with the attorneys' fees in this case, that you see if you-all can work it out, all right?

But I'm going to go now and say goodbye to the jury. You're all free to go. Thank you.

MR. FOX: Thank you, Your Honor. It's been a pleasure.

MS. DURR: Thank you.

(Which were all the proceedings had at this time.)

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/

Anneliese J. Thomson