IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

| | |
|---|---|
| JOSEPH RUFO, | ) |
| | ) |
| | ) Case 1:18-cv-37-LMB-MSN |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) JURY TRIAL DEMANDED |
| ACLARA TECHNOLOGIES, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) *ELECTRONICALLY FILED* |
| | ) |

BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR REMITTITUR,
A NEW TRIAL, AND/OR TO AMEND THE JUDGMENT

**I.    INTRODUCTION**

This Court twice admonished Aclara to consider this case a "learning experience" – once at the hearing on the motion to dismiss this matter and again after the jury handed down its verdict. Aclara's motion proves only that the company has been in no way chastened by the jury's verdict, and evinces little respect for the fact that a jury of its peers listened to Aclara's evidence, put on by an experienced trial team, and still found that Aclara retaliated against Rufo with malice or reckless disregard for his federally-protected rights. In his opening statement during the punitive damages phase at trial, Aclara's counsel emphasized to the Jury that "Aclara respects your verdict." The Court Should Defer to the Jury's Verdict

## II.     ARGUMENT

### A.     The Court Should Defer to the Jury's Verdict

This trial was principally about credibility. Each side presented its own version of events and the Jury decided that it believed Joey Rufo's testimony and found the denials of Aclara's witnesses incredible.

The Court has broad discretion to deny Aclara's motion. See *Herring v. Kennedy-Herring Hardware Co.*, 261 F2d 202 (6th Cir. 1958) (authority to grant new trial under Rule 59(a) rests with federal district court, not court of appeals). In conducting an analysis involving possible remittitur, a court must consider all of the factors that might have influenced the jury in reaching their verdict, and to consider all evidence in the light most favorable to Rufo, the prevailing party at trial. See *Fairshter v. American National Red Cross, et al.*, 322 F. Supp. 2d 646, 658 (E.D. Va. 2004). A new trial or remittitur should only be ordered in circumstances "when a jury award will result in a miscarriage of justice." *Hughston v. New Home Media*, 552 F. Supp. 2d 559, 564-65 (E.D. Va. 2008).

Further, the factual simplicity of this case and the predominance of credibility questions dictate that the Jury's factual findings should be respected. "Where a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge, [in ruling on a motion for new trial], than is necessary where the litigation deals with material which is familiar and simple." *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960), cert. denied 364 U.S. 835 (1960).

### B.     The Jury's Emotional Distress Award is Supported by Record Evidence

Rufo and Ms. Church testified that Rufo endured continuing and severe emotional distress, persisting despite the fact that he secured temporary, lower paying employment with his former employer (owned by Ms. Church's mother). Mr. Rufo further testified that he has deep and

distressing anxiety over the future of his career—something that is completely understandable given that his career has only just begun. It is also important to emphasize that Rufo's emotional distress resulted not only from the loss of his employment with Aclara, but also from being forced to work in a hostile retaliatory environment for nearly a year.

1. <u>Legal Standard</u>

Compensatory damages are available for, among other things, "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Homesley v. Freightliner Corporation*, 61 Fed.Appx. 105, 116 (4th Cir. 2003). "A jury's award of damages stands unless it is grossly excessive or shocking to the conscience." *Fox v. General Motors Corporation*, 247 F.3d 169, 180 (4th Cir. 2001). "Courts defer to a jury's award of damages for intangible harms, such as emotional distress, 'because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Id*. "The trial court 'should extend the fullest consideration possible to the amount returned by the jury' before it concludes that the verdict is excessive.'" *Adams v. Morris*, 706 F.Supp.3d 632, 638 (D. Md. 2010).

In the Fourth Circuit, "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Regional Medical Centers Incorporated*, 333 F. 3d 536, 546 (4th Cir. 2003), citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir.1996). The plaintiff in *Bryant* testified that she was "embarrassed, frustrated, and angry," "very disgusted," and that she "didn't feel very good about coming to work." Further, she described certain physical symptoms she developed related to the distress she felt but testified that she didn't seek medical help because "she had always been taught to believe that 'anything can be handled through prayer and faith and to 'rely on [her family] for strength.'" *Id.* at 547. The Fourth Circuit observed "[t]hat was an understandable way for Bryant [the plaintiff] to respond to the

3

situation in which she found herself", and the fact that she had not sought medical treatment did not minimize her emotional distress. *Id.*

When the trial judge disagrees with a jury verdict, the Seventh Amendment's limitations on the judge's power to reexamine the jury's verdict is implicated. *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). As a consequence, a remittitur can be justified only in limited situations because it is "an invasion of the jury's prerogative and the right of the plaintiff to its determination…." *Earl v. Bouchard Transportation Co., Inc.*, 917 F.2d 1320,1328 (2nd Cir. 1990).

In trying to determine whether a particular judgment for compensatory damages is just, "[s]ome courts have utilized comparisons between similar cases to determine the appropriate range for a jury award." *Id*. The better approach is to "determine whether the judgment awarded, …, is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable." *Jean-Baptiste v. District of Columbia,* 931 F. Supp. 2d 1, 13 (D.D.C. 2013). Comparison to other cases is awkward because jury verdicts are not published in the same manner as opinions of the court so one has only a limited universe of comparisons. *Id.* In addition, to make an appropriate comparison between jury verdicts, one would need to know the damages alleged; whether the damages represent purely compensatory, non-economic damages; and what evidence was offered to support the alleged damages. *Id.* Moreover, even such information does not provide more subtle details such as jury assessments of witness credibility. *Id.*

    2.    <u>This Award is Not an Outlier</u>

Courts regularly uphold emotional distress awards similar to the $300,000 awarded by the Jury in this case. In *Briggs v. Temple Univ.,* No. 16-248, 2018 U.S. Dist. LEXIS 177418, at *116 (E.D. Pa. Oct. 16, 2018), the court upheld an emotional distress award of $350,000 based on similar retaliation claims and similar emotional distress evidence to that raised by Rufo in this case. While Ms. Briggs had not sought medical treatment and had no witness to her emotional distress other

than herself, her testimony revealed that she endured an actual injury sufficient to justify her award based on feelings of loneliness, feelings of dread of going to work in a hostile retaliatory environment, depression, and being humiliated at not being able to afford to do things that she once did. *Id.*

Similarly, in *Westmoreland v. Prince George's Cty.*, Civil Action No. 09-CV-2453 AW, 2013 U.S. Dist. LEXIS 175909, at *38 (D. Md. Dec. 16, 2013), the court upheld a $300,000 emotional distress award where the plaintiff suffered a retaliatory transfer to another fire station, where she worked for approximately three years until she retired. She relied solely on her own testimony to establish emotional distress, testified that the transfer was "disappointing," and caused her to have to perform more demanding duties, interfered with her child care arrangements, and caused her "serious stress." *Id.* The court found that this was more than trivial harm and the degree of harm was ultimately a credibility question that was "quintessentially a question of fact for the jury." *Id.*

In *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 439 (4th Cir. 2004), the Fourth Circuit affirmed a $250,000 emotional distress award where the plaintiff testified that the emotional distress "had eaten him up inside" and "caused him to lose sleep." Similarly, in *Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 620 (4th Cir. 2007), the Fourth Circuit affirmed the district court's refusal to remit the emotional distress award below the applicable $200,000 statutory cap where the plaintiff became "anxious and ill" after being subjected to retaliation after she filed a complaint with the EEOC, finding that this was within the sound discretion of the district court.

In *Jean-Baptiste*, 931 F. Supp. 2d, at 20, *supra*, the court remitted the emotional distress award to $350,000 where the plaintiff (who was sexually harassed and retaliated against) and a corroborating lay witness testified that she was "affected deeply" and felt "less off," "very bad", and "less of a mother" because of the loss of her job. *Id.* She further testified that she felt stress,

anxiety, and depression, and had trouble sleeping. *Id.* Aside from acupuncture, she did not seek medical or psychological treatment. *Id.*

In *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002), the district court awarded $300,000 in emotional distress damages in a discrimination and retaliation case where the defendant's conduct "had a material effect upon her ability to perform and her quality of life in the workplace" and "feelings of depression and sadness typical of plaintiffs in Title VII cases." *Id.* The DC Circuit affirmed this award on appeal, finding that there was sufficient evidence such that the district court did not abuse its discretion. *Id.*

In *Goico v. Boeing Co.*, 358 F. Supp. 2d 1028, 1031 (D. Kan. 2005), a discrimination and retaliation case, the court remitted the jury's emotional distress award to Title VII's applicable cap of $300,000, but declined the defendant's invitation to remit it further. The court found that the plaintiff's and his wife's testimony that he suffered physical manifestations of emotional distress in the form of insomnia, humiliation from having to continue to work among those who discriminated against him, mental anguish from being denied what he testified was his lifelong dream, and the impact of being retaliated against when he made a good-faith complaint of discrimination, to be sufficient evidence to support the $300,000 emotional distress award. *Id.* Rufo and Ms. Church gave nearly identical testimony here, and therefore Rufo's identical $300,000 emotional distress award is supported by the evidence.

In *McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006), the court affirmed the district court's denial of the defendant's motion to remit the jury's $300,000 emotional distress award where the plaintiff testified that the retaliation he endured caused him to suffer humiliation and damage to his reputation, and caused his relationship with his family to suffer.

6

### 3. The Cases Cited by Aclara are Inapposite

Aclara attempts to use *Bennett v. Fairfax Cty.*, 432 F. Supp. 2d 596, 602 (E.D. Va. 2006) to argue that emotional distress awards of more than $100,000 must be supported by medical evidence. This is inconsistent with the holdings of the Fourth Circuit both before and after *Bennett*. See *Stamathis* and *Depaoli, supra*, where in both cases the Fourth Circuit upheld emotional distress awards greater than $100,000 without medical evidence. It is also important that Bennett endured less emotional distress than Rufo because his employment was not terminated. Similarly, in *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 354 (8th Cir. 1997), the plaintiff resigned his position with the defendant. The court in *Chadwell v. Lee City School Board*, 535 F. Supp. 2d 586, 601 (W.D. Va. 2008) was likely influenced by the fact that the defendant was a municipal body. Finally, Aclara relies on a series of cases from the 1980's and 1990's cited by *Bennett* that are no longer authoritative in light of more recent cases cited by Rufo, *supra*.

Finally, it must be reiterated that as explained in *Jean-Baptiste, supra*, the preferred approach in evaluating remittitur on emotional distress awards is on the merits of the case at issue and not on comparison to other awards, which are highly fact-specific and can vary widely as evidenced by the cases cited by both sides.

### C. The Jury's Punitive Damages Award is Not Excessive

#### 1. Aclara Demonstrates a Lack of Humility that Justifies a High Award

Aclara utterly fails to appreciate the significance of its wrongful conduct for which the Jury awarded punitive damages. The Jury <u>specifically</u> found that Aclara retaliated with malice or reckless disregard for Rufo's federally-protected rights. (Dkt. 120). Nonetheless, Aclara disingenuously claims that this was an "isolated incident" and that there was no "intentional malice, trickery, or deceit." (Dkt. 137, at p. 13). This fanciful argument completely ignores the record evidence that:

4848-7811-3152

- Aclara's senior decision makers, including Garcia (the Senior VP of HR), Salvo (the Senior Director of HR), and Director of EEO Compliance (Petrella) knew that Rufo had complained that the PIP was retaliatory, knew that Rufo had engaged in protected activity by submitting his EEO analysis and filing this lawsuit, and knew that retaliating against Rufo for these protected activities would violate both company policies and federal law.

- Nonetheless, they decided to move forward with placing Rufo on a PIP that Aclara admits was (at least in large part) caused by his protected EEO analysis. These same decision makers then approved a scathing performance for Rufo that was based on is face (at least in large part) on criticism of Rufo for performing his protected EEO analysis.

- Finally, these decision makers terminated Rufo's employment while this lawsuit was pending.

In summary, the Jury responded to ample record evidence that Aclara's high-level decision makers deliberately chose to ignore federal law and Aclara's own policies to retaliate against Rufo. This conduct epitomizes malice and reckless disregard.

Even more egregious is the fact that these three decision makers (Garcia, Salvo, and Petrella) are the three individuals at Aclara most responsible for setting and enforcing EEO policy at Aclara. It is commonly known that "when a major company executive speaks, 'everybody listens' in the corporate hierarchy." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001); *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989). Garcia, Salvo, and Petrella therefore sent a clear message to anyone else who might complain of discrimination at Aclara: "keep silent or we will silence you." The Jury plainly intended its punitive damages award to send a message rebuking Aclara for silencing whistleblowers in this manner.

>   2. The Relationship Between the Punitive Award and the Actual Harm Sustained by Rufo is Reasonable

The Jury awarded $400,000 in punitive damages and found $335,000 in actual harm. (Dkts. 120-121). This represents a ratio between punitive damages and actual harm of 1.19 to 1. Further, this ratio will decrease if the Court awards front pay and attorneys' fees and costs. *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) (attorney's fees are a component

of actual harm for the *Gore* ratio analysis); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 235–36 (3rd Cir. 2005) (same).

What constitutes a reasonable factor varies from case to case; the constitutional line is not "marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 580-82 (1996). Indeed, the Supreme Court in *Gore* specifically declined to draw a numerical bright line that constitutes an acceptable ratio—something that the Court repeatedly reaffirmed in subsequent decisions. *See BMW*, 517 U.S. at 582-83; *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425-26 (2003) (holding that, although ratios are instructive, they are not binding measures of constitutionality); *Cooper Indus. v. Leatherman Tool Group*, 532 U.S. 424, 434-35 (2001) (observing that constitutionality of punitive damages award is not to be determined by "simple mathematical formula."); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.").

Further, the Supreme Court and the Fourth Circuit have endorsed high ratios where particularly egregious acts have resulted in only a small amount of economic damages. *Gore*, 517 U.S. at 582; see also *Campbell*, 538 U.S. 408, 425 (2003)(holding that "ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages"). In *EEOC v. Federal Express Corp.*, 513 F.3d 360, 377 (4th Cir. 2008), the court upheld a 12.5 to 1 ratio between the punitive damages and actual harm. The court explained that a punitive damages award should bear some reasonable relationship to the corresponding award of compensatory damages, but that relationship is only one factor in the analysis. Similarly, a 19 to 1 ratio was upheld by the First Circuit in *Romano v.*

9

*U-Haul Int'l*, 233 F.3d 655 (1st Cir. 2000) (awarding $0 in compensatory damages, $15,000 in nominal damages, and $625,000 in punitive damages). The ratio here is reasonable.[1]

### 3. Title VII's Damages Cap is Inapplicable

Aclara's argument that the Court should apply Title VII's $300,000 cap on punitive damages to Rufo's Section 1981 claim is contrary to the weight of authority. In *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1284 (11th Cir. 2008), the court upheld a $500,000 punitive damages award under Section 1981, which was five times Title VII's applicable cap of $100,000. The court explained that "although the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process." *Id.*, quoting *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003), cert. dismissed 540 U.S. 1158 (2004) (affirming $13.3 million punitive award in a Section 1983 case). See also *Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001), cert. denied 535 U.S. 1018 (2002) (observing that, in contrast to Title VII, "Congress has not seen fit to impose any recovery caps in cases under § 1981, although it has had ample opportunity to do so since the 1991 amendments to Title VII", and upholding a $1,000,000 punitive award in a Section 1981 case).

Even courts that have considered Title VII's damages cap as a factor in the *Gore* analysis of a Section 1981 punitive damages award have recognized that Congress declined to cap Section

---

[1] Aclara's argument that the ratio should be limited to 1:1 based on *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) is misplaced. The courts interpreting *Exxon* have uniformly accepted that *Exxon's* 1:1 ratio <u>only applies in</u> <u>maritime tort cases</u> "of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury." *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (JG)(SMG), 2010 U.S. Dist. LEXIS 46036, at *19 n.7 (E.D.N.Y. May 11, 2010); *Allen v. Takeda Pharm. N. Am., Inc.*, No. MDL No. 6:11-md-2299, 2014 U.S. Dist. LEXIS 152066, at *74 n.147 (W.D. La. Oct. 27, 2014); *St Paul Fire & Marine Ins. Co. v. Labuzan*, No. H-05-3811, 2010 U.S. Dist. LEXIS 26717, at *14 (S.D. Tex. Mar. 22, 2010); *Waldman v. Stone*, No. 3:10-CV-164-TBR, 2016 U.S. Dist. LEXIS 5116, at *17 (W.D. Ky. Jan. 14, 2016); *Valerie v. Mich. Dep't of Corr.*, No. 2:07-cv-5, 2008 U.S. Dist. LEXIS 93558, at *27-28 (W.D. Mich. Nov. 17, 2008). In fact, *Exxon* reiterated *Gore*'s core holding that there is no "simple mathematical formula" that courts must follow in evaluating the constitutionality of punitive damage awards. *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (citing *Exxon*, 128 S.Ct., at 2622).

1981 punitive damages and that there was no constitutionally required relationship between Section 1981 damages awards and the Title VII cap. See *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798 (8th Cir. 2004) (remitting punitive damages to $600,000, double Title VII's $300,000 cap); *Kauffman v. Maxim Healthcare Servs.*, 509 F. Supp. 2d 210, 220 (E.D.N.Y. 2007) (the sole case cited by Aclara on this point) ("absence of limits on damages in Section 1981 claims suggests that Congress envisioned that larger awards were appropriate under Section 1981 and that Title VII's statutory cap was not controlling"; remitting punitive damages to $551,470.00). Because the Jury's punitive damage award here was $400,000, the presence of Title VII's $300,000 cap does not suggest that the award is constitutionally unreasonable.

### D.     Rufo Introduced Sufficient Evidence of Aclara's Finances

During the punitive damages phase of trial, Rufo introduced evidence that Aclara sold for $1.1 billion in December of 2017 (a few weeks before this lawsuit was filed and between the time he was placed on a PIP and the time he was terminated). Rufo also introduced evidence of Aclara's net income for 2017. Aclara was afforded an opportunity to (unsuccessfully) challenge the validity of these numbers through the testimony of its Senior Vice President, Michael Garcia.

Aclara now claims that these numbers were not competent evidence of its finances. On the contrary, it is well-settled—both under law and basic economic principles—that "arm's-length sales are, other things being equal, the best evidence of the value of the assets of a business." *United States v. Music Masters, Ltd.*, 621 F. Supp. 1046, 1054 (W.D.N.C. 1985). Aclara's recent sale price is therefore relevant and probative evidence of what punitive award is necessary to make Aclara change its ways. In *Metamining, Inc. v. Barnette*, No. 2:12CV00024, 2013 U.S. Dist. LEXIS 87814, at *5 (W.D. Va. May 6, 2013), the court found that evidence regarding the defendant's recent sales price was relevant to punitive damages.

11

*Sadler v. Advanced Bionics, LLC,* 3:11-CV-450-JGH (W.D. Ky. Mar. 22, 2013)[2], the unpublished order from Kentucky that is the sole authority cited by Aclara on this point, is of no value here. First, the discussion quoted by Aclara is mere dicta because evidence of the defendant's financial condition was irrelevant under Kentucky law. *Id.* Moreover, Aclara's brief conveniently omits the fact that the Advanced Bionics acquisition took place *three years* after the plaintiff's injury and four years after the company manufactured the allegedly defective device that was the subject of the litigation. *Id.* The court found therefore that even if the law allowed evidence of net worth for punitive damages, this acquisition was too remote in time to be a meaningful measure of the company's value at the relevant time.

By contrast, Hubbell's acquisition of Aclara occurred in late-December 2017, in the middle of Aclara's campaign of retaliation against Rufo and a few weeks before the filing of this lawsuit. It is therefore the best evidence of Aclara's value at the time of the events in question. Aclara has proffered no evidence that the acquisition price is somehow inflated as suggested by the court's musings in *Sadler*, and it is therefore wholly speculative for Aclara to argue that it does not reflect the company's value. The acquisition price is therefore relevant and should be admitted.

Aclara's net income for 2017 was further competent evidence of Aclara's financial condition for the purposes of punitive damages. Courts in the Fourth Circuit have uniformly accepted that net income and sales are relevant to punitive damages. See e.g. *Vanguard Military Equip. Corp. v. David B. Finestone Co.*, CIVIL ACTION NO. 2:97cv459, 1997 U.S. Dist. LEXIS 22589, at *20 (E.D. Va. Oct. 15, 1997) (ordering discovery of defendant's gross sales for purpose of punitive damages); *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 96 F.R.D. 147, 149 (E.D. Va. 1982) (defendant's income); *Caton v. Green Tree Servs., L.L.C.*, No. : 3:06-cv-75, 2007

---

[2] Incorrectly cited by Aclara as *Brian v. Advanced Bionics, LLC.*

U.S. Dist. LEXIS 56515, at *17 (N.D.W. Va. Aug. 2, 2007) (same); *Zink v. Doe*, No. 5:14CV25, 2014 U.S. Dist. LEXIS 60486, at *9 (N.D.W. Va. May 1, 2014) (revenue and assets); *Wagner v. Dillard Dep't Stores, Inc.*, No. 1:98CV499, 2000 U.S. Dist. LEXIS 20414, at *34 (M.D.N.C. July 20, 2000) (considering net income on remittitur). Aclara cites only one case from within the Fourth Circuit that erroneously claims that only net worth is relevant. *Moore v. DAN Holdings, Inc.*, No. 1:12-cv-503, 2013 WL 1833557, at *16 (M.D.N.C. Apr. 30, 2013). Tellingly, no court has cited *Moore* for this errant proposition.

### E. The Court Correctly Ruled That Aclara Could Not Introduce Evidence that It Sought the Advice of Outside Counsel

Aclara's argument is moot because Gina Petrella improperly testified in direct contravention of the Court's order that "there was a team that looked at the data." Aclara cannot openly defy the Court's order and then claim prejudice by that same order.

Moreover, in arguing that it was erroneously prohibited from introducing evidence that it sought the advice of its outside counsel, Heidi Kuns Durr, Esquire (who was also Aclara's lead trial counsel in this case), in determining whether further analysis of Rufo's EEO report was warranted, Aclara ignores the fact that it imposed this prohibition upon itself by refusing to waive privilege as to Ms. Durr's advice and instead seeking a protective order quashing Rufo's subpoena of her deposition. (Dkt. 45). Even more striking is that Aclara sought this protective order over the Court's emphatic advice:

> However, sometimes lawyers win the battle but they lose the war. And it does seem to me that if in fact there was a genuine, careful legal analysis of the situation and an appropriate response to what came out in the report, that in my view would be something as a defendant I would have wanted to put before the jury, but you will not be able to do that.

(Dkt. 84-1, Tr. p. 11). As the Court explained, granting Aclara's motion for protective order put the company in a "difficult position" because it prevents the company from testifying that it consulted with counsel before deciding not to investigate. *Id.*, at pp. 2-3. The Court further

13

explained that, "when he focuses the question: My question is, did you or anyone in HR generate any sort of quantitative analysis to address the issue, the answer is going to be: No." *Id.*, at pp. 3-4. The Court summarized the effect this would have on Aclara:

> And as I looked at some of the quotes here, and again, I certainly haven't seen the whole case, but it looks to me as though it's going to put the defense witnesses in a trick bag of basically giving the impression that after the plaintiff brought what should have been troubling information to the HR department about possible racial bias in how employees are being disciplined, the HR people did nothing.

*Id.,* at p. 4. Aclara nonetheless decided not to withdraw its motion for protective order and allow Rufo to take Ms. Durr's testimony.

Ms. Durr's role in Aclara's retaliation against Rufo (including terminating his employment while he already had a pending retaliation suit against the company) was relevant due to the unique facts of this case. It is axiomatic that where a party puts its attorney's advice at issue in litigation, that advice is no longer subject to the attorney-client privilege or work product doctrine. *Twigg v. Pilgrim's Pride Corp.*, No. : 3:05-CV-40, 2007 U.S. Dist. LEXIS 14669, at *23-25 (N.D.W.Va. Feb. 28, 2007), citing *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co*., 32 F.3d 851, 863 (3d Cir. 1994); *Cincinnati Ins. Co. v. Zurich Ins. Co*., 198 F.R.D. 81, 87-88 (W.D.N.C. 2000) ("Where a party intends to use an "attorney's opinions as a sword or shield…, those opinions are not covered by the work product doctrine" or attorney-client privilege).

Aclara sought to use Ms. Durr's advice as a sword, by implying that: 1) punitive damages should not be awarded because it made an effort—by consulting counsel—to comply with the law; 2) its actions were legal because counsel said they were; and 3) it reasonably responded to Rufo's EEO report by consulting counsel. These inferences embody the advice of counsel defense, and require Aclara to waive the attorney-client privilege. *Cobalt Boats, LLC v. Sea Ray Boats, Inc*., 2017 U.S. Dist. LEXIS 96909, at *16 (E.D.Va. Jun 5, 2017).

When Aclara declined to allow Rufo to take discovery on Ms. Durr's advice regarding his EEO Analysis, it irrevocably decided to maintain the privilege at the expense of its ability to explain itself at trial, as allowing Aclara to suddenly waive privilege at trial would have amounted to trial by ambush:

> A party may not use a privilege … as a shield during discovery and then hammer it into a sword for use at the trial. …The Court may order the pretrial disclosure of strategic decisions upon pain of penalty. The penalty is that failure to reveal decisions, information, or documents pretrial shall preclude defendant from using such decisions, information, or documents at trial.

*United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002) (internal citations omitted). Similarly, it would have been unfairly prejudicial to Rufo for Aclara's witnesses to testify that they sought Ms. Durr's legal advice without Rufo being allowed to examine Ms. Durr and Aclara's witnesses about the substance of and rationale behind that advice. Allowing them to so testify would have unfairly deprived Rufo of the ability to prove that Ms. Durr's advice was rendered in bad faith or that Aclara did not follow her advice in good faith.

### F. The Court's Question to Gina Petrella Regarding Lyn Salvo's Approval of Rufo's EEO Analysis Was Not Unfairly Prejudicial

It is axiomatic that jurors are presumed to follow their instructions. *Richardson v. Marsh,* 481 U.S. 200, 211 (1987). The Court correctly instructed the jury that its questions to witnesses are not evidence and do not reflect that the Court holds any opinion:

<u>Court's Questions to Witnesses</u>

During the course of a trial, I may occasionally ask questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may relate. The Court may ask a question simply to clarify a matter—not to help one side of the case or hurt the other side. Remember at all times that you, as jurors, are the sole judges of the facts of this case.

\*\*\*

<u>The Question Is Not Evidence</u>

> The questions asked by a lawyer for either party to this case are not evidence. If a lawyer asks a question of a witness which contains an assertion of fact, therefore, you may not consider the assertion by the lawyer as any evidence of that fact. Only the answers are evidence.

(Dkt. 122, at pp. 5-6). The jury was therefore adequately instructed that the Court's question to Ms. Petrella was not intended to convey any opinion by the Court and that such questions were not evidence that the Jury could consider in deciding the case. It should therefore be presumed that the Jury followed these instructions and did not consider the Court's question as evidence that Ms. Salvo had authorized Rufo to move forward with his proposed analysis. There was therefore no prejudice to Aclara.

Respectfully submitted,

Dated: November 30, 2018

By: */s/ Joshua Erlich, Esq.*

Bruce C. Fox, Esquire (*pro hac vice*)
bruce.fox@obermayer.com
Andrew J. Horowitz, Esquire (*pro hac vice)*
andrew.horowitz@obermayer.com
Obermayer Rebmann Maxwell & Hippel LLP
500 Grant Street, Ste. 5240
Pittsburgh, PA 15219
412-566-1500 (p)
412-281-1530 (f)

Joshua Erlich (VA Bar No. 81298)
The Erlich Law Office, PLLC
2111 Wilson Blvd, Suite 700
Arlington, VA  22201
Tel:     (703) 791-9087
Fax:    (703) 351-9292
Email: jerlich@erlichlawoffice.com

*Counsel for Plaintiff, Joseph Rufo*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

J. Clay Rollins, Esquire
clay.rollins@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA 23219
Tel.: (804) 663-2330
Fax: (855) 843-1809

Heidi Kuns Durr, Esquire
heidi.durr@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
7700 Bonhomme Avenue, Suite 650
St. Louis, MO 63015
Tel.: (314) 802-3935
John B. Flood, Esquire
john.flood@ogletree.com

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1919 K. Street, N.W., Ste. 1000
Washington, D.C. 20006

*/s/Joshua Erlich*

17